## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

|  |  |
|---|---|
| FROST SOLUTIONS, LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>PATRICK BAGLIEN, CHRISTOPER LAREAU,<br>and VUE ROBOTICS, LLC,<br><br>        Defendants. | Civil Action No. |

## COMPLAINT AND JURY DEMAND

Plaintiff Frost Solutions, LLC ("Frost Solutions"), by its undersigned attorneys, complains against Patrick Baglien ("Baglien"), Christopher Lareau ("Lareau"), and Vue Robotics, LLC ("Vue Robotics") (collectively, "Defendants"), as follows:

## NATURE OF THE ACTION

1.     This action seeks damages and injunctive relief arising from Defendants' theft of Frost Solutions' valuable confidential information and trade secrets, and Baglien's and Lareau's breach of fiduciary duties and breach of contract.

2.     While working as top-level officers for Frost Control Systems, LLC, an Indiana limited liability company, and its successor Frost Control Systems, Inc., d/b/a/ Frost Technologies, a Delaware and Indiana-based company (collectively, "Frost Control"), Baglien and Lareau began stealing Frost Control's trade secrets, customer lists, and confidential information.

3.     Baglien and Lareau each executed a confidentiality agreement, which prohibited them from disclosing Frost Control's (or its successors') proprietary information. Baglien executed

a confidentiality agreement prior to, and as a condition of, his employment with Frost Control. Lareau executed a separation agreement, which also obligated him to forever protect Frost Control's (and its successors') confidential information and to not compete directly and unfairly with Frost Control and/or its successors for a duration of six months after his employment with the company had ended.

4.     Baglien and Lareau resigned from Frost Control, and fewer than six months after resigning, they co-founded, began working for, and solicited customers for Vue Robotics, a direct competitor of Frost Solutions, successor to Frost Control.

5.     By using Frost Control's and its successor's trade secrets and confidential information to directly compete with Frost Solutions, and breaching their contractual commitments, Defendants are liable to Frost Solutions under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, and the New Hampshire Uniform Trade Secrets Act, RSA § 350-B *et seq.*, for trade secret misappropriation, and Baglien and Lareau are liable for breaching their fiduciary duties to, and contracts with, Frost Solutions.

## **THE PARTIES**

6.     Plaintiff Frost Solutions, LLC, is a Delaware limited liability company, with its principal place of business in Illinois.  The sole member of Frost Solutions is Clashmore Ventures LLC, whose two members in turn are Michael Kirsch and Michael Bott, who are both residents of Illinois.  Frost Solutions is therefore a citizen of Illinois.

7.     Defendant Christopher Lareau is an individual and the former Vice President of Sales for Frost Control. Upon information and belief, he is a resident of Portsmouth, New Hampshire.  Lareau is therefore a citizen of New Hampshire.

8.     Defendant Patrick Baglien is an individual and former Chief Operating Office and President of Frost Control.  Upon information and belief, he is a resident of Granger, Indiana.  Baglien is therefore a citizen of Indiana.

9.     Defendant Vue Robotics is a limited liability company incorporated in Delaware, with its business headquarters located in Portsmouth, New Hampshire.  Upon information and belief, Vue Robotics has two members, Lareau, who resides in New Hampshire, and Baglien, who resides in Indiana.  Vue Robotics is therefore a citizen of New Hampshire and Indiana.

## JURISDICTION AND VENUE

10.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (actions arising under the laws of the United States) as this action arises, in part, under the federal Defend Trade Secrets Act, § 18 U.S.C. 1831 *et seq.*

11.     The Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction over claims relating to those for which the court has original jurisdiction) as each of the claims in this action are so closely related that they form part of the same case or controversy.

12.     Additionally, this Court has complete diversity jurisdiction under 28 U.S.C. § 1332(a), which provides that "district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between- (1) citizens of different States. . . ."  Complete diversity of citizenship exists between Frost Solutions and Defendants, and the matter in controversy exceeds the sum or value of $75,000, as the wrongful actions of Defendants have damaged Frost Solutions in an amount in excess of this sum.

13.     This Court has personal jurisdiction over Lareau, as he is a citizen of New Hampshire.  Lareau also committed actions in New Hampshire while and after working for Frost Control, in violation of the law and his owed fiduciary duties to Frost Solutions and Frost Control.

14.     This Court has personal jurisdiction over Baglien, as he had significant meaningful contacts with New Hampshire, including co-founding and working for Vue Robotics there, and by using Frost Solutions and Frost Control's trade secrets and confidential information in connection with his work with Vue Robotics in New Hampshire—all of which violated his contractual agreements with and fiduciary duties to Frost Solutions and Frost Control.

15.     This Court has personal jurisdiction over Vue Robotics, as it is a citizen of New Hampshire, and also because it had significant contacts with  New Hampshire by using Frost Solutions and Frost Control's trade secrets and confidential information while in New Hampshire.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) as a substantial portion of the acts, omissions and transactions giving rise to Frost Solutions' injury occurred in this district.

## **FACTUAL BACKGROUND**

17.     Frost Solutions, and its predecessor Frost Control, is an innovative manufacturer of a proprietary weather-security product called the Advance Infrared Monitoring System ("AIMS").

18.     AIMS is a fully-integrated, wireless, weather platform that empowers operators with the information needed about weather conditions so that they can make real-time operational decisions. AIMS provides operators with high-definition imagery and night vision, accurate weather atmospherics, forecasting, and pavement temperature.  AIMS is available from anywhere via mobile web or desktop applications, so operators can monitor road conditions throughout the country from virtually anywhere.

19.     Frost Solutions sells its trusted weather monitoring products, including the proprietary AIMS technology, in twenty-six (26) states and two (2) Canadian provinces.

20.     Frost Solutions also provides safe, reliable and cost effective services for customers who use its AIMS technology, including by providing support, repairs, and analytics.

21.     Frost Control was formed in October 2017.  Frost Solutions was formed as a Delaware limited liability company on June 2, 2022, and became registered to conduct business in Illinois on July 12, 2022. On August 9, 2022, Frost Solutions purchased all of the assets of Frost Control, including, without limitation, all contract rights, general intangibles, customer lists, claims, and intellectual property.  As such, Frost Solutions became a successor to certain assets and rights of Frost Control.

22.     Frost Solutions and its predecessor, Frost Control, have spent years and millions of dollars in developing their business and expertise in the weather-security industry, and developing trade secrets and confidential information. Such trade secrets and confidential information give Frost Solutions a competitive edge over its peers.

23.     Frost Solutions' trade secrets include financial business, technical, economic, and customer information, including the identity of current, former, and prospective customers and non-public information related to longstanding customer relationships, customer purchasing history and financial information, work on development of new customers, and company marketing and sales strategies for economic growth.

24.     Frost Solutions' trade secrets also include (i) proprietary technology, including AIMS; (ii) overall computer systems and software architecture associated with AIMS technology; (iii) information about product design and development; and (iv) information related to specific

vendor and supplier performance, as that information relates to the reliability and efficacy of the components for Frost Solutions' specific products.

25.     Frost Solutions and its predecessor have taken reasonable measures to safeguard their trade secrets.  For instance, Frost Solutions and its predecessor implemented and utilized a confidentiality agreement that employees are required to execute at the start of their employment, including, for example, the Confidentiality Agreement that Baglien entered into when he started with Frost Control. (*See infra* ¶¶ 30–31.)  These confidentiality agreements require, among other provisions, the assignment of rights to any invention made during an employee's time at Frost Solutions, and non-disclosure of Frost Solutions' proprietary information.

26.     Frost Solutions and its predecessor also entered into non-disclosure and non-compete agreements with employees who leave the company, including, for example, the Separation Agreement that Lareau entered into when he resigned from Frost Control. (*See infra* ¶¶ 38–39.)

27.     Frost Solutions and its predecessor also implemented a policy of safeguarding their systems with password protections to further safeguard their trade secrets. Specifically, employees are required to maintain secret and secure network passwords to the Frost entities' systems, which limit access to trade secrets and confidential information stored on their systems to individual employees on a need-to-know basis.

28.     Frost Solutions and its predecessor also implemented a policy of terminating access to confidential information at the conclusion of an individual's employment to further safeguard their trade secrets.

***Frost Control Hires Baglien and Lareau***

29.     In March 2019, Frost Control extended a written offer of employment to Baglien by way of an offer letter (the "Baglien Offer Letter"). A true and accurate copy of this letter is attached as **Exhibit A.**  The Baglien Offer Letter provided that Baglien, upon accepting Frost Control's offer, would become the "Head of Sales" for Frost Control.

30.     As a condition of employment, Baglien was required to execute a "Confidential Information and Invention Assignment Agreement" (the "Confidentiality Agreement").  A true and accurate copy of this Confidentiality Agreement is attached as **Exhibit B.**  The Confidentiality Agreement requires, among other provisions, the assignment of rights to any invention made during an employee's time at Frost Control, and non-disclosure of company proprietary information.

31.     Baglien accepted the offer and signed the Confidentiality Agreement.  In March 2020, he was promoted to the role of Chief Operating Officer, and was later promoted to the role of President. Baglien was also an investor in Frost Control.

32.     As Chief Operating Officer and as President, Baglien's duties included, but were not limited to the following: leading all customer-facing functions, including sales, direct sales, development of customer-relationships, and business-development; establishing a market strategy; managing and developing strategy to develop book of business; and managing post-sale field operations, including the delivery, installation, and quality-control of the AIMS device.

33.     In Baglien's roles as Head of Sales, Chief Operating Officer, and President, Baglien had access to and made use of Frost Control's confidential information and trade secrets, including customer and prospective customer information.  Baglien also had access to Frost Control's longstanding customer relationships and internal business strategies.

34.     On April 8, 2020, Lareau was hired as Regional Vice President at Frost Control, and he was eventually promoted to Vice President of Sales.

35.     Lareau's duties as Vice President of Sales included, but were not limited to the following: overseeing various aspects related to procurement of business, responses to requests for proposals; solicitation and communication with customers; developing customer relationships; and developing strategies and initiatives related to customer intake and retention.

36.     In Lareau's employment role as the Vice President of Sales, he had access to and made use of Frost Control's confidential information and trade secrets, including customer and prospective customer information.   Lareau also had access to Frost Control's longstanding customer relationships and internal business strategies.

### *Baglien and Lareau Resign from Frost Control and Co-Found Vue Robotics, LLC*

37.     On October 11, 2021, Lareau resigned from his employment with Frost Control.

38.     Before he resigned from Frost Control, Lareau executed a separation agreement and mutual release ("Separation Agreement"). A true and accurate copy of the Separation Agreement is attached hereto as **Exhibit C.**  This Agreement includes a "Nondisclosure of Trade Secrets and Confidential Information" provision.  That provision states, in relevant part:

> a) At all times after the Resignation Date (for so long as the information in question remains a Trade Secret under applicable law), Employee will not directly or indirectly transmit or disclose any Trade Secret of the Company or its affiliates to any person, concern or entity, and shall not make use of any such Trade Secret, directly or indirectly, for Employee's own benefit or for the benefit of others, without the prior written consent of Company.

> b) For a period of one (1) years after the Resignation Date, Employee will not, directly or indirectly, transmit or disclose any Confidential Information to any person, concern or entity, or make any use of any such Confidential Information, directly or indirectly, for Employee's own benefit or for others, without the prior written consent of Company.

This Agreement also contained a "Covenant not to Compete," which states in relevant part:

    a)   Employer acknowledges that in the course of Employee's employment with or engagement by Employer, Employee has become familiar with the Trade Secrets and other Confidential Information of Employer and its customers and that Employee's services have been of special, unique and extraordinary value to the Employer. Therefore, in further consideration of the agreements and the covenants of Employer contained herein, Employee agrees that, a period of six (6) months after the Resignation Date, Employee shall not, without the prior express written approval of Employer, directly or indirectly serve as a founder, co-founder, executive officer, manager, consultant, or employee for any enterprise engaged in the manufacture or development of sensors and computer systems built for the analysis and/or reporting of road weather conditions (the "Business"); provided, however, that the foregoing restriction shall not prevent from seeking employment by any department within any of the foregoing that directly competes with the Business and does not provide services in the ordinary course of his employment in a manner that is directly competitive with the Business. Employee acknowledges and agrees that the provisions in this Paragraph 10 shall apply in any locale in which the Employer conducts business or planned to conduct business as of Resignation Date.

This Agreement also contained a "Non-Solicitation" clause, as follows:

    From the [] period of one (1) years after the Resignation Date, Employee shall not, directly or indirectly through another Person, (i) induce or attempt to induce any employee, sales representative, distributor, agent or consultant of any member of the Employer to cease doing business with the Employer, or in any way interfere with the relationship between any such employee, sales representative, distributor, agent or consultant and the Employer (including, without limitation, by making any negative statements or communications about any member of the Employer or its officers or directors), (ii) induce or attempt to induce any employee of the Employer to leave the employ of Employer, or in any way interfere with the relationship between the Employer and any employee thereof (other than through general advertisements for employment not directed at employees of the Employer) or (iii) solicit to hire (other than through general advertisements for employment not directed at employees of the Employer) or hire any person who was an employee of the Employer at any time during the six (6) months preceding such solicitation or hiring.

39.     On October 20, 2021, Baglien resigned from Frost Control.

40.     On or about January 24, 2022, Lareau and Baglien co-founded Vue Robotics to compete against Frost Control and its successor, Frost Solutions.  Baglien is the Chief Executive Officer of Vue Robotics, and Lareau is its Chief Operating Officer.

41.     Immediately after its formation in January 2022, Vue Robotics began developing, and engaging a third-party hardware agency to build, a weather-security product called ARC1, which is strikingly similar to Frost Solutions' AIMS product and that targets the same market.

42.     Upon information and belief, Vue Robotics immediately began soliciting Frost Control's customers, and it succeeded in obtaining the business of at least one of Frost Control's customers, which now obtains all of its weather-monitoring systems from Vue Robotics.

*Frost Control Discovers Defendants' Unlawful Actions*

43.     In June 2022, Frost Control learned from a press release that Baglien and Lareau had co-founded Vue Robotics and had developed the ARC1 technology.  Frost Control suspected that Defendants may have misappropriated Frost's trade secrets and confidential information in order to develop the technology and to solicit Frost Control's customers.

44.     Frost Control then discovered evidence that on September 28, 2021—less than two weeks before his employment ended—Lareau had downloaded a list containing a significant amount of Frost Control's proprietary and confidential customer and prospective customer information—including customer list and email correspondence history—from Frost Control's cloud-based CRM (customer relationship management) database.

45.     Frost Control also learned that Baglien, less than a month before his employment at Frost Control ended, had downloaded from Frost Control's CRM database a confidential and

proprietary list containing all of Frost Control's information regarding current and pending deals with customers.

46.     On June 8, 2022, counsel for Frost Control sent Baglien and Lareau a letter demanding that they cease using any trade secrets or confidential information belonging to Frost Control.  This letter is attached hereto as **Exhibit D.**

47.     On July 5, 2022, counsel for Baglien and Lareau sent a letter to Frost Control stating that Defendants never took any of Frost Control's trade secrets or confidential information, and that they were not in possession of any such information.   This letter is attached hereto as **Exhibit E.**

48.     Around this time, in June 2022, Frost Solutions was formed.  On August 9, 2022, Frost Solutions purchased the assets of Frost Control.

49.     Through its counsel, Frost Solutions then retained a forensics consultant to image Baglien's and Lareau's company laptops, perform an analysis of the underlying metadata activity on the laptops, and perform a forensic analysis on Frost Solutions' and Frost Control's cloud-based systems to determine what else, if anything, was taken by Baglien and/or Lareau.

50.     Through this investigation, which is still continuing, Frost Solutions confirmed that weeks before his departure from Frost Control, Lareau had downloaded the entire list of Frost Control's contacts from its CRM database, and Baglien had downloaded a complete list of all Frost Control's agreements with clients.

51.     The fact that shortly before leaving Frost Control, Lareau and Baglien had downloaded lists all of Frost Control's customer information and deal information, that Vue Robotics had worked with a third-party developer to build a strikingly similar product to AIMS in the span of only a few months, and that Vue Robotics is a direct competitor of Frost Solutions and

has already stolen at least one of its customers, together illustrate that Defendants misappropriated trade secrets, wrongfully obtained and utilized confidential information, and breached their contracts and their fiduciary duties to Frost Solutions.

52.     Given the above, coupled with the fact that Baglien's and Lareau's roles for Vue Robotics include responsibilities nearly identical to their previous roles for Frost Control, it is inevitable that Baglien and Lareau have disclosed Frost Solutions' confidential information and trade secrets, and will continue to do so during the course of their job duties for Vue Robotics.

## **COUNT I**

### **Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.***
### **(Against All Defendants)**

53.     Frost Solutions incorporates by reference all of the allegations contained in paragraphs 1–52 as if alleged in this Paragraph.

54.     The Defend Trade Secrets Act prohibits the misappropriation of trade secrets.

55.     Frost Solutions has developed and owns valuable trade secrets related to its products and services that are used in, or intended for use in, interstate or foreign commerce.

56.     Frost Solutions' trade secrets have value because they are not generally known to the public and are not readily ascertainable.

57.     Frost Solutions' trade secrets include financial business, technical, economic and customer information, including the identity of current, former, and prospective customers and non-public information related to longstanding customer relationships, work on development of new customers, and company marketing and sales strategies for economic growth.  Frost Solutions' trade secrets also include customer bid information, pricing models, proposal response strategies and other information related to the procurement of customer contracts, as well as design features of its proprietary weather-monitoring technology.

58.   Frost Solutions has taken reasonable measures to safeguard its trade secrets.  For instance, Frost Solutions' predecessor, Frost Control, implemented a confidentiality agreement that employees with access to confidential information must execute as a condition of employment. This confidentiality agreement expressly prohibits disclosure of confidential business information and trade secrets to third parties without Frost Control's, and now Frost Solutions' authorization. Baglien executed a confidentiality agreement as a condition of his employment. Lareau executed a confidentiality agreement as a part of a Separation Agreement when he resigned from Frost Control.

59.   Frost Solutions has also implemented a policy of safeguarding its systems with password protections to further safeguard its trade secrets.  Specifically, Frost Solutions employees are required, and its predecessor Frost Control's employees were required to maintain secret and secure network passwords to Frost systems, which limit access to trade secrets and confidential information stored on those systems to individual employees on a need-to-know basis.

60.   Frost Solutions, as well as its predecessor, Frost Control, also implemented a policy of terminating access to confidential information at the conclusion of an individual's employment to further safeguard its trade secrets.

61.   Defendants have obtained an economic benefit from the theft of Frost Solutions' trade secrets, including the stealing of Frost Solutions' existing and prospective customers and business opportunities.

62.   Defendants used improper means to acquire and use Frost Solutions' trade secrets while knowing that the acquisition and use was improper.

63.   As a result of Defendants' unlawful actions, Frost Solutions has suffered harm, including the loss of business, the loss of customer goodwill, and the lost value derived from Frost

Solutions' and its predecessor's investment of a large amount of time and resources to develop proprietary and confidential information that gives Frost Solutions an advantage over its competitors, in an amount to be determined at trial.

**COUNT II**

**Violation of the New Hampshire Uniform Trade Secrets Act, N.H. RSA § 350-B** *et seq.*
**(Against All Defendants)**

64.     Frost Solutions incorporates by reference all of the allegations contained in paragraphs 1–63 as if alleged in this Paragraph.

65.     The New Hampshire Uniform Trade Secrets Act prohibits the misappropriation of trade secrets.

66.     Frost Solutions, and its predecessor, have developed and own valuable trade secrets related to Frost Solutions' products and services that are used in, or intended for use in, interstate or foreign commerce.

67.     Frost Solutions' trade secrets have value because they are not generally known to the public and are not readily ascertainable.

68.     Frost Solutions' trade secrets include financial business, technical, economic and customer information, including the identity of current, former, and prospective customers and non-public information related to longstanding customer relationships, work on development of new customers, and company marketing and sales strategies for economic growth.  Frost Solutions' trade secrets also include customer bid information, pricing models, proposal response strategies and other information related to the procurement of customer contracts, as well as design features of their proprietary weather-monitoring technology.

69.     Frost Solutions has taken reasonable measures to safeguard its trade secrets.  For instance, Frost Solutions' predecessor, Frost Control, implemented confidentiality agreements that

14

employees with access to confidential information must execute as a condition of employment. These confidentiality agreements expressly prohibit disclosure of confidential business information and trade secrets to third parties without Frost Control's, and now Frost Solutions' authorization.  Baglien executed a Confidentiality Agreement as a condition of his employment. Lareau executed a confidentiality agreement as a part of a Separation Agreement when he resigned from Frost Control.

70.     Frost Solutions has also implemented a policy of safeguarding its systems with password protections to further safeguard its trade secrets.  Specifically, Frost Solutions' employees are required, and its predecessor Frost Control's employees were required to maintain secret and secure network passwords to Frost systems, which limit access to trade secrets and confidential information stored on its systems to individual employees on a need-to-know basis.

71.     Frost Solutions and its predecessor, Frost Control, also implemented a policy of terminating access to confidential information at the conclusion of an individual's employment to further safeguard trade secrets.

72.     Defendants used improper means to acquire and use Frost Solutions' trade secrets while knowing that the acquisition and use was improper.

73.     As a result of Defendants' unlawful actions, Frost Solutions has suffered harm, including the loss of business, the loss of customer goodwill, and the lost value derived from Frost Solutions' and its predecessor's investment of a large amount of time and resources to develop proprietary and confidential information that gives Frost Solutions an advantage over its competitors, in an amount to be determined at trial.

## COUNT III

### Breach of Separation Agreement
### (Against Lareau)

74.     Frost Solutions incorporates by reference all of the allegations contained in paragraphs 1-73 as if alleged in this Paragraph.

75.     On September 30, 2021, Frost Control and Lareau entered into the Separation Agreement, which contained a "Nondisclosure of Trade Secrets and Confidential Information" clause, a six-month covenant not to compete, and a one-year non-solicitation clause.

76.     In the Separation Agreement, Lareau agreed that any breach of the Separation Agreement would entitle Frost Control to seek damages and injunctive relief in a court of law. Specifically, the Agreement states that in the event of breach, the following will occur:

> Employee [Lareau] will be responsible for any losses or costs incurred by Employer and/or its affiliates to the extent permitted by law, including attorneys' fees and costs incurred by Employer and/or its affiliates in enforcing the terms of this Agreement. . . .

Further, in the event that Lareau breached specifically the confidentiality or non-disclosure provisions of the Agreement, the following will occur:

> the Parties agree that: (a) Employer's obligation to make any payments to Employee under Paragraph 1 shall cease as of the date of Employee's breach; (b) Employee shall repay to Employer any and all amounts that Employer previously paid to Employee [according to this Agreement].

77.     Notwithstanding the Separation Agreement's confidentiality, non-disclosure, non-competition and non-solicitation clauses, and in breach thereof, within six months of Lareau's resignation from Frost Control, he co-founded and became an officer of Vue Robotics, whereupon he used Frost Control's (now Frost Solutions') trade secrets and confidential information, as well as revealed confidential information to third-party developers in order to build the ARC1 technology and to solicit Frost Control's (now Frost Solutions') current and prospective customers.

78.     Lareau's actions caused the unlawful diversion of customer business, prospective future customer business, profits and opportunities from Frost Control (and now Frost Solutions) to Vue Robotics.

79.     As a direct result of Lareau's breach of the Separation Agreement, Frost Solutions has suffered harm, including the loss of business and the diminution in value of Frost Solutions' confidential information, damaging Frost Solutions in an amount to be determined at trial.

## COUNT IV

**Breach of Confidentiality Agreement**
**(Against Baglien)**

80.     Frost Solutions incorporates by reference all of the allegations contained in paragraphs 1-79 as if alleged in this Paragraph.

81.     On or around March 15, 2019, as a condition of his employment with Frost Control, Baglien entered into the Confidentiality Agreement.

82.     The Confidentiality Agreement is a valid and enforceable contract, and is supported by valuable consideration, including but not limited to hiring Baglien as Head of Sales for Frost Control.

83.     In the Confidentiality Agreement, Baglien agreed to assign to Frost Control the rights to any invention he made during his employment, and not to disclose Frost Control's proprietary information.

84.     Notwithstanding the Confidentiality Agreement's non-disclosure provision, and in breach thereof, three months after Baglien's resignation from Frost Control, he co-founded and became an officer of Vue Robotics, whereupon he used Frost Control's (now Frost Solutions') trade secrets and confidential information, as well as revealed confidential information to third-

party developers in order to build the ARC1 technology and to solicit Frost Control's (now Frost Solutions') current and prospective customers.

85.     Baglien's actions has caused the unlawful diversion of customer business, prospective future customer business, profits and opportunities from Frost Solutions to Vue Robotics.

86.     As a direct result of Baglien's breach of the Confidentiality Agreement, Frost Solutions has suffered harm, including the loss of business and the diminution in value of Frost Solutions' confidential information, damaging Frost in an amount to be determined at trial.

## COUNT V

### Breach of Fiduciary Duties
### (Against Lareau and Baglien)

87.     Frost Solutions incorporates by reference all of the allegations contained in paragraphs 1-86 as if alleged in this Paragraph.

88.     As President and Vice President of Sales, Baglien and Lareau respectively were senior employees and agents of Frost Control, charged with important job duties regarding Frost Control's sales strategies, customer relationships, and procurement plans.

89.     As senior employees and agents of Frost Control, Baglien and Lareau had a duty to not use Frost Control's (and now Frost Solutions') trade secrets, confidential information, and other property for their own purposes.

90.     As senior employees and agents of Frost Control, Baglien and Lareau had a duty to not acquire a material benefit from existing or prospective customers at the expense of Frost Control, and now Frost Solutions.

91.     As senior employees and agents of Frost Control, Baglien and Lareau had a duty to not take steps to unlawfully compete against Frost Control, or its successor, Frost Solutions.

92.     Baglien and Lareau, in the months immediately following their resignations from Frost Control, breached their fiduciary duties to Frost Control by secretly usurping Frost Control's business opportunities, strategies, customers and valuable property, and using these assets to compete against their former employer, and now Frost Solutions, through Vue Robotics.

93.     Baglien's and Lareau's actions were not conducted in good faith.

94.     As a direct result of Baglien's and Lareau's actions, Frost Solutions has suffered harm, including the loss of business and the diminution in value of Frost Solutions' confidential information, damaging Frost Solutions in an amount to be determined at trial.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff Frost Solutions, LLC, respectfully prays that this Court:

1. Enter judgment in its favor against all Defendants under Count I, holding them liable for damages stemming from misappropriation of trade secrets under the Defend Trade Secrets Act, together with interest, costs, attorney's fees, and punitive damages; and enjoining Defendants from using or disclosing any of Frost Solutions' trade secrets;

2. Enter judgment in its favor against all Defendants under Count II, holding them liable for damages stemming from misappropriation of trade secrets under the New Hampshire Uniform Trade Secrets Act, together with interest, costs, attorney's fees, and punitive damages; and enjoining Defendants from using or disclosing any of Frost Solutions' trade secrets;

3. Enter judgment in its favor against Defendant Lareau, holding him liable for damages stemming from breach of contract; together with interest, costs and attorney's fees; and enjoining Lareau from soliciting Frost Solutions' customers and prospective customers and from using Frost Solutions' confidential information;

4.  Enter judgment in its favor holding Defendant Baglien, holding him liable for damages stemming from breach of contract; together with interest, costs and attorney's fees; and enjoining him from soliciting Frost Solutions' customers and prospective customers and from using Frost Solutions' confidential information;

5.  Enter judgment in its favor holding Defendants Baglien and Lareau liable for damages stemming from breach of fiduciary duties, together with interest, costs and attorney's fees; and enjoining them from soliciting Frost Solutions' customers and prospective customers and from using Frost Solutions' confidential information; and

6.  Grant such other relief this Court deems just and equitable.

## JURY DEMAND

Plaintiff Frost Solutions, LLC, demands a trial by jury.

Dated:  October 5, 2022                  Respectfully submitted,

                                         **FROST SOLUTIONS, LLC,**

                                         By its attorneys,

                                         */s/ Laura L. Carroll*
                                         Laura L. Carroll (NH Bar #17444)
                                         BURNS & LEVINSON LLP
                                         125 High Street
                                         Boston, MA 02110
                                         Tel: (617) 345-3000
                                         Fax: (617) 345-3299
                                         Email: lcarroll@burnslev.com

Of Counsel:

Daniel R. Saeedi
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2800
Chicago, Illinois 60601
Tel: 312-527-4000
Email: dsaeedi@taftlaw.com