# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

---

FROST SOLUTIONS, LLC,

               Plaintiff,

      v.

PATRICK BAGLIEN, CHRISTOPHER LAREAU,
and VUE ROBOTICS, LLC,

               Defendants.

Civ. Action No. 1:22-cv-00401-SE

---

## <u>COUNTERCLAIM AND JURY DEMAND</u>

Defendants and Counterclaim-Plaintiffs Patrick Baglien ("Baglien"), Christopher Lareau ("Lareau"), and Vue Robotics, LLC ("Vue Robotics") (collectively, "Counterclaim-Plaintiffs"), through undersigned counsel, bring this counterclaim against Plaintiff and Counterclaim-Defendant Frost Solutions, LLC ("Frost Solutions").  As detailed more fully herein, to the extent Frost Solutions ever intended to use the civil justice system to resolve a good-faith commercial dispute, that objective is long gone and has been replaced by a desire to use the process to crush a competitor at any cost – including by "dropping a dime" on Counterclaim-Plaintiffs by calling their insurance carrier and claiming – fraudulently – that Counterclaim-Plaintiffs had omitted information from their insurance application, seeking to strip Counterclaim-Plaintiffs of their coverage and bankrupt them with legal fees they cannot possibly afford.

As set forth herein, this is just the tip of the iceberg.  Frost Solutions has engaged in a pattern of discovery abuse and spoliation as well as tortious interference with contract, unfair and deceptive acts and practices within the meaning of the New Hampshire Consumer Protection Act, N.H. RSA § 358-A:1, *et seq.*, and negligent infliction of emotional distress.  The actions of

Frost Solutions and its principals have been shameful and outrageous, as well as anti-competitive, and Frost Solutions should be held to account by a New Hampshire jury.

## THE PARTIES

1.      Baglien is an individual residing in Granger, Indiana.  He is the Co-Founder, President, and Chief Executive Officer of Vue Robotics.

2.      Lareau is an individual residing in Portsmouth, New Hampshire.  He is the Co-Founder of Vue Robotics.

3.      Baglien and Lareau are former employees of Frost Control Systems, Inc. d/b/a Frost Technologies ("Frost Control").

4.      Lareau, a veteran, is a former military intelligence officer who served honorably in Iraq and Afghanistan.

5.      Vue Robotics is a limited liability company having a principal place of business 36 Maplewood Avenue, Portsmouth, New Hampshire 03801.

6.      Frost Solutions is a limited liability company with a principal place of business at 44 Farnham Lane, Lake Forest, Illinois 60045.

7.      Frost Solutions was formed on July 12, 2022.

8.      Upon information and belief, the sole member of Frost Solutions is Clashmore Ventures, LLC ("Clashmore Ventures"), whose two members, in turn, are Michael Kirsh ("Kirsh") and Michael Bott ("Bott").

## JURISDICTION AND VENUE

9.      On October 5, 2022, Frost Solutions commenced a civil action (the "Action") by filing a complaint against Counterclaim-Plaintiffs asserting claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq* (Count I – against all Defendants), the New Hampshire

Uniform Trade Secrets Act, N.H. RSA § 350-B *et seq* (Count II – against all Defendants), breach of Separation Agreement (Count III – against Lareau), breach of Confidentiality Agreement (Count IV – against Baglien), and breach of fiduciary duties (Count V – against Baglien and Lareau) (the "Complaint").

10.    This Court has subject matter jurisdiction over the Counterclaim under 28 U.S.C. § 1367 because the claims asserted in the Counterclaim are so related to the claims asserted in the Complaint (for which there is original jurisdiction) such that they form part of the same case or controversy under Article III of the U.S. Constitution.

11.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial portion of the acts, omissions and transactions giving rise to Counterclaim-Plaintiffs' injury occurred in this judicial district.

12.    The Court has personal jurisdiction over Frost Solutions because Frost Solutions filed the Complaint in this judicial district and/or otherwise has constitutionally sufficient contacts in this judicial district to empower this Court to exercise personal jurisdiction over Frost Solutions.

## FACTUAL BACKGROUND

13.    Baglien and Lareau are former employees of Frost Control; they both left Frost Control in the fall of 2021.

14.    Baglien was also an investor in Frost Control through Calvera Ventures LLC and thus received all Frost Control investor updates and related documents.

15.    Baglien and Lareau are the co-founders of Vue Robotics, which offers its ARC1 hardware and accompanying OmniVue software platform to deliver site monitoring services for weather and other environmental conditions.

**Lareau Resigns from Frost Control and Executes a
Separation Agreement that Cannot Be Assigned without His Consent**

16.     On or about September 27, 2021, Lareau tendered his notice of resignation from

Frost Control.

17.     Frost Control and Lareau entered into the Separation Agreement attached as

Exhibit C to the Complaint, effective September 30, 2021.  *See* ECF No. 1 at Exh. C.

18.     Although the Separation Agreement was to be treated confidentially, Frost

Solutions publicly disclosed the document by attaching it as an exhibit to the Complaint.  ECF

No. 1 at Exh. C.

19.     Victor Gill ("Gill"), one of Frost Control's former CEOs, drafted the Separation

Agreement by revising a previous separation agreement used for another former Frost Control

CEO, Bradley Tener ("Tener").

20.     Although the Separation Agreement is entitled, "Separation Agreement and

Mutual Release," and Paragraph 2 is entitled, "Mutual General and Special Release," there is no

mutual release in the Separation Agreement.  Rather, the only release is from Lareau to Frost

Control.

21.     The Separation Agreement does not contain a release from Frost Control to

Lareau.

22.     Gill never informed Lareau that there was no mutual release in the Separation

Agreement and, instead, he provided Lareau with an agreement that expressly states it contains a

"mutual release."

23.     Accordingly, there was no meeting of the minds between Frost Control and

Lareau concerning the terms of the Separation Agreement.

24.     The Separation Agreement is also not supported by adequate consideration.  The only consideration for the Separation Agreement is recited in Paragraph 1, which consists of sales commissions and vacation time *already owed* to Lareau under the terms of his employment.

25.     In the paragraph entitled, "Breach of Agreement," the Separation Agreement expressly acknowledges that the consideration provided by Frost Control under the agreement is set forth in Paragraphs 1 and 2.b.  *See* ECF No. 1 at Exh. C at ¶ 15.

26.     There is no paragraph 2.b. in the Separation Agreement.  *See* ECF No. 1 at Exh. C at ¶ 2.

27.     In the prior Tener separation agreement, Paragraph 2.b. was the release from Frost Control to Tener.  Gill deleted this provision when drafting Lareau's Separation Agreement.

28.     The Separation Agreement is thus void for lack of consideration.

29.     Upon information and belief, Frost Solutions was aware that the Separation Agreement was void for lack of consideration when it filed the Complaint and commenced the Action.  At a minimum, Frost Solutions became aware during the Action that the Separation Agreement is void for lack of consideration, and yet it continued (and continues) to pursue contract-based claims against Lareau.

30.     The Separation Agreement also lacks a provision authorizing assignment of the agreement from Frost Control to Frost Solutions or any other party.

31.     The Separation Agreement contains a non-solicitation clause (the "Non-Solicit").  The Non-Solicit does not prohibit contact with Frost Control customers or prospects.  *See* ECF No. 1 at Exh. C at ¶ 11.

32.     Lareau did not consent to assignment of the Separation Agreement from Frost Control to Frost Solutions or any other party.

33.     No one from Frost Control or Frost Solutions ever requested Lareau to consent to assignment of the Separation Agreement to Frost Solutions or any other party.

34.     Under Indiana law (which governs the Separation Agreement), a non-competition agreement ("non-compete") cannot be assigned without express consent from the employee.

35.     Frost Solutions cannot enforce the non-compete agreement against Lareau because Lareau never consented to assignment of that agreement to Frost Solutions or any other party.

36.      The same principle applies to the entire Separation Agreement – which contains more than one unenforceable restrictive covenant – and thus Frost Solutions similarly cannot enforce the entire Separation Agreement because Lareau never consented to assignment of that agreement to Frost Solutions or any other party.

37.     At the time it filed the Complaint, Frost Solutions knew or should have known that Lareau did not consent to the assignment of the Separation Agreement from Frost Control to Frost Solutions and that Frost Solutions was therefore barred from enforcing any of the restrictive covenants contained in the Separation Agreement against Lareau.

38.     Frost Solutions became aware during the Action that Lareau did not consent to assignment of the Separation Agreement to Frost Solutions and that Frost Solutions therefore cannot enforce any of the restrictive covenants contained in the Separation Agreement against Lareau, and yet it continued (and continues) to pursue this claim against Lareau.

**Baglien Resigns from Frost Control and Is Sent a Warning Letter
Entirely Unrelated to the Claims Asserted in the Action**

39.     Baglien tendered his resignation from Frost Control on or about October 6, 2021.

40.     On or about January 5, 2022, Baglien received a letter from Frost Control's law firm, Ray Quinney & Nebeker P.C. (the "Jan 5 Letter"), alleging that Baglien "may have

violated duties of loyalty, care and good faith *during [his] employment with Frost Control*."
(emphasis added).  *See* Exh. F attached hereto.

41.     The Jan 5 Letter was drafted based on a timeline of facts prepared by Gill.
Specifically, on or about December 21, 2021, Gill sent an email to Ray Quinney & Nebeker P.C.
(the "Dec 21 Email") asserting that "[w]e've found several actions by [Baglien] *during his*
*employee [sic] at Frost [Control] very concerning* and we are working on a detailed review of
his behavior *including inappropriate spending on [sic] concerning travel, entertainment and*
*dining.  Payment of inappropriate unapproved bonuses, and other actions detrimental to the*
*business*."  (emphasis added) (collectively, the "Jan 5 Letter Grievances").  The email proceeds
to lay out a timeline of events from when Baglien started at Frost Control in 2019 through
December 7, 2021.

42.     Frost Solutions produced the Dec 21 Email in the Action on or about September
15, 2023 and, when later given the opportunity, affirmatively chose not to designate the
document as privileged and claw it back.

43.     The Jan 5 Letter Grievances do not include any allegations or claims concerning
purported wrongdoing by Baglien *after* he resigned from Frost Control.  Nor do the Jan 5 Letter
Grievances include any alleged misappropriation of trade secrets or confidential information.

44.     Baglien did not respond to the Jan 5 Letter, and Frost Control did not send any
further communications to Baglien concerning the Jan 5 Letter Grievances.

45.     The Jan 5 Letter triggered a duty for Frost Control to preserve all information
relating to the Jan 5 Letter Grievances, including without limitation a duty to preserve Baglien's
Frost Control laptop, Baglien's Frost Control emails, all Slack messages to/from/concerning

Baglien, and any other devices or accounts to which Baglien had access while at Frost Control the (the "Baglien Materials Relevant to the Jan 5 Letter Grievances").

46.     Frost Control did not preserve all of the Baglien Materials Relevant to the Jan 5 Letter Grievances.

47.     Frost Solutions similarly did not preserve all of the Baglien Materials Relevant to the Jan 5 Letter Grievances after it subsequently acquired Frost Control's assets.

**Frost Control Ceases Business Operations
and 1st Source Bank Acquires Frost Control's Assets**

48.     By Resolution of the Frost Control Stockholders on or about April 15, 2022 (the "April 15 Resolution"), it was decided that Frost Control would cease all business operations and notify its customers, creditors, and other stakeholders of the cessation of Frost Control's business operations.  It was further decided that Frost Control would take whatever steps were necessary to liquidate Frost Control's assets and terminate all of the company's contracts, collect its receivables, and thereafter liquidate its assets.

49.     Nearly two months after the April 15 Resolution and the cessation of Frost Control's business operations, on or about June 8, 2022, Frost Control, through its new law firm Ice Miller, sent Counterclaim-Plaintiffs the demand letter attached as Exhibit D to the Complaint (the "June 8 Letter").  *See* ECF No. 1 at Exh. D.

50.     The allegations in the June 8 Letter are based on information that Frost Control "*learned last week*" – on or around June 2, 2022 – and track the allegations asserted in the Complaint, including, for example, allegations that Baglien and Lareau purportedly downloaded contact and deal information from Frost Control's HubSpot platform shortly before leaving Frost Control, and a claim that Lareau purportedly breached his Separation Agreement.  *See* ECF No. 1 at Exh. D (emphasis added).

51.     On or about July 5, 2022, Counterclaim-Plaintiffs responded, through counsel, to the June 8 Letter, denying all substantive allegations (the "July 5 Response Letter").  The July 5 Response Letter explained that Baglien and Lareau downloaded certain information from Frost Control's HubSpot platform as part of their routine job responsibilities and to assist the company in its transition to a new software platform, and further asserted that Baglien and Lareau each returned their Frost Control laptops at their time of departure and took no Frost Control information with them.  *See* ECF No. 1 at Exh. E.

52.     On or about June 23, 2022, Frost Control – which had ceased operations and was actively looking to liquidate – acknowledged that 1st Source Bank had a perfected security interest in Frost Control's assets (the "Frost Control Assets").  Frost Control then surrendered the Frost Control Assets to 1st Source Bank in partial satisfaction of Frost Control's debt.

53.     Specifically, on or about June 23, 2022, Frost Control, through its counsel Ice Miller, sent a letter to Baglien's attention via Calvera Ventures LLC (the "June 23 Letter").  The June 23 Letter states, "[p]ursuant to the [April 15 Resolution], a majority of the stockholders of Frost [Control] determined and resolved, *inter alia*, that Frost [Control] *would immediately cease business operations and begin liquidation of Frost [Control's] assets* for the benefits of its creditors and other stockholders."  It describes the assets to be liquidated, including without limitation "[c]laims against Messrs. P. Baglien and Lareau for damages to Frost [Control] caused by or resulting from alleged conversion of certain Frost [Control]'s intellectual property rights, breach of contract and tortious interference with contract."  (the "June 23 Letter Claims").  *See* Exh. G (attached hereto) (emphasis added).

54.     The June 23 Letter Claims track the allegations and claims set forth in the June 8 Letter and, subsequently, the Complaint.

55.     The June 23 Letter Claims do not refer to the Jan 5 Letter Grievances.

**Frost Solutions Acquires Certain Frost Control Assets from 1st Source Bank**

56.     Frost Solutions purports to have acquired certain Frost Control Assets ███

████████████████████████████████████████████████████████████

████████████████ the April 15 Resolution by which Frost Control declared it was

immediately ceasing operations.

57.     Frost Solutions' members are sophisticated investors, and thus Frost Control

undoubtedly performed due diligence ████████████████████.

58.     Accordingly, Frost Solutions learned, or should have learned, that Frost Control

did not preserve all evidence relating to the claims asserted in the June 8 Letter, including

without limitation Baglien and Lareau's Frost Control laptops, Baglien and Lareau's Frost

Control email and Slack accounts, and/or Baglien and Lareau's contemporaneous downloads

from HubSpot, Frost Control's CRM database (the "Evidence Relevant to the June 8 Letter").

59.     At a minimum, Frost Solutions had an obligation – prior to commencing litigation

against Counterclaim-Plaintiffs – to investigate the defenses/explanations provided by Baglien

and Lareau in the July 5 Response Letter and to preserve the Evidence Relevant to the June 8

Letter, such as Baglien and Lareau's Frost Control laptops, so that the evidence would later be

available for forensic analysis by all interested parties.

**Frost Solutions Commences the Action Without Performing a Reasonable
or Sufficient Pre-Filing Investigation and Without Having Preserved Critical Evidence**

60.     On October 5, 2022, without performing a sufficient pre-filing investigation, Frost

Solutions commenced the Action.

61.     The Complaint alleges that, after purchasing the Frost Control Assets on or about

August 9, 2022, Frost Solutions, "[t]hrough its counsel, . . . retained a forensics consultant *to*

*image Baglien's and Lareau's company [Frost Control] laptops, perform an analysis of the underlying metadata activity on the laptops*, and perform a forensic analysis on Frost Solutions' and Frost Control's cloud-based systems to determine what else, if anything was taken by Baglien and/or Lareau."  ECF No. 1 at ¶ 49 (emphasis added).

62.     The Complaint further alleges that "[t]hrough this investigation," Frost Solutions purportedly confirmed that "Lareau had downloaded the entire list of Frost Control's contacts from its CRM database, and Baglien had downloaded a complete list of all Frost Control's agreements with clients."  ECF No. 1 at ¶ 50.

63.     The "investigation" referenced in ¶ 50 of the Complaint refers to the forensic investigation conducted by a consultant at the request of Frost Solutions' counsel, as alleged in ¶ 49 of the Complaint.  ECF No. 1 at ¶¶ 49 and 50.

64.     Discovery has established that Frost Solutions included these allegations in the Complaint even though – at the time it commenced the Action – it did *not* have within its possession, custody, or control:  (1) Baglien's Frost Control laptop; (2) Lareau's Frost Control laptop; (3) the contemporaneous files associated with Lareau's purported download of Frost Control's contacts; or (4) the contemporaneous files associated with Baglien's purported download of Frost Control's customer agreements.

65.     Discovery has established that Frost Solutions included these allegations in the Complaint even though – at the time it commenced the Action – it *knew it did not have* within its possession, custody, or control:  (1) Baglien's Frost Control laptop; (2) Lareau's Frost Control laptop; (3) the contemporaneous files associated with Lareau's purported download of Frost Control's contacts; or (4) the contemporaneous files associated with Baglien's purported download of Frost Control's customer agreements.

11

66.     In fact, as of the filing date of this Counterclaim, Frost Solutions still cannot

produce or even state the whereabouts of Baglien's Frost Control laptop or Lareau's Frost

Control laptop, despite alleging in the Complaint that a consultant hired by its counsel "*image[d]*

*Baglien's and Lareau's company [Frost Control] laptops, [and] perform[ed] an analysis of the*

*underlying metadata activity on the laptops*."  ECF No. 1 at ¶ 49 (emphasis added).

67.     Upon information and belief, prior to filing the Complaint, Frost Solutions did not

investigate the statements Counterclaim-Plaintiffs made in the July 5 Response Letter and took

no steps to investigate whether Baglien and Lareau had returned their Frost Control laptops upon

their respective departures from Frost Control.

68.      After months of discovery and repeated requests from Counterclaim-Plaintiffs

that Frost Solutions produce all of this information, Frost Solutions has now admitted that it does

not have in its possession or control:  (1) Baglien's Frost Control laptop; (2) Lareau's Frost

Control laptop; (3) any of the contemporaneous files associated with Lareau's purported

downloads from Frost Control's HubSpot platform; (4) any of the contemporaneous files

associated with Baglien's purported downloads from Frost Control's HubSpot platform; (5)

Baglien's Frost Control email archive; or (6) Lareau's Frost Control email archive.

69.     Though Frost Solutions utterly failed to preserve critical sources of potential

evidence, it continues to pursue its claims against Counterclaim-Plaintiffs.

70.     Paragraphs 49 and 50 of the Complaint are not accurate.

**Frost Solutions Admits that the Complaint Is Based on Information
First Learned in June 2022 and Is Entirely Unrelated to the Jan 5 Letter**

71.     The Complaint alleges that "[i]n June 2022, Frost Control learned from a press

release that Baglien and Lareau had co-founded Vue Robotics and had developed the ARC1

technology.  Frost Control suspected that [Counterclaim-Plaintiffs] may have misappropriated

Frost [Control]'s trade secrets and confidential information in order to develop the technology and solicit Frost Control's customers."  ECF No. 1 at ¶ 43.

72.     Neither Baglien nor Lareau are subject to an agreement that prohibits them from soliciting Frost Control customers, so long as no confidential information is improperly used in the process.

73.     Though Frost Control had ceased business operations as of April 15, 2022, the Complaint alleges that Frost Control "then discovered" (in or after June 2022) purported evidence that Baglien and Lareau downloaded information from Frost Control's HubSpot platform prior to their respective resignations.  ECF No. 1 at ¶¶ 44-45.

74.     Baglien routinely downloaded information from Frost Control's HubSpot platform as part of his job responsibilities at Frost Control.

75.     Lareau routinely downloaded information from Frost Control's HubSpot platform as part of his job responsibilities at Frost Control.

76.     The Complaint further alleges that "[o]n June 8, 2022, counsel for Frost Control sent Baglien and Lareau a letter demanding that they cease using any trade secrets or confidential information belonging to Frost Control."  ECF No. 1 at ¶ 46 and Exh. D.

77.     Paragraph 46 of the Complaint is a reference to the June 8 Letter.

78.     The Complaint does not reference the Jan 5 Letter or the Jan 5 Letter Grievances. The Complaint also does not attach the Jan 5 Letter as an exhibit.

79.     On or about May 22, 2023, in response to an interrogatory asking Frost Solutions to describe with specificity its pre-filing investigation (the "May 22 Interrogatory Response"), Frost Solutions confirmed that it did not discover until "on or around June 2, 2022" that "Baglien

and Lareau had [purportedly] stolen information from Frost to start a competing business."  *See* Exh. H at 6 (attached hereto).

80.     The May 22 Interrogatory Response further states that "[o]n or before June 2, 2022, Frost [Control] contacted counsel to advise them of the situation and seek legal advice.  On or around September 6, 2022, Plaintiff's counsel retained Digital Intelligence to perform digital forensics work."  *Id.* at 7.

81.     The "digital forensics work" referenced in the May 22 Interrogatory Response corresponds to the work described in ¶¶ 49 and 50 of the Complaint.

82.     Kirsh, a principal of Frost Solutions through his interest in Clashmore Ventures, verified the May 22 Interrogatory Response.  *See id.*

83.     The May 22 Interrogatory Response does not reference the Jan 5 Letter or the Jan 5 Letter Grievances.  *See id.*

84.     The May 22 Interrogatory Response confirms that the Jan 5 Letter Grievances are *entirely unrelated* to the allegations and claims asserted in the Action.  Indeed, according to a sworn admission, neither Frost Control nor Frost Solutions began conducting its pre-filing investigation until on or around June 2, 2022, *nearly five months after the Jan 5 Letter*.

85.     On or about August 1, 2023, Frost Solutions supplemented the May 22 Interrogatory Response (the "Aug 1 Supplemental Interrogatory Response") to add that the law firm Ice Miller "participat[ed] in the investigation of Defendants' actions prior to Frost [Solutions'] retention of Taft, Stettinius & Hollister LLC, and by sending to Baglien and Lareau the cease and desist letter attached to the Complaint as Exhibit D:  Ice Miller, LLP."  *See* Exh. I at 4-5 (attached hereto).

86.     Kirsh, a principal of Frost Solutions through his interest in Clashmore Ventures, verified the Aug 1 Supplemental Interrogatory Response under oath. *See id.*

87.     The Aug 1 Supplemental Interrogatory Response further confirms that the Jan 5 Letter Grievances are *entirely unrelated* to the to the allegations and claims asserted in the Complaint because the response:  (1) does not identify the law firm which sent the Jan 5 Letter as being involved with any pre-filing investigation for the Complaint; and (2) does not reference the Jan 5 Letter.

88.     Frost Solutions also produced the Dec 21 Email in this Action on or about September 15, 2023, which specifically limits the basis of the Jan 5 Letter to Baglien's alleged actions *during* his employment at Frost Control and says nothing about trade secrets or confidential information.

**Frost Solutions Attempts to Put Its Competitor Out of Business
By Violating the Protective Order and then Using Fraud
to Strip Counterclaim-Plaintiffs of Their Insurance Coverage**

89.     As part of their Fed. R. Civ. P. 26(a)(1) disclosures, Counterclaim-Plaintiffs produced on or about April 21, 2023 a copy of an insurance policy that may be used to satisfy all or part of a possible judgment in the Action (the "Insurance Policy").

90.     Counterclaim-Plaintiffs designated the Insurance Policy as Confidential Information pursuant to the Protective Order governing the confidentiality of information produced in the Action (the "Protective Order") (ECF No. 28) by marking each page "Confidential."

91.     Frost Solutions never challenged the Confidential designation of the Insurance Policy pursuant to the procedure set forth in the Protective Order.

92.     The Protective Order expressly provides that "Confidential Information or Highly Confidential Information under this Order shall not be used or disclosed by the parties, counsel for the parties or any other persons identified in Paragraph 5(b) or (c) *for any purpose whatsoever other than to prepare for and to conduct discovery, hearings and trial in this action, including any appeal thereof*."  *See* ECF No. 28 at ¶ 5.a. (emphasis added).

93.     On October 23 and November 27, 2023, the parties participated in two days of mediation, which did not succeed in resolving the Action.

94.     Curiously, despite having received a copy of the Insurance Policy months earlier, shortly after the first day of mediation, counsel for Frost Solutions began demanding that the Counterclaim-Plaintiffs produce a copy of the Insurance Policy and any reservation of rights letters issued by the insurance carrier.  Frost Solutions' counsel began demanding this information – as well as the remaining limits on the policy – on October 27, 2023.

95.     On November 1, 2023, counsel for the Counterclaim-Plaintiffs informed counsel for Frost Solutions that the Insurance Policy was produced to them on April 21, 2023 and identified the production number assigned to the document.

96.     Three days after the second day of mediation, on November 30, 2023, Counterclaim-Plaintiffs' insurance carrier received a phone call from a person who identified himself only as "Mike," and who called from the mobile number ███████.

97.     Because the Insurance Policy was marked "Confidential," Frost Solutions was barred from using the document *for any purpose whatsoever other than to prepare for and to conduct discovery, hearings and trial in this action, including any appeal thereof*."  *See* ECF No. 28 at ¶ 5.a. (emphasis added).

98.     Counterclaim-Plaintiffs' insurance carrier returned "Mike's" call. "Mike" told the insurance carrier: (1) he was in litigation with Vue Robotics; (2) he was aware the Counterclaim-Plaintiffs had received a letter from "Frost" *dated January 5, 2022* accusing them of "bad stuff"; and (3) that the Jan 5 Letter was attached as an exhibit to the mediation brief.

99.     The purpose of "Mike's" call was to persuade the insurance carrier that the Counterclaim-Plaintiffs had omitted material information from their insurance application, thereby triggering an investigation that would lead the carrier to withdraw coverage for the Action.

100.    As verified by publicly available information, the mobile number used by "Mike" belongs to Michael Kirsh, a principal of Frost Solutions through his interest in Clashmore Ventures.

101.    Kirsh is the person who called Counterclaim-Plaintiffs' insurance carrier on or about November 30, 2023 and identified himself as "Mike."

102.    Despite verifying the May 22 Interrogatory Response and the Aug 1 Supplemental Interrogatory Response and knowing that the Jan 5 Letter Grievances were entirely unrelated to the allegations and claims asserted in the Complaint based, in part, on the Dec 21 Email Frost Solutions itself produced in the Action, Kirsh contacted Counterclaim-Plaintiffs' insurance carrier and provided a knowingly false description of the Jan 5 Letter for the purpose of persuading the carrier to withdraw its coverage of Counterclaim-Plaintiffs.

103.    Kirsh called the Counterclaim-Plaintiffs' carrier and tried to strip Counterclaim-Plaintiffs of their insurance coverage *by relaying information he knew to be false*.

104.    Kirsh did this because he believed that – without the benefit of their insurance coverage — Counterclaim-Plaintiffs would be unable to defend themselves in the Action and they would be driven out of business.

105.    Kirsh violated the Protective Order by using the information he learned from the Insurance Policy – designated as Confidential Information – for a purpose unrelated to preparing for and conducting discovery, hearings, or trial in the Action.

106.    On or about January 5, 2024, Counterclaim-Plaintiffs received a letter from their insurance carrier indicating that their coverage may be in jeopardy because of the allegations raised in the Jan 5 Letter (the "Insurance Reconsideration Letter").

107.    The first step of Kirsh's plan to destroy a competitor had worked.  By knowingly providing the carrier with false information, Kirsh had triggered an investigation into whether Counterclaim-Plaintiffs had withheld material information during the insurance application process.

108.    By deceiving Counterclaim-Plaintiffs' insurance carrier, Kirsh tortiously interfered with the Insurance Policy and insurance coverage and caused the carrier to erroneously suspect that the Jan 5 Letter had put Counterclaim-Plaintiffs on notice of the claims asserted in the Action.  Kirsh did so even though he knew that the Jan 5 Letter Grievances were entirely unrelated to the allegations and claims asserted in the Complaint.

109.    However, Frost Solutions was unaware that Kirsh's plan had succeeded because no one was providing ongoing information to Frost Solutions about the status of Counterclaim-Plaintiffs' insurance coverage and whether the carrier had taken any action in response to Kirsh's call.

110.     Apparently believing that Kirsh's "anonymous" telephone call had not worked, Frost Solutions decided to again bring the Jan 5 Letter – and the fraudulent argument that that letter had put Counterclaim-Plaintiffs on notice of the claims of the Action – to the insurance carrier's attention.  This time Frost Solutions would use one of its attorneys to peddle the false narrative.

111.     On or about January 11, 2024, Frost Solutions, through one of its attorneys of record and agent (the "Frost Solutions Attorney"), sent a letter to counsel for Counterclaim-Plaintiffs (the "Jan 11 Letter") in which he stated, "we have serious concerns as to the extent of coverage.  We have requested any reservations of rights letter.  *As you know, your client was put on notice of this claim on January 5, 2022.[1]  It appears that the insurance company was not notified until sometime after.  As such, there may be a coverage issue and we would like to know if that is the case. . . .*"  (Emphasis added.)  The Frost Solutions Attorney also *expressly* requested that his Jan 11 Letter be shared with Counterclaim-Plaintiffs' insurance carrier.

112.     The purpose of the Jan 11 Letter was to establish an indirect conduit to Counterclaim-Plaintiffs' insurance carrier so Frost Solutions could relay false information intended to provoke an investigation into whether Counterclaim-Plaintiffs withheld information from their insurance application, thereby interfering with Counterclaim-Plaintiffs' insurance policy and coverage.

113.     Upon information and belief, the Frost Solutions Attorney knew that his assertion that Counterclaim-Plaintiffs were put on notice of "this claim" – *i.e.,* the claims in the Action –

---

[1] Tellingly, Frost Solutions' counsel sent two versions of the Jan 11 Letter.  The first asserted that "your client was put on notice of this claim on June 8, 2022," which refers to the letter attached as Exhibit D to the Complaint.  Shortly thereafter, a "corrected version" of the letter was sent that changed June 8, 2022 to January 5, 2022.

on January 5 (based on the Jan 5 Letter) was false based on, at a minimum, the allegations in the
Complaint, the May 22 Interrogatory Response, the Aug 1 Supplemental Interrogatory Response,
and the Dec 21 Email – all of which were known to the Frost Solutions Attorney, as counsel of
record for Frost Control in the Action.

114.    Upon information and belief, prior to his decision to send the Jan 11 Letter, the
Frost Solutions Attorney was aware that Kirsh had called Counterclaim-Plaintiffs' insurance
carrier.

115.    By insisting that counsel share the Jan 11 Letter with Counterclaim-Plaintiffs'
insurance carrier, the Frost Solutions Attorney – as an agent of Frost Solutions – tortiously
interfered with Counterclaim-Plaintiffs' insurance policy and coverage because he did so
knowing that the Jan 5 Letter Grievances were entirely unrelated to the allegations and claims
asserted in the Complaint.

116.    The Frost Solutions Attorney, as an agent of Frost Solutions, misled the insurance
carrier through his Jan 11 Letter.

117.    On or about January 15, 2024, Counterclaim-Plaintiffs' counsel responded to the
Jan 11 Letter noting that reference to the Jan 5 Letter and a potential "coverage issue" suggested
that someone may have taken steps to encourage the insurance carrier to reconsider its coverage
position (the "Jan 15 Letter").  Counsel also reiterated that the Jan 5 Letter has no bearing on the
underlying litigation, as supported by the Dec 21 Email, other than to reinforce that Frost Control
and Frost Solutions engaged in spoliation.  Counterclaim-Plaintiffs' counsel requested that Frost
Solutions repair the damage it had caused by acknowledging in a stipulation that the Jan 5 Letter
did not – and could not have – put Counterclaim-Plaintiffs on notice of any of the claims in the
Action.

118.     On or about January 24, 2024, Frost Solutions' counsel responded to the Jan 15 Letter accusing Counterclaim-Plaintiffs of trafficking in a *Through the Looking-Glass*-style "conspiracy theory," falsely denying that anyone from Frost Solutions had contacted Counterclaim-Plaintiffs' insurance carrier.

119.     As a direct and proximate result of Frost Solutions' tortious interference with Counterclaim Plaintiffs' Insurance Policy and coverage, Counterclaim-Plaintiffs were forced to: (1) incur substantial additional defense counsel legal fees to address the interference; and (2) retain separate coverage counsel to expose and counteract the lies that Frost Solutions had fed the insurance carrier.

**Frost Solutions' Actions Have Caused Lareau to Suffer Severe Emotional Distress**

120.     As a direct and proximate result of Frost Solutions' tortious interference with the Insurance Policy and coverage, Counterclaim-Plaintiff Lareau, who served his country honorably in Iraq and Afghanistan, experienced and continues to experience severe emotional distress.

121.     Following Lareau's discharge from the military, he began seeing a psychiatrist as an outlet to discuss his service in Iraq and Afghanistan.  This course of treatment had proven successful.

122.     The Insurance Policy has allowed Counterclaim-Plaintiffs to defend themselves against Frost Solutions, whose pockets are far deeper than theirs.  Without the Insurance Policy, Counterclaim-Plaintiffs would have been buried by the Action because they simply could not afford the cost of defense.

123.     Upon receipt of the Insurance Reconsideration Letter, which announced that the carrier was reconsidering its coverage position, Lareau began suffering from serious mental and emotional harm accompanied by anxiety, loss of appetite, loss of interest in activities, and

insomnia.  The emotional distress has impacted his personal relationships.  The timing and severity of these conditions are documented.

124.     As a result of the mental and emotional harm and accompanying physical symptoms proximately caused by Frost Solutions' tortious interference, Lareau's psychiatrist altered his medications because the long-term treatment plan that had been working was no longer effective.  Lareau remains on this altered medical treatment plan, but symptoms persist nonetheless.

125.     It was foreseeable that Frost Solutions' actions to strip Counterclaim-Plaintiffs' insurance coverage (which, if successful, would have put Counterclaim-Plaintiffs out of business) would cause Lareau to suffer emotional distress.

126.     In fact, upon information and belief, the point of Kirsh "dropping a dime" with Counterclaim-Plaintiffs' carrier in the first place was to put Counterclaim-Plaintiffs out of business.

127.     The only reason Frost Solutions would seek to strip Counterclaim-Plaintiffs of the insurance coverage protecting them in the Action is to put Counterclaim-Plaintiffs out of business.

128.     There can be no doubt that Kirsh and Frost Solutions appreciated the potential impact of Kirsh's actions, and the subsequent related actions of their attorney and agent, when they decided to take those actions.

129.     The actions of Frost Solutions and Kirsh and their attorney and agent inflicted emotional distress on Lareau.  Lareau has been harmed – and continues to be harmed – by those actions in an amount to be determined at trial.

**Frost Solutions Engages in Other Unseemly Practices**

130.     Notably, Frost Solutions' tortious interference with the Insurance Policy and Defendants' insurance coverage is not the first time Frost Solutions attempted to disrupt Counterclaim-Plaintiffs' business.

131.     While Vue Robotics and Frost Solutions offer competing products and services, Vue Robotics' products and services are far superior.

132.     From the beginning of this dispute, Frost Solutions has made clear that it would use the litigation process to embarrass, disparage, pummel, and, eventually, destroy its start-up competitor Vue Robotics.

133.     Frost Solutions did not wait long to make known its true motive.  Specifically, on October 20, 2022, both Vue Robotics and Frost Solutions were exhibiting at the same trade show, Equip Exposition 2022, in Louisville, Kentucky.

134.     At approximately 3:30 p.m. on October 20, someone affiliated with Frost Solutions – upon information and belief – provided a process server with trade show access credentials so that she could access the exhibition floor and serve the Complaint on Lareau while he was at the Vue Robotics booth exhibiting a prototype to potential customers.  *See* ECF No. 6 (Affidavit of Service on Lareau).

135.     The process server, donning her trade show credentials lanyard, stood in a line of people waiting to speak with Lareau at the Vue Robotics booth.  Once the process server was at the front of the line, she served the Complaint on Lareau – in front of other people, including potential customers.

136.     Frost Solutions' goal was to make a spectacle of Lareau getting served with the Complaint.  Indeed, Frost Solutions facilitated service of the Complaint on Lareau in the middle

of a trade show to embarrass and harass Lareau and to interfere with Counterclaim-Plaintiffs'

business and their efforts to promote their products and establish commercial relationships.

137.    As another example, Frost Solutions' representatives have actively promoted its

litigation against Counterclaim-Plaintiffs and used the Action to dissuade at least one potential

commercial partner from working with Counterclaim-Plaintiffs.

138.    Specifically, in early 2023, Counterclaim-Plaintiffs were in discussions with

Sitefotos to form a partnership that would allow their respective products and services to work

with one another.  Frost Solutions also met with Sitefotos to inquire about a potential

partnership.  When Sitefotos told Frost Solutions that it was already in discussions with Vue

Robotics, Frost Solutions, upon information and belief, proceeded to let Sitefotos know about

Frost Solutions' lawsuit against Counterclaim-Plaintiffs to, upon information and belief,

discourage Sitefotos from working with Counterclaim-Plaintiffs.

139.    Sitefotos is not a partner of Vue Robotics.  Upon information and belief, Sitefotos

partnered with Frost Solutions instead.

140.    Moreover, during the September 28-30, 2022 Western Snow and Ice Conference

in Loveland, Colorado, Bott, a principal of Frost Solutions through his interest in Clashmore

Ventures, verbally accosted Cory Moore, who works for Vue Robotics' partner TAPCO and who

was working at Vue Robotics' exhibitor booth during the conference, and threatened him in front

of other vendors and prospective customers.

141.    Upon information and belief, Frost Solutions has engaged – and will continue to

engage – in other actions to interfere with Defendants' business, including touting this lawsuit as

a basis for potential prospects to avoid doing business with Defendants.  Defendants'

investigation into such actions is ongoing.

142.     Frost Solutions has also abused the discovery process during the Action, using it to bludgeon Counterclaim-Plaintiffs.  Despite repeated requests from Counterclaim-Plaintiffs, it took Frost Solutions the better part of a year to finally admit that it does not have:  (1) Baglien's Frost Control laptop; (2) Lareau's Frost Control laptop; (3) any of Lareau's contemporaneous downloads from Frost Control's HubSpot platform; (4) any of Baglien's contemporaneous downloads from Frost Control's HubSpot platform; (5) Baglien's Frost Control email archive; or (6) Lareau's Frost Control email archive.

## COUNT I
### (Tortious Interference with Contractual Relations)

143.     Counterclaim-Plaintiffs restate and incorporate by reference the preceding paragraphs of the Counterclaim as though fully set forth herein.

144.     Counterclaim-Plaintiffs had a contractual and economic relationship with their insurance carrier.

145.     Frost Solutions was aware of this relationship between Counterclaim-Plaintiffs and their insurance carrier based on Counterclaim-Plaintiffs' required production of the Insurance Policy, which they produced as "Confidential" pursuant to the Protective Order in the Action.

146.     Frost Solutions, through Kirsh, misused Confidential Information produced by Counterclaim-Plaintiffs in the Action, in violation of the Protective Order, to contact Counterclaim-Plaintiffs' insurance carrier to alert them to the existence of the Jan 5 Letter, the basis for which Kirsh and Frost Solutions knowingly misrepresented.

147.     Based on, at a minimum, the Complaint, the May 22 Interrogatory Response, the Aug 1 Supplemental Interrogatory Response, and the Dec 21 Email produced by Frost Solutions in the Action, Frost Solutions, including Kirsh and its agent the Frost Solutions Attorney, knew

that the Jan 5 Letter Grievances were entirely unrelated to the allegations and claims raised in the Complaint but misrepresented the basis of the Jan 5 Letter to induce the insurance carrier to reconsider its coverage position.

148.    Frost Solutions, through Kirsh, intentionally and improperly interfered with Defendant and Counterclaim-Plaintiffs' contractual and economic relationship with their insurance carrier by misrepresenting the Jan 5 Letter Grievances in an effort to destroy a competitor.

149.    Frost Solutions, through its counsel and agent the Frost Solutions Attorney, intentionally and improperly interfered with Counterclaim-Plaintiffs' contractual and economic relationship with their insurance carrier by claiming in the Jan 11 Letter that he had serious concerns about the extent of their insurance coverage *based on the Jan 5 Letter* and insisting that the Jan 11 Letter be shared with the insurance carrier – despite knowing that the Jan 5 Letter was unrelated to the claims asserted in the Action.

150.    Relying on Frost Solutions' deception, the insurance carrier issued the Insurance Reconsideration Letter.

151.    Frost Solutions tortiously interfered with the contractual and economic relationship between Counterclaim-Plaintiffs and their insurance carrier causing harm to Counterclaim-Plaintiffs, including without limitation additional fees incurred by defense counsel, fees paid to coverage counsel (hired specifically to respond to the Insurance Reconsideration Letter and to advocate for continued coverage), business interruptions, and severe emotional distress experienced by Lareau.

152.    As a result of Frost Solutions' actions, Counterclaim-Plaintiffs were, and continue to be, harmed, and they are entitled to damages in an amount to be determined at trial.

## COUNT II
### (Violation of New Hampshire Consumer Protection Act, N.H. RSA § 358-A:1, *et seq.*)

153.   Counterclaim-Plaintiffs restate and incorporate by reference the preceding paragraphs of the Counterclaim as though fully set forth herein.

154.   The New Hampshire Consumer Protection Act ("CPA") makes it unlawful to use an "unfair method of competition or . . . unfair or deceptive act or practice in the conduct of any trade or commerce within the state."  N.H. RSA § 358-A:2.

155.   Counterclaim-Plaintiffs engaged in "trade or commerce" within the meaning of the CPA because Vue Robotics is located in New Hampshire and they advertise, offer for sale, sell, and/or distribute good and services that directly or indirectly affect people in New Hampshire.

156.   As alleged herein, Frost Solutions has knowingly and willfully violated the CPA by engaging in acts and practices that were unfair and deceptive in a manner that, at a minimum, offends public policy and other established concepts of decency and fairness.

157.   Specifically, Frost Solutions, through Kirsh, knowingly violated the Protective Order in the Action to contact Counterclaim-Plaintiffs' insurance carrier to improperly interfere with their contractual relations – with the goal of depriving Counterclaim-Plaintiffs of their insurance coverage by misrepresenting the basis for the Jan 5 Letter.

158.   Frost Solutions, through its agent the Frost Solutions Attorney, improperly interfered with the contractual relationship between Counterclaim-Plaintiffs and their insurance carrier with the goal of depriving them of their insurance coverage by misrepresenting the basis of the Jan 5 Letter.

159.   Frost Solutions failed to conduct an adequate pre-filing investigation prior to commencing the Action, including without limitation, by asserting in the Complaint that it

performed forensic imaging of Baglien and Lareau's Frost Control laptops when Frost Solutions does not have – and never had – these laptops and without confirming prior to commencing the Action that critical evidence had been preserved.

160. Frost Solutions has abused the discovery and civil litigation process to bludgeon a competitor, including without limitation by taking information protected by the Protective Order and using that protected information to perpetrate a fraud on Counterclaim-Plaintiffs' insurance carrier by knowingly misrepresenting the basis of the Jan 5 Letter.

161. Frost Solutions continues to pursue its claim against Lareau for breach of the non-compete, and the entire Separation Agreement, despite knowing that it cannot enforce that agreement against Lareau because Lareau did not consent to assignment of the Separation Agreement to Frost Solutions.

162. Frost Solutions continues to pursue its claim against Lareau for breach of the Separation Agreement despite knowing that it cannot enforce that agreement against Lareau because the Separation Agreement is void for lack of consideration.

163. Counterclaim-Plaintiffs' have incurred substantial defense costs defending against contract-based claims that Frost Solutions never should have brought because they are baseless.

164. Frost Solutions has used the Action to harass, embarrass, pummel, and/or otherwise interfere with Counterclaim-Plaintiffs and their business.

165. All of Frost Solutions' actions were knowing and willful and have caused substantial harm to Counterclaim-Plaintiffs and, by extension, to New Hampshire residents and consumers.

166. Frost Solutions' actions constitute a knowing and willful violation of the CPA.

167. Frost Solutions has asserted claims in the Action that are frivolous, unreasonable, and/or groundless and/or continues to litigate the Action after Frost Solutions' claim(s) became frivolous, unreasonable, or groundless, and has litigated the Action in bad faith.

168. Upon information and belief, Frost Solutions' actions have been willful or knowing.

169. As a result of Frost Solutions' actions, Counterclaim-Plaintiffs have been, and continue to be, damaged, and they are entitled to damages, including without limitation enhanced damages, in amount to be determined at trial and to recover their attorneys' fees pursuant to N.H. RSA § 358-A:10 and/or Indiana Code section 34-52-1-1.

## COUNT III
### (Negligent Infliction of Emotional Distress)

170. Counterclaim-Plaintiffs restate and incorporate by reference the preceding paragraphs of the Counterclaim as though fully set forth herein.

171. Frost Solutions has a duty to exercise reasonable care towards Counterclaim-Plaintiff Lareau.

172. Frost Solutions breached that duty by, among other things, "dropping a dime" on Counterclaim-Plaintiffs by calling their insurance carrier and knowingly misrepresenting the basis of the Jan 5 Letter for the purpose of inducing the carrier to withdraw coverage. Despite knowing that the Jan 5 Letter was entirely unrelated to the claims asserted in the Action, Frost Solutions told the carrier otherwise. In taking this action, Frost Solutions knew or should have known that one or more of the Counterclaim-Plaintiffs would experience severe emotional distress.

173. It was foreseeable that Frost Solutions' negligent actions would cause Counterclaim-Plaintiff Lareau to suffer emotional distress.

174.    As a result of Frost Solutions' negligent conduct, Counterclaim-Plaintiff Lareau has suffered serious mental and emotional harm accompanied by objective physical symptoms, including without limitation anxiety, loss of appetite, loss of interest in activities, and insomnia. The emotional distress has also impacted his personal relationships.

175.    As a result of Frost Solutions' actions, Counterclaim-Plaintiff Lareau has suffered, and continues to suffer from, severe emotional distress, for which he is entitled to damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Counterclaim-Plaintiffs respectfully pray that the Court:

(1)    Enter judgment in their favor on each of the claims asserted in this Counterclaim;

(2)    Find that Frost Solutions has engaged in tortious interference with contractual relations;

(3)    Find that Frost Solutions has violated the New Hampshire Consumer Protection Act, N.H. RSA § 358-A:1, *et seq.*;

(4)    Find that Frost Solutions is liable for negligent infliction of emotional distress against Counterclaim-Plaintiff Lareau;

(5)    Award Counterclaim-Plaintiffs their actual damages and/or damages permitted by N.H. RSA § 358-A:10 and/or other applicable law;

(7)    Award Counterclaim-Plaintiffs their reasonable attorneys' fees, expenses, and costs (together with interest, including prejudgment interest thereon) pursuant to N.H. RSA § 358-A:10 and/or Indiana Code section 34-52-1-1, and/or other applicable law; and

(8)    Grant such other and/or further relief as the Court deems just and equitable.

## JURY DEMAND

Counterclaim-Plaintiffs demand a trial by jury on each and every claim and defense in this Counterclaim so triable.

Dated:  March __, 2024

Respectfully submitted,

**PATRICK BAGLIEN, CHRISTOPHER LAREAU, AND VUE ROBOTICS, LLC,**

By their attorneys,

_____
Kierstan E. Schultz (N.H. Bar No. 20682)
NIXON PEABODY LLP
900 Elm Street, 14th Floor
Manchester, NH  03101
Tel: (603) 628-4031
Fax:  (603) 628-4040
Email:  kschultz@nixonpeabody.com

Jason C. Kravitz (admitted *pro hac vice*)
Gina M. McCreadie (admitted *pro hac vice*)
NIXON PEABODY LLP
Exchange Place
53 State Street
Boston, Massachusetts  02109
Tel:  (617) 345-1000
Fax:  (617) 345-1300
Email:  jkravitz@nixonpeabody.com
            gmccreadie@nixonpeabody.com