# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

FROST SOLUTIONS, LLC,

        Plaintiff,

    v.

PATRICK BAGLIEN, CHRISTOPHER LAREAU, and VUE ROBOTICS, LLC,

        Defendants.

Civ. Action No. 1:22-cv-00401-SE

## <u>DEFENDANTS' OBJECTION TO FROST SOLUTIONS, LLC'S MOTION TO DISMISS AMENDED COUNTERCLAIM</u>

Since filing this action, Plaintiff Frost Solutions ("Frost" or "Frost Solutions") has waged a persistent campaign to harm Vue Robotics, LLC ("Vue") and its principals Lareau and Baglien ("Defendants") through improper and illegal acts. Defendants' Amended Counterclaim alleges claims arising out of three of those acts.

- In late 2023 and early 2024, Frost—in violation of this Court's protective order—used Vue's confidential information for a purpose other than this litigation. Namely, Frost used confidential discovery information in an effort to get Vue's insurer to drop Vue's coverage. Am. Countercl. at ¶¶ 88-118. Based on this conduct, Lareau asserts a claim for negligent infliction of emotional distress. (**<u>Count I</u>**)

- In the fall of 2024, Frost Solutions settled a lawsuit it had brought against TAPCO, a distributor of Vue's whose sales accounted for a significant portion of Vue's business. Am. Countercl. at ¶ 157-59. Due to Frost's interference, TAPCO illegally terminated its contract with Vue and then, in breach of its contractual obligations to Vue, began using Vue's confidential information to steer Vue's customers and prospective business relations

away from Vue and to Frost.  Am. Countercl. at ¶¶ 157-176.  Based on this conduct, Defendants assert claims for tortious interference with Vue's TAPCO contract (**Count II**), with Vue's contractual relations with customers (**Count III**), and with Vue's prospective business relations (**Count IV**).  Vue also brings a claim for civil conspiracy in **Count VI** based on Frost's and TAPCO's concerted efforts to harm it.

- In the fall of 2024, Frost's recently hired vice president, Jason Ostrander, began using login credentials to Vue's systems that he had been provided from his previous employer, East End Group.  Am. Countercl. at ¶¶147-48.  Ostrander improperly accessed Vue's systems and databases several times, thereby causing East End Group to breach its contractual obligations to Vue.  Am. Countercl. at ¶¶ 142-156.  Based on this conduct, Defendants assert a claim for tortious interference with the East End Group contract (**Count V**).

Frost Solutions now brings this Motion to Dismiss the Amended Counterclaim (the "Motion") in its entirety.  Frost's Motion is premised on two categories of arguments, both of which are flawed.  *First*, Frost argues that dismissal is required because Vue has failed to sufficiently plead certain elements of its claims.  Those arguments, however, are based on (1) Frost's demand for details that are not required at the pleading stage, especially when most of the information relevant to Vue's claims is possessed by other parties, and (2) Frost's misunderstanding of the substantive law underlying Vue's claims.

*Second*, Frost asserts several protections or defenses that are either inapplicable, not supported by law, or unavailable at the pleading stage.  For example, Frost argues that it was justified in tortiously interfering with the TAPCO contract or that the *Noerr-Pennington* doctrine shields it from liability for that interference because the alleged interference arises from the

settlement of litigation.  Memo. at 12-14.  But it cites no law supporting that controversial position and fails to explain how those issues can be resolved at the pleadings stage.  *Id.*  Frost also, *remarkably*, argues for dismissal of the East End Group interference claim on the basis that Mr. Ostrander was working for them and not East End when he improperly accessed Vue's system.  Memo. at 17-19.  But Frost fails to explain why that would excuse East End Group from complying with its contractual obligations to Vue.  *Id.*  Finally, Frost cites no authority for its argument that Vue's civil conspiracy claim fails simply because it has not named Frost's co-conspirator, TAPCO, as a defendant.  Memo. at 20.

As explained in detail below, given the above infirmities, Frost's Motion should be denied.

## STANDARD OF REVIEW

In assessing a motion to dismiss, the Court must accept the well-pleaded facts from the complaint as true and draw reasonable inferences from those facts in Vue's favor.  *Pike v. Budd*, 133 F.4th 74 (1st Cir. 2025).  To survive dismissal, a plaintiff's complaint need only "state sufficient factual matter to satisfy facial plausibility."  *Id.*  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal quotations omitted).

## ARGUMENT

## I.    Vue Robotics Has Alleged Wrongful Interference with its TAPCO Contract.

Frost contends that Vue Robotics' counterclaim for tortious interference with the TAPCO agreement (Count II) must be dismissed because Vue fails to plausibly allege the element of improper interference.  *See* Memo. at pp. 10-14.  In support, Frost argues that Vue has (1) failed to adequately allege that its interference was improper and that (2) its interference cannot be wrongful given that it arises from the settlement of litigation.  Frost is incorrect.

3

### a. **Vue Robotics Has Plausibly Alleged Wrongful Interference.**

Frost contends that the Amended Counterclaim fails to sufficiently allege interference that was improper.  Frost is right that "[o]nly improper interference is deemed tortious in New Hampshire."  Memo. at 11; *Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*, 229 F. Supp. 2d 70, 73 (D.N.H. 2002).  Whether alleged interference is improper "requires an inquiry into the mental and moral character of the defendant's conduct."  *HCC Specialty Underwriters, Inc. v. Woodbury*, 289 F. Supp. 3d 303, 328 (D.N.H. 2018) (quoting *City of Keene v. Cleaveland*, 167 N.H. 731 (2015)).

Relying on the Second Restatement of Torts, the New Hampshire Supreme Court has identified several factors that courts should consider when determining whether an actor's interference is improper.  *Roberts v. Gen. Motors Corp.*, 138 N.H. 532 (1994).  Those factors include: the nature of the actor's conduct, the actor's motive, the interests with which the actor's conduct interferes, the interest sought to be advanced by the actor, the social interests in protecting the freedom of action of the actor and the contractual interests of the other, the proximity of the actor's conduct to the interference, and the relations between the parties.  *Id.* at 540-541.

Vue has alleged more than enough facts to state a viable claim for relief under New Hampshire's multifactored analysis.  Vue alleges that TAPCO illegally terminated its contract with Vue almost immediately after TAPCO and Frost settled Frost's claims in the *Moore* litigation and that this termination, based on information and belief, was a condition of that settlement.  Am. Countercl. at ¶¶ 162-73.  The reasonable inference drawn from these allegations is that Frost provided a benefit to TAPCO—dropping its claims against TAPCO—in exchange for TAPCO's promise to sever its relationship with Vue.  Not only is that an actionable form of interference (*see* Restatement 2d Torts at § 767, cmt. c; § 766 at cmt. k, *Means of Interference*)

4

but the proximity between Frost's conduct and the alleged interference weighs heavily towards a finding that Frost's interference was improper.[1]

Other facts alleged strongly suggest that the interference was improper. To begin with, Frost interfered with a binding contractual relationship, one that Vue had devoted significant time, resources, and effort into developing. Am. Countercl. at ¶¶ 157-176. That is precisely the type of interest that is entitled to significant protection under the law and would require a strong interest—one beyond mere competition—to overcome. *See* R.2d Torts § 767, cmt. f (explaining that economic interest in obtaining business does not overcome another's similar interest when that interest "has been already consolidated into the binding legal obligation of a contract").

Another significant factor supporting a finding of improper interference is the Amended Counterclaim's detailed allegations about Frost's motive. Vue alleges that Frost was motivated by an intent to harm Vue and its principals. Am. Countercl. at pp. 1-3, ¶ 175 (explaining that Frost's interference with the TAPCO contract furthered "its campaign to unlawfully crush a competitor and cause substantial harm, economic and emotional"). This allegation is supported by numerous factual allegations in the Amended Counterclaim from which one could reasonably infer an improper motive. Frost not only waged a coordinated campaign with TAPCO to harm Vue in the marketplace, Am. Countercl. pp. 29-33, it also waged a persistent and overarching campaign to improperly harm Vue through other avenues, all of which is alleged in the Amended Counterclaim, *see* Am. Countercl. at ¶¶ 88-128 (alleging an attempt to put Vue out of business by disclosing confidential information to Vue's insurer in violation of this Court's protective

---

[1] *Restatement (Second) of Torts* § 767, cmt. h ("*Proximity or remoteness of actor's conduct to interference.* One who induces a third person not to perform his contract with another interferes directly with the other's contractual relation. The interference is an immediate consequence of the conduct, and the other factors need not play as important a role in the determination that the actor's interference was improper. The actor's conduct need not be predatory or independently tortious, for example, an mere knowledge that this consequence is substantially certain to result may be sufficient.") (hereinafter R.2d Torts).

order); ¶¶ 142-156 (alleging corporate espionage by Frost employee); ¶¶ 132, 129-141 (detailing other unseemly Frost practices relating to a motive to use the litigation process embarrass and disparage Vue). Frost's suspect motive constitutes improper interference because "[a] motive to injure another or to vent one's ill will on him serves no socially useful purpose." *See* R.2d Torts § 767 cmt. d (explaining that a motive to harm can be a substantial or dispositive factor in the improper interference analysis).

The only argument that Frost has identified to the contrary is its contention that "ordinary means of persuasion or the exertion of limited economic pressure" is not sufficient to allege improper interference. *See* Memo. at 12. In support, Frost relies on a section in *Moulton v. Bane*, which discusses improper interference in the context of a claim for tortious interference with *prospective* contract. *Id.* (citing *Moulton v. Bane*, Civil No. 14-cv-265-JD, 2015 U.S. Dist. LEXIS 154603, at *36 (D.N.H. Nov. 16, 2015)). In its Memorandum, Frost simply ports this standard over to Vue's claim for tortious interference with the TAPCO contract. Memo. at 12. Frost is wrong to do so. As *Wilcox Indus. Corp. v. Hansen*, 870 F. Supp. 2d 296, 307 (D.N.H. 2012)—the case on which *Moulton* relies—makes clear, *Moulton's* language about ordinary means of persuasion only applies to claims for tortious interference with *prospective* contractual relations, "[b]ecause the law provides greater protection to a party's interest in an existing contract than in a prospective one." *Id.*[2]

When taking Vue's allegations as true, as this Court must, there is more than enough factual detail to plausibly allege that Vue will be entitled to relief on its tortious interference claim

---

[2] *Accord* Restat. 2d of Torts, § 767, cmt. e ("Some contractual interests receive greater protection than others. Thus, depending upon the relative significance of the other factors, the actor's conduct in interfering with the other's prospective contractual relations with a third party may be held to be not improper, although his interference would be improper if it involved persuading the third party to commit a breach of an existing contract with the other.").

arising out of Frost's interference with the TAPCO agreement.

### b. **Frost's Decision to Interfere with the TAPCO Contract Through a Settlement of Litigation Does not Immunize its Interference from Liability.**

Frost also contends that it cannot be held liable for the alleged interference because that interference arose from conduct related to litigation.  Specifically, Frost asserts that it cannot be held liable based on the "legally protected interest" defense and the *Noerr-Pennington* doctrine. As explained below, neither argument shields Frost from liability arising from its unlawful interference with the TAPCO contract.

***Frost's Justification Defense Does Not Support Dismissal.***  Frost argues that dismissal is warranted because it was seeking to protect its legally protected interests when it allegedly interfered with the TAPCO agreement.  Frost's argument suffers from both procedural and substantive defects.  To begin with, the "legally protected interest" defense is an affirmative defense, meaning that Frost bears the burden of proving its applicability.  *Emery v. Merrimack Valley Wood Products, Inc.*, 701 F.2d 985, 989 (1st Cir. 1983) (holding that legally protected interest defense was an "affirmative defense" that defendant has burden of proving); *Donovan v. Dig. Equip. Corp.*, 883 F. Supp. 775, 788 (D.N.H. 1994) (same).  Consequently, dismissal based on this defense is only warranted if "the facts establishing the defense are clear on the face of the plaintiff's pleadings." *Thornton v. Ipsen Biopharm., Inc.*, 126 F.4th 76, 82 (1st Cir. 2025) (internal quotations omitted).  In other words, to obtain dismissal based on the legally protected interest defense, the facts alleged in the Amended Counterclaim must *clearly* show that when Frost caused TAPCO to breach its contract with Vue, Frost was either "asserting in good faith a legally protected interest" or  "threat[ning] in good faith to protect the interest by appropriate

means." *Emery*, 701 F.2d at 988-89 (explaining the standard for the legally protected interest affirmative defense).[3]

Frost cannot meet that standard. Far from establishing clarity, the facts alleged in the Amended Counterclaim raise significant doubt that Frost's conduct was justified under the legally protected interest defense. The Amended Counterclaim contains no indication—let alone clear allegations—that Frost was asserting any legally-protected interest when it induced TAPCO to breach its contractual obligations to Vue. Memo. at 12-13. And while Frost cites to its Amended Complaint in the *Moore* litigation for support, that pleading contains no indication that Frost possessed any legally protected interest the enforcement or protection of which would require the breach of TAPCO's contractual obligations to Vue, a non-party to that suit. *See* Frost Am. Compl., Case No. 1:22-cv-06910, ECF No. 21, N.D. Ill. (Feb. 21, 2023). Indeed, that pleading does not even mention Vue. *Id.*

Frost instead appears to argue that because its lawsuit against Moore and TAPCO sought to enforce an alleged legally protected interest—Mr. Moore's confidentiality obligations to Frost Control—then any conduct "inside" that litigation is also necessarily an assertion of a legally protected interest. Memo. at 12-13. But Frost cites to no authority supporting its "anything is justified" by settlement theory, which would allow any litigant to tortiously interfere with any contract of an opposing party so long as it is done in the context of settlement negotiations. Indeed, the cases Frost cites in support of its argument appear to cut the other way—they involve interference that was a <u>direct</u> attempt to enforce a legally protected interest, not an effort to leverage an unrelated litigation to interfere with a third party's contract. *See e.g., Roberts v. General Motors Corp.*, 138 N.H. at 540-42 (concluding that dealer protected a legally protected

---

[3] Given this, it should be no surprise that Frost cites no case in its Memorandum dismissing a claim for Tortious Interference on the pleadings. Memo. at 12-13.

interest by exercising its rights under a right-of-first refusal clause); *Emery v. Merrimack Valley Wood Prods., Inc.*, 701 F.2d 985, 992 (1st Cir. 1983) (defendant sent letter informing of intent to enforce restrictive covenant).

Further, even if Frost's inducement of TAPCO could qualify as the assertion or protection of a legally protected interest, it is far from "clear" based on the allegations of the Amended Counterclaim that this "assertion" was done in "good faith" or "by appropriate means," as required. *Emery*, 701 F.2d at 989. The same alleged facts demonstrating the impropriety of Frost's interference also raise significant factual questions about the applicability of Frost's claimed defense. And as the First Circuit has observed, this good faith inquiry involves "[i]ssues of intent," which are "particularly difficult to resolve" even at summary judgment. *Emery*, 701 F.2d at 992. For the foregoing reasons, Frost's bare invocation of a legally protected interest is not enough to dismiss Vue's claims at the pleading stage.

**The Noerr-Pennington Doctrine is Inapplicable.** Frost contends that Vue's claim for tortious interference is barred by the *Noerr-Pennington* doctrine, which holds that certain First Amendment petitioning activity is exempt from federal antitrust liability. Memo. at 13. Frost argues that the *Noerr-Pennington* doctrine should bar Vue's tortious interference counterclaim because "the claim is based on Frost Solutions' alleged conduct inside the *Moore* litigation." *Id.* at 14. Frost misunderstands the *Noerr-Pennington* doctrine's reach.

Even assuming that New Hampshire would apply the doctrine outside of the consumer protection or antitrust realm (which is just an assumption), private settlement agreements like the one alleged in the Amended Counterclaim do not qualify for *Noerr-Pennington* protection. Courts have routinely held that private settlement agreements, like the one Frost entered into with TAPCO, are not afforded protection under the *Noerr-Pennington* doctrine. Some courts

take the view that private settlement agreements are, categorically, not protected by the *Noerr-Pennington* doctrine.[4]  While other courts have refused to provide *Noerr-Pennington* protection to settlement agreements where, like here, the settlement incorporates provisions beyond the reasonably foreseeable outcome of the litigation at issue.  *United Tactical Sys. LLC v. Real Action Paintball, Inc.*, 2016 U.S. Dist. LEXIS 17135, *20-22 (N.D. Cal. 2016).

In other words, Frost cannot "shield" itself from liability for otherwise illegal conduct simply by making that conduct part of a demand during settlement negotiations.  In fact, the Court in *Toyo Tire*, reasoned that extending that protection to private settlements would result in parties, like Frost, seeking to shield improper conduct by laundering that conduct through the litigation process:

> Holding otherwise would allow actors to shield anticompetitive or tortious conduct that harms third parties simply by appending it to any host of motions in the course of a lawsuit.  For example, *A* could sue *B* for breach of contract, agree to settle its suit against *B* with one of the conditions being that *B* breach an existing contract with *C*, file a motion to dismiss the suit against *B* with the settlement agreement attached, and then assert *Noerr-Pennington* immunity when later sued by *C* for tortious interference. The purposes underlying the *Noerr-Pennington* doctrine do not require such a result.

2017 U.S. Dist. LEXIS 48672 at *18.  Frost's *Noerr-Pennington* argument should be rejected because the *Noerr-Pennington* doctrine does not apply to settlement agreements and "[t]he purposes underlying the *Noerr-Pennington* doctrine" do not support shielding Frost's private and tortious conduct from liability.  *Id.*

---

[4] *See e.g., Toyo Tire & Rubber Co. v. Atturo Tire Corp*, Case No. 14 C 0206, 2017 U.S. Dist. LEXIS 48672, at *18 (E.D. Ill. 2017) ("[P]rivate settlement agreements fall outside of *Noerr-Pennington* immunity."); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 641 (E.D. Mich. 2000) (rejecting *Noerr-Pennington* protection for private settlement agreement and observing that "the courts have not broadly applied *Noerr-Pennington* immunity to purely private settlement agreements"); *In re New Mexico Natural Gas Antitrust Litig.*, 1982 U.S. Dist. LEXIS 9452, at *16 (D.N.M. 1982) ("When parties . . . voluntarily withdraw their dispute from the court and resolve it by agreement among themselves there would be no purpose served by affording Noerr- Pennington protection.").

II.    **Vue Robotics Plausibly Alleged a Breach by East End Group.**

As alleged in the Amended Counterclaim, Frost interfered with Vue's contractual relationship with its customer, East End Group, when Frost's vice president, Jason Ostrander, used his login credentials from East End to improperly access Vue's computer systems. Am. Countercl. at ¶¶ 142-156. Frost argues that this claim should be dismissed for two interrelated reasons: (1) the Amended Counterclaim alleges that Mr. Ostrander was working for Frost and not East End when he committed the alleged corporate espionage and (2) to the extent that Mr. Ostrander was working for East End at the time, there is no allegation that Mr. Ostrander was acting within the scope of his employment. Memo. at 17-19. Based on these arguments, Frost appears to assert that Vue cannot sufficiently plead that East End breached its contractual obligations to Vue. Memo. at 18.

Frost's argument fails because regardless of who Mr. Ostrander was working for, East End still had the responsibility to safeguard Vue's information. Vue alleged that East End promised, among other things, that it would not reverse engineer Vue's products and services, only use Vue's services consistent with Vue's terms and conditions, not disclose Vue's confidential information to others, and refrain from making Vue's products and services available to third parties for their business operations. *See* Am. Countercl. at ¶¶ 144, 206. Given these allegations, the Amended Counterclaim has plausibly alleged that East End breached its contractual duties by allowing Ostrander, one of East End's users, to access Vue's systems for another party's business operations, which was the aim of Frost's interference. *See* Am. Countercl. at pp. 26-29, ¶¶ 210, 207-209. Moreover, given East End's obligations, it is reasonable to infer that a East End's user's improper access to Vue's system would cause a breach of East End's contractual obligations to Vue. To hold otherwise would be to draw

reasonable inferences *against* Vue, contrary to the motion to dismiss standard.

That conclusion is supported by the language of the contract itself, which contained covenants requiring customers like East End Group to, among other things, (a) ensure that its "Designated Users". . . comply with this Agreement" and (b) "take all necessary steps to prevent unauthorized access to or use of the Services."[5]  The Court can, and should, consider this agreement because its obligations are central to Vue's claim and sufficiently referred to in the Amended Counterclaim.  *See Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993); Am. Countercl. at ¶¶ 144, 206-210.  Accordingly, East End had contractual obligations that it failed to abide by as a result of Frost's wrongful interference.

No more is required to plead a breach of the East End contract, and thus Frost's motion to dismiss this claim should be denied.[6] Yet, to the extent the Court concludes that Vue's allegations are lacking, Vue requests that the Court dismiss its claim without prejudice so that it has the opportunity to supplement its pleading with further detail about East End's contractual obligations to Vue.

### III.    Vue Has Plausibly Alleged Interference with its Customer Relationships.

Frost contends that Vue's claims for tortious interference with contracts with its customers (Count III) and with its prospective business relations (Count IV) fail to state a claim because (Frost argues) those claims only make "vague and conclusory allegations[.]"  Memo. at 14.  Frost identifies a number of particularized details about the alleged tortious scheme with TAPCO that,

---

[5] *See* Vue's Terms and Conditions of Service, at § 16(a) and (c) (setting forth customer's duties and restrictions), which can be found at https://vuerobotics.io/terms.  While these terms, which Vue retained authority to change (*see* §§ 1-2), have been slightly modified since the operative version signed by East End Group in 2022, the terms quoted above are the same.

[6] Without citing any support, Frost argues that Ostrander had to be within the scope of his employment with East End for any breach to occur.  But *respondeat superior* is a tort defense that is not applicable to contract actions.  *See e.g.,* Guardian Title Co. v. Mitchell, 54 P.3d 130, 134 (Ut. Sup. Ct. 2002) (reversing lower court's decision to apply respondeat superior to contract action).

it claims, are missing from Vue's factual allegations. *Id.* at 14-15. Frost, for example, complains that the Amended Counterclaim fails to identify specific customers and contracts, specific contractual obligations, and specific details about how Frost interfered with its customer relationships. *Id.* at 14-15. Frost also argues that Vue has failed to plead (1) a reasonable expectation of prospective business and (2) interference that was sufficiently improper to support its claim for interference with prospective business relationships. *See* Memo. at 15-16.

However, as explained below, Frost has adequately and plausibly alleged the factual circumstances giving rise to its claims for tortious interference in Counts III and IV, and Frost's arguments to the contrary should be rejected. To the extent the Court concludes that Vue has inadequately alleged these counts, the Court should dismiss Vue's claims without prejudice to allow Vue to supplement its counterclaim with the necessary details.

>   a. <u>**Vue Has Alleged Enough Detail About its Customer Relationships.**</u>

At this stage of the litigation, Vue is not obligated to plead the granular details Frost demands. Here, before discovery has occurred and before an evidentiary record has been fleshed out, Vue need only plead enough facts to make out a plausible claim for relief, which it has done. *Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 539 (1st Cir. 2023). And, because much of the specific details of Frost's and TAPCO's tortious scheme is within those entities' "exclusive possession," Vue is not required to assemble detailed allegations at this stage. *Hamann v. Carpenter*, 937 F.3d 86, 91 (1st Cir. 2019) (rejecting argument that plaintiff had failed to state claim for tortious interference because it had not provided "precise details" of defendant's interference). Under these standards, Vue has alleged sufficient detail to render its claim for relief plausible.

Notably, Vue alleged in detail the economic and contractual circumstances giving rise to its relationships with customers to whom TAPCO sold Vue products. Vue alleged, for example,

that TAPCO, through a binding distribution agreement, acted as a conduit between Vue and current as well as prospective government customers.  Am. Countercl. at ¶¶ 157-160.  Under the terms of that agreement, TAPCO agreed to market and sell Vue's products for a fee based on the products and services that it sold.  *Id.* at ¶¶ 158-59.  Vue also alleged that through TAPCO it obtained customers and had established business relationships with other prospective customers in the form of current customers approaching renewal and customers who had submitted purchase orders to TAPCO for Vue products.  *Id.* at ¶ 172.

Vue further alleged that Frost, with the help of TAPCO, undertook a concerted campaign to interfere with those relationships through several wrongful means, including:

- TAPCO's willful violation of its contractual obligations to market and promote Vue's products and services by steering customers away from Vue (*id.* at ¶ 174);
- TAPCO's willful breach of its contractual obligations by spreading falsehoods about Vue's products (*id.* at ¶ 174); and
- Frost's use of confidential information obtained from TAPCO about Vue's current and prospective customers to steal business from and cause harm to Vue (*id.* at ¶ 175).

And Vue has alleged that as a result of that interference campaign it has been harmed in the form of lost customer relationships.  *Id.* at ¶¶ 172, 175 (alleging that Frost stole business away from Vue); ¶176 (alleging that Frost interfered with Vue's contracts and advantageous business relationships "with customers who had purchased" its products); ¶ 195 (alleging that Frost's interference caused "customers to break their contracts with Vue"); ¶ 200 (alleging that Frost's interference caused Vue to not enter into customer relationships with Vue or discontinue current business relationships).  No more detail about the interference scheme is required at this juncture.

### b.  <u>Vue Need Not Identify Specific Customers and Specific Contracts.</u>

Frost nevertheless argues that the Amended Counterclaim must be dismissed because it fails to identify specific customers or contracts.  Memo. at 15.  There is, however, no legal support for

14

Frost's claim that a party must identify the contracts or customers that it has lost with specificity, and Frost does not cite any. *See* 44B Am Jur 2d Interference § 55 ("The plaintiff is not required to specifically identify the third party with whom it has a business expectancy in order to satisfy the pleading requirements."); *Haw. Med. Ass'n v. Haw. Med. Serv. Ass'n*, 148 P.3d 1179, 1219 (Haw. 2006) ("failure to identify the third party or parties by name is not fatal."). In *Wilcox*, the Court held that it was sufficient to plead that Wilcox "had relationships with existing customers that gave rise to a reasonable expectation of economic advantage[.]" 870 F. Supp. 2d at 307. Notably, Wilcox did not allege the identities of any customers that it lost with specificity and the Court did not require any such allegations. *See id.*

And Frost understands that such details are not required because Frost has pled its own claims without identifying specific customer relationships or contracts. For instance, in the *Moore* litigation, Frost's Amended Complaint against Moore asserts claims for both tortious interference with contract and with prospective business advantage. Frost Am. Compl., Case No. 1:22-cv-06910, ECF No. 21, at 15-16. In neither of those counts does Frost allege its contracts or its customers with any specificity. *Id.* In fact, in the recitation of facts, Frost alleged that "Moore interfered with Frost's business relationships by diverting accounts held by Frost. *Specifically*, Moore began soliciting Frost's customers, and it is believed he has succeeded in obtaining the business of at least one or more of Frost's customers." *Id.* at ¶ 30 (emphasis added). Further, in this case, Frost makes certain claims which allegedly resulted in the loss of "customer business, prospective future customer business, profits and opportunities[.]" Compl., ¶¶ 78, 85. Nowhere in the Complaint against Vue does Frost specifically identify the customers, prospective customers, profits or opportunities it allegedly lost. Frost is demanding a pleading standard that it has demonstrated it knows does not apply.

### c.  Vue Has Sufficiently Alleged Details of the Underlying Contracts.

Relying on *Conformis, Inc. v. Aetna, Inc.*, 58 F.4th at 539, Frost argues that Vue has failed to adequately allege the details of its contracts with customers.  In *Conformis*, the First Circuit explained that "a plaintiff must furnish enough detail about the obligations of the alleged contracts to allow a reasoned determination as to whether the second element – breach of contract – is alleged."  58 F.4th at 538.  There, the Court held that the plaintiff failed that standard because it had not alleged any details beyond the existence of the contracts it had with healthcare providers and that those healthcare providers stopped placing orders for its product. *Id.* at 526-27, 38.  Thus, the Court was unable to identify, solely based on the allegations in the complaint, how the customers breached their contracts with Conformis by failing to continue to place orders for Conformis' products.  *Id.*

The Amended Counterclaim alleges more detail than the mere existence of contracts.  Vue does allege that it had contracts with customers for the purchase of its sales and services.  Am. Countercl. at ¶ 172, 176.  But it also alleges a concerted campaign between Frost and TAPCO through which both wrongfully attempted—with success—to get Vue's customers to switch from Vue to TAPCO.  *Id.* at pp. 29-32, *id.* at ¶ 175 (alleging Frost's theft of customers).  And, unlike the allegations in *Conformis*, Vue's Amended Counterclaim specifically alleges that Vue's customers broke their purchase contracts with Vue as a result of the alleged interference. *Id.* at ¶ 195 (alleging that Frost's interference "cause[d Vue's] customers to break their contracts with Vue.").  Given these allegations, Vue's Amended Counterclaim is not susceptible to dismissal based on a lack of allegations about Vue's contracts with customers.

### d.  Vue Has Sufficiently Alleged a Reasonable Expectation of Business Relationships.

Frost also contends that Vue's claim for tortious interference with its prospective business relations fails because Vue did not "sufficiently allege a reasonable expectation of future

business." Memo. at 15. To allege a claim for tortious interference with prospective customer

relations, Vue must allege Frost's interference with "*already existing* relationships that give rise

to a reasonable expectation of economic advantage." *Beckwith Builders, Inc. v. Depietri*, Civil

No. 04-cv-282-SM, 2006 U.S. Dist. LEXIS 67060, at *15-16 (D.N.H. 2006) (internal quotations

and citations omitted; emphasis in original).

The allegations in the Amended Counterclaim clear that hurdle. Vue has alleged that Frost

induced TAPCO to engage in a campaign to disrupt the relationships of customers with which

Vue had a reasonable expectation of future business, including current Vue customers that were

approaching renewal with Vue and potential customers that had submitted purchase orders for

Vue services through TAPCO. *See* Am. Countercl. at ¶¶ 172-176, 199-201. *See also Wilcox*,

870 F. Supp. 2d at 307 ("Wilcox has pled both that it had relationships with its existing

customers that gave rise to a reasonable expectation of economic advantage[.]").[7] Those are not

the types of speculative customer relationships that have caused courts to dismiss claims for

tortious interference with prospective business relations. *C.f. Beckwith*, 2006 U.S. Dist. LEXIS

67060 at *15-16. Vue has also alleged details supporting its reasonable expectation that it would

secure business with these prospects. Namely, Vue hired TAPCO, on its behalf, to market and

sell its services to these customers and to foster and develop those customer relationships. *Id.* at

¶¶ 158-160, 162, 193. Frost also disrupted that process by inducing TAPCO's breaches of its

contractual obligations. Although TAPCO possesses most of the information concerning these

relationships, Vue has alleged enough details at this stage for its claims for interference with

prospective contractual relations to go forward.

---

[7] Moreover, Vue's expectation as to the length of the relationships with its current/prospective customers does not preclude its claim in the first instance. *See Beaulac v. All Sys. Satellite Distribs.*, Civil No. 17-cv-162-JD, 2017 U.S. Dist. LEXIS 153896, at *7 (D.N.H. Sept. 21, 2017) ("reasonable expectation as to the length of the relationship may affect their damages but does not preclude the claim").

### e.  **Vue Has Sufficiently Alleged Improper Interference with Prospective Contractual Relations.**

Frost contends, without much support or argument, that Vue has not and cannot allege actionable interference with prospective business relations.  *See* Memo. at 16-17.  A claim for tortious interference with prospective contractual relations requires interference that goes beyond "the use of ordinary means of persuasion or the exertion of limited economic pressure."  *See Wilcox*, 870 F. Supp. 2d at 306-07.  When determining what level of interference is necessary, "courts look to whether the underlying conduct was itself wrongful or tortious—e.g., whether it involved defamation, fraud, violence, or threats."  *Planet Fitness Int'l Franchise v. JEG-United, LLC*, 633 F. Supp. 3d 484, 504 (D.N.H. 2022) (citing R.2d Torts § 766B cmt. e (addressing interference with prospective economic relationships and stating that "when the means adopted is not innately wrongful and it is only the resulting interference that is in question as a basis of liability, the interference is more likely to be not improper")).

Here, Vue has alleged actions by Frost that go much farther than the use of ordinary means of persuasion or the exertion of limited economic pressure and, in fact, constitute conduct that was itself wrongful or tortious.  Specifically, Vue has alleged that Frost improperly induced TAPCO to commit several breaches of its contract with Vue, thereby tortiously interfering with and ultimately destroying a valued distribution relationship Vue expended significant resources developing.  *See* Am. Countercl. at pp. 29-33; *supra* at Argument, § I(a).  Frost then leveraged the breaches and harm caused by that tortious interference to target Vue's prospective business relations, which is not ordinary marketplace behavior.  Am. Countercl. at ¶¶ 172, 174-75.  As a result of Frost's tortious interference with the TAPCO contract, Vue's valued distribution partner who it had hired to sell and market its products, instead steered customers *away* from Vue and instead to Frost.  Am. Countercl. ¶ 172-74.  Frost and TAPCO, in violation of the TAPCO

contract, used Vue's confidential information to induce customers of Vue not to renew their contracts with Vue and to instead purchase equipment and services from Frost.  Am. Countercl., ¶¶ 172, 175, 199, 200.  TAPCO also in violation of its contractual obligations and as a result of Frost's interference, spread falsehoods about Vue's products on the marketplace in an effort to support Frost.  Am. Countercl. at ¶ 174.  In other words, Frost's solicitation of and interference with Vue's prospective customers is itself dependent on, and an outgrowth of, Frost's tortious interference with—and destruction of—Vue's valuable distribution relationship with TAPCO.

That is conduct that goes beyond "ordinary means of persuasion" and is itself independently wrongful.  Accordingly, Vue has sufficiently alleged improper interference with its prospective contractual relations.

### f.  Vue Should be Given the Opportunity to Re-Plead.

To the extent the Court concludes that Vue's claims concerning third party customers are insufficiently pled, any dismissal of those claims should be without prejudice to Vue amending its counterclaims to add further detail.  While much of the relevant information to Vue's claims is possessed by Frost and TAPCO, and although it should be unnecessary at this stage, Vue can add further details about specific customer contracts and customers with which it believes Frost improperly interfered.  Further, Vue is likely to obtain discovery in the near future concerning these issues, given their relevance to Vue's claim for interference with the TAPCO contract.

### IV.    Vue Robotics' Civil Conspiracy Claim Should not be Dismissed.

Vue has stated a claim for a civil conspiracy involving TAPCO and Frost.  Contrary to Frost's claims, and for the reasons stated above, the Amended Counterclaims plausibly allege independent torts that serve as the basis of the alleged civil conspiracy.  Further, Frost cites to no authority supporting its argument that all co-conspirators must be named as defendants in a civil conspiracy claim.  *See* 16 Am Jur 2d Conspiracy §§ 57 (*Persons liable for civil conspiracy*.  "A

defendant's liability for conspiracy depends on participation in an underlying tort for which the plaintiff seeks to hold at least one member of the conspiracy liable."),  68 (*Parties in action for civil conspiracy*.  "Under the principle of joint and several liability, all conspirators may be joined as parties defendant in the action, but it is not necessary, in order for one member of a civil conspiracy to be liable, that all members of conspiracy be named defendants or joined as defendants; the plaintiff, at their option, may maintain suit against any one or more of them."). *See also Curis v. James*, Case No: 2021-189533-CH, Case No. 2021-189937-CH, 2023 Mich. Cir. LEXIS 1737, at * (Mich. Cir. Ct. Feb. 17, 2023) (refusing to dismiss claim for civil conspiracy for failure to allege co-conspirators by name when moving party cites no caselaw in support).  Frost offers no practical reason why complete relief cannot be awarded to Vue as currently constituted.

**V.    Lareau Has Alleged a Claim for Negligent Infliction of Emotional Distress.**

To allege a claim for negligent infliction of emotional distress, a party must allege "(1) causal negligence of the defendant; (2) foreseeability; and (3) serious mental and emotional harm accompanied by objective physical symptoms." *Tessier v. Rockefeller*, 162 N.H. 324, 342 (2011).  The allegations in the Counterclaim satisfy this standard.  Lareau has alleged that Frost used its confidentially designated information to negligently and improperly make misleading statements to Defendants' insurance carrier with the intent to strip Defendants of coverage and exert undue economic pressure.  Am. Countercl at pp. 16-22**.**  Lareau has further alleged that this imperiled the viability of Defendants' business, causing him severe and foreseeable emotional distress that has manifested in physical symptoms.  *Id.* at ¶¶ 122-128.  These allegations plainly allege a claim for negligent infliction of emotional distress under New Hampshire law.

Yet, Frost contends that Lareau's negligent infliction of emotional distress claim must be dismissed because Lareau has failed to plausibly allege that (1) Frost owed it a duty or (2) that Frost's conduct would foreseeably harm Lareau. *See* Memo. at 9-10. As Lareau explained in detail in its Partial Objection to Frost's Motion to Dismiss Counterclaims, Frost is mistaken. *See* ECF No. 94.

**Frost Owed Lareau a Duty of Care.** Frost is correct that a duty is required to sustain a negligent infliction of emotional distress claim. *See BK v. N.H. HHS*, 814 F. Supp. 2d 59, 72-73 (D.N.H. Sept. 30, 2011). But Frost is wrong to contend that Lareau has not alleged such a duty in his counterclaim. To begin with, the New Hampshire Supreme Court has recognized the "general tort principle" that "one who voluntarily assumes a duty thereafter has a duty to act with reasonable care." *Walls v. Oxford Mgmt. Co.*, 137 N.H. 653, 659 (1993) (citing R.2d Torts §§ 323-324). Here, there is no dispute that Frost voluntarily undertook the duty to maintain the confidentiality of Defendants' information and to not use that information for any purpose other than litigating this action.

Further, the New Hampshire Supreme Court has recognized that parties have a duty to not engage in improper conduct that will foreseeably cause emotional distress. *See Tessier v. Rockefeller*, 162 N.H. 324, 342 (2011). In *Tessier*, the New Hampshire Supreme Court rejected the defendants' argument that no duty could exist between former adversaries in a pre-litigation dispute where misrepresentations underlying the plaintiff's fraud claim could foreseeably have caused the plaintiff emotional distress. *Id.* at 342. The same result should follow here. Frost violated its promise to not use confidential information outside of this litigation (Doc. No. 28 at ¶ 5(a)) and made deliberately misleading statements to Defendants' insurance carrier, all in ways that could have foreseeably caused Lareau emotional harm. Amended Countercl. at ¶¶ 88-91,

95-107, 119-128. Granting all reasonable inferences to Lareau, as the Court must at this stage, the Counterclaim properly alleges a duty arising out of Frost's representations and its assurances to Defendants about the use of information produced with a confidential designation.

Frost also appears to contend that Lareau's counterclaim should be dismissed because no tort duty can exist between adverse parties in litigation. Memo. at pp. 9-10. This argument is also flawed. Frost is alleged to have flagrantly violated this Court's order and to have also purposefully violated the agreed-upon confidentiality orders governing this case. Am. Countercl. at ¶¶ 91-96. While Frost cites to authority suggesting that attorneys owe no duties to adversary parties in ordinary contexts,[8] it has cited no New Hampshire case supporting the proposition that litigants owe no duties to comply with court orders and the very procedures that they have agreed to by stipulation. A contrary rule allowing an "anything goes" litigation environment would undermine the functioning of the court system and be contrary to public policy.

The New Hampshire Supreme Court recognized as much in *Aranson v. Schroeder*, 140 N.H. 359, 365-68 (1995). In *Aranson*, the Court concluded that an attorney who, acting as defense counsel, allegedly fabricated evidence during litigation could be liable in tort under a malicious defense theory. *Id.* Far from excluding the possibility of tort liability between parties, the *Aranson* court specifically acknowledged the harm that the abuse of the litigation system can cause those embroiled in litigation. *Id.* at 365-67.

***Lareau Has Alleged Foreseeability.*** Frost's contention that Lareau has failed to plausibly allege foreseeability is flawed. Frost is incorrect. Lareau alleges that Frost's principal, Michael

---

[8] *See Chalifoux v. Chalifoux*, 2017 N.H. Lexis 203, at *9-10 (dismissing negligence claim against attorney by opposing party for lack of duty when plaintiff failed to allege that attorneys did any affirmative wrong to him); *Macmillan v. Scheffy*, 147 N.H. 362, 364-65 (holding in malpractice case that attorney drafting deed owed no duty to non-client grantees of deed).

Kirsch, contacted its insurance carrier because he "believed that Counterclaim-Plaintiffs would be unable to defend themselves in the Action and they would be driven out of business."  Am. Countercl. at ¶ 103; *see also id.* at ¶¶ 124-128. The Amended Counterclaim further alleges that the only reason that Frost would undertake the alleged scheme to attempt to strip Defendants of coverage would be to "put Counterclaim-Plaintiffs out of business."  *Id.* at ¶ 126.  Finally, the Counterclaim also alleges that Kirsh and Frost appreciated this potential impact when they decided to contact Defendants' insurance carrier.  *Id.* at ¶ 127.  These facts, when taken in the light most favorable to Lareau, properly allege that the emotional harm Lareau suffered was foreseeable.

## <u>CONCLUSION</u>

For the foregoing reasons, Frost's Motion to Dismiss should be denied.

Respectfully submitted,

Dated: May 5, 2025

PATRICK BAGLIEN, CHRISTOPHER LAREAU, AND VUE ROBOTICS, LLC

*/s/ Ryan Lirette*

By their attorneys,
David W. McGrath (NH Bar No. 9347)
James P. Harris (N.H. Bar No. 15336)
Ryan P. Lirette (N.H. Bar No. 19561)
Sheehan Phinney Bass & Green, P.A.
1000 Elm Street, 17th Floor
Manchester, NH 03101
Tel: (603)627-8255
Fax: (603) 641-2349
dmcgrath@sheehan.com
jharris@sheehan.com
rlirette@sheehan.com

## CERTIFICATE OF SERVICE

I hereby certify that on the date of this filing, I electronically served copies of this document on all counsel of record via the Court's CM/ECF system.

*/s/ Ryan Lirette*
Ryan Lirette