## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

FROST SOLUTIONS, LLC,

        Plaintiff,

        v.

PATRICK BAGLIEN, CHRISTOPHER
LAREAU, and VUE ROBOTICS, LLC,

        Defendants.

Case No. 1:22-cv-00401-SE

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
## FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ................................................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS .................................................................. 2

LEGAL STANDARD ............................................................................................................. 12

ARGUMENT ...................................................................................................................... 13

I.      The Lareau and Baglien Agreements are valid contracts.................................... 13

II.     The restrictive covenants in the Lareau and Baglien Agreements are enforceable
        as a matter of law............................................................................................... 14

        A.      The restrictive covenants protect Frost's legitimate interests .............. 14

        B.      The scope of each restrictive covenant at issue is "reasonable" as a
                matter of law.......................................................................................... 16

                1.      The Lareau non-compete covenant .......................................... 16

                2.      The Lareau non-disclosure covenants ...................................... 17

                3.      The Lareau non-solicitation covenant ...................................... 19

                4.      The Baglien non-disclosure covenant....................................... 20

                5.      The Baglien customer non-solicitation covenant..................... 21

                6.      The Baglien employee non-solicitation covenant .................... 22

                7.      Alternatively, the Court may "blue pencil" the covenants as
                        necessary.................................................................................. 22

III.    There is no genuine dispute of material fact regarding certain of Lareau's and
        Baglien's breaches of their respective restrictive covenants ............................. 23

        A.      Lareau's breaches of his restrictive covenants...................................... 23

        B.      Baglien's breaches of his restrictive covenants..................................... 24

CONCLUSION .................................................................................................................... 25

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*4408, Inc. v. Losure,*
 373 N.E.2d 899 (Ind. Ct. App. 1978) ............................................................................16

*Ackerman v. Kimball Int'l, Inc.,*
 652 N.E.2d 507 (Ind. 1995) ..........................................................................................16

*Bodemer v. Swanel Beverage, Inc.,*
 884 F. Supp. 2d 717 (N.D. Ind. 2012).................................................................... 15, 18

*Bridgestone Americas Holding, Inc. v. Mayberry,*
 878 N.E.2d 189 (Ind. 2007) ..........................................................................................18

*Buffkin v. Glacier Grp.,*
 997 N.E.2d 1 (Ind. Ct. App. 2013) ................................................................... 14, 17, 18

*Captain & Co., Inc. v. Towne,*
 404 N.E.2d 1159 (Ind. Ct. App. 1980)..................................................................... 15, 21

*Centers v. Centennial Mortg., Inc.,*
 398 F.3d 930 (7th Cir. 2005)..........................................................................................14

*City of Indianapolis v. Twin Lakes Enters., Inc.,*
 568 N.E.2d 1073 (Ind. Ct. App. 1991)..........................................................................13

*Coates v. Heat Wagons, Inc.,*
 942 N.E.2d 905 (Ind. Ct. App. 2011) ............................................... 14, 15, 16, 19, 21

*Collins v. McKinney,*
 871 N.E.2d 363 (Ind. Ct. App. 2007) ............................................................................13

*CraneTech, Inc. v. Slack,*
 789 F. Supp. 3d 662 (N.D. Ind. 2025).............................................................................22

*Distrib. Serv., Inc. v. Stevenson,*
 16 F. Supp. 3d 964 (S.D. Ind. 2014) ...............................................................................15

*Dooley v. Liberty Mut. Ins. Co.,*
 307 F. Supp. 2d 234 (D. Mass. 2004) .............................................................................12

*Gleeson v. Preferred Sourcing, LLC,*
 883 N.E.2d 164 (Ind. Ct. App. 2008)..............................................................................16

*Leeman v. Regions Ins., Inc.,*
 No. 14-CV-1777, 2017 WL 1197280 (N.D. Ind. Mar. 31, 2017) .........................*passim*

*Licocci v. Cardinal Assocs., Inc.*,
    445 N.E.2d 556 (Ind. 1983) ........................................................................... 14, 16, 23

*Meuser v. Fed. Express Corp.*,
    564 F.3d 507 (1st Cir. 2009) ........................................................................... 13

*Norlund v. Faust*,
    675 N.E.2d 1142 (Ind. Ct. App. 1997) ........................................................... 20

*Norwood Promotional Prods., LLC v. KustomKoozies, LLC*,
    835 F. Supp. 2d 685 (S.D. Ind. 2011) ............................................................ 12

*Palmer v. Menards*,
    No. 12 CV 828, 2013 WL 3147374 (N.D. Ind. June 17, 2013) ........................ 13, 14

*In re Paternity of M.F.*,
    938 N.E.2d 1256 (Ind. Ct. App. 2010) ........................................................... 13

*Reyes-Orta v. P.R. Highway & Transp. Auth.*,
    811 F.3d 67 (1st Cir. 2016) ............................................................................ 12

*Sharvelle v. Magnante*,
    836 N.E.2d 432 (Ind. Ct. App. 2005) ............................................................. 15

*SJS Refractory Co., LLC v. Empire Refractory Sales, Inc.*,
    952 N.E.2d 758 (Ind. Ct. App. 2011) ............................................................. 22

*Steve Silveus Ins., Inc. v. Goshert*,
    873 N.E.2d 165 (Ind. Ct. App. 2007) ............................................................. 18

*Titus v. Rheitone, Inc.*,
    758 N.E.2d 85 (Ind. Ct. App. 2001) ............................................................... 19

*Waterfield Mortg. Co. v. O'Connor*,
    361 N.E.2d 924 (Ind. Ct. App. 1977) ............................................................. 16

*Zimmer, Inc. v. Masters*,
    2014 No. 14-cv-312, 2014 WL 1317090 (2014) .............................................. 18, 20

**Federal Rules**

Fed. R. Civ. P. ........................................................................................................... 12

D.N.H. Rule 2.5 ......................................................................................................... 2

## INTRODUCTION

Defendants Lareau and Baglien are former executives of Plaintiff Frost's predecessor in interest. While employed, they had access to and regularly used Frost's confidential business information and trade secrets to sell Frost's products, and regularly interacted with Frost's customers, distributors, and employees in performing their job duties. Frost filed this lawsuit after learning that Lareau and Baglien formed a competing business (Defendant Vue Robotics) while employees of Frost, downloaded Frost's confidential information and trade secrets, and used that information to compete against Frost, and to solicit and steal away its customers and distributors.

Frost moves for partial summary judgment as to the validity and enforceability of Lareau's and Baglien's contractual obligations to Frost, including restrictive covenants prohibiting competition against Frost, use and disclosure of its confidential business information and trade secrets, and solicitation of its employees, customers, and distributors. The undisputed evidence establishes that Frost had strong, legitimate interests in maintaining the secrecy of its proprietary information, as well as the "goodwill" built up through interactions with its customers and distributors, and training and investing in its employees. Because the restrictive covenants at issue are narrowly focused on protecting those interests and reasonably limited in scope, they are "reasonable" and enforceable as a matter of law.

Certain of Lareau's and Baglien's breaches of the restrictive covenants at issue are also undisputed and appropriate for summary judgment (Frost intends to prove up other breaches at trial). They downloaded all of Frost's confidential customer contact and deal information and used it to solicit via email several of Frost's customers and its most important distributor, and to compete against Frost by servicing them. Documents revealed in discovery and Lareau's and Baglien's admissions at deposition remove these issues from dispute. For these reasons, discussed more fully below, the Court should grant partial summary judgment in Frost's favor.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      Frost Solutions, LLC, including its predecessors in interest, Frost Control Systems, Inc. and Frost Control Systems, LLC (collectively, "Frost"), designs, manufactures, and sells environmental and road weather information systems and related products and services, including a proprietary weather-security product called Advance Infrared Monitoring System ("AIMS"). (ECF No. 110, Defs.' Answer to Pl.'s 1st Am. Compl. ("Answer") ¶ 17; **Ex. 1**, Kirsh Dep.[1] 8:05–10; **Ex. 2**, Lareau Dep. 44:17–45:06.) Frost serves both the public and private sectors, from government entities to construction and commercial snow removal companies. (**Ex. 3**, Bott Dep. 179:10–180:01.) Within the subset of the environmental sensing market focused on road weather security, Frost provides unique devices and offers sophisticated advantages over other products on the market. (**Ex. 4**, Kreager Dep. 88:12–89:04; Bott Dep. 151:14–16.) In September 2021, Frost operated in 38 states and 7 Canadian provinces. (Bott Dep. 187:15–22.)

2.      Frost used a CRM (customer relationship management) software called HubSpot to track and store customer information and deal specifics, including customer name, number of products purchased, and contract/term length. (Lareau Dep. 200:19–201:13, 204:07–09; **Ex. 5**, Ritchie Dep. 180:08–21.) It also included information about prospective customers and other contacts. (Lareau Dep. 203:14–23.) Frost's sales reps used HubSpot as a "collection point" and put customer and other contact info into HubSpot. (*Id.* at 204:01–05; Ritchie Dep. 104:03–19.)

3.      This information, developed over time and stored on HubSpot regarding Frost's customers, was extremely valuable to Frost and kept confidential, including by password protection, and only certain individuals at Frost, including sales employees and executives, had access. (Ritchie Dep. 106:09–18, 311:22–313:05; **Ex. 6**, Bonardi Dep. 167:14–21.)

---

[1] The deposition exhibits attached to this Memorandum include only the relevant testimony cited. Full deposition transcripts are available upon request, per Local Rule 2.5(b).

4.    On August 9, 2022, Frost Solutions, LLC purchased the assets of Frost Control

Systems, Inc., including, without limitation, all contract rights and all breach-of-contract and other

claims that had accrued as of that date. (Kirsh Dep. 8:11–9:10; **Ex. 7** (Asset Purchase Agreement).)

Specifically, the Asset Purchase Agreement stated that Frost Solutions purchased and assumed all of

Frost Control's right, title, and interest in the assets/collateral listed in Exhibit B, including all

"contract rights," "claims," "intellectual property," and "right to sue and recover for past

infringement of patents, trademarks and copyrights, customer lists, goodwill, licenses and permits

necessary for operation of the business of" Frost Control. (Ex. 7 (Asset Purchase Agreement).)

5.    Defendant Patrick Baglien is a former Head of Sales, Chief Operating Officer, and

President of Frost, employed from approximately March 2019 to October 20, 2021 (Answer ¶¶ 8,

36; **Ex. 8**, Baglien Dep. 20:02–17.) As Head of Sales, Baglien's job duties included learning about the

products Frost sold, identifying prospective customers, interacting with customers, selling Frost's

products and subscription-based services, and communicating with the engineering team and

company leadership about customer feedback regarding Frost's products and services. (Baglien Dep.

24:04–26:03, 32:06–33:06, 39:13–41:16, 43:11–46:20, 54:17.)

6.    Baglien's title changed to Chief Operating Officer in the spring of 2020, at which

point he supervised three salespeople and one marketing person while remaining involved in sales

activities and directly interacting with customers. (*Id.* at 46:03–20, 51:01–22.)

7.    As part of his sales and management roles, Baglien had access to Frost's confidential

customer and business information stored in HubSpot. (*Id.* at 166:18–167:14; Lareau Dep. 202:09.)

Baglien also relayed customer feedback to Mario Bonardi and the rest of the Frost engineering team,

which was then incorporated into the Frost 2.0 product and user interface plans that Frost was

developing. (Bonardi Dep. 24:04–26:03, 137:11–138:03.)

8.    As a condition of employment, Baglien was required to and did sign an Employee

Confidential Information Invention Assignment Agreement (the "Baglien Agreement"). (Answer ¶ 32; Baglien Dep. 33:07–17; *see* **Ex. 9** (Baglien Agreement).)

9. Baglien accepted employment with Frost by signing an offer letter on March 20, 2019, which stated that signing a confidential information/invention assignment agreement was a condition of employment. (Baglien Dep. 83:07–86:15; **Ex. 10** (Baglien Offer Ltr.); **Ex. 11** (Acceptance of Baglien Offer Ltr.).)

10. Baglien acknowledged that during his employment with Frost, he would have access to Frost's "Confidential Information" to perform his duties. (Baglien Agreement § 3(a).) He agreed to abide by a non-disclosure covenant, which provides:

> At all times during the term of the Relationship and thereafter, I shall hold in strictest confidence, and not use, except for the benefit of the Company to the extent necessary to perform my obligations to the Company under the Relationship, and not disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information that I obtain, access or create during the term of the Relationship, whether or not during working hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved. I shall not make copies of such Confidential Information except as authorized by the Company or in the ordinary course of my obligations to the Company under the Relationship.

(*Id.*)

11. The Baglien Agreement defines "Confidential Information" as follows:

> "Confidential Information" means any and all information and physical manifestations thereof not generally known or available outside the Company and information and physical manifestations thereof entrusted to the Company in confidence by third parties, whether or not such information is patentable, copyrightable or otherwise legally protectable. Confidential Information includes, without limitation: (i) Company Inventions (as defined below); and (ii) technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, agreements with third parties, lists of, or information relating to, employees and consultants of the Company (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom I called

4

or with whom I became acquainted during the Relationship), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.

(*Id.* § 3(b).)

12.    Baglien agreed to abide by two non-solicitation covenants, which provide:

(a)    **Employees, Consultants.** During the term of the Relationship, and for a period of twelve (12) months immediately following the termination of the Relationship for any reason, whether with or without cause, I shall not, directly or indirectly, solicit any of the Company's employees or consultants to terminate their relationship with the Company, or attempt to solicit employees or consultants of the Company, either for myself or for any other person or entity.

(b)    **Other Parties.** During the term of the Relationship, I will not influence any of the Company's clients, licensors, licensees or customers from purchasing Company products or services or solicit or influence or attempt to influence any client, licensor, licensee, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.

(*Id.* § 8(a)–(b).)

13.    The Baglien Agreement required that Baglien sign upon termination a "Termination Certification" requiring Baglien to "preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information" including products, customer lists, and financial information. (*Id.*, Ex. B.) It also stated that for 12 months after termination, Baglien would not solicit any of Frost's employees or consultants, and would not use any Confidential Information to influence or solicit any of Frost's clients or customers. (*Id.*)

14.    The Baglien Agreement required Baglien to "sign and deliver the 'Termination Certification' attached hereto as Exhibit B" upon termination, stating that his "failure to sign and deliver [it] shall in no way diminish [his] continuing obligations under this Agreement." (*Id.* § 6.) Baglien failed to sign the Termination Certification upon resigning from Frost. (*Id.*)

15.    The Baglien Agreement contains an Indiana governing law provision, (*id.* § 12(a)),

and a severability clause stating that "[i]f one or more of the provisions in this Agreement are deemed void or unenforceable to any extent in any context, such provisions shall nevertheless be enforced to the fullest extent allowed by law in that and other contexts, and the validity and force of the remainder of this Agreement shall not be affected." (*Id.* § 12(e).) It specifies that Baglien and Frost intended to limit the Agreement's restrictive covenants "only to the extent necessary to protect the Company from unfair competition[,]" and that if a court finds that the scope of either "exceeds the maximum restrictiveness such court deems reasonable and enforceable, the parties intend that the court should reform, modify and enforce the provision to such narrower scope as it determines to be reasonable and enforceable under the circumstances existing at that time." (*Id.* § 12(e).)

16.　　Defendant Christopher Lareau is a former Regional Vice President and Vice President of Sales for Frost, employed from April 2020, to October 8, 2021. (Answer ¶¶ 7, 37, 41; Lareau Dep. 234:13–15.) As Regional Vice President of Sales for the Northeast region, Lareau sold Frost's sensor systems and camera-enabled systems through subscription contracts, working directly with customers and prospective customers to secure deals. (Lareau Dep. 40:16–23, 59:08–61:09.) Lareau's activities included cold outreach via phone and email, attending industry events and trade shows, and contracting with specific Frost customers. (*Id.* at 60:17–61:19.)

17.　　As part of his sales role, Lareau had access to Frost's confidential customer and business information stored in HubSpot; he also relayed customer feedback to Mario Bonardi and the Frost engineering team, which was then incorporated into the Frost 2.0 product and user interface plans Frost was developing. (*Id.* at 202:04–06, 203:14–204:21; Bonardi Dep. 24:20–26:03.)

18.　　On September 27, 2021, Lareau informed Frost that he intended to resign his employment. (Answer ¶ 40.) Three days later, Lareau executed a Separation Agreement and Mutual Release (the "Lareau Agreement"), which listed his resignation date as October 8, 2021. (Answer ¶ 41; Lareau Dep. 234:15; *see* **Ex. 12** (Lareau Agreement).)

19.    As consideration for executing the Lareau Agreement, Frost paid Lareau $14,539.50 in sales commissions, and allowed him to use all his remaining paid vacation days through the date of resignation. (Lareau Agreement § 1(a)–(b); Lareau Dep. 235:10–14, 237:14–21, 238:11–13.)

20.    During his employment, Lareau had "become familiar with the Trade Secrets and other Confidential Information of [Frost] and its customers and [agreed that his] services have been of special, unique and extraordinary value to [Frost]." (Lareau Agreement § 10.) He agreed that, "(for so long as the information in question remains a Trade Secret under applicable law), [he would] not directly or indirectly transmit or disclose any Trade Secret of the Company or its affiliates to any person, concern or entity, and shall not make use of any such Trade Secret, directly or indirectly, for Employee's own benefit or for the benefit of others," without prior written consent. (*Id.* § 9(a).)

21.    The Lareau Agreement defines "Confidential Information" as follows:

"**Confidential Information**" in this Paragraph 9 means information in any form whatsoever, other than Trade Secrets, which: (1) relates to Company, Company's activities, Company's business or Company's suppliers or customers; (2) is not generally known by persons not employed by Company (the term "Company" as used in the foregoing clauses (1) and (2) shall include the Company and its affiliates); and (3) is or has been disclosed to Employee, or of which Employee became aware, as a consequence of or through Employee's relationship with Employer and its affiliates. "Confidential Information" includes, but is not limited to, technical or non-technical data, a formula (including cost and/or pricing formula), pattern (including cost and/or pricing methods, marketing programs and operating methods), technique, drawing, process, financial data, or list of actual or potential customers or suppliers. "Confidential Information" shall not include information that has become generally available to the public by the act of one who has the right to disclose such information without violating any legal right of Company or its affiliates.

(*Id.* § 9(e)(ii).)

22.    Lareau understood at the time of signing that for one year after the resignation date, he could not use Frost's Confidential Information for his own or others' benefit without prior written consent. (Lareau Dep. 242:08–18.) He agreed that for 12 months after resigning, he would "not, directly or indirectly, transmit or disclose any [Frost] Confidential Information to any person, concern or entity, or make any use of any such Confidential Information, directly or indirectly, for

7

Employee's own benefit or for others," without prior written consent. (Lareau Agreement § 9(b).)

23.     Lareau understood at the time of signing that Section 10 of the Lareau Agreement "included a covenant not to compete." (Lareau Dep. 243:08–11.) He agreed that for six months following the resignation date, he would "not, without the prior express written approval of [Frost], directly or indirectly serve as a founder, co-founder, executive officer, manager, consultant, or employee for any enterprise engaged in the manufacture or development of sensors and computer systems built for the analysis and/or reporting of road weather conditions (the 'Business')." (Lareau Agreement § 10.)

24.     Lareau understood at the time of signing that for one year after the resignation date, he could not induce or attempt to induce Frost employees, sales representatives, distributors, agents, or consultants to cease doing business with Frost or interfere with those relationships. (Lareau Dep. 249:13–250:13.) He agreed that for one year following the resignation date, he would not:

> (i) induce or attempt to induce any employee, sales representative, distributor, agent or consultant of any member of the Employer to cease doing business with the Employer, or in any way interfere with the relationship between any such employee, sales representative, distributor, agent or consultant and the Employer (including, without limitation, by making any negative statements or communications about any member of the Employer or its officers or directors),
>
> (ii) induce or attempt to induce any employee of the Employer to leave the employ of Employer, or in any way interfere with the relationship between the Employer and any employee thereof (other than through general advertisements for employment not directed at employees of the Employer) or
>
> (iii) solicit to hire (other than through general advertisements for employment not directed at employees of the Employer) or hire any person who was an employee of the Employer at any time during the six (6) months preceding such solicitation or hiring.

(Lareau Agreement § 11 (line breaks added).)

25.     The Lareau Agreement contains an Indiana governing law provision, (*id.* § 18), and a severability clause providing that if "any part of this Agreement be declared invalid, void or unenforceable," this "shall not affect other provisions or applications of this Agreement which can

be given effect without the invalid, void or unenforceable provisions or applications and to this end the provisions of this Agreement are declared to be severable." (*Id.* § 19.)

26.     Baglien and Lareau co-founded Defendant Vue Robotics, LLC, a competitor to Frost in the road weather monitoring sector of the environmental sensing market. (Lareau Dep. 9:07–21; 35:02–15.) Vue's "cameras detect environmental and weather hazards": a customer logging into Vue's system can "understand road weather conditions," and Vue's product analyzes and reports "conditions," including "road weather conditions." (*Id.* at 9:06–09, 246:03–247:12.) Baglien is the CEO of Vue and Lareau is the Chief Operating Officer. (Answer ¶¶ 47, 53; Baglien Dep. 10:11–12; Lareau Dep. 9:04–05.)

27.      On August 23, 2021, while still employed by Frost, Baglien sought a quote request from Glow Labs for assistance building a new product—a wireless camera and weather sensor—stating that he was "[a]bout to start a new company." (**Ex. 13** (Glow Labs Emails).)

28.     On September 25, 2021, while still employed by Frost, Lareau downloaded information from Frost's HubSpot platform, including the entire list of Frost's contacts (7,033 records). (Lareau Dep. 207:01–209:06; **Ex. 14** (Lareau HubSpot Screenshot).)

29.     On October 11, 2021, while still employed by Frost, Baglien downloaded information from Frost's HubSpot platform, including a complete list of all of Frost's agreements with clients. (Baglien Dep. 166:20–167:14; **Ex. 15** (HubSpot Screenshots).)

30.     On or about October 8, 2021, Lareau registered the domain name "vuerobotics.io" and set up email accounts for himself and Baglien under that domain. (Answer ¶¶ 48–49; Lareau Dep. 85:05–19, 87:06–10; *see* **Ex. 16** (Vue Calendar Invite).)

31.     On October 11, 2021, Lareau set up a new account on Slack (an online "platform for communication") called "Vue Robotics," and Baglien joined the Slack workspace two days later. (Answer ¶ 49; Lareau Dep. 80:02–14, 82:04–08; **Ex. 17** (Vue Slack Email).)

32.     On or around October 19, 2021, Baglien and Lareau were drafting a product requirements document for Vue Robotics. (Answer ¶ 51.) It described the ███████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████ (**Ex. 18** (█████ ████████████████); Lareau Dep. 117:02–05.) Lareau then ████████████ ██████████████████████████████████████████ (Lareau Dep. 144:21–146:23; **Ex. 19** (████████████).)

33.     On November 3, 2021, Baglien wrote that ██████████████████████ █████████████████████████████████████████████████████████████████ ███████████████████ (**Ex. 20** (██████████████); *see* Lareau Dep. 128:05–130:21.)

34.     Vue was formed as an entity on January 24, 2022. (Answer ¶ 53; **Ex. 21** (Vue Formation Docs.); Lareau Dep. 13:11–12.)

35.     In an email sent to Baglien on March 14, 2022, Lareau wrote that █████████████ █████████████████████████████████████████████████████████████████ █████████████████ (**Ex. 22** (3/14/22 Vue Email); Baglien Dep. 157:13–158:07.) In that same email, Lareau also wrote about the ████████████████████████████ (Ex. 22 (3/14/22 Vue Email); Lareau Dep. 192:01–193:20.)

36.     On March 15, 2022, Baglien emailed individuals at SNO Services, a Frost customer, whom he had met while he was at Frost, sending them information and materials about Vue Robotics. (Baglien Dep. 150:13–154:04; **Ex. 23**, SNO Services Email; **Kirsh Decl.** ¶ 2.)

37.     On September 20, 2022, Lareau emailed contacts at multiple Frost customers about doing business with Vue and with the intent to sell Vue products to these municipalities. (Lareau Dep. 273:05–284:05; **Ex. 24**, (Lareau Solicitations); *see* Kirsh Decl. ¶ 2.)

38.     Lareau met each of these customer contacts while working at Frost and learned of

their contact information from the Frost HubSpot platform. (Lareau Dep. 273:05–284:05, *see* Kirsh Decl. ¶¶ 3–19.)

39.    On September 23, 2022, Baglien emailed contacts at several Frost customers about doing business with Vue, and included a flyer of Vue's products that Baglien was trying to sell. (Baglien Dep. 164:19–165:22; **Ex. 25** (Baglien Solicitations); *see* Kirsh Decl. ¶ 2.) Baglien had worked with these individuals while at Frost and learned their contact information from the Frost HubSpot platform. (Baglien Dep. 166:15–17; *see* Kirsh Decl. ¶¶ 3–19.)

40.    Traffic and Parking Control, Inc. ("TAPCO") provides traffic safety and parking solutions, and distributes road safety products to customers, including public entities and private businesses. (**Ex. 26**, Moore Dep. 23:01–08.) Frost Control had a business relationship with TAPCO by which TAPCO purchased and distributed its product to TAPCO's customers. (*Id.* at 49:25–50:09; Bott Dep. 254:18–256:13; Kirsh Dep. 132:19–24.) Through their employment with Frost, Lareau and Baglien knew Frost had a relationship with TAPCO. (Lareau Dep. 62:03–08; Baglien Dep. 112:06–09.) Baglien was the point person at Frost involved with TAPCO. (Lareau Dep. 62:14–16.)

41.    As early as July 2022, Lareau and Baglien contacted and corresponded with TAPCO for the purpose of entering into a business relationship between Vue and TAPCO. (Lareau Dep. 257:09–258:14, 262:12–263:03; **Ex. 27** (Solicitation of TAPCO).) In July 2022, TAPCO ended its relationship with Frost and told Frost that TAPCO was going to work with Vue. (Bott Dep. 258:03–08; Kirsh Dep. 127:17–128:05, 157:05, 189:01–10.) In August 2022, a TAPCO employee was asking Frost customers about canceling their contracts with Frost and switching to Vue products. (Moore Dep. 95:23–96:16; **Ex. 28** (Moore Solicitation).)

42.    In September 2022, Vue and TAPCO entered into a Sales Representation and Distribution Agreement to distribute and sell Vue products and services to TAPCO customers. (Baglien Dep. 164:02–15; Lareau Dep. 27:01–20, 264:11–12; **Ex. 29** (2022 TAPCO Agreement).) In

March 2024, they renewed this Agreement (**Ex. 30** (2024 TAPCO Agreement).)

43.     Vue had about $900,000 in annual subscription revenue in 2024, and by July 2025, Vue's year-to-date subscription revenue was about $1.1 million. (Baglien Dep. 15:07–11, 16:05–07.)

44.     Frost filed this action in October 2022. (ECF No. 1, Compl.) Frost's amended complaint against Baglien, Lareau, and Vue Robotics asserts claims for trade secret misappropriation, breach of contract, breach of fiduciary duty, and tortious interference, and seeks in the alternative a declaratory judgment related to the Baglien Agreement's invention assignment provision. (ECF No. 108, 1st Am. Compl. ("Am. Compl.").)

## LEGAL STANDARD

Rule 56 provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). A party seeking partial summary judgment on a part of a claim or defense in effect seeks "a pretrial adjudication that certain issues shall be deemed established for the trial of the case." *Dooley v. Liberty Mut. Ins. Co.*, 307 F. Supp. 2d 234, 240 (D. Mass. 2004) (quoting Fed. R. Civ. P. 56(d), Advisory Comm. n. to 1946 am.). This procedure "serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact." Fed. R. Civ. P. 56(d), Advisory Comm. n. to 1946 am.; *see Norwood Promotional Prods., LLC v. KustomKoozies, LLC*, 835 F. Supp. 2d 685, 697 (S.D. Ind. 2011) (collecting cases).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" where it has the potential to affect the outcome of the suit under applicable law. *Reyes-Orta v. P.R. Highway & Transp. Auth.*, 811 F.3d 67, 73 (1st Cir. 2016). A dispute is "genuine" where a reasonable jury could resolve the point in the favor of the non-moving party. *Id.* "Once the moving party avers an absence of evidence to support the non-moving party's case, the non-moving

party must offer definite, competent evidence to rebut the motion." *Meuser v. Fed. Express Corp.*, 564 F.3d 507, 515 (1st Cir. 2009) (citation omitted). While the Court construes the record in the light most favorable to the nonmovant and resolves reasonable inferences in that party's favor, the nonmovant "cannot rest on conclusory allegations, improbable inferences, or unsupported speculation" to defeat summary judgment. *Id.* (cleaned up).

## ARGUMENT

Count III alleges that Lareau breached his non-compete, non-disclosure, and non-solicitation clauses, and Count IV alleges that Baglien breached his non-disclosure and non-solicitation covenants.[2] (Am. Compl. ¶¶ 85–99.) Both Agreements contain an Indiana governing law provision. (SUMF ¶¶ 15, 25.) Frost must show a valid contract, breach, and resulting damages. *Collins v. McKinney*, 871 N.E.2d 363, 370 (Ind. Ct. App. 2007).

## I.    The Lareau and Baglien Agreements are valid contracts.

The "validity" of a contract is a question of law. *City of Indianapolis v. Twin Lakes Enters., Inc.*, 568 N.E.2d 1073, 1079 (Ind. Ct. App. 1991). The elements of "offer, an acceptance, consideration, and a manifestation of mutual assent" are met here with respect to both Agreements. *In re Paternity of M.F.*, 938 N.E.2d 1256, 1259 (Ind. Ct. App. 2010). Frost "made an offer when it provided [Lareau and Baglien] a copy of" their Agreements. *Palmer v. Menards*, No. 12 CV 828, 2013 WL 3147374, at *3 (N.D. Ind. June 17, 2013). They each "accepted that offer by signing the agreement." *Id.* Both Agreements are supported by adequate consideration. Lareau agreed to abide by his Agreement's express terms—including the restrictive covenants—and Frost paid Lareau $14,539.50 and allowed him to use seven paid vacation days through the date of resignation. (SUMF ¶ 19.) Baglien's

---

[2] The validity of the Lareau and Baglien Agreements (and the restrictive covenants therein) are also elements of Counts VI and VII, alleging tortious interference, and Count VIII, seeking a declaratory judgment related to the Baglien Agreement's invention assignment provision. (*See* Am. Compl. ¶¶ 110–31.) Frost also seeks partial summary judgment on these aspects of these counts.

employment offer was conditioned on signing the Baglien Agreement and agreeing to its terms. (*Id.* ¶¶ 8–9.) A "promise of continued at-will employment is consideration for a valid contract." *Palmer*, 2013 WL 3147374, at \*3 (cleaned up). "Finally, by signing the agreement, both parties evidenced their assent to the contract." *Id.*[3]

## II.     The restrictive covenants in the Lareau and Baglien Agreements are enforceable as a matter of law.

Restrictive covenants are enforceable if they are "reasonable," a determination that depends "upon the basis of the facts and circumstances surrounding each case." *Licocci v. Cardinal Assocs., Inc.*, 445 N.E.2d 556, 561 (Ind. 1983). The employer must show that it has a "legitimate interest" to be protected, and that the covenant is reasonable in scope as to the time, activity, and geographic area, such that it restricts an employee only so far as necessary to protect the employer's legitimate interests. *Id.*; *Leeman v. Regions Ins., Inc.*, No. 14-CV-1777, 2017 WL 1197280, at \*5 (N.D. Ind. Mar. 31, 2017); *Buffkin v. Glacier Grp.*, 997 N.E.2d 1, 10 (Ind. Ct. App. 2013). "[T]he ultimate determination of whether the covenant is reasonable is a question of law for the court." *Licocci*, 445 N.E.2d at 561.

### A.     The restrictive covenants protect Frost's legitimate interests.

"A legitimate protectable interest is an advantage possessed by an employer, the use of which by the employee after the end of the employment relationship would make it unfair to allow the employee to compete with the former employer." *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 913 (Ind. Ct. App. 2011) (cleaned up). "[G]oodwill," which includes "secret or confidential

---

[3] Lareau previously argued that the non-compete covenant is unenforceable because he never consented to the Lareau Agreement's assignment from Frost Control to Frost Solutions. (*See* ECF No. 58, Def. C. Lareau's Mot. for Partial Summ. J. on One Aspect of Count III at 1–2.) Frost incorporates by reference its objection to Lareau's motion for partial summary judgment. (*See* ECF No. 76, Pl.'s Obj. to Def. C. Lareau's Mot. for Partial Summ. J.) If Lareau re-raises this argument in his objection to this motion, Frost will address this issue in reply. Additionally, Frost acquired fully matured legal claims against Lareau, rather than just contract rights, as Lareau had already violated the restrictive covenants before the closing date of August 9, 2022. *See Centers v. Centennial Mortg., Inc.*, 398 F.3d 930, 935 (7th Cir. 2005).

information such as the names and address of customers and the advantage acquired through representative contact, is a legitimate protectable interest." *Id.* (cleaned up); *Captain & Co., Inc. v. Towne*, 404 N.E.2d 1159, 1162 (Ind. Ct. App. 1980). Indiana courts "are more willing to enforce broad restrictive covenants when those covenants protect trade secret or confidential information." *Bodemer v. Swanel Beverage, Inc.*, 884 F. Supp. 2d 717, 731 (N.D. Ind. 2012) (collecting cases). "Also subject to protection as goodwill is the competitive advantage gained for an employer through personal contacts between employee and customer when the products offered by competitors are similar." *Coates*, 942 N.E.2d at 913. And "information derived from an employee's contacts with customers is a legitimate protectable interest even if it is not confidential." *Distrib. Serv., Inc. v. Stevenson*, 16 F. Supp. 3d 964, 971 (S.D. Ind. 2014). Frost also has a legitimate interest in the time, resources, and goodwill invested in its employees. *See Sharvelle v. Magnante*, 836 N.E.2d 432, 440 (Ind. Ct. App. 2005) (enforcing covenant prohibiting solicitation of current employees).

The restrictive covenants at issue here protect these legitimate interests. Lareau acknowledged that during his employment, he had "become familiar" with Frost's and its customers' trade secrets and "Confidential Information," and that his "services have been of special, unique and extraordinary value to [Frost]." (SUMF ¶ 20.) Baglien acknowledged that during his employment with Frost, he would have access to Frost's "Confidential Information" to perform his job duties. (*Id.* ¶ 10.) They both had access to the Frost HubSpot platform, which contained confidential customer information—and they used that access shortly before resigning by downloading "all contacts" and "all deals" from HubSpot. (*Id.* ¶¶ 7, 17, 28–29.) Lareau and Baglien also had extensive contact with Frost's customers while employed, and communicated with Frost's engineering team, relaying customer feedback for use in future product development. (*Id.* ¶¶ 7, 17.) The undisputed evidence thus establishes that Frost had a legitimate, protectible interest in protecting its confidential information, its customer relationships, and the "goodwill" derived therefrom.

**B.    The scope of each restrictive covenant at issue is "reasonable" as a matter of law.**

Courts evaluate the scope of a restrictive covenant by examining the time, activity, and geographic area restricted. *Licocci*, 445 N.E.2d at 561. These parameters are considered together, not in isolation, as "[i]t is the interrelation of the considerations of protectible interest, time, space, and proscribed activity that make a particular covenant reasonable or unreasonable." *4408, Inc. v. Losure*, 373 N.E.2d 899, 900 (Ind. Ct. App. 1978) (citation omitted). Here, the short duration of each covenant at issue factors in when analyzing the other aspects of its scope.

**1.    The Lareau non-compete covenant**

The Lareau Agreement's non-compete covenant prohibited Lareau from working in certain positions "for any enterprise engaged in the manufacture or development of sensors and computer systems built for the analysis and/or reporting of road weather conditions (the 'Business')," with certain exceptions discussed below. (SUMF ¶ 23.) Lareau understood this when he signed. (*Id.*) This covenant is reasonable in scope. First, the duration was only six months, well within reasonable limits. "Indeed, Indiana courts have upheld non-competition agreements that restrict competitive activity for two-year periods." *Gleeson v. Preferred Sourcing, LLC*, 883 N.E.2d 164, 174 (Ind. Ct. App. 2008) (collecting cases).

Second, the restriction is limited geographically to only those "locale[s] in which [Frost] conducts business or planned to conduct business as of [the] Resignation Date." (Lareau Agreement § 10.) An employer "has an interest in protecting its interests in each state in which it conducts business" in the industry in which it operates. *Coates*, 942 N.E.2d at 915. "[I]f an employee obtained confidential information" of the employer during his employment, "he may be restricted in the competitive use and disclosure of such information to the full extent of the employer's business which is thereby affected." *Waterfield Mortg. Co. v. O'Connor*, 361 N.E.2d 924, 927 (Ind. Ct. App. 1977); *see also Ackerman v. Kimball Int'l, Inc.*, 652 N.E.2d 507, 510 (Ind. 1995) (noting that a covenant

16

that contains no geographic limitation at all may still be enforceable if "trade secrets are involved"). It is undisputed that Lareau had access to Frost's confidential business information and trade secrets and regularly used them to perform his job duties. Moreover, he and Baglien downloaded "all contacts" and "all deals" Frost had stored on its HubSpot platform, encompassing the entire geographic scope of Frost's business and customers as of September 25, 2021, days before Lareau's resignation. (*See* SUMF ¶¶ 28–29.) This justifies the covenant's coverage of all "locale[s]" (specific locations, not entire states) where Frost did business as of Lareau's resignation date.

Third, the scope of prohibited activity is reasonable. The non-compete covenant prohibits Lareau from working "for any enterprise engaged in the manufacture or development of sensors and computer systems built for the analysis and/or reporting of road weather conditions (the 'Business')," Frost's subset of the industry. (*Id.* ¶ 23.) This is further limited in several ways:

- Position: it only limits Lareau from "directly or indirectly serv[ing] as a founder, co-founder, executive officer, manager, consultant, or employee" of a competing "Business";

- Competitive activity: the covenant does "not prevent [Lareau] from seeking employment by any department within any of the foregoing that directly competes with the Business and does not provide services in the ordinary course of his employment in a manner that is directly competitive with the Business";

- Stock ownership: the covenant does not "prohibit [Lareau] from being a passive owner of not more than two percent (2%) of the outstanding securities of any publicly traded company engaged in the Business, so long as [he] has no active participation in the Business."

(*Id.*; Lareau Agreement § 10.) These limitations ensure the covenant is narrowly tailored to prevent only competition that would directly threaten Frost's legitimate business interests in its Confidential Information, its customer relationships, and the goodwill derived therefrom. *Buffkin*, 997 N.E.2d at 10–11.

### 2. The Lareau non-disclosure covenants

Sections 9(a) and 9(b) of the Lareau Agreement prohibited Lareau from transmitting,

disclosing, or using for his or another's benefit, without Frost's prior consent (a) Frost's Trade

Secrets, "for so long as the information in question remains a Trade Secret under applicable law,"

and (b) Frost's Confidential Information, for one year after the resignation date. (SUMF ¶¶ 20–22.)

Lareau understood this when he signed. (*Id.*)

      Sections 9(a) and 9(b) are reasonable in scope. "Confidentiality agreements, unlike non-

solicitation or non-compete agreements, don't require a geographic or temporal limitation, if they

don't prohibit a former employee from working or competing with his or her former employer."

*Leeman*, 2017 WL 1197280, at \*5. The covenants here do not prohibit competition or solicitation, as

that work is done elsewhere in the Lareau Agreement. In any event, both non-disclosure covenants

do contain time limits. Section 9(a) applies "[a]t all times after the Resignation Date (for so long as

the information in question remains a Trade Secret under applicable law)." (SUMF ¶ 20; Lareau

Agreement § 9(a).) Protectible trade secret rights exist as long as secrecy is maintained. *See Bridgestone

Americas Holding, Inc. v. Mayberry*, 878 N.E.2d 189, 192 (Ind. 2007). And Section 9(b) is limited to one

year after the Resignation Date, which is reasonable for all sorts of covenants. (SUMF ¶ 22); *see, e.g.*,

*Zimmer, Inc. v. Masters*, No. 14-cv-312, 2014 WL 1317090, at \*4 (N.D. Ind. Mar. 31, 2014).

      The scope of activity restricted by Section 9(a) is reasonable, prohibiting Lareau from

transmitting, disclosing, or using a Trade Secret for Lareau's own benefit or the benefit of others.

(SUMF ¶ 20.) Federal and state trade secret laws recognize disclosure and/or use of another's trade

secret to the disadvantage of the owner as "misappropriation." *See, e.g.*, *Steve Silveus Ins., Inc. v. Goshert*,

873 N.E.2d 165, 180–81 (Ind. Ct. App. 2007). And courts recognize the importance of trade secrets

to a business, giving even greater deference to confidentiality provisions that involve trade secret

information. *See Bodemer*, 884 F. Supp. 2d at 734.

      Section 9(b) is reasonable in the scope of restricted activity as well, as its prohibitions are

limited to transmitting, disclosing, or making use of Frost's "Confidential Information," which the

Lareau Agreement clearly defines. (SUMF ¶¶ 21–22.) The definition establishes a three-part conjunctive test requiring that information (1) relates to Frost's activities, business, suppliers, or customers; (2) is not generally known by persons not employed by Frost; and (3) was disclosed to or became known by Lareau through the employment relationship. The enumerated categories (including technical data, trade secrets, customer information, supplier relationships, and financial data) represent standard protectable interests recognized across industries and jurisdictions because they are clearly advantages possessed by Frost and their use by a former employee would make it unfair to allow the former employee to compete with Frost. *Coates*, 942 N.E.2d at 913. Courts routinely uphold non-disclosure provisions protecting these categories of information, as they constitute the type of proprietary business information that companies have legitimate reasons to safeguard and that provide a competitive advantage. *See, e.g.*, *Leeman*, 2017 WL 1197280, at *3–5; *Titus v. Rheitone, Inc.*, 758 N.E.2d 85, 92–93 (Ind. Ct. App. 2001). The provision's combination of threshold requirements, specific enumerated categories, relationship-based limitations, and practical boundaries shows reasonableness here.

### 3. The Lareau non-solicitation covenant

Lareau agreed that for one year after resigning, he would not (1) induce or attempt to induce any Frost employee, sales representative, distributor, agent, or consultant to cease doing business with Frost, or interfere with such relationships; (2) induce or attempt to induce any Frost employee to leave employment, or interfere with such relationships; or (3) solicit to hire or hire anyone who was a Frost employee during the six months preceding such solicitation or hiring. (SUMF ¶ 24.) The second and third portions except "general employment advertisements not directed at Employer's employees." (*Id.*) Lareau understood these obligations when he signed. (*Id.*)

This covenant is reasonable in scope. First, it was only one year long. (*Id.*) Sections 11(i) and (ii) are limited to individuals with an employment or other important relationship with Frost at the

time of the inducement or interference activity, while Section 11(iii) is limited to only those individuals who were Frost employees during the six months preceding the solicitation or hiring activity. (*Id.*) These time limitations are well within the boundaries of what Indiana courts consider reasonable. *See, e.g., Zimmer*, 2014 WL 1317090, at *4.

Language limiting the scope of a restrictive covenant to only certain classes of individuals and entities "can substitute for a geographic limitation." *Leeman*, 2017 WL 1197280, at *5; *see Norlund v. Faust*, 675 N.E.2d 1142, 1155 (Ind. Ct. App. 1997). The non-solicitation covenant here does so. Section 11(i) is limited to current (at the time of the activity) employees, sales representatives, distributors, agents, and consultants of Frost; Section 11(ii) is limited to current (at the time of the activity) Frost employees; and Section 11(iii) is limited to "any person who was an employee of the Employer at any time during the six (6) months preceding" the solicitation or hiring activity. (SUMF ¶ 24.) Thus, this covenant "clearly identifies the class of persons with whom contact is prohibit[ed]." *Leeman*, 2017 WL 1197280, at *5 (enforcing a customer non-solicitation covenant).

As for scope of activity, this covenant prohibits solicitation, hiring, interference, and actual and attempted inducement—narrowly tailored to prevent only those competitive activities that would directly threaten Frost's legitimate interests in its employees, distributors, and other important, specified relationships. The covenant is further limited by exempting "general advertisements for employment not directed at employees of" Frost. (SUMF ¶ 24.) These restrictions, considered together and viewed in light of Lareau's access to vast amounts of Frost's trade secret and confidential information, render this covenant "reasonable" and enforceable.

### 4.    The Baglien non-disclosure covenant

Baglien agreed to "hold in strictest confidence" and not use or copy (except to perform his job duties) or disclose without authorization Frost's Confidential Information while such information remained confidential. (SUMF ¶ 10.) The Termination Certification similarly obligated

Baglien to "preserve as confidential" all of Frost's Confidential Information, and stated that Baglien

shall not use any Confidential Information to influence or solicit any of Frost's clients or customers.

(*Id.* ¶ 13.) Again, a non-disclosure covenant need not have a time or geographic limitation to be

reasonable.[4] *Leeman*, 2017 WL 1197280, at *5.

      This covenant is reasonable in the scope of restricted activity, as its prohibitions are limited

to transmitting, disclosing, or making use of Frost's "Confidential Information," which the Baglien

Agreement clearly defines. (SUMF ¶ 11.) The definition serves an important, legitimate purpose by

protecting information that provides Frost with a competitive advantage in the marketplace. It

appropriately covers materials "not generally known or available outside the Company" and

information "entrusted to the Company in confidence by third parties"—that is, genuinely

confidential materials rather than general industry knowledge or publicly available information. The

enumerated categories (including technical data, trade secrets, customer information, supplier

relationships, and financial data) represent standard protectable interests recognized across industries

and jurisdictions. *Coates*, 942 N.E.2d at 913; *Captain & Co.*, 404 N.E.2d at 1162. The provision's

combination of threshold requirements (information not generally known), specific enumerated

categories, relationship-based limitations, and practical boundaries demonstrates reasonableness,

especially here, as Baglien had access to vast amounts of Frost's trade secret and confidential

business information while employed. (SUMF ¶¶ 2–3, 7, 10, 29.)

      **5.**     **The Baglien customer non-solicitation covenant**

      Baglien agreed that during his employment, he would not influence Frost's clients, licensors,

licensees, or customers to refrain from purchasing Frost products or services, or solicit or influence

any such party to direct purchases of products or services to any competing business. (SUMF ¶ 12.)

---

[4] In any event, limiting the definition of "Confidential Information" to information "not generally known or
available outside the Company" creates an automatic temporal limitation. Once information becomes publicly
known through lawful means, it falls outside the definition's scope.

Significantly, the covenant applies only "during the term of the Relationship"—that is, while Baglien was still employed. (*Id.*) Unlike many customer non-solicitation provisions that extend one or two years post-employment, this restriction ended when Baglien resigned, making it much more limited than other covenants courts have found reasonable. And the scope of prohibited activity targets conduct that would be a breach of the duty of loyalty. Employees have a fiduciary duty not to compete with their employer or divert business opportunities while employed, and this provision simply codifies and clarifies that common-law obligation. *SJS Refractory Co., LLC v. Empire Refractory Sales, Inc.*, 952 N.E.2d 758, 768 (Ind. Ct. App. 2011). In light of the strong, legitimate interest in Frost's customer relationships, the limited scope of this covenant, and Baglien's access to Frost's customers and Confidential Information, this covenant is reasonable as a matter of law.[5]

### 6.    The Baglien employee non-solicitation covenant

Baglien agreed that during his employment and for one year after, he would not directly or indirectly solicit any of Frost's employees or consultants to terminate their relationship with Frost, either for himself or for anyone else. (SUMF ¶ 12.) This covenant is reasonable for the same reasons as the non-solicitation covenant in the Lareau Agreement, discussed above. Indeed, the non-solicitation covenant in the Baglien Agreement is *more* limited, applying to only Frost employees and consultants. Frost incorporates by reference the above discussion here.

### 7.    Alternatively, the Court may "blue pencil" the covenants as necessary.

"Indiana courts have adopted the 'blue pencil' doctrine," which "allows a court to delete unreasonable restrictions from an otherwise enforceable covenant if the restrictions are severable, and to enforce the reasonable restrictions." *CraneTech, Inc. v. Slack*, 789 F. Supp. 3d 662, 675 (N.D.

---

[5] The Termination Certification prohibited Baglien from using Confidential Information to solicit or attempt to influence any Frost Control customer or any other person to purchase products or services from a competitor. (SUMF ¶ 13.) This implicates the other covenants, and the discussion in this section applies to this obligation as well.

Ind. 2025). Accordingly, if the Court finds that a portion of any of the restrictive covenants discussed above is overbroad, it may excise that portion and enforce the restrictions that are reasonable. *Licocci*, 445 N.E.2d at 561. The severability clauses in the Lareau and Baglien Agreements provide further authorization for doing so. (SUMF ¶¶ 15, 25); *see Leeman*, 2017 WL 1197280, at *5.

III.    **There is no genuine dispute of material fact regarding certain of Lareau's and Baglien's breaches of their respective restrictive covenants.**

Some of Lareau's and Baglien's breaches of their contractual obligations to Frost are undisputable and therefore appropriate for partial summary judgment.

A.    **Lareau's breaches of his restrictive covenants**

Lareau breached the non-compete, non-disclosure, and non-solicitation covenants in at least three ways. First, he breached the non-compete covenant by cofounding and working for Vue, which directly competed against Frost in the road weather monitoring sector of the environmental sensing market, during the six-month restricted period. (SUMF ¶¶ 26, 34.) Lareau registered the domain name "vuerobotics.io" and set up email accounts for himself and Baglien under that domain, and set up a new account and workspace on Slack called "Vue Robotics," which Baglien joined. (*Id.* ¶¶ 30–31.) He worked with Baglien to draft a ██████████████████████ for Vue Robotics describing the ████████████████████████████████████████████████████████████████████████████████████████████████████████ (*Id.* ¶ 32.) Lareau emailed a copy of this document to a third party from a Vue Robotics email account. (*Id.*) All of these actions, as well as the HubSpot downloads and solicitation actions discussed below, directly violated the non-compete covenant.

Second, Lareau violated the non-disclosure and non-solicitation covenants by using Frost's confidential information and goodwill gained from working at Frost to target and form a partnership with TAPCO, a major Frost distributor. (SUMF ¶¶ 40–42.) Lareau knew that Frost had a relationship with TAPCO, including during the time that Lareau worked at Frost. (*Id.* ¶ 40.) Lareau

admitted that he and Baglien contacted and corresponded with TAPCO on July 21, 2022, for the purpose of entering into a distribution partner arrangement between Vue and TAPCO. (*Id.* ¶ 41.) As a result of Lareau's communications with TAPCO, TAPCO ended its relationship with Frost in July 2022 and told Frost that TAPCO was going to work with Vue. (*Id.*) In August 2022, TAPCO was contacting Frost customers about canceling their contracts with Frost and switching to Vue products. (*Id.*) Vue and TAPCO entered into formal agreements in September 2022 and March 2024 through which TAPCO sold Vue products to third parties. (*Id.* ¶ 42.)

Third, Lareau violated the non-disclosure and non-solicitation covenants by using confidential customer information that he downloaded from the Frost HubSpot platform to solicit Frost customers less than a year after resigning from Frost. (*Id.* ¶¶ 28, 37–38.) After setting his sights on the "███████████████████████," (*id.* ¶ 35), Lareau emailed contacts at several Frost customers, stating that he had launched his own business, Vue, and seeking to do business with them. (*Id.* ¶ 37.) Lareau admitted that he intended for Vue to sell products to these municipalities, through TAPCO. (*Id.*) The only way Lareau knew how to target these municipalities was through the information he downloaded from HubSpot and from working at Frost. Lareau met each of the contacts for these customers while working at Frost. (*Id.* ¶ 38.) These actions occurred during the one-year restricted period following Lareau's resignation on October 8, 2021—he sent these emails on September 20, 2022. (*Id.* ¶¶ 18, 37.)

Thus, there is no genuine dispute as to any material fact regarding these breaches by Lareau of his non-compete, non-disclosure, and non-solicitation covenants.

**B.    Baglien's breaches of his restrictive covenants**

Baglien breached the non-disclosure and non-solicitation covenants, and the Termination Certification. First, as described above regarding Lareau's breaches, Baglien used confidential information and goodwill gained from working at Frost to target and partner with Frost's major

distributor, TAPCO. Baglien knew Frost had a relationship with TAPCO; during his employment with Frost, Baglien was the point person involved with TAPCO. (*Id.* ¶ 40.) Lareau admitted that both he and Baglien contacted TAPCO for the purpose of Vue partnering with TAPCO to do business. (*Id.* ¶ 41.) As a result of Baglien's solicitations, TAPCO ended its relationship with Frost in July 2022. (*Id.*) TAPCO contacted Frost customers about canceling with Frost and switching to Vue in August 2022. (*Id.*) Vue and TAPCO entered into formal agreements in September 2022 and March 2024 through which TAPCO sold Vue products to third parties. (*Id.* ¶ 42.)

Second, like Lareau, Baglien breached his obligations under the non-disclosure and non-solicitation covenants, as well as the Termination Certification, by using confidential customer information to solicit Frost customers less than a year after resigning from Frost. On October 11, 2021, while still employed by Frost, Baglien downloaded information from Frost's HubSpot platform, including a complete list of all of Frost's agreements with customers. (*Id.* ¶ 29.) Less than a month later, he wrote in an email that he and Lareau "█████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████." (*Id.* ¶ 33.) In March 2022, Baglien emailed information and materials about Vue Robotics to individuals at SNO Services, a Frost customer. (*Id.* ¶ 36.) In September 2022, Baglien sent emails to Frost customers about doing business with Vue and included a flyer of the Vue products that Baglien was attempting to sell. (*Id.* ¶ 39.) Baglien admitted that he had worked with all of these individuals when he worked at Frost, and their contact information was included in the HubSpot downloads. (*Id.*) These actions occurred during the one-year restricted period.

Thus, there is no genuine dispute as to any material fact regarding these breaches by Baglien of his non-disclosure and non-solicitation covenants, and the Termination Certification.

## CONCLUSION

For the foregoing reasons, the motion for partial summary judgment should be granted.

Dated: February 17, 2026

Respectfully submitted,

**FROST SOLUTIONS, LLC,**

By its attorneys,

/s/ *Laura L. Carroll*
Laura L. Carroll (NH Bar No. 17444)
ARENTFOX SCHIFF LLP
800 Boylston Street, 32nd Floor
Boston, MA 02199
Tel:     (617) 973-6100
Email:  laura.carroll@afslaw.com

Todd A. Rowden (admitted *pro hac vice*)
James L. Oakley (admitted *pro hac vice*)
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, IL 60601
Tel:     (312) 527-4000
Fax:     (312) 527-4011
Email:  trowden@taftlaw.com
          joakley@taftlaw.com

Amir R. Tahmassebi (admitted *pro hac vice*)
KONICEK & DILLON, P.C.
70 West Madison Street, Suite 2060
Chicago, IL 60602
Tel:     (312) 328-9166
Fax:     (630) 262-9659
Email:  amir@konicekdillonlaw.com