# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

FROST SOLUTIONS, LLC,

           Plaintiff,

     v.

PATRICK BAGLIEN, CHRISTOPHER LAREAU, and VUE ROBOTICS, LLC,

          Defendants.

Case No. 1:22-cv-00401-SE

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANTS' AMENDED COUNTERCLAIM

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff Frost Solutions, LLC ("Frost") submits its Memorandum of Law in Support of its Motion for Summary Judgment on Defendants' Amended Counterclaims, together with Declarations by Michael Kirsh, co-CEO of Frost, and James Oakley, counsel of record for Frost, introducing exhibits to this motion. As shown below, Frost is entitled to entry of judgment as a matter of law that it did not negligently inflict emotional distress on Defendant Christopher Lareau, it did not tortiously interfere with any contracts or customers of Vue Robotics, LLC (existing or prospective), and it did not engage in civil conspiracy.

/s/ *Laura L. Carroll*
Laura L. Carroll (NH Bar No. 17444)
ArentFox Schiff LLP
800 Boylston Street, 32nd Floor
Boston, MA 02199
Tel:    (617) 973-6100
Email:  laura.carroll@afslaw.com

Todd A. Rowden (admitted *pro hac vice*)
James L. Oakley (admitted *pro hac vice*)
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, IL 60601
Tel:    (312) 527-4000
Fax:    (312) 527-4011

Email:  trowden@taftlaw.com
        joakley@taftlaw.com

Amir R. Tahmassebi (admitted *pro hac vice*)
KONICEK & DILLON, P.C.
70 West Madison Street, Suite 2060
Chicago, IL 60602
Tel:      (312) 328-9166
Fax:      (630) 262-9659
Email:  amir@konicekdillonlaw.com

*Attorneys for Plaintiff Frost Solutions, LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION .................................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ................................................ 1

LEGAL STANDARD ................................................................................................ 9

ARGUMENT .......................................................................................................... 10

I.     Defendants forfeited their counterclaims when they did not reassert
them in their answer to Frost's First Amended Complaint ............................. 10

II.    Frost is entitled to judgment as a matter of law on Lareau's and
Vue's counterclaims ...................................................................................... 11

       A.    Lareau's counterclaim for NIED (Count I) fails to create a
genuine dispute of material fact on any element ............................... 11

              1.    Frost did not owe Lareau a legal duty and could not
have reasonably foreseen the harm alleged ............................... 13

              2.    Lareau fails to establish both causation and
"significant" and "lasting" harm ............................................... 14

       B.    Vue cannot prevail on any of its tortious interference claims
(Counts II–V) .................................................................................. 16

              1.    Counts II and III fail because any alleged interference
resulted from an assertion of a legally protected
interest and was not improper ................................................... 17

              2.    Count IV fails because there is no genuine dispute
that Frost did not improperly interfere with any Vue
prospective business ................................................................... 20

              3.    Count V fails because Frost did not interfere with the
EEG Quote, and Vue was not damaged by Ostrander's
authorized access to its system ................................................... 21

       C.    Count VI fails for several reasons, including the lack of an
underlying tort ................................................................................. 24

CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alt. Sys. Concepts, Inc. v. Synopsys, Inc.,*
229 F. Supp. 2d 70 (D.H.H. 2002) ................................................................................... 22

*Barrows v. Boles,*
141 N.H. 382 (1996) ........................................................................................................ 20

*Barton v. Clancy,*
632 F.3d 9 (1st Cir. 2011) ................................................................................................ 12

*In re Bayview Crematory, LLC,*
155 N.H. 781 (2007) ........................................................................................................ 15

*Bi-Rite Enters., Inc. v. Bruce Miner Co., Inc.,*
757 F.2d 440 (1st Cir. 1985) ............................................................................................ 12

*BK v. N.H. Dep't of Health & Hum. Servs.,*
814 F. Supp. 2d 59 (D.N.H. 2011) ................................................................................... 13

*Boyd v. Wells Fargo Bank, N.A.,*
No. 18-cv-253-JL, 2018 DNH 102 (D.N.H. May 17, 2018) ............................................ 17

*Bremer Bank, Nat. Ass'n v. John Hancock Life Ins. Co.,*
No. CIV. 06-1534 ............................................................................................................. 11

*Brink's Cap., Ltd. Liab. Co. v. Joe Randazzo's Fruit & Vegetable, Inc.,*
No. 24-cv-11570, 2025 WL 2074327 (E.D. Mich. July 23, 2025) ................................... 11

*Davric Maine Corp. v. Rancourt,*
216 F.3d 143 (1st Cir. 2000) ............................................................................................ 23

*Delta MB, LLC v. 271 S. Broadway, LLC,*
798 F. Supp. 3d 156 (D.N.H. 2025) ................................................................................... 9

*Doe v. Williston Northampton Sch.,*
766 F. Supp. 2d 310 (D. Mass. 2011) .............................................................................. 11

*Emery v. Merrimack Valley Wood Products, Inc.,*
701 F.2d 985 (1st Cir.1983) ............................................................................................. 18

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico,*
37 F.4th 746 (1st Cir. 2022) ............................................................................................. 10

*Gen. Mills, Inc. v. Kraft Foods Glob., Inc.,*
495 F.3d 1378 (Fed. Cir. 2007) ........................................................................................ 11

*Grady v. Jones Lang LaSalle Constr. Co., Inc.,*
    171 N.H. 203 (2018) ................................................................................................13

*Green Mountain Realty Corp. v. Fifth Est. Tower, LLC,*
    161 N.H. 78 (2010) ..................................................................................................19

*Jakobiec v. Merrill Lynch Life Ins. Co.,*
    711 F.3d 217 (1st Cir. 2013) .....................................................................................9

*Johnson v. Berry,*
    228 F. Supp. 2d 1071 (E.D. Mo. 2002) ...................................................................11

*Judge v. Moving Into Maths,*
    No. CIV. 93-213-JD, 1994 WL 262883 (D.N.H. Jan. 11, 1994) ..............................18

*Lewis v. Abramson,*
    673 F. Supp. 3d 72 (D.N.H. 2023) ...........................................................................25

*Macie v. Helms,*
    156 N.H. 222 (2007) ................................................................................................14

*MacMillan v. Scheffy,*
    147 N.H. 362 (2001) ................................................................................................13

*McNell v. Hugel,*
    No. CIV. 93-462-JD, 1994 WL 264200 (D.N.H. May 16, 1994) ............................24

*Melendez v. Univ. of N.H.,*
    No. 23-cv-00172-SM-TSM, 2024 WL 5408179 (D.N.H. Nov. 12, 2024) ...............24

*Michnovez v. Blair,*
    No. 10-cv-110-LM, 2012 DNH 114 (D.N.H. July 5, 2012) ....................................15

*Minturn v. Monrad,*
    64 F.4th 9 (1st Cir. 2023) ...........................................................................................9

*Montrone v. Maxfield,*
    122 N.H. 724 (1982) ................................................................................................18

*Moore v. Mortg. Elec. Registration Sys.,*
    848 F. Supp. 2d 107 (D.N.H. 2012) .........................................................................24

*Movitz v. Home Depot U.S.A., Inc.,*
    82 F. App'x 230 (1st Cir. 2003) ...............................................................................25

*Nieves-Romero v. United States,*
    715 F.3d 375 (1st Cir. 2013) .....................................................................................9

*O'Donnell v. HCA Health Servs. of N.H., Inc.,*
    152 N.H. 608 (2005) ....................................................................................12, 14, 15

*Par Pharm., Inc. v. QuVa Pharma, Inc.*,
  764 F. App'x 273 (3d Cir. 2019) ................................................................10

*Pichowicz v. Hoyt*,
  No. 92-388-M, 2000 DNH 040 (D.N.H. Feb. 11, 2000) ................................15

*Planet Fitness Int'l Franchise v. JEG-United, LLC*,
  633 F. Supp. 3d 484 (D.N.H. 2022) ................................................17, 18, 21

*Pruden v. CitiMortgage, Inc.*,
  No. 12-cv-452-LM, 2014 DNH 115 (D.N.H. May 23, 2014) ........................14

*Quintana-Dieppa v. Dep't of Army*,
  130 F.4th 1 (1st Cir. 2025) ...........................................................................9

*Sanchez v. Warden, FCI Berlin*,
  No. 22-cv-231-SE, 2023 DNH 051 (D.N.H. May 3, 2023) ..............................9

*Settlement Cap. Corp. v. Pagan*,
  649 F. Supp. 2d 545 (N.D. Tex. 2009) ..........................................................11

*Tessier v. Rockefeller*,
  162 N.H. 324 (2011) ....................................................................................20

*Tsiatsios v. Anheuser-Busch, Inc.*,
  No. 07-CV-003-JL, 2009 DNH 009 (D.N.H. Jan. 16, 2009) ..........................19

*Vosburgh v. Bourassa*,
  No. 07-CV-101-SM, 2008 DNH 133 (D.N.H. Aug. 5, 2008) ........................15

*Westerdahl v. Williams*,
  276 F.R.D. 405 (D.N.H. 2011) ......................................................................15

*Wilcox Indus. Corp. v. Hansen*,
  870 F. Supp. 2d 296 (D.N.H. 2012) ..............................................................17

*Wilder v. City of Keene*,
  131 N.H. 599 (1989) ....................................................................................14

*William Soler Justice v. Sununu*,
  No. 20-cv-517-PB, 2024 DNH 019 (D.N.H. Mar. 19, 2024) ........................12

**Statutes**

28 U.S.C. § 1367 ...................................................................................................12

**Other Authorities**

15A C.J.S. Conspiracy § 12 (2023)...........................................................................................................25

Fed. R. Civ. P. 15 .................................................................................................................................. 10, 11

Fed. R. Civ. P. 26(a)(2)(B)........................................................................................................................15

Fed. R. Civ. P. 56 .........................................................................................................................................9

L.R. 2.5(b) ....................................................................................................................................................2

Wright, et al., *Fed. Prac. & Proc.* § 1476 (3d ed. 2010)...............................................................................10

## INTRODUCTION

The Court should grant summary judgment in Plaintiff Frost's favor as to all of the counterclaims asserted by Defendants Lareau and Vue Robotics, LLC in their Amended Counterclaim. First, they forfeited these counterclaims by failing to reassert them in their answer to Frost's First Amended Complaint. The Court need go no further than that to grant this motion.

The counterclaims also fail on their merits. Lareau claims he suffered approximately one month of insomnia and severe emotional harm as a result of Frost principal Michael Kirsh calling Vue's insurer to inquire about Vue's insurance coverage, and the insurer's subsequent investigation into Vue's insurance application. Lareau's alleged harm does not rise to the level of "significant" and "lasting," as a matter of law, and Lareau's insomnia was not foreseeable for Kirsh when he made the phone call. Frost is entitled to summary judgment on this claim.

Vue asserts four tortious interference counterclaims. For each, there is no genuine issue of material fact that Frost's interference (to the extent there is any interference at all) was in any way improper. This is an essential element of tortious interference, and each interference counterclaim fails for this reason. Finally, Vue asserts that Frost and TAPCO (an entity that has been a distributor for both Frost and Vue in the past) engaged in a civil conspiracy to harm Vue and its customer relationships. But Frost and TAPCO have not agreed to any scheme, and neither committed any underlying tort, both of which are required to sustain civil conspiracy.

For these reasons, discussed more fully below, the Court should grant this motion and enter summary judgment in Frost's favor as to all of the counterclaims.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.     Frost's business

1.      Plaintiff Frost Solutions, LLC ("Frost Solutions" or "Frost") is a Delaware limited liability company with its principal place of business in Illinois. (ECF No. 110, Defs.' Answer to 1st

Am. Compl. ("Answer"), ¶ 6.) The sole member of Frost Solutions is Clashmore Ventures LLC, whose members are Michael Kirsh and Michael Bott. Kirsh and Bott function as co-CEOs of Frost Solutions and are both involved in its day-to-day operations. (Decl. of J. Oakley ("Oakley Decl.")[1] ¶ 3, Ex. 1, Kirsh Dep. 7:06–19;[2] Ex. 2, Bott Dep. 10:18–12:11.)

2.      On August 9, 2022, Frost Solutions purchased the assets of Frost Control Systems, Inc. ("Frost Control"), including, without limitation, all contract rights and all legal claims that had accrued as of that date. (Ex. 1, Kirsh Dep. 8:11–9:10; Ex. 3 (Asset Purchase Agreement).)

3.      Frost designs, manufactures, and sells environmental and road weather information systems and related products and services, including a proprietary weather-security product called Advance Infrared Monitoring System ("AIMS"). (Answer ¶ 17; Ex. 1, Kirsh Dep. 8:05–10; Ex. 4, Lareau Dep. 44:17–45:06.)

4.      Defendant Christopher Lareau is the former Vice President of Sales for Frost Control, and he worked for Frost Control from approximately April 8, 2020, to October 11, 2021. (Answer ¶¶ 7, 37.) Defendant Patrick Baglien is the former Chief Operating Officer and President of Frost Control, and he worked for Frost Control from approximately March 2019 to October 20, 2021. (Answer ¶¶ 8, 31, 45.)

## II.   Baglien and Lareau found a competing business, Vue Robotics

5.      Before their resignation from Frost Control, Defendants co-founded Defendant Vue Robotics, LLC ("Vue"), with Baglien serving as Vue's Chief Executive Officer and Lareau as its Chief Operating Officer; Vue was formed as a legal entity on or about January 24, 2022. (Answer ¶¶ 47, 53; Ex. 5 (Vue Entity Information); Ex. 6 (Operating Agreement); Ex. 7, Baglien Dep. 10:11–

---

[1]   The Oakley Declaration, attached hereto, discusses and authenticates Frost's exhibits. All "Ex." citations in this Memorandum are to the exhibits to Mr. Oakley's Declaration.

[2]   The deposition exhibits attached to this Memorandum include only the relevant testimony cited. Full deposition transcripts are available upon request, per L.R. 2.5(b).

12; Ex. 4, Lareau Dep. 9:04–23, 13:11–12.)

6.      Vue is a competitor to Frost in the road weather monitoring sector of the environmental sensing market. (Answer ¶ 4; Ex. 4, Lareau Dep. 9:07–21, 35:02–15.) Vue's "cameras detect environmental and weather hazards"—a customer logging into Vue's system "can . . . understand road weather conditions," and Vue's product analyzes and reports "conditions," including "road weather conditions." (Ex. 4, Lareau Dep. 9:06–09, 246:03–247:12.)

7.      On January 5, 2022, an attorney for Frost Control sent Baglien a letter (the "January 5 Letter") stating that "a number of facts have come to the attention of our client indicating that you may have violated your duties of loyalty, care and good faith during your employment with Frost Control." (Ex. 8, (Jan. 5 Ltr.)) The January 5 Letter further stated that such "acts include, but are not limited to, your use of corporate assets to benefit yourself and members of your team at the expense of and without benefit to the corporation or its shareholders," and made clear that Frost Control was "still in the early stages of investigating these issues." (*Id.*)

## III.    Frost sues and then settles with Cory Moore and TAPCO

8.      Frost Control's former Regional Manager of Sales and Business Development, Cory Moore, had resigned from Frost Control in March 2022, and, shortly thereafter, joined Traffic and Parking Control, Inc. ("TAPCO") as a Regional Sales Manager. (Ex. 9, Moore Dep. 21:04–06, 22:15–18, 65:03–10, 86:23–87:02.)

9.      TAPCO is a provider of traffic safety and parking solutions. (*Id.* 23:01–08.) It has a network through which it can distribute road safety products to its customers, including public entities and private businesses. (*Id.*)

10.     Moore was an early investor in Vue, and he served as a "product specialist for VUE," promoting Vue's products while he worked at TAPCO. (*Id.* 88:11–12; Ex. 10 (Moore Email).)

11.     Frost Control had a long-standing business relationship with TAPCO by which TAPCO distributed Frost Control's product to TAPCO's customers. (Ex. 9, Moore Dep. 49:25–50:09.) In September 2022, TAPCO began doing business with Vue. (Ex. 23 (2022 TAPCO Agreement).)

12.     When Frost Control transitioned to Frost Solutions, the new ownership discovered that, in Moore's position at TAPCO, Moore was violating the Confidentiality and Invention Assignment Agreement and the Termination Agreement (the "Moore Agreements") he signed as a condition of his employment. (Decl. of M. Kirsh ("Kirsh Decl.") ¶ 2.)

13.     On December 8, 2022, Frost filed a lawsuit against Moore related to Moore's theft and misuse of Frost's confidential business information and trade secrets and to enforce the restrictive covenants in the Moore Agreements (the "Moore Litigation"). (Ex. 11, *Frost Sols., LLC v. Moore*, No. 1:22-cv-06910 (N.D. Ill.), ECF No. 105 (2d Am. Compl.) ¶¶ 60–70.) Frost also added claims against TAPCO in the Moore Litigation. (*Id.* ¶¶ 75–93.)

14.     On March 1, 2024, TAPCO and Vue entered into a Sales Representation and Distribution Agreement (the "TAPCO Agreement"), negotiated by Moore. (Ex. 12 (2024 TAPCO Agreement).) Under the TAPCO Agreement, TAPCO agreed to market and sell Vue's products and services to TAPCO's customers throughout the country. In return, TAPCO would be paid a fee based on the Vue products and services sold. (*Id.*)

15.     On or about November 6, 2024, Vue received a letter from TAPCO terminating the TAPCO Agreement. (Ex. 13 (Email & Ltr. Terminating TAPCO Agreement).) TAPCO terminated the relationship because it discovered that Vue failed to disclose to TAPCO that Moore was a Vue investor when he had been responsible for negotiating contract terms on TAPCO's behalf, and he had discretion over the margins at which to sell Vue products. (*Id.*) TAPCO conveyed that this represented an unacceptable conflict of interest and violation of the implied covenant of good faith

and fair dealing. (*Id.*)

16.     The Moore Litigation settled in November 2024. (Kirsh Decl. ¶¶ 3.) Frost did not receive any of Vue's confidential information from TAPCO as a result of the settlement, or at any other time. (*Id.* ¶ 4.)

17.     Frost has never received any confidential information from TAPCO about Vue or its customers. (*Id.* ¶ 5.) Frost therefore did not solicit or obtain any TAPCO customers through the use of Vue's confidential information. (*Id.* ¶ 6.) Further, TAPCO has never given Frost access to any Vue product in TAPCO's possession or control. (*Id.* ¶ 7.) Frost does not have, and has never had, any Vue products in its possession or control. (*Id.* ¶ 8.)

18.     Frost and TAPCO have never agreed on any plan or course of action with the object of inflicting harm on Vue, and Frost has never engaged in an unlawful act with the purpose of inflicting harm on Vue. (*Id.* ¶¶ 9–10.)

## IV.     East End Group and Jason Ostrander

19.     In November 2022, prior to contracting with TAPCO, a company called East End Group, Inc. ordered a unit of Vue's ARC 1 System and signed Quotation #S00024 (the "EEG Quote"). (Ex. 14 (EEG Quote); Ex. 15, Ostrander Dep. 22:06–25.)

20.     East End Group was contracting with Frost and Vue at the same time and utilized both products in its business operations. (Ex. 15, Ostrander Dep. 22:21–23:03.)

21.     At the time the EEG Quote was signed, East End Group's Chief Operating Officer was Jason Ostrander. (*Id.* 17:05–06, 19:24–20:09.) He was authorized to access Vue's software platform during his employment with East End Group. (ECF No. 100, Defs.' 1st Am. Countercl. ("Countercl.") ¶ 145; Ex. 15, Ostrander Dep. 54:10–18; Ex. 4, Lareau Dep. 306:06–10.)

22.     Ostrander resigned from full-time employment with East End Group in the fall of 2024, but stayed on part-time until April 2025. (Ex. 15, Ostrander Dep. 31:08–17, 32:23–34:25.)

23.     On or around September 30, 2024, Ostrander joined Frost as its Vice President of Commercial Operations. (*Id.* 32:02–05, 42:08–10, 61:10–12; Ex. 1, Kirsh Dep. 206:18–207:10; Ex. 16 (Ostrander Emp't Offer).) Thus, Ostrander's employment with East End Group and Frost overlapped for approximately seven months. (Ex. 1, Kirsh Dep. 208:19–209:02; Ex. 17, Frost 30(b)(6) Dep. 226:25–227:06.)

24.     While he was a part-time employee, Ostrander accessed Vue's software platform on October 23, November 1, November 19, and November 26, 2024, in connection with his work for East End Group to check construction sites, monitor for labor issues, watch the time lapses, and communicate with construction folks. (Ex. 15, Ostrander Dep. 63:12–17, 65:02–03, 66:04–12, 71:04–06; Ex. 18 (Ostrander Account Login History).)

25.     No one at Frost instructed Ostrander to access Vue's platform or features on Frost's behalf. (Ex. 15, Ostrander Dep. 63:18–23; Kirsh Decl. ¶ 11.) Ostrander did not communicate with anyone at Frost about the Vue platform before or after logging into the Vue system. (Ex. 15, Ostrander Dep. 63:18–64:11, 65:14–66:03, 67:06–15, 68:10–20.) He did not share his account or login credentials with anyone outside of East End Group. (*Id.* at 56:10–12.) And he did not take screenshots or data from Vue's system. (*Id.* at 64:18–25, 67:23–25, 68:01–03).[3] No one at Frost gained access to Vue's platform or features through Ostrander's login. (Kirsh Decl. ¶ 11.)

26.     East End Group had a right to terminate its relationship with Vue, and it did so. (Ex. 14 (EEG Quote); Ex. 4, Lareau Dep. 310:03–05.) East End Group was delinquent in its payments to Vue prior to Ostrander's employment with Frost. (*Id.*)

## V.     Kirsh calls Vue's insurer to compare coverage

27.     While this litigation was pending, Kirsh discovered that Vue's insurer was paying for

---

[3]     Frost's principals confirmed Ostrander's testimony in their own depositions. (Ex. 1, Kirsh Dep. 211:03–06, 211:24–212:20; Ex. 17, Frost 30(b)(6) Dep. 227:14–23, 228:18–25, 229:22–23.).

Defendants' defense. (Ex. 1, Kirsh Dep. 177:24–178:17.) Curious as to the type of coverage that would defend or indemnify a company in this type of litigation, Kirsh called Frost's insurer to inquire as to whether Frost had similar coverage. (*Id.*) Unsatisfied with the result of that call, Kirsh called Vue's insurer to request information about Vue's policy. (*Id.* at 178:06–19, 179:22–180:06.) Kirsh identified himself as an adverse party in litigation with Vue during that call. (*Id.* at 181:02–07.) Kirsh applied for insurance with Vue's insurer as a result of his conversation with the insurance representative. (*Id.* at 178:18–19.)

28.      On or about January 5, 2024, Defendants received a letter from Vue's insurance carrier informing them that it was opening an investigation into their insurance application. (Countercl. ¶¶ 105, 122.)

29.      Lareau believes Kirsh's call was an attempt by Frost to strip Defendants of the insurance coverage financing their defense of this lawsuit. (*Id.* ¶¶ 95–103.) Lareau alleges that Kirsh told Vue's insurer about the January 5 Letter that Frost Control sent to Baglien (notifying him that Frost Control was investigating his actions) in an effort to persuade the insurer that Defendants had omitted material information from their insurance application. (*Id.*)

30.      When asked whether the purpose of his call was to attempt to get Defendants' coverage cancelled, Kirsh responded: "Absolutely not," and: "I know for a fact I didn't go into [the call] thinking that they were going to open an investigation or something like that. I wanted to understand what kind of policy it was[.]" (Ex. 1, Kirsh Dep. 183:04–08, 184:24–185:02.)

31.      Vue's insurer did not refuse to defend Defendants or withdraw coverage as a result of the investigation. (Ex. 4, Lareau Dep. 294:09–14.)

32.      Lareau alleges the insurance investigation caused him mental and emotional harm, including difficultly sleeping, strained relationships with his girlfriend and customers, and a strained "ability to perform [his] job." (*Id.* at 295:07–297:14.) He also testified that these effects lasted for

roughly one month. (*Id.*)

33.    Lareau concedes that he had been on a treatment plan for several years for other medical conditions. (*Id.* at 296:01–03.) His medical records reflect that he has complained of nightmares and insomnia regularly since at least 2021. (Ex. 19 (Lareau's Med. Rs.) at 218–21, 331–34, 358-60, 420–21.)

34.    At Lareau's treatment on January 9, 2024—four days after he received the letter from Vue's insurance company— ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████

35.    Lareau has designated his treating healthcare professional, Nurse Practitioner Daniel Salazar, PMHNP-BC, as the expert who will testify as to his alleged emotional distress and manifestation of physical symptoms. (Ex. 20 (Lareau Expert Disclosure).)

## VI.    Defendants file a Counterclaim and Amended Counterclaim, then fail to replead when Frost amends its Complaint.

36.    On April 3, 2024, Defendants filed their initial Counterclaim, pleading three causes of action against Frost. (ECF No. 72.) Frost moved to dismiss.[4] (ECF Nos. 83, 92.)

37.    Before that motion could be ruled on, Defendants moved for and received leave to file an amended counterclaim.[5] (ECF No. 97.) Defendants filed their First Amended Counterclaim several days later. (Countercl.) Frost moved to dismiss again. (ECF No. 102.)

---

[4]    Frost filed its motion to dismiss on April 24, 2024. (ECF No. 83). On May 24, 2024, the Court entered an order denying without prejudice all then-pending motions while the parties participated in mediation. Mediation was unsuccessful, and Frost refiled its motion to dismiss. (ECF Nos. 90, 92.)

[5]    Frost consented to Defendants amending their Counterclaims but expressly reserved its rights as to the merits of those claims. (ECF No. 97, ¶ 7.)

38.    Before that motion could be ruled on, Frost moved for and received leave to file an amended complaint. (ECF No. 106.) Frost filed its First Amended Complaint the next day. (ECF No. 108.) When Defendants filed their Answer to the First Amended Complaint, they did not plead or otherwise assert any counterclaims. (ECF No. 110.)

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "carries with it the potential to affect the outcome of the suit." *Sanchez v. Warden, FCI Berlin*, No. 22-cv-231-SE, 2023 DNH 051, at *1 (D.N.H. May 3, 2023) (citation omitted). A factual dispute is "genuine" if "a reasonable jury could resolve the point in the favor of the non-moving party." *Id.* (citation omitted). The court considers the undisputed material facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Minturn v. Monrad*, 64 F.4th 9, 14 (1st Cir. 2023). "This standard is favorable to the nonmoving party, but it does not give him a free pass to trial." *Nieves-Romero v. United States*, 715 F.3d 375, 378 (1st Cir. 2013) (citation omitted).

The summary judgment stage is "the put up or shut up moment in litigation." *Jakobiec v. Merrill Lynch Life Ins. Co.*, 711 F.3d 217, 226 (1st Cir. 2013) (citation omitted). "[C]onclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative will not suffice to ward off a properly supported summary judgment motion." *Nieves-Romero*, 715 F.3d at 378 (cleaned up); *see also Quintana-Dieppa v. Dep't of Army*, 130 F.4th 1, 7 (1st Cir. 2025) ("[T]he nonmoving party must present definite, competent evidence to rebut the motion on any issue for which it bears the ultimate burden of proof.").

Where "a district court rules simultaneously on cross-motions for summary judgment, it must view each motion, separately, through this prism." *Delta MB, LLC v. 271 S. Broadway, LLC*, 798

F. Supp. 3d 156, 168 (D.N.H. 2025) (quoting *Estate of Hevia v. Portrio Corp.*, 602 F.3d 34, 40 (1st Cir. 2010)). Accordingly, cross-motions for summary judgment do not alter the summary judgment standard; they simply require the Court "to determine whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 37 F.4th 746, 759 (1st Cir. 2022) (citations omitted).

## ARGUMENT

The Amended Counterclaim asserts six causes of action against Frost. Lareau asserts a counterclaim for negligent infliction of emotional distress (Count I), while Vue asserts counterclaims for tortious interference with the TAPCO Agreement (Count II), tortious interference with contractual relations with TAPCO's customers (Count III), tortious interference with prospective business relations (Count IV), tortious interference with the East End Group Contract (Count V), and civil conspiracy (Count VI).[6] Frost is entitled to summary judgment on each of these counterclaims.

## I.    Defendants forfeited their counterclaims when they did not reassert them in their answer to Frost's First Amended Complaint.

Earlier in this litigation, Defendants filed a Counterclaim and then an Amended Counterclaim. But after Frost filed its First Amended Complaint, Defendants did not assert any counterclaims in or with their answer. (SUMF ¶¶ 36–38.) An amended pleading takes precedence over an earlier pleading. *See* Wright, et al., *Fed. Prac. & Proc.* § 1476 (3d ed. 2010) ("A pleading that has been amended under Rule 15(a) supersedes the pleading it modifies and remains in effect throughout the action unless it subsequently is modified."). The First Circuit has not directly ruled on this issue, but two circuits have held that a defendant's failure to replead counterclaims in response to an amended complaint voids the counterclaims. *Par Pharm., Inc. v. QuVa Pharma, Inc.*,

---

[6]    It appears that only Vue asserts Counts II-VI. To the extent Lareau is a counterclaim-plaintiff on these counts as well, his claims should be dismissed for the same reasons as Vue's.

764 F. App'x 273, 277 n.3 (3d Cir. 2019); *Gen. Mills, Inc. v. Kraft Foods Glob., Inc.*, 495 F.3d 1378,

1378–79 (Fed. Cir. 2007). Sixth Circuit precedent also endorses this conclusion. *See Brink's Cap., Ltd.*

*Liab. Co. v. Joe Randazzo's Fruit & Vegetable, Inc.*, No. 24-cv-11570, 2025 WL 2074327, at *2 (E.D.

Mich. July 23, 2025) (citing *Clark v. Johnston*, 413 F. App'x 804 (6th Cir. 2011)); *Drake v. City of Detroit*,

266 F. App'x 444 (6th Cir. 2008)). Several other district courts, including one within the First Circuit,

have followed this approach. *Doe v. Williston Northampton Sch.*, 766 F. Supp. 2d 310, 313–14 (D. Mass.

2011); *Bremer Bank, Nat. Ass'n v. John Hancock Life Ins. Co.*, No. CIV. 06-1534 ADM/JSM, 2009 WL

702009, at *12 (D. Minn. Mar. 13, 2009), *aff'd sub nom*, *Bremer Bank v. John Hancock Life Ins. Co.*, 601

F.3d 824 (8th Cir. 2010); *Settlement Cap. Corp. v. Pagan*, 649 F. Supp. 2d 545, 562 (N.D. Tex. 2009);

*Johnson v. Berry*, 228 F. Supp. 2d 1071, 1079 (E.D. Mo. 2002).

This approach squares with the plain language of Rule 15:

> The last sentence of Fed. R. Civ. P. 15(a) requires a party to plead in response to an amended pleading. No option is given merely to stand on preexisting pleadings made in response to an earlier complaint. As the language of Rule 13(a) and (b) makes clear, a counterclaim is part of the responsive pleading.

*Johnson*, 228 F. Supp. 2d at 1079. This reasoning applies here. Defendants "abandoned" their

Amended Counterclaim "by failure to prosecute it in response to the first amended complaint." *Id.*

Summary judgment in favor of Frost is therefore required. *Id.*

## II.    Frost is entitled to judgment as a matter of law on Lareau's and Vue's counterclaims.

Although the Court need not go any further to grant summary judgment in Frost's favor

here, each cause of action asserted in the Amended Counterclaim fails on the merits. For the reasons

discussed in Frost's motion to dismiss (ECF No. 102, incorporated herein by reference), and in this

memorandum, Frost is entitled to summary judgment on the counterclaims.

### A.    Lareau's counterclaim for NIED (Count I) fails to create a genuine dispute of material fact on any element.

Lareau cannot establish any element of his negligent infliction of emotional distress

("NIED") counterclaim. New Hampshire law requires a party alleging NIED to prove (1) causal negligence of the defendant; (2) foreseeability; and (3) serious mental and emotional harm accompanied by objective physical symptoms.[7] *William Soler Justice v. Sununu*, No. 20-cv-517-PB, 2024 DNH 019, at *7 (D.N.H. Mar. 19, 2024) (quoting *O'Donnell v. HCA Health Servs. of N.H., Inc.*, 152 N.H. 608, 611 (2005)).

There is no connection between Lareau's alleged emotional damage and Frost that is sufficient to support a legally cognizable claim. Lareau asserts that in November 2023, Kirsh, a principal of Frost, attempted to strip Defendants of the insurance coverage financing their defense of this lawsuit by calling Vue's insurer and accusing Defendants of "bad stuff." (SUMF ¶ 29.) Specifically, Lareau alleges that Kirsh told Vue's insurer about the January 5 Letter that Frost Control sent to Baglien, notifying Baglien that Frost Control was investigating his actions in an effort to persuade the insurer that Defendants had omitted material information from their insurance application. (*Id.*) Thereafter, around January 5, 2024, Vue's insurer notified them it was opening an investigation—but it never revoked coverage. (*Id.* ¶ 28.) Lareau alleges the insurance investigation caused him serious mental and emotional harm. (*Id.* ¶ 32.)

However, Kirsh testified that his reasons for contacting Vue's insurer were to determine whether Frost could obtain different insurance coverage. When Kirsh discovered Vue's insurance carrier was paying for Defendants' defense in this action, he was curious as to the type of coverage that would defend or indemnify a company in this type of litigation. (SUMF ¶ 27.) Kirsh first called his own carrier to inquire about additional coverage, but when his carrier was unfamiliar with such a

---

[7]    The Court has supplemental jurisdiction over the state law claims alleged in Defendants' Amended Counterclaim. 28 U.S.C. § 1367. "A federal court . . . exercising supplemental jurisdiction over a state law claim must apply state substantive law." *Barton v. Clancy*, 632 F.3d 9, 17 (1st Cir. 2011) (citation omitted). Specifically, the Court "must apply the substantive law of the state in which it sits." *Bi-Rite Enters., Inc. v. Bruce Miner Co., Inc.*, 757 F.2d 440, 442 (1st Cir. 1985). Defendants have never challenged the application of New Hampshire law to their counterclaims. (*See* ECF No. 103.)

policy, he called Vue's carrier. (*Id.*) He stated: "I know for a fact I didn't go into [the call] thinking that they were going to open an investigation or something like that. I wanted to understand what kind of policy it was[.]" (*Id.* ¶ 30.) When asked whether the purpose of his call was to attempt to get Defendants' coverage cancelled, Kirsh responded: "Absolutely not." (*Id.*)

Kirsh, as a matter of law, did not owe a duty of care to Lareau, and he could not have reasonably foreseen that his call would result in Lareau's alleged emotional harm. Further, the call is too remote to be the legal cause of the alleged harm, and the alleged harm itself is insufficient to establish an NIED claim.

### 1. Frost did not owe Lareau a legal duty and could not have reasonably foreseen the harm alleged.

Neither Frost nor Kirsh owed Lareau a duty of care. An NIED claim, "like any other negligence claim, demands the existence of a duty from the defendant to the plaintiff." *BK v. N.H. Dep't of Health & Hum. Servs.*, 814 F. Supp. 2d 59, 72 (D.N.H. 2011). Whether a duty exists is a question of law for the Court. *Grady v. Jones Lang LaSalle Constr. Co., Inc.*, 171 N.H. 203, 207 (2018). Lareau alleged that Frost owed him a duty of reasonable care, but suggested in previous dispositive motion briefing that the Protective Order and the parties' role as adversaries in litigation also established a duty.[8] (Countercl. ¶ 180; *see* ECF No. 103, Defs.' Obj. to Pl.'s Mot. to Dismiss Am. Countercl. at 1, 20–23.)

Frost and Lareau have no relationship that would give rise to a duty of care. No duty is owed to adversaries in litigation—a proposition that would threaten litigants with circular rounds of lawsuits based on the allegedly negligent conduct in the suit before. Indeed, the Court has never created such a duty. *Cf. MacMillan v. Scheffy*, 147 N.H. 362, 365 (2001) ("[W]e decline to impose on

---

[8] Defendants assert that because their insurance policy was marked "Confidential," Kirsh using the insurance policy for any purpose violated the parties' Protective Order. (Countercl. ¶¶ 89–91, 96, 104.) The Protective Order, however, does not create a heightened duty—if anything, it is the type of contractual agreement that might preclude a negligence claim.

an attorney a duty of care to a non-client whose interests are adverse to those of the client."). Because there is no cognizable basis for Frost to owe Lareau a duty, Lareau's NIED claim fails as a matter of law. *Pruden v. CitiMortgage, Inc.*, No. 12-cv-452-LM, 2014 DNH 115, at *18–19 (D.N.H. May 23, 2014) (granting summary judgment in favor of the defendant on the plaintiff's NIED claim for failure to show a duty existed).

Even if such a duty existed, Kirsh's conduct would not have breached it. The scope of a defendant's duty is limited to risks that are "reasonably foreseeable." *Macie v. Helms*, 156 N.H. 222, 224–25 (2007). It was not reasonably foreseeable that a phone call to Vue's insurance carrier asking about insurance coverage options would cause Lareau severe emotional distress. The connection between the two is far too attenuated. *See Wilder v. City of Keene*, 131 N.H. 599, 602–05 (1989). Kirsh had no reason to know that Defendants had not already submitted the January 5 Letter as part of Vue's insurance application. Kirsh would have had to know that Vue had excluded the January 5 Letter in its insurance application, and reasonably foresee that his call would result in the insurer opening an investigation—*and* that such an investigation would cause Lareau severe emotional distress. The "injury" is simply too far removed from Kirsh's actions to be reasonably foreseeable.

### 2.     Lareau fails to establish both causation and "significant" and "lasting" harm.

Lareau's NIED claim fails for several other reasons. To give rise to an NIED claim, the emotional harm at issue "must be a significant, painful mental experience with lasting effects." *O'Donnell*, 152 N.H. at 611. Lareau does not allege that he suffered any emotional harm severe enough to qualify here. He testified that the possibility of Vue's insurance coverage being revoked and not being able to afford his defense made it difficult for him to sleep, "strained" his relationships with his girlfriend and with unidentified Vue customers, and "strained" his "ability to perform [his] job at the time." (SUMF ¶ 32.) He also testified that these effects lasted for roughly one month. (*Id.*)

The alleged "strained" relationships do not support Lareau's claim here because only "physical symptoms of [emotional] distress" can give rise to an NIED claim. *O'Donnell*, 152 N.H. at 611. And Lareau's claimed one month of insomnia is neither "significant" nor "lasting." *Id.* Further, Lareau concedes that he had been on a treatment plan for several years for other medical conditions, indicating that any conduct by Frost was only a secondary cause of any alleged emotional harm. (SUMF ¶ 33); *see Pichowicz v. Hoyt*, No. 92-388-M, 2000 DNH 040, at *2, *4 (D.N.H. Feb. 11, 2000) (rejecting NIED claim because, among other reasons, the distress was "secondary" to other stressors unrelated to the allegedly tortious conduct). Indeed, his medical records reflect that he has complained of nightmares and insomnia regularly since 2021—long before Vue's insurance company opened an investigation in January 2024. (SUMF ¶ 34.)

Additionally, New Hampshire courts have "repeatedly held that expert testimony is required to prove physical symptoms suffered from alleged negligent infliction of emotional distress." *O'Donnell*, 152 N.H. at 611 (cleaned up); *In re Bayview Crematory, LLC*, 155 N.H. 781, 786 (2007). This serves two purposes: "it establishes both the seriousness of the emotional injury and the causal relationship between that injury and the defendant's alleged negligence." *Michnovez v. Blair*, No. 10-cv-110-LM, 2012 DNH 114, at *9 (D.N.H. July 5, 2012). Lareau designated Daniel Salazar, PMHNP-BC, his treating healthcare provider, as the expert who will testify as to "his treatment of Mr. Lareau" and that "Frost's conduct . . . likely caused, aggravated, and/or significantly exacerbated [his] emotional distress." (SUMF ¶ 35.) Salazar has not provided an expert report under Fed. R. Civ. P. 26(a)(2)(B). Critically, "in the absence of a report, a plaintiff's treating physician cannot testify to opinions based on information not learned during the course of treatment"—in other words, causation opinions must be based on the treatment alone. *Westerdahl v. Williams*, 276 F.R.D. 405, 408 (D.N.H. 2011) (cleaned up). The healthcare provider cannot answer hypothetical questions or provide opinions based on information obtained outside the treatment relationship. *Id.*; *Vosburgh v.*

*Bourassa*, No. 07-CV-101-SM, 2008 DNH 133, at *7–8 (D.N.H. Aug. 5, 2008) (holding that, without a report, a treating physician could testify as to "his diagnosis and treatment of plaintiff," but not the cause of the plaintiff's condition, because that was not based on his "examination and treatment of plaintiff").

Lareau's medical records make clear that Salazar did not conclude during the course of treatment that any condition was caused by actions taken by Kirsh or Frost. (SUMF ¶ 34.) Although Mr. Salazar makes general references to "legal proceedings" throughout his notes, there are no references to the insurance investigation that is the basis of Lareau's claim, not even from the appointment Lareau attended four days after Vue received the insurance investigation letter. (*Id.*) Accordingly, Salazar cannot opine that Frost's or Kirsh's actions, or the insurance investigation, caused Lareau harm. Because Mr. Salazar cannot provide causation testimony, Lareau cannot establish a prima facie case for NIED.

***

For all of these reasons, Lareau cannot prove the required elements of negligent infliction of emotional distress as a matter of law, and there is no genuine issue of material fact regarding this counterclaim. Accordingly, Frost is entitled to summary judgment on Count I.

### B.     Vue cannot prevail on any of its tortious interference claims (Counts II–V).

Vue asserts four causes of action for tortious interference: three related to TAPCO and one related to East End Group. Count II alleges that Frost interfered with the TAPCO Agreement; Count III alleges Frost interfered with existing customers who purchased Vue products through TAPCO; Count IV alleges Frost interfered with prospective customers Vue planned to obtain through TAPCO; and Count V alleges tortious interference with the EEG Quote between Vue and East End Group. (Countercl. ¶¶ 157–76.) None of these claims have evidentiary support, and they are so threadbare that they would not have survived Frost's motion to dismiss.

"New Hampshire recognizes two distinct tortious interference theories: intentional interference with *existing* contractual relations and intentional interference with *prospective* contractual relations." *Wilcox Indus. Corp. v. Hansen*, 870 F. Supp. 2d 296, 306 (D.N.H. 2012) (emphases added). Counts II, III, and V invoke the former and Count IV invokes the latter. Tortious interference with contractual relations requires showing (1) the plaintiff had an economic relationship with a third party; (2) the defendant knew of this relationship; (3) the defendant intentionally and improperly interfered with this relationship; and (4) resulting harm to the plaintiff. *Boyd v. Wells Fargo Bank, N.A.*, No. 18-cv-253-JL, 2018 DNH 102, at *2 (D.N.H. May 17, 2018) (citing *City of Keene v. Cleaveland*, 167 N.H. 731, 738 (2015)).

Tortious interference with *prospective* contractual relations involves the same four-element framework, except the first element differs significantly: "the relationship between the plaintiff and third party must give rise to a reasonable expectation of economic advantage." *Planet Fitness Int'l Franchise v. JEG-United, LLC*, 633 F. Supp. 3d 484, 501 (D.N.H. 2022) (cleaned up). Further, when the alleged improper interference involves a prospective rather than established contractual relationship, the prospective relationship must be "sufficiently concrete" to be reasonable—"mere hope for a future successful negotiation that might result in a contract is not sufficient." *Id.* at 503. The scope of this claim is intentionally narrow. Discussions about a potential economic relationship, without identification of any terms or scope, are insufficient to create a reasonable expectation of consummating an economically advantageous transaction. *Id.* As discussed below, all of these counts fail as a matter of law.

1.    **Counts II and III fail because any alleged interference resulted from an assertion of a legally protected interest and was not improper.**

There is no genuine dispute of material fact that Frost did not *intentionally* and *improperly* interfere with Vue's relationship with TAPCO and TAPCO customers. Vue thus cannot establish a requisite element of Counts II and III, which is fatal to these counterclaims.

First, TAPCO terminated its contract with Vue because of Vue's own misconduct. TAPCO "discovered that Vue failed to disclose to TAPCO that it maintained a financial relationship" with Cory Moore, the TAPCO employee "who was responsible for negotiating contract terms on TAPCO's behalf with Vue and had discretion over the margins at which to sell Vue products." (SUMF ¶ 15.) TAPCO pointed out that this represented an unacceptable conflict of interest and violation of the implied covenant of good faith and fair dealing, and informed Vue that this was the reason why it terminated the TAPCO Agreement. (*Id.*)

TAPCO's legally enforceable justification for the cancellation precludes the assertion of outside interference. *Montrone v. Maxfield*, 122 N.H. 724, 726 (1982) (granting summary judgment because the agent sued had acted within the purview of his contract and therefore could not be sued for tortious interference); *Emery v. Merrimack Valley Wood Prods., Inc.,* 701 F.2d 985, 988–89 (1st Cir.1983) (applying New Hampshire law). There is no genuine dispute of material fact as to the reason TAPCO terminated the TAPCO Agreement, leading to Vue's loss of TAPCO customers—it was Vue's own misconduct.

Despite TAPCO's straightforward (and undisputed) reason for cancelling its contract with Vue, Vue attempts to manufacture interference by Frost by referencing the Moore Litigation. "Mere interference, in itself, is legally insufficient to state a claim. Rather, only *improper* interference is deemed tortious in New Hampshire." *Boyd*, 2018 DNH 102, at *2 (cleaned up). "[T]he use of ordinary means of persuasion or the exertion of limited economic pressure will not, by itself, be sufficient to establish tortious interference with a prospective contractual relationship." *Planet Fitness Int'l Franchise*, 633 F. Supp. 3d at 501–02 (cleaned up). Instead, "improper" conduct is typically associated with fraud and illegality. *See Judge v. Moving Into Maths*, No. CIV. 93-213-JD, 1994 WL 262883, at *4 (D.N.H. Jan. 11, 1994).

It is undisputed that no such fraud or illegality exist here. The Moore Litigation itself cannot provide a foundation for tortious interference. Frost's assertion of its legally protected interest—its right to pursue litigation and protect its legitimate interests—is not improper as a matter of law. (Countercl. ¶¶ 163–66.) Certain conduct, "which would otherwise amount to tortious interference with contractual relations, is justified where an employer has acted to protect its own legitimate interests." *Tsiatsios v. Anheuser-Busch, Inc.*, No. 07-CV-003-JL, 2009 DNH 009, at *5 (D.N.H. Jan. 16, 2009). For example, use of the courts to protect one's own legitimate business interests by enforcing a valid restrictive covenant does not constitute improper interference. *Id.* Moreover, this conduct is protected from liability by the *Noerr-Pennington* doctrine. *See Green Mountain Realty Corp. v. Fifth Est. Tower, LLC*, 161 N.H. 78, 86 (2010) (discussing and finding "persuasive" a Second Circuit case holding that "the filing of a single non-sham lawsuit" was entitled to *Noerr-Pennington* immunity and thus "could not form the basis of . . . a common law claim for tortious interference with business expectancy" (citing *Suburban Restoration Co., Inc. v. Acmat Corp.*, 700 F.2d 98 (2d Cir. 1983))).

Frost took the exact same action in the Moore Litigation that the court permitted in *Tsiatsios*—enforcing the restrictive covenants Moore signed as an employee of Frost Control. 2009 DNH 009, at *5. Frost asserted claims in the Moore Litigation related to Moore stealing its confidential business information and trade secrets, and then (after joining TAPCO) using that information to redirect customers to Vue. (SUMF ¶ 13.) In essence, Moore was converting TAPCO from a Frost customer to a competitor. (*Id.*) Frost amended its complaint in the Moore Litigation to add TAPCO as a defendant, asserting claims of tortious interference and civil conspiracy against both TAPCO and Moore—again, to protect Frost's legitimate interest in its contracts and business relationships with customers and prospective customers. (*Id.*) Frost eventually settled with both Moore and TAPCO. (*Id.* ¶ 16.) Thus, Frost's allegedly improper conduct was simply the prosecution of its case in the Moore Litigation. (*Id.* ¶ 13.)

19

Count III (interference with TAPCO customers) is a corollary to Count II (interference with the TAPCO Agreement), and it fails for the same reason. (SUMF ¶¶ 9, 14.) Further, Frost did not receive any confidential information from TAPCO about Vue or its customers. (SUMF ¶ 17.) Frost therefore did not solicit or obtain any TAPCO customers through use of Vue's confidential information. (*Id.*) TAPCO has never given Frost access to any Vue product in TAPCO's possession or control. (*Id.*) Frost does not have, and has never had, any Vue products in its possession or control. (*Id.*) These undisputed facts eliminate Vue's supposed basis for asserting that Frost tortiously interfered with its TAPCO customers.

Additionally, Vue fails to identify specific TAPCO customers or contracts that would support this claim. Vue also cannot show any breach of TAPCO's contracts with its own customers. "[W]here contractual obligations were performed, there can be no claim for tortious interference with contractual relations." *Tessier v. Rockefeller*, 162 N.H. 324, 337 (2011). That is, Vue cannot show that TAPCO stopped servicing its own customers by switching from Vue to another distribution partner. And more fundamentally, Vue cannot sue for tortious interference of a contract it was not a party to. *Barrows v. Boles*, 141 N.H. 382, 393 (1996) (elements of tortious interference include showing "the defendants wrongfully induced the third party to breach his agreement *with the plaintiff*" (emphasis added)).

### 2.    Count IV fails because there is no genuine dispute that Frost did not improperly interfere with any Vue prospective business.

Count IV is based on allegations that Frost improperly interfered with Vue's contractual relations with prospective customers related to the TAPCO Agreement. Specifically, Vue alleges that Frost "induced TAPCO to share Vue's confidential information" and then misused it to interfere with customers who planned to purchase Vue's products through TAPCO. (Countercl. ¶¶ 175–76.) Summary judgment in favor of Frost is warranted here for the same reasons articulated above: Frost did not receive confidential information from TAPCO about Vue or its customers, Frost did not

20

solicit or obtain any TAPCO customers through use of Vue's confidential information, and Frost has never possessed Vue's technology or products. (SUMF ¶ 17.) Thus, Vue cannot show improper interference.

Further, the claim for interfering with prospective relationships is more narrow than existing relationships, and requires Vue to show that the alleged relationships were sufficiently concrete. *Planet Fitness Int'l Franchise*, 633 F. Supp. 3d at 503. Discussion about a potential economic relationship without identification of terms or scope is insufficient. *Id.* Vue cannot show any concrete relationship here.

Lareau identified the potential customers on which this claim relies as "in some cases, those were customers that had kind of already given the verbal that 'We want to work with Vue Robotics.'" (Ex. 4, Lareau Dep. 322:12–15.) Further, Frost's interrogatories requested that Defendants identify all of Vue's prospective customers since its formation in 2022. (Ex. 21, Defs.' 2d Supp. Objs. and Resps. to Pl.'s 1st Set of Interrogs., Resp. to Interrog. No. 5.) In response, Defendants referenced charts identifying "any Vue Robotics customer that also appears in the spreadsheets Frost Solutions produced" as improperly solicited customers, and stated that it "considers any attendee of an industry trade show and/or event at which Vue Robotics attends and/or exhibits, as well as any member of any organization or association affiliated with all such industry trade shows and/or events, to be a prospective customer of Vue Robotics." (*Id.*) These vague, hypothetical references to unidentified prospective customers cannot show a genuine dispute of material fact as to Count IV. *See Planet Fitness*, 633 F. Supp. 3d at 500.

### 3.    Count V fails because Frost did not interfere with the EEG Quote, and Vue was not damaged by Ostrander's authorized access to its system.

Vue next asserts that Frost tortiously interfered with Vue's contractual relationship with East End Group via Jason Ostrander, a third party. Ostrander, however, had valid login credentials to Vue's system at the time of his access, and Vue admits it can articulate no recoverable damages as a

result of Ostrander accessing its system. Again, Vue must show *improper* interference—and that Vue suffered damages as a result. *Boyd*, 2018 DNH 102, at *2. The undisputed facts make clear that neither element can be met.

At all times relevant to this counterclaim, Ostrander was an East End Group employee with authorized access to Vue's system. Ostrander was Chief Operating Officer of East End Group when it began contracting with Vue in November 2022. (SUMF ¶ 21.) Vue granted Ostrander access to its software platform as part of its services. (*Id.*) Although Ostrander resigned as COO of East End Group in the fall of 2024, he stayed on part-time through April 2025. (*Id.* ¶ 22.) In the interim, Ostrander had joined Frost as its Vice President of Commercial Operations around September 30, 2024. (*Id.* ¶ 23) Ostrander accessed Vue's software platform on October 23, November 1, November 19, and November 26, 2024, to perform work for East End Group—checking construction sites, monitoring for labor issues, watching the time lapses, and communicating with construction workers. (*Id.* ¶ 24.)

First, the EEG Quote is a signed quote that does not include or incorporate any of the obligations Vue claims a breach of here. (<u>Ex. 14</u>, EEG Quote & Cancellation Email.) They are thus not part of the EEG Quote, and Vue cannot sue for tortious interference over obligations its counterparty never agreed to. *Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*, 229 F. Supp. 2d 70, 73 (D.H.H. 2002) (granting summary judgment on tortious interference claim where the alleged interference related to negotiations for a contract that was never finalized).

Second, Ostrander had valid login credentials to the Vue platform at all times when he accessed it; his access was therefore proper. Lareau conceded at deposition that if Ostrander was working for East End Group at the time he accessed the Vue system, he would be able to log in. (SUMF ¶ 21.) It is undisputed that Ostrander was a part-time employee of East End Group in October and November 2024. (*Id.* ¶ 22.)

Third, Ostrander was not instructed to access the Vue platform by or for anyone at Frost. (SUMF ¶ 25.) Ostrander did not communicate with anyone at Frost about the Vue platform prior to or after logging into the Vue system. (*Id.*) He did not share his account or login credentials with anyone outside of East End Group. (*Id.*) And he did not take screenshots or capture data from Vue's system. (*Id.*) Thus, it is undisputed that none of Ostrander's actions related to the Vue platform were at the request or for the benefit of Frost. Instead, although he could not recall each specific reason he logged into Vue's system on the four days in October and November 2024, he testified that he would generally use the Vue platform and cameras to check construction progress, check job sites for labor issues, and watch the video time lapses—that is, in his capacity as an employee of East End Group, for East End Group purposes. (*Id.*) This confirms that Ostrander's actions were legitimate, and he did not access the platform as an agent of Frost.

Finally, Vue did not suffer any damages from Ostrander's access. Vue concedes that East End Group had a right to terminate its relationship with Vue, and that East End Group already had not paid on the contract in several years, predating Ostrander's employment with Frost. (SUMF ¶ 26.) No one at Frost accessed Vue's platform or features through Ostrander's login. (*Id.* ¶ 25.) Vue's other purported damages—filing a cybersecurity insurance claim and hiring cybersecurity counsel—are too vague and remote to be compensable. (Ex. 22, Vue 30(b)(6) Dep. 39:08–40:15); *see Davric Maine Corp. v. Rancourt*, 216 F.3d 143, 150 (1st Cir. 2000) (granting summary judgment because mere innuendo and conjecture were insufficient to create a causal link between the alleged interference and the claimed damage).

The timeline of Ostrander's employment and access are established and cannot be disputed. Ostrander, Bott, and Kirsh have each testified that Ostrander was not asked to access Vue's platform for Frost's benefit, and Frost's personnel confirmed that they did not access Vue's platform or technology through Ostrander's login. Thus, there is no genuine dispute of material fact

as to the lack of improper interference and lack of resulting harm, and Frost is therefore entitled to summary judgment on this claim.

### C.    Count VI fails for several reasons, including the lack of an underlying tort.

As established above, Frost neither had access to Vue's confidential information nor engaged in wrongful conduct with TAPCO. Nevertheless, Vue claims that shortly after TAPCO terminated the TAPCO Agreement, Frost and TAPCO were "actively engag[ed] . . . in a campaign to cause customers to cease doing business with Vue." (Countercl. ¶ 172.) Vue alleges that Frost and TAPCO jointly engaged in a conspiracy to commit a lawful act by unlawful means by (1) inducing Vue's customers to reduce their business with Vue or cease doing business with Vue altogether; (2) soliciting Vue's prospective customers utilizing Vue's confidential information against Vue in the process; and (3) spreading false information about Vue in the marketplace. (*Id.* ¶¶ 214–17.)

The elements of civil conspiracy are "(1) two or more persons (including corporations); (2) an object to be accomplished (i.e. an unlawful object to be achieved by lawful or unlawful means or a lawful object to be achieved by unlawful means); (3) an agreement on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." *Moore v. Mortg. Elec. Registration Sys.*, 848 F. Supp. 2d 107, 134 (D.N.H. 2012) (quoting *Jay Edwards, Inc. v. Baker*, 130 N.H. 41, 47 (1987)).

Here, the underlying tort claims are Vue's allegations of tortious interference with contractual relations as to the TAPCO agreement (Count II), with TAPCO customers (Count III), and prospective business relations (Count IV). In New Hampshire, there is no such thing "as a civil action based upon conspiracy alone. For a civil conspiracy to exist, there must be an underlying tort which the alleged conspirators agreed to commit." *Melendez v. Univ. of N.H.*, No. 23-cv-00172-SM-TSM, 2024 WL 5408179, at *14 (D.N.H. Nov. 12, 2024) (citation omitted). "Where the court dismisses the underlying tort because the plaintiff has failed to allege the essential elements, the

conspiracy claims must also be dismissed." *McNell v. Hugel*, No. CIV. 93-462-JD, 1994 WL 264200, at *8 (D.N.H. May 16, 1994); *see also Movitz v. Home Depot U.S.A., Inc.*, 82 F. App'x 230, 231 (1st Cir. 2003) (noting that under New Hampshire law, "if the underlying tort claim fails, the action for civil conspiracy also fails"). For the reasons discussed above, there is no genuine dispute of material fact that each of those counterclaims fail as a matter of law. Thus, those torts cannot support civil conspiracy.

Further, Frost and TAPCO have never agreed on any plan or course of action with the object of inflicting harm on Vue, and Frost has never engaged in an unlawful act with the purpose of inflicting harm on Vue. (SUMF ¶ 18.) *Lewis v. Abramson*, 673 F. Supp. 3d 72, 85 (D.N.H. 2023) (even a showing that alleged co-conspirators interacted with one another and carried out similar torts is insufficient); *see* 15A C.J.S. Conspiracy § 12 (2023) ("Without a meeting of the minds, the independent acts of multiple wrongdoers do not amount to a conspiracy"). There is therefore no genuine dispute of material fact as to several elements required to prevail on civil conspiracy. Accordingly, Frost is entitled to summary judgment on Vue's civil conspiracy counterclaim.

## CONCLUSION

For the reasons discussed above, the Court should grant this motion, enter summary judgment in Frost's favor as to all of the causes of action asserted in Defendants Christopher Lareau and Vue Robotics, LLC's First Amended Counterclaim, and award any further relief that the Court deems just and proper.

Dated: February 17, 2026

Respectfully submitted,

**FROST SOLUTIONS, LLC,**

By its attorneys,

/s/ *Laura L. Carroll*
Laura L. Carroll (NH Bar No. 17444)
ArentFox Schiff LLP
800 Boylston Street, 32nd Floor
Boston, MA 02199
Tel:    (617) 973-6100
Email:  laura.carroll@afslaw.com

Todd A. Rowden (admitted *pro hac vice*)
James L. Oakley (admitted *pro hac vice*)
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, IL 60601
Tel:    (312) 527-4000
Fax:    (312) 527-4011
Email:  trowden@taftlaw.com
        joakley@taftlaw.com

Amir R. Tahmassebi (admitted *pro hac vice*)
KONICEK & DILLON, P.C.
70 West Madison Street, Suite 2060
Chicago, IL 60602
Tel:    (312) 328-9166
Fax:    (630) 262-9659
Email:  amir@konicekdillonlaw.com