## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

_____ )
                                        )
FROST SOLUTIONS, LLC,                   )
                                        )
              Plaintiff,                )        Civ. Action No. 1:22-CV-00401-SE
                                        )
v.                                      )
                                        )        **ORAL ARGUMENT REQUESTED**
PATRICK BAGLIEN, CHRISTOPHER            )
LAREAU, and VUE ROBOTICS, LLC,          )
                                        )
              Defendants.               )
_____ )

# PROVISIONALLY FILED UNDER SEAL

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR
PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF'S TECHNOLOGY AND
CUSTOMER INFORMATION TRADE SECRET CLAIMS
<u>(COUNTS I AND II OF THE FIRST AMENDED COMPLAINT)</u>**

# **TABLE OF CONTENTS**

II.     INTRODUCTION ............................................................................................... 1

III.    STATEMENT OF MATERIAL UNDISPUTED FACTS ................................. 2

   A.    Frost Solutions' Purported Technical Trade Secrets ....................................... 2

     1.    The Former Frost Control's Technology ................................................... 5

     2.    The Former Frost Control Stopped All Product Development in 2021 ..................... 7

     3.    The Former Frost Control Openly Shared Information About its Future Product Plans and Details About Its Technology ................................................... 8

     4.    Vue Retained Paragon to Design a Device from Scratch ............................. 10

   B.    Frost Solutions' Purported Customer Trade Secrets ....................................... 13

     1.    The Identities and Contact Information of the Entities Identified in Frost Solutions' Damages Disclosure Are Publicly Available ......................................... 14

     2.    The Entities Identified in Frost Solutions' Damages Disclosure are Largely Public Entities Subject to Public Records Disclosure Laws ................................. 14

IV.    STANDARD OF REVIEW ............................................................................... 16

V.     ARGUMENT ..................................................................................................... 16

   A.    Frost Solutions Has the Burden to Prove its Trade Secrets Claims ................ 16

   B.    Frost Solutions' Technology Trade Secret Claims Fail .................................. 18

     1.    Frost Solutions Failed to Sufficiently Specify its Alleged Technology Trade Secrets. 18

     2.    Frost Solutions' Purported Technology Trade Secrets are Generally Known and Readily Ascertainable ......................................................................... 20

     3.    The Customer Feedback Is Not Confidential ............................................ 26

     4.    Independent Development Is Not Actionable ........................................... 28

   C.    Frost Solutions' Customer Information Trade Secret Claims Fail .................. 31

     1.    The Identities and Contact Information of Frost Solutions and/or Frost Control's Current, Former, and Prospective Customers Are Not Protectable Trade Secrets .............. 31

     2.    Information Provided to Public Entities is Subject to Public Disclosure Laws and is Therefore Not Protectable as a Trade Secret ........................................... 33

VI.    CONCLUSION ................................................................................................... 35

## II.    **INTRODUCTION**

Plaintiff, Frost Solutions, LLC ("Frost Solutions"), attempts to secure noncompetition restrictions for which it did not bargain through an expansive interpretation of the term "trade secret." This gambit manifests in two ways. First, Frost Solutions claims that every aspect of its technology is a trade secret, including knowledge of the "features and functionalities" its system performs, which are obvious to any user or observer. Frost Solutions attempts to claim *what* its system does as trade secrets because there is no evidence and no allegations that Patrick Baglien ("Baglien") or Christopher Lareau ("Lareau") had any knowledge of *how* the system worked. By proscribing a list of features and functionalities that all competitors in the marketplace also deploy, Frost Solutions attempts to stifle lawful competition to prevent Baglien and Lareau from working in an industry where the basic features are the same from company to company. Frost Solutions makes no effort to distinguish the purported trade secrets from what is generally known or readily ascertainable. Its claim is based on technology that did not exist when Baglien and Lareau worked at their former employer, the now defunct Frost Control Systems ("Frost Control"). Rather, the claim is that Baglien and Lareau had committed to memory detailed information about products Frost Control planned to develop, even though the record is clear that Frost Control abandoned all development of product enhancements months before Baglien and Lareau resigned. When Frost Control cratered and announced to the world its intention to liquidate, the owners actively shopped the remaining assets and in so doing, openly publicized the concepts for possible future enhancements it had shelved without securing any promises of confidentiality. Frost Solutions also claims that feedback received from customers about its products is a trade secret, even though the record is clear that such information is not confidential in any respect. Finally, Frost Solutions cannot overcome the undisputed fact that Vue Robotics, LLC ("Vue") hired a third-party to develop its product from scratch and without any reference to

1

or use of any information pertaining to either Frost company, so its systems were, by definition, independently developed.

The second way Frost Solutions extends the concept of a trade secret beyond its statutory bounds is by claiming that the identity of its customers and the available customer base is a trade secret. In truth, such information about customers is widely available, including by purchase or from government websites. Frost also claims information about its relationships with governmental entities is a trade secret, even though those entities are subject to right-to-know laws and must, as a matter of law, share information about their relationships with vendors. Neither Frost Controls nor Frost Solutions attempted to shield its information from such public disclosures, as evidenced by the fact that the information was readily provided in response to simple letters requesting it.

As demonstrated in this Memorandum, Defendants are entitled to judgment as a matter of law as to Counts I and II of Plaintiff's First Amended Complaint.

### III.     <u>STATEMENT OF MATERIAL UNDISPUTED FACTS</u>

#### A.     Frost Solutions' Purported Technical Trade Secrets

In its Amended Complaint, Frost Solutions alleges violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*. and New Hampshire's Uniform Trade Secrets Act, RSA 350-B. Frost Solutions identifies the purported technology trades secrets as:

(i)     proprietary technology, including AIMS, which is described as the AIMs 2.0 device, which included a solar powered, cellular-connected camera equipped with weather-detecting AI image recognition as memorialized in FROST_0018930, a document produced in discovery;

(ii)     overall computer systems and software architecture associated with AIMS technology, which it describes as the Frost Tech User Interface ("Frost Tech UI"), a platform for customers to utilize, manage and gather data from the AIMS 2.0 device; and Frost Vision, a weather detecting AI image recognition model ("Frost Vision"). They further describe Frost Vision and Frost Tech UI to include their development plans, the strategy behind their development, their wireframes/blueprints, web design, use of data sourced from third-party cameras and sensors, as well as marketing plans;

2

(iii)    information about product design and development; and
(iv)    information related to specific vendor and supplier performance, as that information relates to the reliability and efficacy of the components for Frost Solutions' specific products.

Pl.'s First Am. Compl. ("FAC") at ¶¶ 24-26.

Frost Solutions ***does not*** allege that Baglien and Lareau took any documents or files embodying any technological trade secret.[1]  Rather, the claim is that Baglien and Lareau knew about the problems plaguing Frost Control's product and used that purportedly secret knowledge to design the Vue product.  Specifically, those purportedly secret problems were: ███

███████████████████████████████████████████████████████████████████████

████████████████████████.  Bott Day 2 at 80, 82, 85-86.[2]  According to Frost Solutions,

Baglien and Lareau also learned from their time at Frost Control ██████████████

█████████████████████████████████████████████████.  *Id*. at

87.  For Frost Solutions, the knowledge of ████████████████████████████████

███████████████████████████████████.  *Id*. at 88,[3] 123-24.[4]

When asked to identify the similarities between the Frost Solutions' product and the Vue

product that evidence misappropriation of trade secrets, Mr. Bott responded, "█████████

██████████████████████████████████████"  *Id*. at 122.  To him, ████████████████

██████████████████

[1] Michael Bott, Frost Solutions' co-owner, testified that █████████████████████████████
████████████████████ Bott Depo. (1/8/2026)
("Bott Day 2") at 129 ("██████████████████████████████████████████."), excerpts
attached at **Exhibit A**.  He also does not know if ████████████████████████████████
█████████████.  Bott Day 1 (9/22/2025) at 174, excerpts attached at **Exhibit B**.
[2] There is no allegation that Baglien or Lareau stole computer code or that the two systems use the same code.  Bott
Day 2 at 126; Bott Day 1 at 174 (████████████████████████████████).
[3] Mr. Bott testified: "████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████" Bott Day 2 at 88.
[4] Mr. Bott testified: "Q. █████████████████████████████████████████
██████████████████████████████████████████████████████████████
████████████ Bott Day 2 at 123-24.

████████████████████████████████████████████████

████████████████. *Id*. at 122-23.  He also identified the ████████████

████████████████████████████████████████

███████████████████████████ as unlawful similarities.  *Id*. at 125.

That said, Frost Solutions is not certain whether █████████████████████

████████████ *Id*. at 127-28.  Frost Solutions also focuses on the ████████████

████████████████████████████. *Id*. at 131-32.

According to Frost Solutions, the misappropriated technology trade secrets are embodied

in a Frost Control hardware product requirements document (Frost_00189830) and states the

█████████████████████████████, the one that did not exist until more than a

year after Baglien and Lareau left Frost Control.  Bott Depo. at 135.  Again, Frost Solutions ***does***

***not*** contend that Baglien or Lareau took this document (or anything like it) when they left Frost

Control, so the claim rests on whatever information was in their heads.  *Id*. at 135.[5]  Frost

Solutions claims the entirety of the document constitutes a trade secret because it is "a████████

████████████████████████████████████████████████

███████████████████████████████

████████████" *Id*. at 136, 138.  Bott conceded he was not sure whether ████████████

████████████████████████. *Id*. at 139.[6]  Frost

Solutions' claim is based entirely on the belief that █████████████████ *Id*. at 142.

[5] Bott testified: "███████████████████████████████████████
████████████████████████████████████
█████████████████████████." Bott Day 2 at 135.
[6] Bott testified: "████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████" Bott
Day 2 at 139.

4

In its Amended Complaint, Frost Solutions concedes that the AIMS 2.0 device, Frost Tech UI and Frost Vision ***were not actually in use*** when Baglien and Lareau worked for Frost Control, but they were "in the developmental stages when Messrs. Baglien and Lareau were at Frost and when they both left Frost in the fall of 2021." FAC ¶ 25. In other words, Frost Solutions claims that Baglien and Lareau misappropriated trade secrets that did not exist when they were employed by Frost Control. For example, the AI technology Frost Solutions has recently integrated into its camera systems (Frost Vision) was ███████████████████

███████████████████████████████████████████████████████████

███████████████████████████. Michael Kirsh Depo. at 96-97, excerpts attached as

**Exhibit C**. Bott clarified that the notion of integrating AI into the cameras ███████████

███████████████████████████████████████████████ Bott Day 2

at 113-14. Indeed, Frost Solutions ███████████████████████

███████████████████████████████████████████████████████████

███████████████████████████ *Id*. at 115-16. Frost

Solutions claims that its trade secrets, which did not exist when Baglien and Lareau were in a

position to misappropriate them, ███████████████████████████████

██████. Bott Day 2 at 78 (███████████████████████████

1. <u>The Former Frost Control's Technology</u>

Mario Bonardi was the VP of Engineering and Operations at Frost Control in 2021 and until his resignation in March 2022. He differentiates between ***what*** Frost Control's system did and ***how*** it did it. With respect to the plan to later implement machine learning, he explained that "the underlying detail of how we would do that would be the trade secret. It's not the doing of it." Bonardi Depo. at 132, excerpts attached at **Exhibit D**. He also explained that any user of Frost Control's app or products would have an understanding of what the technology

accomplished, so the fact that Frost Control performed a task was no secret. *Id*. at 132-33; *id*. at 135 (the fact that Frost had a camera, took temperature readings and had a battery was no secret). Bonardi was asked directly whether there was anything unique about Frost Control's products, whether there was something that set Frost Control apart from its competitors from an engineering standpoint, to which he responded flatly, "not particularly, no." *Id*. at 160.

Victor Gill, Frost Control's former CEO until he resigned in March 2022, described Frost Control's trade secrets as the sensors and their ability to collect data, the product's mounting angle, the build material, the firmware driving the sensor components, the manner in which the product was protected for outdoor operation, and how the device was powered (solar and hard-wired). Victor Gill Depo. at 18, excerpts attached at **Exhibit E**. The only functionality he could identify that was unique to Frost Control was ice detection; otherwise Frost Control's technology performed the same functions as the other competitors in the market. *Id*. at 114.

Gill acknowledged that some of the purported trade secret information was published to third parties, such as the mounting instructions. *Id*. at 19, 71. While Gill identified firmware as a Frost Control trade secret, he had no information that Baglien or Lareau misappropriated any software code and Frost Solutions does not allege it, either. *Id*. at 73. With respect to powering the Frost Control device, Gill testified that the Frost engineering team developed a solution for power management, but that Baglien and Lareau had no involvement other than, he speculated, communicating customers' demands for a product that worked in the winter. *Id*. at 79-80.[7] Gill

---

[7] Mr. Gill testified:

> Q.   Were Patrick or Chris involved in the engineering decisions about how to manage the power?
> …
> A.   … But they might have literally sat right next to the person that is doing those things and saying what are you working on, how does it work. Here is the product requirement, the customer requirement we need to meet. So they might have said, look, as an engineer you need to understand that it doesn't matter if this works [in] summer. They don't care. They're not looking at the sensor in the summer. This has to work October through February. That's what the customer really cares

6

is not aware of any evidence that Baglien or Lareau stole any confidential information about how Frost Control's products worked, nor does he have any information that they used confidential information about the Frost Control product to develop the Vue product. *Id*. at 141-42.

Cory Moore, who worked at Frost Control from 2020 to March 2022 as a salesperson and later Director of Sales (and assumed many of Baglien's responsibilities when Baglien left), testified that when he worked for Frost Control he did not understand the company to have any trade secrets, nor did he believe Frost Control had any trade secrets. Moore Depo. at 83, excerpts attached at **Exhibit F**. Matthew Gardner, who was an advisor from the Notre Dame IDEA Center and ultimately a Frost Control Board Member, also testified that █████████████

███████████████████. Gardner Depo. at 79, excerpts attached at **Exhibit G**.

2.  The Former Frost Control Stopped All Product Development in 2021

There is no dispute that Frost Control **stopped all development of the AIMS 2.0 and other technology enhancements in early 2021**. In fact, at that time Frost Control fired its engineers and other professionals who were responsible for product and software enhancements, and the remaining engineering resources were redeployed away to support sales activities. Bonardi Depo. at 147, 171; Gill Depo. at 67-69 (Gill, as CEO, directed the company to stop efforts to progress the evolution to the next generation product in September 2021). When asked to describe the impact of firing the engineers, Bonardi explained, "It [advancement of AIMS 2.0] essentially ended. We went to just tr[y] to sell the 1.3 [version] in order to gain sales traction,

---

about. Tell me how we're going to meet that requirement. And everybody in the business would have been around the engineer and sharing those product requirements. Getting feedback from the engineers, in the engineer's best ability to put into lay terms what they're doing, and then saying yeah that's going to work or no it's not.

I cannot speak intelligently to either Patrick or Chris level of sophistication in having those conversations because, like I said, when I started I kind of put those conversations to an end, or at least I tried to.

Gill Depo. at 79-80.

revenue growth, and then raise money to restart the 2.0 effort."). Bonardi Depo. at 147-48; *see also* Gill Depo. at 67-68 (describing the reduction in force affecting team members working on the next generation of product). For his part, Gill conceded he was not focused on the development of the next generation of Frost Control's product. *Id*. at 66-67 ("So I didn't have like a great depth of familiarity with what the next generation was going to be."); *id*. at 68 (after the engineers were terminated, Gill "wasn't paying attention to that part of the business at all.").

As of September 2021, when Lareau left, Frost Control had no timeline to launch a more sophisticated version of its technology. Gill Depo. at 120-21. Bott acknowledged that █████

███████████████████████████████████████████████████████████████████

███████████████████████. Bott Day I at 166. In fact, Frost Control did not restart the AIMS 2.0 effort by the time Bonardi resigned in March 2022, five months after Baglien resigned. Bonardi Depo. at 148.[8] Gill could not say how long it would have taken to restart the development of the AIMS 2.0, if the engineers could have been rehired. Gill Depo. at 68-69. Despite this, Frost Solutions implausibly contends that the purported trade secrets were "under development" in 2021. In reality, AIMS 2.0 was dead in the water.[9]

### 3. The Former Frost Control Openly Shared Information About its Future Product Plans and Details About Its Technology

It is undisputed that Frost Control published, without securing promises of confidentiality, much of what Frost Solutions now claims are its trade secrets. For example, they distributed a "pitch deck," which Bonardi described as a "deck of information that you provide to potential investors." Bonardi Depo. at 128; Ex, 39, attached at **Exhibit I**. This pitch deck

---

[8] For clarity, this means that Frost Control still had not restarted the abandoned development of AIMS 2.0 and associated technology advancement five months after Baglien and Lareau left the company.
[9] In fact, when Frost Control was actively shopping itself for buyers, the lawyers for the company explicitly conceded that "████████████████████████████." 6/28/2022 Letter from Ice Miller to Jerome Baglien, attached as **Exhibit H**.

included images of the "2022 Frost-UI," ████████████████████████████████

████████████████ :



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY          FROST_0018702

Pitch Deck, Ex. 39 at Bates 18702; Bonardi Depo. at 129-30.

The next pages of the pitch deck depicted ███████████████████████

████████████████████ . *See* Depo. Ex. 39 at Bates 18703-08; Bonardi Depo. at 130.  Other

pages in the pitch deck communicated to potential investors Frost Control's future products and

capabilities, ████████████████████████████████████

████████████████ :



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY          FROST_0018709

Ex. 39 at Bates 18709; Bonardi Depo. at 131.

Bonardi conceded that Frost Control ***did not*** secure any promises of confidentiality from the persons to whom the pitch deck was presented, so the information, including the images and details about future technology enhancements, was not treated as secret. Bonardi Depo. at 128-29 ("Q. So whoever received this pitch deck was free to do with it whatever they wanted? A. In essence, yes."); *see also* Kreager Depo. at 159-60, attached at **Exhibit J** (███████████

█████████████████████████████████

██████████████████████████).

As one might expect, Frost Control also described its features and functionalities in marketing materials that were provided without securing nondisclosure agreements. Gill Depo. at 117, attached at **Exhibit K**; *see also* Kreager Depo. at 145 (██████████████

████████████████████████████████

█████████████████████). *See, e.g.*, Frost Control 9/23/2021 Email to Kent County attaching marketing materials (Vue0184426), attached at **Exhibit L**; Frost Solutions 6/11/2024 Email to Kent County attaching marketing materials (Vue0184254), attached at **Exhibit M**.[10]

### 4. Vue Retained Paragon to Design a Device from Scratch

The undisputed record is that Defendants contracted with a design firm called Paragon Innovations ("Paragon"), which designed Vue's ARC-1 from scratch. Paragon was founded in 1992 and in the subsequent twenty years had developed medical devices, camera-based devices, and many IoT devices for its customers. Paragon Depo. at 14, attached at **Exhibit N**. Paragon therefore had substantial experience designing hardware, designing circuits board, determining

---

[10] Both of these emails and attached marketing materials were provided through a public records request to Defendants' counsel directly from the municipality and subsequently produced in this litigation.

components and parts, designing mechanical enclosures, and writing device-level software (a.k.a. firmware). *Id*. Prior to working on the Vue project, Paragon had developed products such as a camera system for football helmets and hunting/trail camera systems that included sensors that measured data similar to what Vue intended. *Id*.

When Baglien and Lareau approached Paragon about the project, they identified the most basic functionalities they desired only on a high-level. *Id*. at 16-17 ("It was basically a local camera, weather station device that – that the – you know, there were certain sensors and things like that that were outlined on their – on the requirements document, and for the most part, it was, you know, pretty down the fairway for us."). In Paragon's experience, the product requirements outlined for the project were unsophisticated and lacked detail. *Id*. at 52-53; *id* at 53 ("Q. Okay. But you would put what you received from Patrick and Chris on the lower end of the spectrum [of sophistication]? A. Yes.").[11] From only that basic description (and nothing else), Paragon generated and presented a proposal for development. *Id*. 17-18. ***Paragon, not Baglien or Lareau, chose the components for the device.*** *Id*. at 18 ("I mean, they gave us the requirement overall but we [Paragon] selected the components."). Paragon's representative was clear that Paragon determined ***how*** to accomplish the tasks Baglien and Lareau desired. *Id*.

The ultimate set of design requirements for Vue's ARC-1 resulted from a collaboration with Paragon. When Baglien and Lareau outlined the functionalities they desired, Paragon added its own ideas on the functionality and design. *Id*. at 40-41. At the most, Baglien and Lareau identified that they wanted sensors for air temperature, dew point, relative humidity, air quality, and surface temperature, along with the desire for a camera that is "day/night capable, wide viewing, image quality, digital zoom." *Id*. at 44-45. This list of desired requirements does

---

[11] *See also* Expert Rebuttal Report of Gavin Scott, pgs. 41-42, excerpts attached at **Exhibit O** (████████ ████████████████████████) ("Scott Report").

not convey any secret information.  With respect to the waterproof enclosure, Baglien and

Lareau requested that Paragon locate an off-the-shelf solution, rather than engineer one uniquely

for the ARC-1.  *Id*. at 25-26.[12]  This is in contrast to Frost Control's product, which ████

████████████.  Kreager Depo. at 30, 93; Gill Depo. at 74-75.  Even though it is

mentioned on the list of requirements Baglien and Lareau presented to Paragon, Paragon did not

do any work on "machine learning" or related algorithms.  Paragon Depo. at 53-54.[13]  To the

extent Frost Solutions alleges that Baglien and Lareau misappropriated "know-how" and lessons

learned regarding waterproofing, none of that was even considered when developing Vue's

ARC-1, which is emblematic of the disconnect between Frost Solutions' claims and reality.

Paragon's representative was clear that Baglien and Lareau did not provide any drawings,

plans, schematics, or bill of materials for the product they wanted Paragon to design.  *Id* at 50-

51.  Baglien and Lareau did provide photographic images of what they intended, but they were

not photos of the Frost product, and the product Paragon ultimately designed looked nothing like

the photos Baglien and Lareau provided.  *Id*.  When asked whether Paragon did anything to

attempt to reverse engineer any other party's products to create a design for Vue, Paragon's

representative answered unequivocally, "Absolutely not."  *Id* at 51.

Throughout the years working with Paragon, Baglien and Lareau never even mentioned

Frost Control.  *Id*. at 51.  Paragon's engineers had no knowledge of Frost Control or Frost

Solutions; they had never even heard of those companies until Frost Solutions served a subpoena

on Paragon in this litigation.  *Id*. at 12-13.  Paragon did not even know Baglien and Lareau

previously worked at Frost Control.  *Id*. at 18-19.  Baglien and Lareau did not give Paragon any

---

[12] Utilizing an off-the-shelf enclosure was within Paragon's extensive experience.  Paragon Depo. at 26-27 ("As I mentioned before, we've done a lot of products that fit these kind of things, so we were kind of relying on our previous experience to be able to implement the requirements they have here.").
[13] Vue contracted with another third party, Object Spectrum, to handle the development of Vue's software.

information about Frost Control's (or Frost Solutions') customers; they did not share anything Paragon identified as confidential or trade secret belonging to any third party. *Id*. at 51.

Paragon's contract with Vue explicitly states that Paragon **will not** utilize information from third parties, such as Frost Control (or Frost Solutions). *Id*. at 36-37 (Paragon "won't take something that someone just brings us as someone else's IP and then break it down, dissect it, and try to recreate it," "won't take that usable application and try to break it down into source code to try to recreate it," and "we're not going to take someone else's product, disassemble it, analyze it, and try to recreate it.") (describing Paragon's understanding of the contractual promises it made). Paragon's representative summarized those promises bluntly, "We ethically aren't going to do that as a company." *Id*. at 37. There is no evidence in the record to support the notion that Paragon violated those core principles.

### B.    Frost Solutions' Purported Customer Trade Secrets

In addition to asserting a trade secret claim based on technology, Frost Solutions also alleges that its trade secrets include:

> financial business, technical, economic, and customer information, including the identity of current, former, and prospective customers and non-public information related to their category interest, preferences, product and pricing feedback as well as longstanding customer relationships, customer purchasing history and financial information, work on development of new customers, and company marketing and sales strategies for economic growth.

FAC ¶ 23. Plaintiff further alleged that its trade secrets include:

> financial business, technical, economic and customer information, including the identity of current, former, and prospective customers and non-public information related to longstanding customer relationships, work on development of new customers, and company marketing and sales strategies for economic growth. Frost Solutions' trade secrets also include customer bid information, pricing models, proposal response strategies and other information related to the procurement of customer contracts, as well as design features of their proprietary weather-monitoring technology, including AIMs 2.0, Frost Tech UI and Frost Vison.

13

FAC ¶ 68.  While Frost Solutions alleged that it took reasonable measures to safeguard its trade

secrets, FAC ¶¶ 27, 69, and explained certain actions that Frost Solutions or Frost Control took

as it related to employees, Frost Solutions does not allege what, if any, reasonable measures it

took to safeguard its alleged trade secrets in the hands of third parties, including its customers.

*See generally* Counts I, II.

> 1. The Identities and Contact Information of the Entities Identified in Frost
>    Solutions' Damages Disclosure Are Publicly Available

Frost Solutions has identified sixty-seven (67) entities that it alleges Defendants have

solicited improperly using alleged confidential information or trade secrets.[14]  **Exhibit P**,

Frost_0311997 (hereinafter "Frost Solutions' damages disclosure").  The identities and contact

information of thirty-one (31) of those entities were disclosed on publicly available lists through

industry groups such as the American Public Works Association ("ASCA"), Accredited Snow

Contractors Association ("APWA), and the Snow and Ice Management Association ("SIMA").

The names of these entities and the lists in which they can be found in appear in **Exhibit Q**.  In

addition, all of the identities of the public entities listed on Frost Solutions' damages disclosure

would necessarily be listed on U.S. Census data with contact information available on the public

entities' website.  Mr. Moore testified that Frost Control built its customer lists by, among other

things, purchasing trade show attendee lists, such as ones distributed by the APWA, and data

obtained from the U.S. Census.  Moore Depo. at 74-77.  He also testified that there was a lot

more information available online as to the contact information for public entities.  *Id*. at 79-80.

> 2. The Entities Identified in Frost Solutions' Damages Disclosure are
>    Largely Public Entities Subject to Public Records Disclosure Laws

---

[14] Vue's 25th Interrogatory asked Frost to "identify each customer or potential customer whom you contend
Defendants improperly solicited and for each customer or potential customer please state the basis (as defined
above) for your contention that such customer or potential customer was improperly solicited."

Frost Control and Frost Solutions' customers include, in large part, local municipalities and other public entities. Of the 67 entities that Frost Solutions identified as evidence of its damages, 49 are local municipalities or other public entities, located in 25 different jurisdictions. *See* **Exh. P**. Generally, information and documents provided to public entities are subject to disclosure under the applicable freedom of information act, unless the information or documents falls under an enumerated exception or exemption. In fact, each of the 25 jurisdictions that cover the 49 public entities has an applicable freedom of information act, requiring public access to government documents. A list of these jurisdictions and the applicable statutory citations is outlined in **Exhibit R**.

Frost Control and Frost Solutions have or had notice that the documents, information, and communications provided to public entities could be subject to public disclosure. Mr. Moore acknowledged that the information and documents he provided to and communications with public entities could be disclosed to the general public. Moore Depo. at 84-86, 101-02. In addition, five municipalities (Reno, NV; Rochester Hills, MI; St. Paul, MN; Washington County, MN; and Wyoming, MI) brought to either Frost Control or Frost Solutions' attention that certain information provided to the municipality was subject to public disclosure. A list of these entities and their communications to Frost Control or Frost Solutions is outlined in **Exhibit S**.

In fact, Defendants, through counsel, obtained documents and communications that Frost Solutions or Frost Control submitted to 19 of the public entities identified on Frost Solutions' damages disclosure. These public records responses included Frost Solutions and Frost Control draft/unsigned Master Services Agreements, signed Master Services Agreements, draft/unsigned proposals, including pricing, signed proposals, invoices and purchase orders, email communications with the public entity, email communications amongst public entities, internal

15

public entity communications, bid information, and marketing presentations and other materials. A list of these categories, the applicable municipalities providing such information, and the corresponding documents is outlined in **Exhibit T**.

Neither Frost Control nor Frost Solutions marked any of these documents as trade secrets or otherwise informed these public entities that the documents should fall under an applicable exception or exemption from disclosure pursuant to that entity's public records laws. While it is apparent that the information Frost Control and/or Frost Solutions provides to public entities is publicly available, Frost Solutions still maintains that a customer's price, for example, is considered a trade secret. In fact, Bott used ██████████████████████ ████████████████████████████████████████████ ████████████████████████████████. *See* Bott Day 2 at 241-243. More to the point, the records obtained from Concord, MA show all of the potential bidders and their prices for that contract. *See* **Exh. T**, Vue0209602.

### IV.    STANDARD OF REVIEW

The Court will grant summary judgment, construing the record in the light most favorable to the nonmoving party, "the movant shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### V.    ARGUMENT

#### A.    Frost Solutions Has the Burden to Prove its Trade Secrets Claims

To assert a viable claim for misappropriation of trade secrets, Frost Solutions must show that "(1) a trade secret existed, (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means, and (3) the defendant *used* the trade secret without authorization from the plaintiff." *GE Betz, Inc. v. Moffitt-Johnston*, 885 F.3d 318, 325 (5th Cir. 2018) (quoting *CQ, Inc. v. TXU Mining Co.*, 565 F.3d 268, 273 (5th Cir. 2009))

16

(emphasis in original).  A trade secret is information that derives independent economic value from being not generally known or readily ascertainable through proper means and the owner of which makes a reasonable effort to maintain its secrecy.  18 U.S.C. § 1839(3); RSA 350-B:1, IV.

Frost Solutions bears the burden to separate with sufficient particularity its purported trade secrets from what is general knowledge in the trade and from special knowledge of those persons skilled in the trade.  *Bureau Veritas Tech. Assessments, LLC v. Brosa*, 2025 U.S. Dist. Lexis 233595, *8 (D. Ariz. Dec. 1, 2025) (citing *InteliClear, LLC v. ETC Glob. Holdings, Inc.,* 978 F.3d 653, 658 (9th Cir. 2020)).[15]  Matters of public knowledge or of general knowledge in an industry cannot be claimed as a trade secret, as the essence of a trade secret is something known to only a few and not susceptible of general knowledge.  *See Dice Commc'ns, LLC v. Zappolo*, 2023 U.S. Dist. Lexis 97938, *7 (D. Neb. Jun. 6, 2023) (applying Nebraska's version of the Uniform Trade Secrets Act).

It is well-settled law that the general ability and know-how an employee brings into employment, and the skill and experience acquired during it, cannot qualify as a trade secret.  "[O]rdinarily, an employer has no legitimate business interest in postemployment prevention of an employee's use of some general skill or training acquired while working for the employer, although such on-the-job acquisition of general knowledge, skill or facility may make the employee an effective competitor. . . ." *Dice Commc'ns*, 2023 U.S. Dist. Lexis 97938, at *8 (quotation omitted).  Restatement (Third) of Unfair Competition § 42 cmt. d. (AM. LAW INST. 1995) (Information forming the "general skill, knowledge, training, and experience of an employee cannot be" a trade secret or subject to a contractual restrictive covenant.).  Stated

---

[15] *EarthCam, Inc. v. OxBlue Corp*., 49 F.Supp.3d 1210 (N.D. Ga. 2014) (A plaintiff has the burden of proving each statutory element as to each claimed trade secret.) (citing *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1158 (11th Cir. 2004)).  The claim fails if any of the elements are not shown.  *Id*.

simply, trade secrets cannot "merely be the facility, skill or experience learned or developed during an employee's tenure with an employer." *EarthCam, Inc. v. OxBlue Corp.*, 49 F.Supp.3d 1210, 1237 (N.D. Ga. 2014) (applying N.J. law).

**B.    Frost Solutions' Technology Trade Secret Claims Fail**

Despite the obligation to specify what is a trade secret as opposed to information generally known, Frost Solutions claims that the entire AIMS 2.0 device is a trade secret. It also claims that its user interface (Frost Tech UI) and its AI/machine learning capability (Frost Vision) are trade secrets, even though Frost Control did not consider or treat the user interface as secret and Frost Control openly publicized its plan to integrate machine learning (despite having shuttered its engineering program).[16] Frost Solutions claims that customer feedback provided to Frost Control is a trade secret, even though that information is inherently not confidential. Finally, Frost Solutions cannot prove its trade secrets were used by Defendants, given the independent development undertaken by Paragon.

1.    Frost Solutions Failed to Sufficiently Specify its Alleged Technology Trade Secrets

Frost Solutions contends that every element of a document entitled, "AIMS 2.0 Hardware Product Requirements", Frost_0018930 (**Exh. U**), constitutes a trade secret, but such an assertion is legally deficient. *See Freeman Inv. Mgmt. Co., LLC v. Frank Russell Co.*, 2016 U.S. Dist. LEXIS 136220, 2016 WL 5719819, at *10 (S.D. Cal. Sept. 30, 2016), aff'd, 729 F. App'x 590 (9th Cir. 2018) (granting summary judgment on trade secret claim where "Plaintiff's disclosure

---

[16] Frost Control's former employees described a much narrower view of what was considered a trade secret. To the extent Frost Solutions claims its trade secrets derive from Frost Control's technologies, Frost Solutions is limited by Frost Control's practices. In other words, if Frost Solutions acquired Frost Control's assets, and if Frost Control's assets were not trade secrets, Frost Solutions cannot transform those assets into protectable trade secrets. If Frost Solutions substantially modified the inchoate development work that was shuttered by Frost Control before Baglien and Lareau left, then Frost Solutions cannot prove that Baglien and Lareau misappropriated those trade secrets because they differ materially from that to which Baglien and Lareau had access during their employment. If this were not the case, Frost Solutions would effectively secure a noncompetition covenant for which it did not bargain.

resembles an effort to categorize every piece of information or know-how that could potentially have value to the company" and "impermissibly . . . shifts its burden onto [Defendant] (and the Court) to sift through' voluminous documents in order 'to ascertain [its] trade secret.'").

This 11-page document includes lots of information that could never be a trade secret, as it is merely Frost Solutions' high-level recitation of ███████████████████████ ████████████████ *Id*. (██████████████████████████████████████ ███████████████████████████████████████████████████ ████████████). The document reflects the choice of ██████████████████████ ████████████████████████████████████████████████. *Id*. It lists the sensors included: ███████████████████████████████████████████████ ███████████████████████████████. *Id*. It repeats that ███████████████████████████ ████████████████████. *Id*. Specific components are identified, including ██████████████████. *Id*. the document includes a basic block diagram depicting ██████████████████████████████ ████████████████████████████████████████. *Id*. The only technical information in the document is a block diagram of ██████████████████ (*id*.), but there is no allegation that Baglien or Lareau knew this technical information or used it when they hired Paragon to design a completely different system with its own configuration.

Frost Solutions' claim that all of its features and functionalities constitute misappropriated trade secrets cannot stand. *See Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998) ("A plaintiff seeking relief for misappropriation of trade secret 'must identify the trade secrets and carry the burden of showing that they exist.' . . . The plaintiff 'should describe the subject matter of the trade secret with sufficient particularity to separate it

from matters of general knowledge in the trade or of special knowledge of those

persons . . . skilled in the trade.").  Frost Solutions does not own the market for measuring

ambient conditions in a system with a camera that can be mounted on a pole and communicate

via cellular technology.

2.  <u>Frost Solutions' Purported Technology Trade Secrets are Generally
Known and Readily Ascertainable</u>

With respect to Frost Solutions' technology claim, there is no allegation and no evidence

that Baglien or Lareau took any document or electronic information that embodied the purported

trade secrets, so the claim is limited to whatever information Baglien and Lareau had in their

heads.[17]  When examined with any care, it is clear that Frost Solutions' technology claim is

nothing more than an attempt to cabin what is truly general skill and knowledge.

i.  *What the System Does and What Frost Control Planned to Do Is No
Secret.*

What the Frost Control system did was no secret, so the notion that all of the features of

the system can be protected is flawed as a matter of law.[18]  Any user of the system and any

viewer of Frost Control's marketing materials would know the features and functionalities of the

Frost Controls system.  Bonardi Depo. at 132-33, 135.  *SMH Enters., LLC v. Krispy Krunchy

Foods, LLC*, 2021 U.S. Dist. Lexis 249750 (E.D. La. May 28, 2021) (granting summary

judgment because the plaintiff's purported trade secrets consisted of its user interface and other

outward facing components and plaintiff failed to prove they were not generally known).

The hope of what the Frost Control system might do in the future was also no secret.

---

[17] When asked to describe what aspects of Frost Controls' development process was misappropriated, Michael Bott of Frost Solutions focused ███████████████████████████████.  Bott Day 2 at 104.
[18] *Cf. EarthCam, Inc. v. OxBlue Corp*., 49 F.Supp.3d 1210, n. 11 (N.D. Ga. 2014) ("To the extent that EarthCam claims its use of a camera manufactured by a third party, such as Toshiba, is a 'trade secret,' that claim is analogous to Apple asserting that the incorporation of Near Field Communication technology ('NFC') into its products is a trade secret. NFC allows smart phones to communicate wirelessly with point-of-sale terminals. It enables a smart phone user to pay for goods with his or her phone.").

Frost Control published its future planned enhancements, including its plan to ████████ ████████████████████████ in the "pitch deck" that was provided to any potential investor that would listen.  Depo. Ex. 39; *see* pp. 7-9, *supra*.  RSA 350-B:1, IV (a trade secret must derive value from not being generally known and must be the subject of reasonable secrecy measures).

What Frost Solutions' system does today is also not a secret.  Indeed, Frost Solutions includes most of the information on its Products Requirements document on its own website.  When describing the mini-RWIS, Frost Solutions discloses that it utilizes solar power, takes readings every minute, utilizes a day & night vision camera with a wide angle, and transmits data via cellular service.[19]  And, Frost Solutions provides images of its user interface.  *Id*.  On another page, Frost Solutions describes and depicts in a photograph its snow depth sensor.[20]  On this page, it provides another image of the user interface and describes the cellular connectivity.  On another page, Frost Solutions describes the Frost Vision Camera and its "weather detecting AI."[21]  This solution is described as solar powered and connected via cellular technology.  *Id*.  Frost Solutions publicizes many of the very features it claims are secret in Exhibit 8.[22]

What an RWIS system does cannot be a trade secret, but Frost Solutions attempts to protect its "features and functionality."  *Thomas & Betts Corp. v. Richards Mfg. Co.*, Civil Action No. 01-4677 (SRC), 2007 U.S. Dist. LEXIS 31085, at *43 (D.N.J. Apr. 26, 2007) (granting summary judgment due to a lack of evidence that a design is "the secret of a particular employer and not a matter of general knowledge in the industry." (citing *Rohm & Haas Co. v. Adco Chemical Co.*, 689 F.2d 424, 431 (3d Cir. 1982)).  Bonardi recognized the gulf between an

---

[19] *See* https://www.frostsolutions.io/mini-weather-station (last visited Feb. 15, 2026**).**
[20] *See* https://www.frostsolutions.io/snow-depth-sensor (last visited, Feb. 15, 2026).
[21] *See* https://www.frostsolutions.io/vision-camera (last visited, Feb. 15, 2026).
[22] The product Frost Solutions uses today looks nothing like the AIMS 2.0 product in the document it claims embodies its trade secrets, Frost_0018930 (**Exh. U**), which shows there is even further divergence between what Baglien and Lareau sold at Frost Controls and what Frost Solutions ultimately developed for sale.

identification of *what* a product does and *how* a product does what it does.  *Id*. at 159.  Frost

Solutions ignores this distinction, because it lacks any evidence of misappropriation of any

"how-to" technical information.

> ii.     *Frost Solutions' Alleged Trade Secrets are Obvious.*

Beyond Frost Solutions' own marketing, much of what Frost Solutions considers to be a

trade secret is open and observable to anyone.  For example, Victor Gill identified the angle at

which the Frost Control's product was mounted as a trade secret.  He acknowledged, however,

that the systems are typically mounted on a pole and any observer could look up and see how the

systems are mounted.  Gill Depo. at 71.[23]  He also conceded that Frost Control published

mounting instructions to third parties, so they were not really secret.  *Id*.; *EarthCam*, 49 F. Supp.

3d at 1228 (Information "commonly known by or available to the public" cannot be a trade

secret); *IDX Systems Corp. v. Epic Systems Corp.*, 285 F.3d 581, 583-84 (7th Cir. 2002) (items

that could be seen by "any user or passer-by" could not be a trade secret).

Ryan Kreager, Frost Control's former interim CEO, agreed that



That included

Kreager Depo. at 144.  *See Princess Cruises, Inc. v.

Amrigon Enterprises, Inc.,* 51 F. App'x 626, 628 (9th Cir. 2002) (A trade secret may not be

grounded on matters that are "common or obvious in the relevant industry.").

Obvious engineering or design concepts like the ones asserted in this case are not

---

[23] Mr. Gill testified: "Q. And is it possible for any observer to just look up at the pole and see how they're mounted?
A. Absolutely.  You could easily take a picture.  You could easily assess kind of general like height.  In my expertise
on the significant figures and tolerances on the mounting angle and height, I can't speak intelligently to that.  But
you could probably get a pretty reasonable understanding of how to mount a similar sensor."  Gill Depo. 71.  He
also explained that someone with a simple protractor could figure out the mounting angle "and they would get some
insight into what our technology is.  Because that mounting angle will kind of give you some inference into what the
technology is."  *Id*. at 72.

protectable confidential information. *See Dynamics Research Corp. v. Analytic Sciences Corp.,* 9 Mass. App. Ct. 254, 267, 400 N.E.2d 1274 (1980) (concepts that would be obvious to an inertial guidance engineer were not protectable as trade secrets). Since obvious concepts are not confidential, obvious combinations of them are not protectable either. *See Strategic Directions Grp., Inc. v. Bristol-Myers Squibb Co.,* 293 F.3d 1062, 1065 (8th Cir. 2002) (obvious combination of known elements not a trade secret); *Julie Research Lab. v. Select Photographic Eng'g,* 998 F.2d 65, 67 (2d Cir. 1993) (particular combination of design choices not a trade secret if "obvious, widely known, easy for others to discover legitimately, or disclosed" publicly by manufacturer).[24]

Even the architecture or design of software is deemed obvious and easily duplicated once seen by the public.  *Hayden v. IBM*, 2025 U.S. Dist. Lexis 115803, *51-52 (S.D.N.Y. June 17, 2025) (citing *LinkCo, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 499 S.D.N.Y. 2002) and *My Mavens LLC v. Grubhub, Inc.,* 2023 U.S. Dist. LEXIS 142204, at *20 (S.D.N.Y. Aug. 14, 2023); *see also Sys. Dev. Servs. V. Haarmann,* 389 Ill. App. 3d 561, 907 N.E.2d 63 (Ill. Ct. App. 2009) (the intricacies of a customer's computer system or network are readily accessible to other technicians in the competitive marketplace by similar means. Information that is "within the realm of general skills and knowledge in the industry cannot be a trade secret.").  Frost Solutions' "features and functionality" are so obvious, they cannot be the basis for trade secrets.

### iii.    Lots of Competitors Did/Do the Same Things.

The record is clear that many companies do the same things as Frost Control and Frost

---

[24] Ironically, after Frost Solutions purchased the assets of Frost Control, Frost Solutions ██████████████████████████████.  Bott Day I at 57, 59, 131.  One of the obvious solutions employed was not to have a hole in the top of the enclosure that would allow water to infiltrate.  *Id*. at 64 ("██████████████████████████████████).  That is the kind of "insider knowledge" Frost Solutions seeks to protect.

Solutions.  For example, Mario Bonardi explained that Frost Control was not the only company in the market that had a weatherproof enclosure, a power source, or weather sensors.  Bonardi Depo. at 123-24.  Although Victor Gill identified protecting the system against the environment as a Frost Control trade secret, he admitted that all competitors in the industry addressed that problem as well.  Gill Depo. at 74.[25]

Documents regarding Frost Control's development confirm that others in the marketplace were already doing many of the things Frost Control was doing and wanted to do.  In fact, Frost Control examined the capabilities of competitors in order to make design decisions.  Deposition Ex. 117 memorialized ███████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████.  Bonardi Depo. at 157-58.  Even the ███████████████████, which Bonardi believes was a trade secret of the former Frost Control's, was evaluated based on ███████████████████.  Id. at 158-59; Depo. Ex. 118, attached at **Exhibit V**.  The same is true for the planned future advancement of the ██████ which was also based on ███████████████.  Id. at 159-60; Depo. Ex. 119, attached at **Exhibit W**.  Ryan Kreager, Frost Control's former interim CEO, agreed that it was possible to ███████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████.  Kreager Depo. at 143-44.

The fact that so many competitors in the industry performed the same functions as the

---

[25] Gill explained that Frost Controls developed a custom solution for weatherproofing its system, and that custom solution had a significantly high failure rate such that it was going to have to be re-engineered.  Id. at 75-76.  Stealing an enclosure design that fails at such a high rate is illogical to even assert, but Frost Solutions does so anyway. The undisputed record is that Vue purchased an off-the-shelf box from a third party to weatherproof its system, so there is no plausible claim of misappropriation there either.  See p. 10, supra.

Frost Solutions' system, it is clear that, at least in the general terms with which Frost Solutions describes its purported trade secrets, they are readily ascertainable.[26]  Information that would be readily ascertainable by someone in the industry, i.e., ascertainable quickly and at little cost, is also not afforded trade secret protection. Just as information that is obvious upon examination of a publicly available product is not a trade secret, deductions or conclusions that would be reached with little time or effort by people experienced in the general industry are not protected as trade secrets.  *Clearwater Sys. Corp. v. Evapco, Inc.*, 2005 U.S. Dist. Lexis 35942, *26-27 (D. Conn. July 26, 2005) (citing *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 750 (2d Cir. 1998)).

> iv.    *Frost Solutions Does Not Account for What Is Generally Known in the Industry.*

Frost Solutions' own description of the purported trade secrets is nothing more than a recitation of what is generally known in the industry, which is reinforced by the uncontradicted expert opinion of Dr. Gavin Scott.[27]  Dr. Scott ultimately concludes that Frost Solutions has failed to identify information that could qualify as trade secrets and failed to show any misappropriation.  In that context, he describes the contours of the types of information that is generally known in Frost Solutions' industry.  More specifically, IoT devices utilize sensors and electronics including a network interface to communicate with other devices and systems.  Scott Report at ¶ 30 ("In simple cases, IoT devices are deployed as remote sensors that communicate their readings back to a user device or server.").  Developers of every IoT device must chose among various options for connecting the device to a wide network, "with the choice of communication mechanism and protocol depending on various factors, such as power

---

[26] Representative samples of information from the websites of two competitors, Vaisala and Vaesys can be found at **Exhibit X**.  They reveal systems with similar sensors, cameras, solar panels, and apps.
[27] Dr. Scott's credentials can be found in **Exh. O**, at ¶¶ 6, 7, 9, 10.

consumption, required coverage distance, cost, and complexity." *Id*. at ¶ 31-36 (explaining Bluetooth, Wi-Fi, long-range wide area networks, and cellular options). He also explains that IoT devices perform some computational functions and process sensor data before transmitting to the network and that it is common to develop interface applications and dashboards to enable users to view and interact with the data. *Id*. at ¶ 37.

Frost Solutions nevertheless claims that all aspects of the AIMS 2.0 (including basic features like cellular connectivity and solar power) are its trade secrets. Because Dr. Scott identifies these features and functionalities as generally known in the industry in which Frost Solutions operates, anyone employed at any one of the several competitors in the space will have some knowledge of issues such as connectivity and power regulation.

### 3. The Customer Feedback Is Not Confidential

Frost Solutions contends that ███████████████████████████████████████ ████████████████████████████ are trade secrets, even though the third parties owed no duty of confidentiality and did not treat such ███████ as confidential. Bott Day 2 at 87-88 (███████████████████████████████████████████████ ); *id*. at 92 (███████████████████████████ ████████████████████████████████████████).[28]

Moore testified that ██████████████████████████████████ ██████. Moore Depo. at 33. To Moore, ███████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

---

[28] It bears noting that the current principals of Frost Solutions cannot testify from personal knowledge as to what Frost Control treated as or considered to be confidential, because they were not present. The current iteration of Frost Solutions is entirely dependent upon the testimony of former Frost Control personnel for the facts necessary to establish the practices in place at the time of Baglien's and Lareau's employment.

██████████████████████████████████████████████ were not confidential. *Id*. at 31-32. Moore acknowledged that ███████████████████ are generally known in the industry. *Id*. at 43-44. According to Moore, that included ██████████████████████ ███████████████████████████████████████████. *Id*. at 43-44.

Customers and potential customers ████████████████████████████████ █████████████████████████████ *Id*. at 60, 62. Moore explained that a majority of customers would ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ *Id*. at 99. Those customers would ██████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ ██████████████████████. *Id*. at 99. Victor Gill similarly explained that Frost Control regularly received information from customers about the capabilities of competitors' products, which is indicative that technological information flowed through the marketplace and that Frost Control was "paying attention to what our competitors were doing." Gill Depo. at 113-14.

Indeed, Frost Solutions concedes that it ██████████████████████████████ ██████████████████████████████████████████████████████████ ██████████. Bott Depo. at 17-21 (████████████████████████████████████████ ████████████████████████████████████). Frost Solutions does not consider █████████████████████████████████████████████████████████████ ██████████████████████. Bott Day I at 152. Despite itself soliciting and receiving information about a competitor from that competitor's customer, Frost Solutions claims the information Frost Control received years ago from customers is somehow a secret.

Customers also freely shared information about all systems at trade shows and similar

industry events. Frost Solutions' Vice President of Commercial Operations, Jason Ostrander, Chief Operating Officer of East End Group, a former Vue customer that is now owned by Frost Solutions, testified that ███████████████████████████████████████

███████████████████████████████████████████████████████

███████████████. Ostrander Depo. at 18-19, attached at **Exhibit Y** (███████████

███████████████████████████████████████'). Attendees

openly ███████████████████████████████████████████████

███████████████ information Frost Solutions claims is a trade secret in this case. *Id.*

at 19 ("███████████████████████████████████████████

██████████████."). He also testified that ███████████████████████

███████████████████████████████████████████████

███████████████. *Id.* at 29. Those qualities and characteristics are, according to

Ostrander, ███████████████████████████. *Id.* He indicated that when he was a

consumer, he would ███████████████████████████. *Id.* at 29-30. In

other words, ███████████████ is openly shared in the marketplace and is not a trade secret.

4.  Independent Development Is Not Actionable

In order for Frost Solutions to prevail on its claim of trade secret misappropriation, it must prove that its purported trade secrets were actually used by Paragon. The record is undisputably clear that no trade secret information was communicated to Paragon and that Paragon used its years of experience to develop the ARC-1 entirely from scratch. There simply was no time or cost savings resulting from an alleged misappropriation of information from Frost Control or Frost Solutions. Frost Solutions cannot overcome the uncontradicted evidence that Baglien and Lareau conveyed no Frost Solutions or Frost Control information to Paragon and that Paragon developed the ARC-1 product from scratch. *See* pp. 9-12, *supra*. *Mattel, Inc. v.*

*MGA Entm't, Inc.*, 782 F. Supp. 2d 911, 963 (C.D. Cal. 2011) ("the UTSA does not prevent a person from using independently developed or properly obtained trade secret information already in the possession of another."); *see also Intellisoft, Ltd. v. Acer Am. Corp*., 2018 U.S. Dist. 206508, *42 (N.D. Cal. Dec. 6, 2018) ("[N]othing prohibits Acer from implementing an independently developed and publicly disclosed idea, even if that idea matches a technology that plaintiff previously kept as a trade secret.").

Information that has been independently obtained without reference to the plaintiff's purported trade secrets cannot qualify as a trade secret. *Moore v. Kulicke & Soffa Indus., Inc.*, 318 F.3d 561, 567 (3d Cir. 2003) ("If there is proof that the defendant independently developed a technique that resembles the trade secret, then the defendant did not 'use' the trade secret"); *StorageCraft Tech. Corp. v. Persistent Telecom Solutions, Inc*., 2015 U.S. Dist. Lexis 173753 (D. Utah Dec. 31, 2025) (citing *MedSpring Group, Inc. v. Feng*, 368 F. Supp. 2d 1270, 1279 (D. Utah 2005)); *Envirotech Corp. v. Callahan*, 872 P.2d 487, 494 (Utah Ct. App. 1994) ("[T]rade secret law . . . does not offer protection against discovery by fair and honest means such as by independent invention…."). Where, as here, public information and the defendant's own knowledge, uninformed by the trade secret, effectively confine the scope of the trade secret, "more than . . . similarity" is needed to prove misappropriation. *Elmagin Cap., LLC v. Chao Chen*, 2024 U.S. App. Lexis 13608, *5 (3d Cir. Mar. 21, 2024) (citing *Am. Can Co. v. Mansukhani,* 742 F.2d 314, 331 (7th Cir. 1984)). Frost Solutions must prove that Vue's ARC-1 product was not independently developed, which it cannot do given the uncontroverted evidence of Paragon's development process.

Frost Solutions offers at best rank speculation that Baglien and Lareau had knowledge of how any feature or functionality worked (or might work in the future). This is insufficient. *See*

*Dur-A-Flex, Inc. v. Dy,* 349 Conn. 513, 321 A.3d 295, 334 (Conn. 2024) ("[A] defendant cannot 'use' a trade secret . . . if the defendant does not have knowledge of the trade secret itself. That is, the defendant must actually or constructively possess the information that constitutes the trade secret, and not merely use or possess a product that embodies the trade secret but does not disclose to the defendant any material aspect of the trade secret itself.").  Frost Solutions must prove actual disclosure of the trade secret itself to impose liability on Defendants. *See Silvaco Data Systems v. Intel Corp.,* 109 Cal. Rptr. 3d 27, 45 (Cal. App. 2010) (concluding that trade-secret liability requires knowledge of the trade secret and without knowledge, one cannot "use" a trade secret); *see also Dur-A-Flex,* 321 A.3d at 334.

When shown a document created by Vue for its independent developer, Paragon, describing the basic components and functionalities Vue desired, (Depo. Ex. 10, attached as **Exhibit Z**), the only item on that list that Bonardi identified as approaching a Frost Control trade secret was that Frost Control "had plans to use AI to do some things that no one else had ever done, particularly with surface-state detection and snow depth, that would have used the image sensor and AI models."  Bonardi Depo. at 124-25.[29]  Bonardi was not sure if Frost Control was the only company using a non-invasive infrared sensor.  *Id*. at 125.  Bonardi was nevertheless clear that Frost Control's use of an infrared sensor was no secret, as Frost Control openly marketed its use.  *Id*. at 125.[30]  Even if one credits all of Bonardi's testimony, including his uncertainty about the uniqueness of the infrared sensor, all of the other components of the Vue product, as described in the document, ***were not trade secrets of Frost Control****,* and therefore

---

[29] Bonardi testified that by September 2021 (around the time of Baglien's and Lareau's departures), the surface-state sensor was still in testing and Frost Controls was not even certain whether it was going to be used in a product. Bonardi Depo. at 125-26.

[30] Frost Controls stopped all work on enhancing its product in 2021.  *See* pp. 6-7, *supra*.  It turns out that Frost Solutions did not even deploy ███████████ until three years after Baglien and Lareau left, which indicates there was no valuable information to misappropriate in September 2021.  Kirsh Depo. at 96-97.

cannot rightfully be claimed by Frost Solutions as such.  That would include the features sought

by Vue, such as the 

**Exh. Z**.  Based on Bonardi's review, the fact that Vue planned to

was of no moment.  That Vue planned to have

was also not evidence of misappropriation, because

Frost Control did not consider those functions to be its trade secret.  Frost Solutions nevertheless

contends Defendants misappropriated these features, components and functionalities, even

though the person responsible for product development at Frost Control disagrees.

### C.    Frost Solutions' Customer Information Trade Secret Claims Fail

Frost Solutions alleges that several generic categories of information about its customers

are considered trade secrets.  However, for all customers—both public and private—Frost

Solutions cannot establish that the identity of current, former, or prospective customers and their

contact information is a trade secret because that information is readily ascertainable from public

sources.  In addition, for public customers, Frost Solutions cannot establish that the contracts,

pricing information, order forms, bid information, communications with such customers, and any

other information or documents provided to those public entities are trade secrets because that

information is generally subject to public disclosure.

1.    <u>The Identities and Contact Information of Frost Solutions and/or Frost
Control's Current, Former, and Prospective Customers Are Not
Protectable Trade Secrets</u>

The identities and contact information (contact name, phone number, email address, etc.)

of Frost Solutions' or Frost Control's current, former, and prospective customers are not

protectable trade secrets under the NHUTSA or DTSA because that information is readily

31

ascertainable.  *See Carriage Hill Health Care v. Hayden*, Civil No. 96-101-SD, 1997 U.S. Dist. LEXIS 21755, at *13 (DNH Apr. 30, 1997) ("'Trade secret' is defined as information that 'is not readily ascertainable' from other sources, RSA 350-B:1, IV(a); otherwise, the information cannot be claimed a 'secret.'").  "[T]rade secret protection extends only to that information not readily ascertainable, but no further."  *Carriage Hill Health Care v. Hayden*, Civil No. 96-101-SD, 1997 U.S. Dist. LEXIS 21755, at *14 (DNH Apr. 30, 1997).

Frost Control and Frost Solutions service(d) a known industry segment—local municipalities, state agencies, snow and ice contractors, property managers, and anyone who might need to monitor road, site, or weather conditions.  Names, addresses, and phone numbers of customers in a specific industry are not protectable trade secret because that information is readily ascertainable.  *See id.* at *17-18 (finding that a customer list of dentists was not a protectable trade secret because it was "readily ascertainable to anyone in the dental supply business with a Maine telephone directory[.]").  *See also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("Information that is public knowledge or that is generally known in an industry cannot be trade secret."); *Nextdoor.com, Inc. v. Abhyanker*, No. C-12-5667, 2014 U.S. Dist. LEXIS 56702, at *13 (N.D. Cal. Apr. 23, 2014) ("Secrecy is a requisite element of a trade secret.  . . . Information that is generally known to the public or in an industry lacks the requisite secrecy.").

As explained in **Exhibit Q**, the identities and contact information of at least 31 of the 67 entities—both public and private—listed on Frost Solutions' damages disclosures are available to <u>anyone</u> who pays for them through ASCA, AWPA, and SIMA.  These lists are equally available to Frost Solutions, Vue, or anyone who might be interested in them and willing to pay a modest amount.  In addition, anyone, for no cost at all, can obtain the names of municipalities in

certain areas from the U.S. Census Bureau website and then find the applicable contact information from other online sources, including the municipality's own website. "Information that is 'readily obtainable through public sources' is not a trade secret because it cannot derive independent economic value." *Moreland Apts. Assocs. v. LP Equity LLC*, Case No. 5:19-cv-00744-EJD, 2019 U.S. Dist. LEXIS 214591, at *6 (N.D. Cal. Dec. 12, 2019) (holding that names, addresses, and phone numbers of limited partners who were alleged to have been improperly solicited were not protectable trade secrets because that information can be accessed via publicly available databases). Therefore, because the identities of Frost Control and Frost Solutions' former, current, or prospective customers fall under a specific industry segment and are readily ascertainable through public lists, the identities themselves are not trade secrets.

2. Information Provided to Public Entities is Subject to Public Disclosure
Laws and is Therefore Not Protectable as a Trade Secret

Any information that Frost Control or Frost Solutions provided to a public entity has the potential to be disclosed pursuant to that jurisdiction's public records laws and, therefore, any information provided to public entities cannot be a protectable trade secret. "If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984). *See also Nextdoor.com, Inc. v. Abhyanker*, No. C-12-5667, 2014 U.S. Dist. LEXIS 56702, at *13 ("Information that an individual discloses to others who are under no obligation to protect its confidentiality also lacks secrecy."). "Contracts with a public body, and any information contained therein, are generally considered public information." *Volume Servs. v. Ovations Food Servs., L.P.*, 18 CVS 194, 2018 NCBC LEXIS 108, at *47 (N.C. Super. Ct. Oct. 17, 2018).

In Nevada, Minnesota, and Michigan, Frost Control and/or Frost Solutions had notice

33

that certain information it provided to the public entities it served in those jurisdictions could and likely would be subject to public disclosure.  In addition, municipalities in Washington, Iowa, Massachusetts, Illinois, Minnesota, Virginia, Nevada, Michigan, and Ohio actually did publicly disclose Frost Control and/or Frost Solutions documents and communications.  These documents included historical pricing information, contracts, order forms, purchase orders, invoices, communications evidencing negotiations, bid or RFP information, communications evidencing the primary contact for the municipality—all things that Frost Solutions' claims are trade secrets in this case.  While many (if not all) of the jurisdictions that Frost Control and/or Frost Solutions interacted with have exceptions to disclosure for trade secrets/confidential information or if disclosure would violate some other law, such as the DTSA, those exceptions require some form of notice to the municipality.  "The trade secret owner who fails to label a trade secret as such, or otherwise to specify in writing upon delivery to a state agency that information which it contends is confidential and exempt under the public records law is not to be disclosed, has not taken measures or made efforts that are reasonable under the circumstances to maintain the information's secrecy."  *Sepro Corp. v. Fla. Dep't of Envtl. Prot.*, 839 So. 2d 781, 784 (Fla. App. Ct. 2003).  Clearly marking the documents and information confidential and proprietary is generally enough to put the public entity on notice that the documents and information might be subject to an exception to the applicable public disclosure law.  *See CaremarkPCS Health, LLC v. N.H. Dep't of Admin. Servs.*, 167 N.H. 583, 589 (2015).

With the exception of the form contract provided to each customer of Frost Control or Frost Solutions that contained a general confidentiality section, and at least with respect to the public entities from which Defendants obtained public records responses, neither Frost Control nor Frost Solutions marked any of the documents it provided to public entities confidential,

proprietary or trade secrets or otherwise notified the public entity of such designation or exemption under the public records law. *See Iowa Film Prod. Servs. v. Iowa Dep't of Econ. Dev.*, 818 N.W.2d 207, 224-25 (Iowa 2012) (finding lack of reasonable efforts to maintain secrecy of alleged trade secrets when, among other things, plaintiffs "never asserted trade secret status for anything they had submitted to [the governmental entity] until the present dispute arose.").

In addition, the very fact that these records were available and provided upon request defeats any claims of trade secrets for the information contained therein. *See Hanneman Family Funeral Home & Crematorium v. Orians*, 235 N.E.3d 361, 362 (Ohio 2023) ("But here, the customer information at issue had been provided to a third party . . . and was available as a public record upon request. Therefore, the information was not protected by the Ohio Uniform Trade Secrets Act as a trade secret."). Therefore, information in any documents provided to or communications with public entities, at least public entities in nine jurisdictions where documents have been disclosed, cannot be considered trade secrets because that information is readily ascertainable and Frost Control and/or Frost Solutions failed to take reasonable measures to maintain its secrecy.

## VI.    <u>CONCLUSION</u>

For the reasons stated, Defendants are entitled to summary judgment as to Counts I and II of Plaintiff's First Amended Complaint.

Respectfully submitted,

PATRICK BAGLIEN, CHRISTOPHER LAREAU
AND VUE ROBOTICS, LLC,

By their attorneys,

SHEEHAN PHINNEY BASS & GREEN, P.A.

Dated: February 17, 2026        */s/ James P. Harris*
                                    David W. McGrath (NH Bar No. 9347)
                                    James P. Harris (NH Bar No. 15336)
                                    Ryan P. Lirette (NH Bar No. 19561)
                                    Abbygale M. Dow (NH Bar No. 272938)
                                    1000 Elm Street, 17th Floor
                                    Manchester, NH 03101
                                    (603) 627-8255
                                    dmcgrath@sheehan.com
                                    jharris@sheehan.com
                                    rlirette@sheehan.com
                                    adow@sheehan.com

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically served copies of the foregoing on all counsel of record via the Court's CM/ECF system.

Dated:  February 17, 2026           */s/ James P. Harris*