**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

|  |  |  |
|---|---|---|
| FROST SOLUTIONS, LLC, | ) ) ) | Civ. Action No. 1:22-CV-00401-SE |
| Plaintiff, | ) ) | |
| v. | ) ) | **ORAL ARGUMENT REQUESTED** |
| PATRICK BAGLIEN, CHRISTOPHER LAREAU, and VUE ROBOTICS, LLC, | ) ) ) | |
| Defendants. | ) ) | |

**PROVISIONALLY FILED UNDER SEAL**

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR OBJECTION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT ON DEFENDANTS' COUNTERCLAIMS**

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................... 1

II.   MATERIAL FACTS DEMONSTRATING GENUINE DISPUTE ...................................... 2

  A.    Plaintiff's Interference with Vue's Relationship with TAPCO, including Current and Prospective Customers ........................................................................................... 2

    1.    Vue's Relationship with TAPCO ............................................................... 2

    2.    Settlement of Frost's Lawsuit Against TAPCO ............................................ 3

    3.    TAPCO's Breach of Agreement with Vue and Resulting Fallout ...................... 5

  B.    Frost's Interference with Vue's Contract with East End Group ........................... 6

  C.    Frost's Actions in Violation of the Protective Order to Jeopardize Defendants' Insurance Coverage and the Resulting Effects ......................................................... 8

    1.    Mr. Kirsh Learns of Vue's Insurance Coverage ........................................... 8

    2.    Kirsh Calls Defendants' Insurance Carrier ................................................. 9

    3.    Vouch Initiates Coverage Dispute and Frost Latches On ............................... 9

    4.    Kirsh's Misguided Actions Exacerbated Mr. Lareau's PTSD and Depression ......... 10

  D.    Defendants' Counterclaims Arise from Frost's Actions During Litigation ............... 11

III.  STANDARD OF REVIEW .................................................................................. 12

IV.   LEGAL ARGUMENT ........................................................................................ 12

  A.    A Genuine Dispute of Material Fact Exists as to Whether Frost Tortiously Interfered with Vue's Current and Prospective Contractual Relations as a Result of its Settlement with TAPCO. 12

    1.    Frost's Actions Were Improper ................................................................ 12

    2.    Frost's Improper Actions Induced TAPCO to Otherwise Breach its Contract with Vue 15

    3.    The Customers Listed on Schedule 4 of the Dealer Agreement Support Defendants' Current and Prospective Customer Interference Claims ........................................... 16

  B.    A Genuine Dispute of Material Fact Exists About Whether Frost Interfered with East End Group ............................................................................................................. 18

  C.    A Genuine Dispute of Material Fact Exists as to Whether Kirsh's Actions Negligently Inflicted Emotional Distress Upon Lareau. ............................................................. 19

    1.    Frost Owed a Duty of Care to Lareau ....................................................... 20

    2.    Kirsh's Actions Breached that Duty ......................................................... 21

    3.    Kirsh's Breach Caused Significant and Lasting Emotional Distress .................. 22

  D.    Defendants Did Not Forfeit Their Counterclaims ........................................... 23

V.    CONCLUSION ................................................................................................ 25

## I.    INTRODUCTION

Plaintiff, Frost Solutions, LLC ("Frost") attempts to avoid liability on each count of Defendants' First Amended Counterclaims ("FACC") by relying on facts that are plainly contradicted by evidence in the record or at the very least require the Court to resolve disputed issues of material fact, either of which require denial of its Motion for Summary Judgment.[1]

Frost first attempts to avoid liability on Defendants' interference with contractual relations claims (Counts II-IV), and relatedly their conspiracy claim (Count V), by arguing that, as a matter of law, Frost's actions were proper. The record demonstrates, however, that Frost, likely with the knowledge and complicity of TAPCO, used the filing and immediate settlement of claims against TAPCO as an effort to conceal its interference with the Vue/TAPCO relationship and cloak its actions in a misguided screen of legitimacy. The law is clear, however, that parties to private settlement agreements are not immune from tortious interference claims. Yet Frost contends it could not be found liable for interference as a matter of law.

Frost also asks the Court to adopt a benign view of why Frost's newly hired Vice President surreptitiously accessed Vue's system several times over a period of weeks, including on his very first day on the job. Frost then begs the Court to resolve a dispute about the motivations of its principal, Michael Kirsh, and the emotional trauma he caused when he contacted Vue's insurer after settlement discussions did not proceed to his satisfaction. He did so, in circumvention of the Protective Order issued in this case, in an effort to undermine Vue's insurance coverage and put pressure on Defendants, resulting in severe emotional trauma for Christopher Lareau. Despite these and other facts, Frost Solutions contends it could not possibly be found liable.  For the reasons stated fully below, Frost Solutions' motion should be denied.

---

[1] Frost even seeks to escape the FACC altogether, relying on an argument that elevates procedure above substance. There is no support in the First Circuit for Frost's contention that Defendants' failure to refile their FACC with their answer to Frost's amended complaint, and it has been rejected by other circuits.

1

II.    **MATERIAL FACTS DEMONSTRATING GENUINE DISPUTE**

A.    **Plaintiff's Interference with Vue's Relationship with TAPCO, including Current and Prospective Customers**

1.    Vue's Relationship with TAPCO

Traffic and Parking Control Company ("TAPCO") distributes traffic safety and parking solutions to government and businesses across the U.S. and Canada.[2] After TAPCO ended its relationship with Frost Control, TAPCO's Signal Solutions Business Development Manager, Bryan Everard, began to interview new vendors. Deposition of Byan Everard at 50, excerpts attached at **Exhibit A**; **Ex. B**, 4/11/22 Email Cancelling Frost Order (Frost_0291391). Prior to their meeting in July 2022, Everard reached out to Baglien about a vendor interview after seeing a post on LinkedIn; Baglien did not initiate contact. Everard Dep. 44. By that time, Moore (a minority investor in Vue, investing only $10,000 of his own money) worked at TAPCO. Deposition of Cory Moore at 89, excerpts attached at **Exhibit C**. Moore had no authority to make decisions for and no role in managing Vue, and he did not participate in any of the negotiations between TAPCO and Vue or any conversation between TAPCO and Frost. *Id.*; **Ex. D**, 7/19/22 Frost, TAPCO Meeting Invite (Frost_0112100); **Ex. E**, Moore/Everard Chat (Frost_0112016). In fact, the negotiations between TAPCO and Vue for their 2022 and 2024 contracts are memorialized in emails where Moore did not participate and was not even copied. **Ex. F**, 2022 Contract Negotiation Emails; **Ex. G**, 2023-2024 Contract Negotiation Emails. The 2024 emails reference discussions with TAPCO's CFO, COO, and purchasing manager, not Moore. *See id.* On March 1, 2024, approximately 20 months after Everard first contacted Vue, TAPCO and Vue signed an agreement requiring, among other things, that TAPCO "use commercially reasonable efforts to further the promotion, marketing, sale, and distribution" of Vue's products. **Ex. H**, 2024 Vue/TAPCO Agreement (Vue0207972).

Everard testified that the decision to go with Vue was made by TAPCO leadership, Moore

---

[2] *See* https://www.tapconet.com/about-us (last accessed March 18, 2026).

did not have any influence on TAPCO's decision not to work with Frost, and Moore's investment in Vue would not have influenced the decision to go with Vue over Frost. Everard Dep. 74-75, 89, 96. At the prodding of Frost, Moore's investment in Vue ultimately became TAPCO's proffered reason for terminating Moore's employment and its agreement with Vue. Moore Dep. 90; **Ex. I**, 11/6/24 Email (Vue0207996). Moore testified, however, that he told Everard about his modest investment in Vue shortly after starting at TAPCO, and Everard told him it was not a problem. Moore Dep. 89-90.

### 2.    Settlement of Frost's Lawsuit Against TAPCO

On December 8, 2022, Frost sued Moore (the "*Moore* Litigation") alleging claims arising from his employment with TAPCO, TAPCO's distribution of Vue's products, and his alleged misuse of Frost's confidential information in violation of alleged contractual obligations. **Ex. J**, Moore Complaint. Frost filed a second amended complaint ("SAC") in the *Moore* Litigation on October 7, 2024, adding TAPCO as a defendant. **Ex. K**, Moore SAC. Just ten days after being sued, TAPCO's CEO, Eric Stangel, emailed Bott and TAPCO's Chief Revenue Officer, Robert Prosser, asking them to ██████████████████████████████████████ and stating that he was ████████████████████ **Ex. L**, 10/17/24 Email (Frost_0310491). Prosser then noted receipt of a calendar invite for noon that day with Bott. *Id.* Later that day, Bott sent TAPCO's General Counsel, Patrick Callahan, proposed terms for settlement of Frost's claims against TAPCO. **Ex. M**, Bott Dep. Ex. 15. The proposal included, among other things, ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ *Id.* In fact, Kirsh testified that ████████████████

████████████████████ Kirsh Dep. 200. The next day, on October 18, 2024,[3] Bott sent

---

[3] Also on October 18, 2024, Frost took Everard's deposition in the Moore Litigation, where Everard testified that he was unaware of Moore's investment in Vue. Everard Dep. 94.

TAPCO the proposed terms in a draft agreement. **Ex. N**, Bott Dep. Ex. 16. In addition to the above proposals, the settlement agreement contained ███████████████████████ ███████████████████████. *Id.*

Prior to providing comments on the Frost/TAPCO settlement agreement, on October 22, 2024, Stangel reached out to Frost about connecting ███████████████████████ ███████████████████████ **Ex. O**, 10/22/24 Email (Frost_0310474). On October 29, 2024, Attorney Callahan sent Bott and Kirsh a redlined copy of the settlement agreement. **Ex. P**, 10/29/2024 Email (Frost_0310482). In his email, Attorney Callahan wrote, ███████████ ███████████████████████████████████████ ███████████████████████████████████████ *Id.* In TAPCO's redlines, ███████████████████████████████████████ ███████████████████████████████████████ ███████████ *Id.* In addition, TAPCO ███████████████████████████████. *Id.*

Frost and TAPCO signed the agreement that settled Frost's claims on October 30, 2024. **Ex. Q**, Signed Frost/TAPCO Settlement Agreement (Frost_0310466). At the same time, contained within a different Docusign Envelope and apparently signed on October 28, 2024, Frost and TAPCO entered into a separate Dealer Agreement—which was referenced as Exhibit A throughout the Settlement Agreement. **Ex. R**, Dealer Agreement (Frost_0310501). In the Dealer Agreement, TAPCO committed to the partnership efforts outlined in Schedule 3 and to abruptly cease all dealings with Vue. The Dealer Agreement required TAPCO to ███████████████████ ███████████████████████████████████████ ███████████ *Id.* It further required TAPCO to ███████████████████████ ███████████████████████████████████████ ███████████████████████████████████████

██████. TAPCO also agreed █████████████████████████████

*Id.* Schedule 4 of the Dealer Agreement contains ███████████████████

████████████████████████████████. *Id.*

### 3.    TAPCO's Breach of Agreement with Vue and Resulting Fallout

On October 11, 2024, Baglien reached out to TAPCO about new purchase orders for 18 TAPCO/Vue customers who had renewal dates upcoming or recently passed. **Ex. S**, 10/11/24 Email (TAPCO_008165). TAPCO did not respond, so Baglien reached out again on October 29, and noted internal changes at TAPCO, referencing the termination of Moore's employment. *Id.* After not receiving a substantive response, Baglien emailed again on November 4. *Id.* On November 6, 2024, Baglien received an email from Prosser terminating TAPCO's agreement with Vue ███████ ████████████████████ **Ex. I**. In the attachment, Prosser explained that TAPCO was terminating due to its alleged discovery of a conflict of interest: █████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ *Id.* The Vue-TAPCO Distribution Agreement only provided for immediate cancellation upon certain circumstances, none of which occurred here. *See* **Ex. H.**

Vue felt the effects of TAPCO's improper termination almost immediately. In fact, Vue can trace at least six customer non-renewals to Frost's unlawful interference with TAPCO and Vue's relationship and TAPCO's improper termination of its agreement with Vue.

- November 6, 2024 – In response to Vue's email to TAPCO customers about transitioning directly to Vue, Polk County emailed that it was going a different route. **Ex. T**, 11/6/24 Email (Vue0207957). Polk County ███████████████████████████ ██████████████████████████████. **Ex. R**.

- November 12, 2024 – Vue received an email from Auglaize County that it "decided to use another company[.]" **Ex. U**, 11/12/24 Email (Vue0207952). Auglaize ████████████ ██████████████████████████████████████. **Ex. R**. Bott admitted that

Auglaize ███████████████████████████████████. Bott (9/22) Dep. 300-301.

- January 27, 2025 – Vue received an email from Portage that it did not intend to stay with Vue. **Ex. V**, 1/27/25 Email (Vue0207963). Portage ██████████████████████████ ███████████████████████. **Ex. R**. On or before November 18, 2024, Kirsh spoke with Portage about moving to Frost. *See* **Ex. W**, 11/18/24 Email (Frost_0310480). Frost used Portage to solicit other Vue customers. *See* **Ex. X**, 12/20/24 Email (Vue0190487).

- May 6, 2025 – Vue received an email from Washington County with the subject, "Termination of Contract" and written in the body, "Just making sure TAPCO notified you." **Ex. Y**, 5/6/25 Email (Vue0207954). The email attached a Notice of Termination, which referenced the fact that TAPCO was no longer a distribution partner of Vue. *Id.* Washington County ██████████ ███████████████████████████████████████████ ██████████ **Ex. R**. In April 2025 Washington County and Frost entered into a 3-year agreement through May 1, 2028. **Ex. Z**, Washington-Frost Agreement (Vue0187496).

- August 6, 2025 – Vue received an email from Muskegon County stating that it was looking to cancel its contract with Vue in the next fiscal year. **Ex. AA**, 8/6/24 Email (Vue0207961). ████ ████████████████████████████████ Muskegon ███████████████████████ ██████████████. **Ex. R**. On November 21, 2024, Kirsh reached out to Muskegon about Frost's "new partnership" with TAPCO. **Ex. BB**, 11/21/24 Email (Vue0213351).

- September 24, 2025 – Vue received an email from Ottawa County stating that it was not going to renew its contract. **Ex. CC**, 9/24/25 (Vue0207960). Ottawa ███████████████████████ ███████████████████████████████████████████. **Ex. R**.

### B.    Frost's Interference with Vue's Contract with East End Group

Vue and East End Group ("EEG") signed a quote for services on November 7, 2022. **Ex. DD**, EEG Signed Quote (Vue0011935). While this quote was for one year, EEG continued to use Vue until it terminated service on December 30, 2024. **Ex. EE**, 12/30/24 Email (Vue0194995). Jason Ostrander, who signed the quote with Vue on behalf of EEG, was the Chief Operating Officer of EEG from April 2022 through April 2025 and the primary user of Vue's product at EEG for the purpose of monitoring a construction project. Deposition of Jason Ostrander at 20, 56, excerpts attached at **Exhibit FF**. At EEG, Ostrander normally accessed the Vue system via the web interface to review the time lapse and monitor construction. Ostrander Dep. 57-58.

On September 9, 2024—during the pendency of this litigation and while EEG used Vue— Clashmore Ventures (Frost's parent company, owned by Bott and Kirsh) offered Ostrander a position as the VP of Commercial Operations at Frost. **Ex. GG**, Ostrander Dep. Ex. 3. The

6

September 5th Offer ████████████████████████████████████████

████████████████████████████████████████. *Id.* On September 19, Ostrander

responded ███████████████████████ *Id.* On September 27, Ostrander signed an offer

letter with Frost to start as the VP of Commercial Operations on September 30, 2024, which was his

first day at Frost. **Ex. HH**, Ostrander Dep. Ex. 6; Ostrander Dep. 52.

On Ostrander's first day at Frost, in the middle of the workday, Ostrander accessed Vue's

platform. *See* **Ex. II**, Ostrander Dep. Ex. 8. Prior to that time, Ostrander had not accessed Vue's

platform for over a month. *Id.* When asked if he took screenshots of Vue's platform on September

30, Ostrander ████████████ and could only say ████████████████ Ostrander

Dep. 64. In fact, although Ostrander was ██████████████████████████████

███████████████, and as outlined in **Exhibit II**, he could not recall at all ████████████

████████████████████████ Ostrander Dep. 61-69. Ostrander accessed Vue's platform again

on October 23, November 1, November 19, and November 26, 2024. **Ex. II**.

When a user, such as Ostrander, accesses Vue's system, before clicking into their customer

profile, the user receives a warning that reads: "████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ **Ex. JJ**, Ostrander Dep. Ex. 7.

A few days after starting at Frost, on October 2, 2024, Ostrander forwarded a Vue marketing

email that he received to his EEG email account to Bott and Kirsh.[4] **Ex. KK**, Ostrander Dep. Ex.

10. Apparently, after Ostrander started working at Frost, he continued to work part-time for EEG.

Ostrander Dep. 31-34. Ostrander testified that ████████████████████████████████

---

[4] This was not the only time that Ostrander reported on Vue's activities. *See* **Ex. LL**, Ostrander Dep. Ex. 11.



. *Id.* at 33. Ostrander confirmed that ▌

▌

▌ *Id. See also id.* at 61. He further confirmed that ▌

▌

▌. *Id.* at 34. At some point after Ostrander began working at Frost, Clashmore

Ventures (Frost's parent company, owned by Bott and Kirsh) ▌. *Id.* at 35.

On November 26, 2024, Defendants discovered that Ostrander was accessing Vue's

platform and that he had recently started working for Frost. **Ex. II**. Defendants immediately shut

off Ostrander's access and consulted with cybersecurity counsel to determine the appropriate steps.

30(b)(6) Deposition of Vue Robotics at 39-40, excerpts attached at **Exhibit MM**. On December 18,

2024, Defendants notified EEG via email of a potential cybersecurity breach. **Ex. NN**, 12/18/24

Email to EEG. EEG did not respond and has not returned Vue's device. Vue 30(b)(6) Dep. 40-42.

### C. Frost's Actions in Violation of the Protective Order to Jeopardize Defendants' Insurance Coverage and the Resulting Effects

1. Mr. Kirsh Learns of Vue's Insurance Coverage

On or around April 21, 2023, Defendants produced their insurance policy as part of their

Rule 26 disclosures and marked said policy "Confidential" pursuant to the Protective Order. *See* **Ex.**

**OO**, 4/21/23 Transmittal Email; **Ex. PP**, Vouch Policy (Vue0000066-120). Six months later, on

October 23, 2023, the Parties engaged in mediation. The Parties did not settle at the October 23

mediation session and engaged in a further mediation session on November 27, 2023, but were still

unable to come to a resolution. Kirsh confirmed that he learned of Defendants' insurance coverage

through the litigation, explaining that, during mediation, he thought: "▌

▌

▌ which is when he learned that Defendants had an insurance policy. Deposition of Michael

Kirsh at 179, excerpts attached hereto as **Exhibit QQ**.

8

2.      Kirsh Calls Defendants' Insurance Carrier

After apparently learning at mediation that Defendants had insurance coverage paying for their defense, on or around November 29, 2023 (two days after mediation failed), Kirsh called Defendants' insurer, Vouch. *See* **Ex. RR**, 11/29/23 Vouch Email (Frost_0311988); Kirsh Dep. 177-180. While Kirsh disclaimed memory of what was said on the call to Vouch, he could remember that he said ███████████████████████████████████████████

███████████████████ Kirsh Dep. 181. Kirsh also confirmed that ██████████████

████████████████████████████████████████████████████████

██████████████████ *Id.* However, Kirsh could not specifically deny ████████████

████████████████████████████████████████████████████████

██████████ Kirsh Dep. 187:2-11.[5] Though Kirsh contends ████████████████

████████████████, that is in fact what occurred. Kirsh Dep. 183.

3.      Vouch Initiates Coverage Dispute and Frost Latches On

On or about January 5, 2024, Vue received a letter from its insurer, initiating an investigation into the availability of Defendants' coverage given the recent disclosure of the January 5, 2022, letter—apparently disclosed to Vouch by Kirsh. *See* **Ex. SS**, 1/17/2024 Email Chain (Vue0050355). Given the January 5, 2024, coverage inquiry, Defendants were forced to obtain insurance coverage counsel. *See id.* On January 11, 2024—just six days after discovering coverage was at risk—Defendants' counsel received a letter from Frost's counsel characterized as a settlement communication, where four of the five paragraphs discussed Defendants' insurance coverage. *See* **Ex. TT**, 1/11/24 Letter (Settlement Communications Redacted). In fact, in this letter, Frost's counsel all but admitted that Kirsh alerted Vouch to potential coverage issues: "we have serious concerns as to the extent of coverage. We have requested any reservation of rights letter. As you

---

[5] Kirsh's testimony cited herein and his inability to remember this conversation stands in stark contrast to the firm and absolute testimony Frost chose to highlight in its Memo. *See* Memo. at 7.

know, your client was put on notice of this claim on January 5, 2022. It appears that the insurance company was not notified until sometime thereafter. As such, there may be a coverage issue[.]" *Id.* Frost's counsel even went as far as to request that their January 11, 2024, letter be sent to Vouch and offered to speak with Vouch's insurance coverage counsel. *Id.*

4.    Kirsh's Misguided Actions Exacerbated Mr. Lareau's PTSD and Depression

Lareau has a documented history of post-traumatic stress disorder and depression following his service in the U.S. Army and his deployments to Iraq and Afghanistan. *See generally* **Ex. UU**, Excerpts of Lareau's Medical Records. Following Kirsh's actions and the resulting inquiry into Defendants' insurance coverage, Lareau experienced severe and extraordinary emotional distress. Deposition of Chris Lareau at 296, excerpts attached at **Exhibit VV**. Lareau had ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.*

Lareau—a combat veteran—testified that this period was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

Lareau met with his treating provider, Daniel Salazar, on January 9, 2024, four days after Vouch's letter, and reported ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Ex. UU**, Vue0198881-2. Salazar wrote that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ *Id.* At Lareau's next appointment, he reported: ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

at Vue0198870. In every entry after January 9, 2024, as part of his "Formulation", Salazar wrote that Lareau ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ *See id.* at Vue0198873, -858, -815, -804, -795, -763, -720, -708, -690.

10

**D.      Defendants' Counterclaims Arise from Frost's Actions During Litigation**

When Defendants answered Frost's initial Complaint on December 9, 2022, Defendants did not assert counterclaims as part of their responsive pleading. *See* ECF 13. Defendants first asserted counterclaims on April 3, 2024 (ECF 59), after receiving permission from the Court, asserting three counts arising out of Kirsh's actions during the litigation that jeopardized Vue's insurance coverage. Frost moved to dismiss Defendants' Counterclaims (ECF 83), but, on February 5, 2025, Defendants filed an Assented-To Motion to Amend Counterclaims (ECF 97), seeking to remove Counts I and II of the original Counterclaims and adding additional facts and claims discovered during the course of the litigation. Defendants' Motion to Amend was granted and Defendants filed their First Amended Counterclaim ("FACC")—the currently operative Counterclaim pleading—on April 7, 2025. *See* ECF 100. Frost moved to dismiss the FACC (ECF 102) and Defendants objected (ECF 103). The Court has not acted on Frost's Motion to Dismiss.

On October 21, 2025, six months after the FACC was filed, after some discovery regarding it was completed,[6] and one day before the fact discovery deadline at the time (ECF 105), Frost moved to amend its complaint (ECF 106). Defendants did not object. The motion was granted and Frost filed its First Amended Complaint ("FAC") on November 7. *See* ECF 108. In its motion, Frost noted that it did not anticipate additional discovery relating to the new allegations. S*ee* ECF 106 ¶ 4. The fact discovery deadline would only be extended to December 31, 2025. ECF 107. On November 25, 2025, Frost took Vue's Rule 30(b)(6) deposition, questioning Lareau on the FACC. Defendants answered Frost's FAC on December 5, 2025, but did not refile the FACC. *See* ECF 110.

After answering Frost's FAC, Defendants conducted additional discovery on the FACC, including taking the depositions of Cory Moore and Bott, both individually and as Frost's Rule

---

[6] Prior to the filing of the FAC, both Parties served written discovery relating to the FACC. **Ex. WW**, Defendants' Fourth Set of Requests for Production (4/25/25); **Ex. XX**, Frost's Third Set of Requests for Production (9/12/25), nos. 16-21. The Parties also took depositions of key witnesses, including Lareau (7/17/25), Baglien (7/18/25), Kirsh (9/23/25), Bott (9/24/25), and Ostrander (10/20/25), and asked questions relating to the FACC.

30(b)(6) designee. The Parties also have upcoming depositions which will include questions relating to the FACC, including TAPCO's Rule 30(b)(6) designee and Lareau's treating provider.

## III.    STANDARD OF REVIEW

Summary judgment is only appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The "court must scrutinize the record in the light most flattering to the party opposing the motion, indulging all reasonable inferences in that party's favor." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003). In so doing, the court refrains from making credibility determinations, weighing the evidence, and disregards conclusory allegations and unsupported speculation. *McGrath v. Tavares,* 757 F.3d 20, 25 (1st Cir. 2014).

## IV.    LEGAL ARGUMENT

### A.    A Genuine Dispute of Material Fact Exists as to Whether Frost Tortiously Interfered with Vue's Current and Prospective Contractual Relations as a Result of its Settlement with TAPCO.

Frost's Motion as to Counts II, III, and IV of the FACC fails because the evidence shows that Frost tortiously interfered with Vue's current and prospective contractual relations through its settlement with TAPCO. At a minimum, a dispute of fact exists precluding summary judgment.

#### 1.    Frost's Actions Were Improper[7]

Frost's Motion fails because its interference was carried out by improper acts. Whether such acts are improper "requires an inquiry into the mental and moral character of the defendant's conduct." *HCC Specialty Underwriters, Inc. v. Woodbury*, 289 F. Supp. 3d 303, 328 (D.N.H. 2018) (quoting *City of Keene v. Cleaveland*, 167 N.H. 731 (2015)). The N.H. Supreme Court has identified

---

[7] For all of the reasons discussed herein, a genuine dispute of material fact also exists as to whether Frost and TAPCO were acting jointly to interfere with TAPCO's relationship with Frost and summary judgment should not be granted on Defendants' Civil Conspiracy claim.

several factors that should be considered when determining whether the interfering acts are improper, including the nature of the conduct, motive, the interests with which the conduct interferes, the interest sought to be advanced, the social interests in protecting the freedom of action and the contractual interests of the other, the proximity of the conduct to the interference, and the relations between the parties. *Roberts v. Gen. Motors Corp.*, 138 N.H. 532, 540-41 (1994).

Frost misses the mark when it argues that its actions in the *Moore* Litigation were taken to protect its legitimate interests and therefore cannot, as a matter of law, be improper. *See* Memo. at 19 (citing *Tsiatsios v. Anheuser-Busch, Inc.*, No. 07-CV-003-JL, 2009 DNH 009, at *5 (D.N.H. Jan. 16, 2009)). The fact that Frost filed a lawsuit and then settled that lawsuit by insisting on settlement terms harmful to Vue does not cleanse its unlawful actions. Frost ignores evidence that its actions were not taken to protect legitimate interests and were intended to interfere with Vue's contract with TAPCO and Vue's current and prospective business relations. In fact, the communications between Frost and TAPCO and the timeline of events leading up to TAPCO's termination demonstrate both pretext and a motive to harm Vue. *See Restatement (Second) of Torts* § 767, cmt. h[8] (hereinafter R.2d Torts), cmt. d (explaining that motive to harm can be a substantial or dispositive factor in the improper interference analysis).

Frost first sued Moore in December 2022 but he remained working for TAPCO and distributing Vue's products through October 2024. Despite this, Frost did not sue TAPCO until October 7, 2024, even though Frost knew throughout that TAPCO was selling Vue's products. Then, just 10 days after making TAPCO a defendant in the *Moore* Litigation, TAPCO's CEO emailed Bott ▮▮▮▮▮▮▮▮▮▮▮▮▮ Frost and TAPCO apparently met that day; and then Frost

---

[8] "*Proximity or remoteness of actor's conduct to interference.* One who induces a third person not to perform his contract with another interferes directly with the other's contractual relation. The interference is an immediate consequence of the conduct, and the other factors need not play as important a role in the determination that the actor's interference was improper. The actor's conduct need not be predatory or independently tortious, for example, mere knowledge that this consequence is substantially certain to result may be sufficient."

sent TAPCO's GC proposed settlement terms. Those terms included ███████████████████ ████████████████████████████████████████████████████████████████████—again only 10 days after being sued. Notably, none of the relief Frost requested in the SAC against TAPCO would have resulted in the termination of Vue's relationship with TAPCO. The reasonable inference here, viewed in the light most favorable to Defendants, is that the lawsuit and immediate settlement of those claims were pretext, and that the real point of it all was to interfere with TAPCO's contract with Vue.[9] The timeframe between the suit against TAPCO (almost two years after first suing Moore) and the prompt exchange of settlement terms, including ████████ ████████████████████████████████████████████████████████████████████████████████ ████████ demonstrate that Frost instituted the suit against TAPCO for the very purpose of trying to conceal its interference with Vue's relationship with TAPCO and the customers and prospective customers TAPCO served on behalf of Vue. As further evidence, the draft agreement first sent to TAPCO on October 18, 2024, contained ███████████████████████████████████████ ████████████████. This suggests that the settlement agreement was drafted prior to Frost bringing TAPCO into the *Moore* Litigation and that TAPCO was brought in solely for the purpose of coming to a settlement agreement to interfere with TAPCO's contract with Vue. In fact, Frost and TAPCO could have obtained what they got in the settlement agreement without Frost filing suit, but the evidence demonstrates that they chose to do so as a shield against the exact claims made here.[10]

---

[9] Neither the Court nor Defendants can assess TAPCO's testimony on this topic because Defendants have been unable to schedule TAPCO's 30(b)(6) deposition prior to the filing of this Objection. This deposition was scheduled for February 25, 2025, but TAPCO asked to reschedule and despite efforts to get an earlier date, TAPCO only recently offered March 31 and April 1.

[10] Frost also again argues that its conduct is protected by the *Noerr-Pennington* doctrine, which protects certain government petitioning from federal antitrust liability. *See* Memo. 19. As previously explained in Defendants' objections to Frost's motions to dismiss, the *Noerr-Pennington* doctrine does not apply. Assuming that N.H. would apply the doctrine outside of the antitrust/consumer protection realm, courts have routinely held that private settlement agreements do not qualify for *Noerr-Pennington* protection. *See, e.g., Toyo Tire & Rubber Co. v. Atturo Tire Corp*, Case No. 14 C 0206, 2017 U.S. Dist. LEXIS 48672, at *18 (E.D. Ill. 2017) ("[P]rivate settlement agreements fall outside of *Noerr-Pennington* immunity."); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 641 (E.D. Mich. 2000) (rejecting *Noerr-Pennington* protection for private settlement agreement and observing that "the courts have not broadly applied *Noerr-Pennington* immunity to purely private settlement agreements"). *Noerr-Pennington* cannot shield litigation wielded as an anticompetitive weapon.

14

2.      <u>Frost's Improper Actions Induced TAPCO to Otherwise Breach its Contract with Vue</u>[11]

Frost's improper actions interfered with Vue's relationship with TAPCO by requiring that TAPCO terminate its agreement with Vue without cause and breach its obligations to promote, market, sell, and distribute Vue's products. *See* **Ex. H**.

First, Frost induced TAPCO to breach its agreement with Vue by inducing it to terminate without cause. According to the Vue-TAPCO Distribution Agreement, TAPCO could only terminate during the term of the agreement if Vue was in material breach and was insolvent, filed bankruptcy, sought dissolution, etc. **Ex. H**. Frost's argument that TAPCO was legally justified in terminating its contract with Vue requires resolving a genuine issue of material fact. To start, TAPCO has not yet been deposed in this case, so neither party can rely upon TAPCO's deposition testimony to determine its true motive behind terminating its contract with Vue. *See* fn. 9, *supra*. In addition, TAPCO's settlement agreement with Frost required that TAPCO ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ which suggests that TAPCO's purportedly legitimate motives are pretext. Given TAPCO's non-exclusive agreement with Vue, termination of its contract would have been unnecessary for TAPCO to merely sell Frost's products. **Ex. H**. Moreover, the reasons cited in TAPCO's termination letter to Vue are erroneous. TAPCO did not "recently learn" of Moore's investment. Moore testified that he told Everard about his investment in Vue shortly after starting at TAPCO. While Everard testified that he was not aware of Moore's investment, that creates a genuine dispute of material fact—a dispute Frost requests this Court resolve on summary judgment.

---

[11] Frost argues that it did not induce TAPCO to breach its agreement because Frost (1) did not receive confidential information about Vue or its customers; (2) did not solicit or obtain TAPCO customers using Vue's confidential information; and (3) Frost never received Vue products in TAPCO's possession. Memo at 20. However, Defendants' interference claim does not hinge on misappropriation of confidential information and, in any event, much of the information about Vue's customers in TAPCO's possession would not constitute confidential information. *See generally* <u>Defendants' Memorandum of Law in Support of Their Objection to Frost's Partial Motion for Summary Judgment on Contract Issues</u>, filed contemporaneously herewith. Moreover, the information that Frost did receive about Vue's customers, contained in Schedule 4 of the Dealer Agreement, is the exact type of information Frost argues is confidential in its affirmative claims.

Moreover, the evidence demonstrates that Moore took no role in negotiating contract terms with Vue and that it was, in fact, Everard, along with members of TAPCO's C-Suite, who negotiated those terms. And those contract negotiations demonstrate that the margins at which to sell Vue products were set by TAPCO, not Moore. Therefore, Frost cannot demonstrate at summary judgment an absence of disputed material fact as to whether TAPCO was legally justified in terminating its contract with Vue.

Second, Frost induced TAPCO to breach its obligation to Vue to promote, market, sell, and distribute Vue's products. *See* **Ex. H**. Bott's first email to TAPCO with settlement terms included ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ **Ex. M**. The settlement agreement proposed by Frost also included a provision that required TAPCO to, among other things, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. **Ex. N**. As part of the final settlement agreement between Frost and TAPCO, TAPCO agreed to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. **Ex. Q**. Schedule 4 of the Dealer Agreement, attached to the settlement agreement and entitled ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Ex. R**. By forcing TAPCO as a condition of settlement to not ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ with the help of TAPCO, Frost improperly interfered with TAPCO's agreement with Vue causing TAPCO to breach.

3. <u>The Customers Listed on Schedule 4 of the Dealer Agreement Support Defendants' Current and Prospective Customer Interference Claims</u>

Frost argues that Defendants fail to identify customers or prospective customers to support their interference claims. However, one need not look further than Schedule 4 of the Dealer

Agreement to know the customers and prospective customers (current customers up for renewal) that support Defendants' interference claims. In fact, the evidence demonstrates, and Bott admits, ██████████████████████████████████████████. Deposition of Michael Bott (9/22) at 299, excerpts attached at **Exhibit YY**. As one example, on or before November 18, 2024, Kirsh spoke with Portage about transitioning to Frost. *See* **Ex. W**. Portage had ████████████████████████████████████████. **Ex. R**. Frost solicited Portage while it was still under contract and when Vue expected Portage to renew for a higher amount. And, close in time to Frost's actions, Portage stopped using Vue. **Ex. T**. As further example, on December 20, 2024, Frost sent an email to at least one customer about switching to Frost "like Portage is doing." **Ex. X**.

Further, Defendants can trace at least six customers, including Portage, who failed to renew their contracts to Frost's actions, all of which were listed on Schedule 4 of the Dealer Agreement.

(1) Polk County notified Vue that it was going in a different direction immediately upon receiving Vue's email that it was no longer working with TAPCO. **Ex. T**.

(2) Auglaize County notified Vue that it decided to use a different company less than one week after TAPCO purported to terminate its contract with Vue. **Ex. U**. Bott admitted that Auglaize ████████████████ Bott (9/22) Dep. 300-301.

(3) Portage started discussing a contract with Frost in November 2024, as described above, and notified Vue in January 2025 that it was not going to stay with Vue. **Ex. V**.

(4) Washington County terminated its contract with Vue in May 2025 and referenced TAPCO in the body of the email and its termination letter. **Ex. Y**. In April 2025, Washington County and Frost entered into a 3-year agreement from May 1, 2025, through May 1, 2028. **Ex. Z**.

(5) Muskegon County notified Vue in August 2025 that it planned to cancel its contract with Vue in the coming fiscal year. **Ex. AA**. In addition, on November 21, 2024, Kirsh reached out to Muskegon County about Frost's "new partnership" with TAPCO. **Ex. BB**.

(6) Ottawa County notified Vue in September 2025 that it was not going to renew. **Ex. CC**.

With the exception of Washington and Ottawa Counties, the above entities had contracts that were set to expire well before TAPCO's contract with Vue. Therefore, Vue was entitled to TAPCO's performance under the Distributor Agreement to promote the sale of Vue's products.

17

Frost's improper conduct prevented TAPCO from performing and Vue from renewing each of the above customers. Frost's actions induced TAPCO not to fulfil its obligations under the contract as to the customers listed on Schedule 4 of the Dealer Agreement and at the very least, as to those customers listed on Schedule 4 and who have since terminated their relationship with Vue.[12]

### B.    A Genuine Dispute of Material Fact Exists About Whether Frost Interfered with East End Group

Every time that a user, including Ostrander, logs in to the Vue platform and prior to entering that user's specific customer profile, a conspicuous warning appears cautioning the user that unauthorized access of the system or use <u>for unauthorized purposes</u> is prohibited. **Ex. JJ**. The warning further provides that if the user proceeds, that user is acknowledging that they have read and understood it. *Id.* This warning, therefore, constitutes a contract that a user agrees to upon accessing Vue's platform and entering their specific customer profile. *See Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 61, n.10 (1st Cir. 2018) (citing *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 394-402 (E.D.N.Y. 2015) for descriptions of the four general types of online contracts). In addition, unauthorized access to computer systems and data in violation of click-wrap, browser-wrap, or other implied contracts can serve as a sufficient basis for breach of contract to support tortious interference. *See X Corp. v. Bright Data Ltd.*, 733 F. Supp. 3d 832, 846-48 (N.D. Cal. 2024).

Frost first argues that because Ostrander had valid login credentials and because he was apparently still employed at EEG, his access to Vue's system while also employed at Frost was proper. That explanation misreads the term "unauthorized" and ignores the express requirement that access be for an authorized purpose. While Ostrander *may* have properly possessed EEG credentials through his apparent continued employment by EEG, that does not mean the purpose and the use of those credentials on those specific dates was proper or authorized. Neither Ostrander

---

[12] Those customers listed on Schedule 4, at minimum, also demonstrate sufficiently concrete relationships for Defendants' interference with prospective business relations claim. Moreover, TAPCO's extensive customer network created sufficiently concrete expectations of future business.

nor Frost disputes that Ostrander logged in to the Vue platform on September 30, October 23, November 1, 19, and 26, 2024. *See* Memo. at 6, 23; Ostrander Dep. 69.

It is undisputed that Ostrander accessed the Vue platform on his first day at Frost after he had not accessed the system for over a month. Ostrander testified that his part-time role at EEG had nothing to do with the daily operations of EEG, that it was solely related to the business side of ongoing union issues, and that he would have no reason to monitor weather or other conditions. In fact, Ostrander could not remember why he accessed the Vue platform. It could have been relatively easy for someone else at EEG, someone not also employed by Frost, to log in to the Vue platform to perform whatever functions were necessary and avoid an obviously suspicious event.

Finally, at least twice, Ostrander informed Bott and Kirsh about Vue's actions, including on Ostrander's third day at Frost. *See* **Exs. KK**, **LL**. When asked why he sent those emails, Ostrander testified that he did so to ▮▮▮▮▮▮▮▮▮▮ Ostrander Dep. 72. These emails demonstrate that Ostrander had an inherent conflict of interest; one that Frost exploited. A reasonable jury could find that Frost induced Ostrander to use his EEG credentials to access Vue's system for unauthorized purposes, thereby tortiously interfering with Vue's contract with EEG.

Frost also argues that Defendants did not suffer any damages as a result of Frost's interference. This is simply incorrect. As a direct result of Frost's actions, Defendants hired cyber security counsel and put the daily operations of their business on hold to deal with the consequences of unauthorized use of their system. The repercussions of Frost's actions and the damage resulting therefrom are continuing in nature and are neither remote nor vague. This is yet another instance of Frost's unseemly and inappropriate actions to improperly try to put a competitor out of business.

### C.    A Genuine Dispute of Material Fact Exists as to Whether Kirsh's Actions Negligently Inflicted Emotional Distress Upon Lareau.

Frost's Motion as to Count I of the FACC fails because a genuine dispute of material fact exists as to whether Frost negligently inflicted emotional distress upon Lareau.

1.      Frost Owed a Duty of Care to Lareau

The New Hampshire Supreme Court has recognized the "general tort principle" that "one who voluntarily assumes a duty thereafter has a duty to act with reasonable care." *Walls v. Oxford Mgmt. Co.*, 137 N.H. 653, 659 (1993) (citing R.2d Torts §§ 323-324). Frost voluntarily undertook the duty to maintain the confidentiality of information Defendants designated as confidential and to not use it for any purpose other than litigating this action. The N.H. Supreme Court has also recognized that parties have a duty not to engage in improper conduct that will foreseeably cause emotional distress. *See Tessier v. Rockefeller*, 162 N.H. 324, 342 (2011). In *Tessier*, the court allowed a negligent infliction of emotional distress claim to go forward between former adversaries in a pre-litigation dispute where misrepresentations underlying the plaintiff's fraud claim could foreseeably have caused emotional distress. *Id.* at 342. The same result should follow. Frost flagrantly violated its promise to not use confidential information outside of the litigation and made deliberately misleading statements to Defendants' insurer, all in ways that could have foreseeably caused harm.

While Frost cites to authority suggesting that attorneys owe no duties to adversary parties in ordinary contexts,[13] it has cited no New Hampshire case supporting the proposition that litigants owe no duties to comply with court orders and the very procedures to which they have stipulated. A contrary rule allowing an "anything goes" litigation environment would undermine the functioning of the court system and be contrary to public policy. The New Hampshire Supreme Court recognized as much in *Aranson v. Schroeder*, 140 N.H. 359, 365-68 (1995). In *Aranson*, the Court concluded that an attorney who, acting as defense counsel, allegedly fabricated evidence during litigation could be liable in tort under a malicious defense theory. *Id.* Far from excluding the possibility of tort liability between parties, the *Aranson* court specifically acknowledged the harm that

---

[13] *See Chalifoux v. Chalifoux*, 2017 N.H. Lexis 203, at *9-10 (dismissing negligence claim against attorney by opposing party for lack of duty when plaintiff failed to allege that attorneys did affirmative wrong to him); *Macmillan v. Scheffy*, 147 N.H. 362, 364-65 (holding in malpractice case that attorney drafting deed owed no duty to non-client grantees of deed).

20

abuse of the system can cause those embroiled in litigation. *Id.* at 365-67. Therefore, a genuine dispute of material fact exists precluding summary judgment. *See Young v. Abalene Pest Control Services, Inc.*, 122 N.H. 287, 291 (1982) (Douglas, J., *dissenting*) ("Unless the existence of a duty is so clear as to be established as a matter of law . . . it should be treated as a jury question[.]").[14]

                2.      Kirsh's Actions Breached that Duty

Frost argues that Kirsh could not have breached a duty owed to Lareau because "[i]t was not reasonably foreseeable that a phone call to Vue's insurance carrier asking about insurance coverage options would cause Lareau severe emotional harm." Memo. at 14. This is a restricted and incorrect version of events. If Kirsh had in fact only inquired into insurance coverage options, Defendants' insurance provider would not have known that Kirsh was involved in litigation with Defendants or that Baglien had received a letter on January 5, 2022, that could have an effect on the availability of insurance coverage. And if Kirsh had only inquired into coverage options, such a call would never have triggered a coverage review based on very specific information—the January 5, 2022, letter.

A broader, more accurate version of the facts tells a much different story. Six months after Defendants produced their insurance policy, marked "Confidential," and in the midst of mediation, Kirsh apparently discovered that Defendants had insurance covering their defense. While Kirsh now tries to frame his curiosity as an interest in arming himself with similar coverage, his words and actions and those of his legal team at the time cast real doubt on his explanation. A reasonable jury could construe Kirsh's statements as evidence that he was upset Defendants could maintain their defense of Frost's claims, and that he hoped to interfere with the insurance coverage enabling such defense. There is also little doubt that Kirsh referenced the January 5, 2022, letter during his call and that there would be no reason to do so other than to insinuate an issue with coverage. Without that,

---

[14] Given the lack of direct case law on this topic in New Hampshire, the court should look to jurisprudence first recognizing bystander liability and hold that "[t]he broader inquiry of foreseeability is therefore more appropriate in determining whether a duty exists." *Corso v. Merrill*, 119 N.H. 647, 652 (1979).

there would have been no reason for the insurance company to initiate a coverage review. And, after Defendants had been put on notice of a potential coverage issue as a result of Kirsh's call, Frost's legal team sent a letter demanding a reservation of rights letter, referencing the January 5, 2022, letter that caused the coverage issue, and noting "serious concerns as to the extent of coverage." **Ex. TT**.

Kirsh opted to imperil Defendants' insurance coverage instead of trying to preserve recovery, therefore demonstrating that his real purpose was to destroy Vue and its owners. There can be no claim that Kirsh's actions, which precipitated the events that followed, would not have been reasonably foreseeable to cause Lareau—or anyone—severe emotional distress due to the potential withdrawal of his insurance coverage—the very thing enabling him to fight Frost's claims.

3.    Kirsh's Breach Caused Significant and Lasting Emotional Distress

Frost argues that Lareau cannot prove that Kirsh caused his emotional distress or that he suffered significant and lasting harm. That is simply not the case. "[F]reedom from mental distress is an interest that is today worthy of legal protection." *Corso v. Merrill*, 119 N.H. at 652. The emotional harm "must be a painful mental experience with lasting effects" and "must be susceptible to some form of objective medical determination and proved through qualified medical witnesses." *Id.* at 653.

Lareau suffered significant, lasting harm in the form of severe and extraordinary emotional distress, exhibited through ████████████████████████████████████████ ████████████████████████████████████████. Lareau Dep. 296. Frost's argument that "one month of insomnia is not significant or lasting" is a weak attempt to downplay the real harm they inflicted, which Lareau—a combat veteran—considered one of the worst months of his life. Moreover, Frost cannot argue that Kirsh's actions did not cause Lareau's injuries because Lareau had ongoing treatment. "One of the bedrock foundations of tort law is that the defendant takes the plaintiff as it finds him." *Trull v. Volkswagen of Am., Inc.*, 320 F.3d 1, 10 (1st Cir. 2002). It is perfectly allowable for Lareau to assert and his treating provider to confirm that Kirsh's actions

22

exacerbated Lareau's preexisting condition and for Lareau to recover damages for that injury. *See id.*

Finally, Lareau has designated his treating provider, Daniel Salazar, to testify in this action. Critically, the Parties have been unable to schedule Salazar's deposition and therefore cannot state on this record what Salazar would or would not testify to. Frost is correct that "in the absence of a report, a plaintiff's treating physician cannot testify to opinions based on information not learned during the course of treatment, e.g., information contained in a hypothetical posed by counsel." *Westerdahl v. Williams*, 276 F.R.D. 405, 408 (D.N.H. 2011) (quotations omitted). That does not mean, however, that Salazar can only testify as to the exact statements in the medical records. Rather, it means Salazar may only offer an opinion based on his examination and treatment. This opinion need not be explicitly provided in the medical records. In fact, the January 9, 2024, appointment notes reference ███████████████████ which reasonably would refer to the recent insurance issues. In addition, at his February 23, 2024, appointment, Lareau and Salazar discussed ███████ ██████████. The temporal proximity between Kirsh's call, receipt of the letter, and the exacerbation of Lareau's condition creates clear causal link to justify denying summary judgment.

## D.    Defendants Did Not Forfeit Their Counterclaims

Frost argues that Defendants forfeited their counterclaims because those claims were not refiled with Defendants' Answer to Frost's FAC. This is an absurdly strict reading of the Federal Rules of Civil Procedure that has no support in this District.

The Federal Rules of Civil Procedure do not require repleading counterclaims in response to a subsequently amended complaint. FRCP 1 states that the rules "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." However, the Rules "do not specifically address whether a defendant that fails to replead a counterclaim in response to an amended complaint may continue to assert that counterclaim." *Sinclair Wyo. Ref. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 775

23

(10th Cir. 2021). Frost's argument that Defendants have forfeited their counterclaims "put[s] form over substance[,]" which courts routinely reject. *Hughes v. Abell*, 867 F. Supp. 2d 76, 91 (D.D.C. 2012).[15] "An answer and a counterclaim, even if contained in the same document, serve different functions; the counterclaim shares more with a complaint, setting out claims against the other party, than it does with the answer." *Id.* Here, Defendants' counterclaims arise from actions taken during the litigation and, therefore, could not have been asserted in response to Frost's initial complaint. Moreover, not only are Defendants' counterclaims filed in a separate document, but Defendants also sought leave of court to bring the claims and again to amend to assert new claims based on further actions taken during the litigation. The inflexible rule for which Frost advocates would not serve the interests of justice. *See Sinclair*, 989 F.3d at 778; *Davis v. White*, 794 F.3d 1008, 1016 (8th Cir. 2015).

While the First Circuit has not yet decided this issue, both the 10th (*Davis*) and 8th (*Sinclair*) Circuits have held that a counterclaim is not automatically abandoned when it is not refiled with an answer to a subsequently amended complaint. In those cases, the courts analyzed whether the plaintiff would be prejudiced by the continued assertion of the counterclaims, emphasizing the notice provided to the plaintiff that defendant was continuing to pursue the counterclaim, *Davis*, 794 F.3d at 1016; *Sinclair*, 989 F.3d at 778, and the fact that discovery on the counterclaim had taken place, *Davis*, 794 F.3d at 1016. This prejudice analysis has been adopted in district courts in at least five states.[16] In addition, district courts in at least twelve states have held that filing an answer to an

---

[15] The two cases Frost relies on are inapplicable. *See* <u>Memo</u> 10-11 (citing *Par Pharm., Inc. v. QuVa Pharma, Inc.*, 764 F. App'x 273, 277 n.3 (3d Cir. 2019); *Gen. Mills, Inc. v. Kraft Foods Glob., Inc.*, 495 F.3d 1378, 1378–79 (Fed. Cir. 2007)). First, in *Par Pharma*, the principle upon which Frost relies is contained in a footnote about the court's jurisdiction. 764 F. App'x at 277, n.3. This statement is clearly dicta and should not instruct this Court's analysis. Second, the facts of *General Mills* are distinguishable to the facts here. In that case, the court granted the motion to dismiss the second amended complaint. 495 F.3d at 1379. The court held that the counterclaims were not pending at the time of dismissal because they were not reasserted in response to the amended complaint. *Id.* at 1381. In fact, that makes logical sense. The defendant in *General Mills* would have been unable to reassert counterclaims in a dismissed a case as. Here, Defendants' FACC was never attached to any responsive pleading and Defendants did not move to dismiss Frost's claims.

[16] *Mathews v. Ohio Pub. Emples. Ret. Sys.*, Civil Action 2:12-cv-1033, 2014 U.S. Dist. LEXIS 133506, at *13-15 (S.D. Ohio Sept. 23, 2014); *Ellering v. Sellstate Realty Sys. Network, Inc.*, Civil No. 10-CV-1025 (RHK/LIB), 2011 U.S. Dist. LEXIS 166948, *9 (D. Minn. Aug. 25, 2011); *Davis v. Beard*, Case No. 4:10-CV-1429 NAB, 2014 U.S. Dist. LEXIS 30461, *12-13 (E.D. Mo. Mar. 10, 2014); *Schutt v. Garland Indep. Sch. Dist.*, CIVIL ACTION NO. 3:17-CV-1708-B, 2019 U.S. Dist.

amended complaint does not affect the previously filed counterclaims without analyzing prejudice.[17]

Frost cannot show, and has not even argued, that it has suffered prejudice. In fact, Frost cannot point to any evidence that Defendants actually abandoned their counterclaims. That is because Frost knows Defendants have been actively pursuing their counterclaims since their filing, including issuing written discovery, as early as April 2025, and taking depositions from September of 2025 through the present. Moreover, Frost has issued written discovery requests, taken depositions, and expects to take at least one more deposition involving the FACC. Therefore, this Court should hold that filing an answer to an amended complaint—filed quite close to the end of discovery—does not automatically render the pending counterclaims abandoned. The Court can go one step further and find that, in any event, Frost must demonstrate prejudice and cannot do so here.

## V.    CONCLUSION

For all of the reasons herein, the Court should deny Frost's Motion for Summary Judgment on Defendants' Counterclaims.

---

LEXIS 114031, *8-9 (N.D. Tex. July 9, 2019); *Affordable Care, LLC v. JNM Office Prop. LLC*, Civil No. 1:19cv827-HSO-JCG, 2021 U.S. Dist. LEXIS 98158, *8 (D. Miss. Feb. 2, 2021).

[17] *Cortez-Melton v. Capital One Fin. Corp.*, Civil Action No. 3:19cv127; Civil Action No. 3:20cv404; Civil Action No. 3:20cv415, 2021 U.S. Dist. LEXIS 36676, at *24 (E.D. Va. Feb. 26, 2021); *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 705-06 (D. Md. 2011); *Head v. Ebert*, 6:14-CV-06546 EAW, 2019 U.S. Dist. LEXIS 48183, *13-14 (W.D.N.Y. Mar. 22, 2019); *AVKO Educ. Research Found. v. Morrow*, Case Number 11-13381, 2013 U.S. Dist. LEXIS 49463, *30 (E.D. Mich. Apr. 5, 2013); *Nautilus Ins. Co. v. Socayr SFH, LLC*, CIVIL ACTION NO. 3:19-CV-00485-GNS, 2020 U.S. Dist. LEXIS 104902, *10 (W.D.K.Y. June 16, 2020); *Hayden v. Ariz. Pool & Fountain Guys, LLC*, No. CV-16-00840-PHX-SRB, 2016 U.S. Dist. LEXIS 192832, *4-5 (D. Ariz. Aug. 2, 2016); *Dunkin' Donuts v. Romanias*, Civil Action No. 00-1886, 2002 U.S. Dist. LEXIS 28405, *5-6 (W.D. Penn. May 29, 2002); *Williams & Cochrane, LLP v. Rosette*, Case No.: 3:17-CV-01436-GPC-MSB, 2020 U.S. Dist. LEXIS 70824, *7, n.6 (S.D. Cal. Apr. 21, 2020); *Williams & Cochrane, LLP v. Quechan Tribe of Fort Yuma Indian Reservation*, Case no.: 3:17-cv-01436-GPC-MDD, 2018 U.S. Dist. LEXIS 141031, *20-21 (S.D. Cal. Aug. 20, 2018); *Abcellera Biologics Inc. v. Bruker Cellular Analysis*, Case No. 20-cv-08624-JST (Consolidated), 2024 U.S. Dist. LEXIS 476, *11, n.1 (N.D. Cal. Jan. 2, 2024); *Lindsey v. Collier*, No. 2:20-cv-00062, 2021 U.S. Dist. LEXIS 155783, *33 (M.D. Tenn. Aug. 18, 2021); *Chandler v. Skipper*, 2:25-cv-08210-MWC-PVCx, 2025 U.S. Dist. LEXIS 271140, *9 (C.D. Cal. Dec. 8, 2025); *United States ex rel. GLF Constr. Corp. v. Fedcon Joint Venture*, Case No: 8:17-cv-01932-T-36AAS; Case No. 8:17-cv-02650-T-36TGW, 2019 U.S. Dist. LEXIS 180575, *13, n.3 (M.D. Fla. Oct. 18, 2019); *Drywall Elements, LLC v. Edward Wolff & Assocs., LLC*, CIVIL ACTION NO. 4:21-CV-00537-CAN, 2023 U.S. Dist. LEXIS 54080, *2, n.1 (E.D. Tex. Mar. 29, 2023); *Whiskey River on Vintage v. Ill. Cas. Co.*, 503 F. Supp. 3d 884, 904, n.2 (S.D. Iowa Nov. 30, 2020).

Respectfully submitted,

PATRICK BAGLIEN, CHRISTOPHER LAREAU
AND VUE ROBOTICS, LLC,

By their attorneys,

SHEEHAN PHINNEY BASS & GREEN, P.A.

Dated: March 19, 2026                  */s/ James P. Harris*
                                       David W. McGrath (NH Bar No. 9347)
                                       James P. Harris (NH Bar No. 15336)
                                       Ryan P. Lirette (NH Bar No. 19561)
                                       Abbygale M. Dow (NH Bar No. 272938)
                                       1000 Elm Street, 17th Floor
                                       Manchester, NH 03101
                                       (603) 627-8255
                                       dmcgrath@sheehan.com
                                       jharris@sheehan.com
                                       rlirette@sheehan.com
                                       adow@sheehan.com

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically served copies of the foregoing on all counsel of record via the Court's CM/ECF system.

Dated: March 19, 2026                  */s/ James P. Harris*

26