## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

FROST SOLUTIONS, LLC,

       Plaintiff,

    v.

PATRICK BAGLIEN, CHRISTOPHER
LAREAU, and VUE ROBOTICS, LLC,

       Defendants.

Case No. 1:22-cv-00401-SE

## PLAINTIFF'S OPPOSITION TO DEFENDANTS BAGLIEN'S
## AND LAREAU'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................ 1

RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS ................................. 2

LEGAL STANDARD ........................................................................................................ 4

ARGUMENT ................................................................................................................... 4

I.      Defendants' request for relief is inconsistent with their argument ................................. 4

II.     Defendants fail to establish that Lareau's non-compete covenant is
        unenforceable .......................................................................................................... 5

        A.      Under the view of non-compete assignability endorsed by Indiana courts,
                enforcement is permitted in certain circumstances ............................................... 6

        B.      The "strangers to the original undertaking" view explains relevant
                Indiana law ............................................................................................................ 11

        C.      Frost Solutions was not a "stranger to the undertaking" .................................... 12

III.    Defendants fail to establish that Lareau's non-solicitation covenant is
        unenforceable ......................................................................................................... 16

        A.      Frost may recover damages for Lareau's breach of his non-solicitation
                covenant for the reasons discussed above ........................................................... 16

        B.      Non-solicitation covenants are not personal services contracts and
                thus are not subject to the same restrictions on assignment as
                non-compete covenants ......................................................................................... 17

        C.      There is a genuine dispute of material fact as to whether Lareau breached
                his non-solicitation covenant ............................................................................... 18

        D.      The non-solicitation covenant is not overbroad as a matter of law .................... 19

        E.      The Lareau Agreement was supported by adequate consideration .................... 21

IV.     Frost's tortious interference claim against Baglien should go to a jury ........................... 22

CONCLUSION ............................................................................................................... 22

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alexander & Alexander, Inc. v. Koelz,*
    722 S.W.2d 311 (Mo. Ct. App. 1986) ..........................................................................9

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ...................................................................................................19

*Armstrong v. Ill. Bankers Life Ass'n,*
    217 Ind. 601 (1940) ...................................................................................................14

*Burk v. Heritage Food Serv. Equip., Inc.,*
    737 N.E.2d 803 (Ind. Ct. App. 2000) ......................................................................20

*Clark's Sales & Serv., Inc. v. Smith,*
    4 N.E.3d 772 (Ind. Ct. App. 2014) ..........................................................................21

*Essex v. Ryan,*
    446 N.E.2d 368 (Ind. Ct. App. 1983) ......................................................................14

*First Cmty. Bank & Trust v. Kelley, Hardesty, Smith & Co.,*
    663 N.E.2d 218 (Ind. Ct. App. 1996) ........................................................................7

*Griggs-Ryan v. Smith,*
    904 F.2d 112 (1st Cir. 1990) ......................................................................................4

*Heraeus Med., LLC v. Zimmer, Inc.,*
    135 N.E.3d 150 (Ind. 2019) ...........................................17, **Error! Bookmark not defined.**, 20

*Hess v. Gebhard & Co. Inc.,*
    808 A.2d 912 (Pa. 2002) ................................................................................8, 9, 10, 18

*Jones v. Servel, Inc.,*
    186 N.E.2d 689 (Ind. Ct. App. 1962) ..............................................................6, 7, 17

*Mesnick v. Gen. Elec. Co.,*
    950 F.2d 816 (1st Cir. 1991) ......................................................................................4

*Norlund v. Faust,*
    675 N.E.2d 1142 (Ind. Ct. App. 1997) ...........................................7, 11, 12, 13, 16

*Perthou v. Stewart,*
    243 F. Supp. 655 (D. Or. 1965) ..................................................................................8

*Peters v. Davidson, Inc.*,
        359 N.E.2d 556 (Ind. Ct. App. 1977)................................................................................12

*Reyes-Orta v. P.R. Highway & Transp. Auth.*,
        811 F.3d 67 (1st Cir. 2016).................................................................................................4

*SDL Enters., Inc. v. DeReamer*,
        683 N.E.2d 1347 (Ind. Ct. App. 1997)....................................................5, 7, 11, 17

*Securitas Sec. Servs. USA, Inc. v. Jenkins, No. 032950BLS*,
        2003 WL 21781385 (Mass. Super. Ct. July 18, 2003)...............................................8

*Smith, Bell & Hauck, Inc. v. Cullins*,
        183 A.2d 528 (Vt. 1962) ...............................................................................7, 8, 9, 17

*Trubowitch v. Riverbank Canning Co.*,
        182 P.2d 182 (Cal. 1947).....................................................................................................12

*TSG Finishing LLC v. Bollinger*,
        2016 NCBC 65 (N.C. Super. Ct. Aug. 26, 2016) ......................................................9

*UARCO Inc. v. Lam*,
        18 F. Supp. 2d 1116 (D. Haw. 1998)..............................................................................9

*Wells Fargo Ins., Inc. v. Heitkamp*,
        2007 No. 1:06-cv-0397-WTL-LJM, 2007 WL 9811143 (2007) ..........................12

**Statutes**

California
        Cal. Bus. & Pro. Code § 16600.1....................................................................................6

Florida
        Fla. Stat. 542.335 .................................................................................................................6

North Dakota
        N.D. Cent. Code 9.08.06....................................................................................................6

Oklahoma
        15 Okla. St. § 219A. ............................................................................................................6

**Federal Rules**

Fed. R. Civ. P.
        Rule 56 ....................................................................................................................................4

**INTRODUCTION**

Plaintiff Frost Solutions, LLC ("Frost" or "Plaintiff"), alleges that Defendant Lareau, its former Vice President, breached his Separation Agreement with Frost (the "Lareau Agreement") when he formed a competing business (Defendant Vue Robotics), downloaded Frost's confidential information and trade secrets, and used that information to compete against Frost and to solicit and steal away its customers and distributors. Frost also alleges that Defendant Baglien tortiously interfered with the Lareau Agreement by encouraging and inducing Lareau's breaches.

These claims are supported by a substantial evidentiary record built over two years of litigation and 15-plus depositions. They arise from standard, negotiated provisions—a confidentiality covenant, a non-solicitation covenant, and a non-competition covenant—that Lareau, a sophisticated businessperson, freely signed. The Court should reject Defendants' attempt to keep these claims from a jury, because Defendants' arguments do not fit the law or the facts.

Only Defendants' consideration argument attacks the Lareau Agreement as a whole, and it is their weakest. It rests solely on Lareau's own self-serving declaration, which is directly contradicted by deposition testimony from Frost's former CEO establishing that Lareau's separation package, including the restrictive covenants, was the product of a negotiated compromise. That dispute alone precludes summary judgment on the entire contract.

Defendants' remaining arguments attack only the non-compete and non-solicitation provisions, and they fare no better. Defendants' assignability theory fundamentally misstates Indiana law. Indiana bars enforcement of a non-compete only by a "stranger" to the original undertaking, and Frost is not one. The non-compete covenant expired before any meaningful change in Frost's corporate form, and the transition from Frost Control to Frost Solutions was a change in legal formality, not in the substance of the enterprise. Regardless, Defendants' request to dismiss Counts III and VI in their entireties is facially inconsistent with this argument: it says nothing about the

Lareau Agreement's confidentiality and nondisclosure provisions, which Frost may enforce no matter how assignability is resolved. Finally, whether the TAPCO distributor relationship had "already ended" before Lareau's interference is a genuine dispute of material fact supported by testimony from several witnesses.

A jury must resolve these disputes and decide whether Lareau and Baglien are liable on Counts III and VI. For these reasons, discussed more fully below, Defendants' motion should be denied.

## RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS

A.    Undisputed.

B.    Disputed in part. Frost disputes the first two sentences of Statement B, which mischaracterize Victor Gill's September 23, 2021 email. (Defs.' Mem. of Law in Supp. of Their Motion for Partial Summary Judgment ("Defs.' Br."), ECF No. 116-1, at 5.) Gill's email stated that the business could "run out of cash" if certain events occurred, with several qualifications, among them that this outcome was contingent on certain things going wrong in the business—and that it was "possible [his] read [was] way off/wrong on this[.]" (*See* Lareau Decl., Ex. 2.) Further, in this email Gill "le[ft] it to [Lareau]" and others to "clarify" the company's financial position, demonstrating that Lareau was already aware of Frost's financial position. The remainder of Paragraph B is undisputed.

C.    Disputed. As to paragraph 1 of Statement C, in the email chain Defendants reference as Exhibit 1, a Frost board member pointed out that Lareau overstated the compensation to which he asserted he was entitled, both as to commissions owed at the time of his resignation and his right to use unpaid vacation time. (*See* Ex. 1 to Defs.' Br., ECF No. 116-2, Gallagher_0001861.) Frost does not dispute that Lareau signed the Lareau Agreement on September 30, 2021.

As to paragraph 2 of Statement C, Frost does not dispute that the Lareau Agreement includes a "Governing Law" provision, which provides that the agreement is governed by Indiana law. (*See* **Ex. 1**, Lareau Agreement § 18.) Frost does not dispute that the Lareau Agreement contains a narrow, enforceable non-compete provision. (*Id.* § 10.)

As to paragraph 3 of Statement C, Frost agrees that the Lareau Agreement includes a narrow, enforceable non-solicitation covenant. (*Id.* § 11.) Frost contends that the non-solicitation agreement applies to TAPCO for the reasons discussed in the Argument section of this Response brief. (*See infra* Section II.C.)

As to paragraph 4 of Statement C, Frost does not dispute that the Lareau Agreement does not contain an *express* assignment clause, and that the Agreement contains a clause labeled "Entire Agreement" at § 20. Frost does not dispute that Lareau never *expressly* consented to assignment of the Lareau Agreement.

D.      Disputed. Statement D mischaracterizes the Lareau Agreement. The Lareau Agreement does not describe the $14,539.50 paid to Lareau as compensation for commissions "already owed." Nor does it describe the seven days of vacation time Lareau was permitted to use as vacation time to which he was entitled. If he was entitled to it, he would have been permitted to use three weeks of vacation time—what he claimed he was owed—rather than the seven days provided for in the Lareau Agreement. The Lareau Agreement itself resolves this issue, as Lareau agreed that he "*has received any and all compensation to which [he] may have been entitled.*" (Lareau Agreement § 6 (emphasis added).)

E.      Disputed in part. Frost does not dispute that Frost Solutions acquired all of Frost Control's contract rights, including its rights to enforce the Lareau Agreement. Further, Frost acknowledges that as part of its reorganization as Frost Solutions, LLC, Frost Control voluntarily surrendered its assets to 1st Source Bank which, at that time, had already entered into an agreement

3

to sell the assets of Frost Control to Frost Solutions. (*See* Ex. 3 to Defs.' Br., ECF No. 116-3.) Frost does not dispute that it alleges that Lareau breached the Lareau Agreement, but notes that the operative complaint is Frost's Amended Complaint, ECF No. 108. Frost's claims against Lareau for breach of the Lareau Agreement are at paragraphs 85–90 of the Amended Complaint.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" where it has the potential to affect the outcome of the suit under applicable law. *Reyes-Orta v. P.R. Highway & Transp. Auth.*, 811 F.3d 67, 73 (1st Cir. 2016). A dispute is "genuine" where a reasonable jury could resolve the point in the favor of the non-moving party. *Id.*

"Summary judgment's role is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (citation omitted). The Court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990).

## ARGUMENT

### I.    Defendants' request for relief is inconsistent with their arguments.

Defendants ask this Court to dismiss Count III of the Amended Complaint, which alleges Lareau breached the Lareau Agreement, and Count VI, which alleges tortious interference by Baglien with that Agreement. Looking at the table of contents of their Motion alone, it is clear Defendants' showing is inadequate. They argue that the non-compete and non-solicitation covenants are unassignable. (Defs.' Br. at 11, 16.) But they say nothing about the confidentiality provisions in the Lareau Agreement. (*see* Lareau Agreement, ¶ 9.) They also fail to connect the dots and explain how their assignability arguments lead to the conclusion that the *entire* Lareau Agreement

4

is unassignable and thus unenforceable. In fact, those dots cannot be connected.

Regardless of the merits of their assignability arguments—which should be rejected for reasons explained below—they cannot result in the dismissal of Count III of the Amended Complaint. Count III alleges that Lareau breached the Lareau Agreement's confidentiality and nondisclosure agreements, including a "Nondisclosure of Trade Secrets and Confidential Information" clause. (*See* Am. Compl., ECF No. 108, ¶¶ 85–89.) Even if the non-compete and non-solicitation provisions were to be considered unassignable, the confidentiality provisions in the Lareau Agreement would nonetheless remain enforceable.[1]

## II.   Defendants fail to establish that Lareau's non-compete covenant is unenforceable.

Defendants assert that Indiana law "prohibits enforcement of non-competes without express consent of the employee" (Defs.' Br. at 11), contending that Lareau did not consent to assignment of the Lareau Agreement  This misstates Indiana law. Indiana has no ironclad prohibition on enforcement of a non-compete agreement by a successor entity. Instead, under the common law of Indiana, non-compete agreements *generally* are not assignable because they are considered personal service contracts, and personal service contracts *generally* are not assignable. *SDL Enters., Inc. v. DeReamer*, 683 N.E.2d 1347, 1349 (Ind. Ct. App. 1997). This general principle does not apply here, however, where the term of the non-compete expired before Frost Control became Frost Solutions; the non-compete for which Frost Solutions seeks to recover damages was only in effect prior to the change in control of the business. Additionally, the transaction by which Frost Control became Frost Solutions primarily changed the corporate formalities of the business, but other important aspects of the business stayed the same. Further, there was no provision in the Lareau Agreement prohibiting assignment of Frost Control's rights under the Agreement.

---

[1]   The only argument Defendants offer that goes to the validity of the entire Lareau Agreement is its argument that the Lareau Agreement is unsupported by adequate consideration. The Court should reject this long-shot argument for the reasons explained in Section III.E.

**A.    Under the view of non-compete assignability endorsed by Indiana courts, enforcement is permitted in certain circumstances.**

Defendants take the position that Indiana strictly prohibits assignment of non-compete agreements, arguing that the "only recognized exception" to Indiana's purported ban on non-competes is where the employee "*expressly consents* to assignment of the contract." (Defs.' Br. at 11.) This is not an accurate statement of Indiana law.

First, it is important to note that Defendants' support for this assertion comes from Indiana common law, not statutory law. By way of contrast, Florida prohibits assignment of non-competes without express consent by statute. *See* Fla. Stat. § 542.335(1)(f).[2] Other states have even stricter restrictions on non-competes, prohibiting their enforcement altogether.[3]

Second, limitations on the enforceability of non-competes under Indiana law are derived from their being considered "personal services contracts." *See Jones v. Servel, Inc.*, 186 N.E.2d 689, 694 (Ind. Ct. App. 1962) ("[A] covenant not to allow competition [is] in nature a personal relationship . . . the covenant not to compete . . . w[as] of such a personal nature that [it] terminate[d] at death."). There are several implications for non-compete agreements being considered a personal services contract. The primary implication is that another party cannot stand in for one of the parties for purposes of contract performance; "It is impossible to replace the performance of the absent party because the performance was unique to that party." 14 Corbin on Contracts § 75.2.[4] The additional implication relevant here is that such an agreement is generally not assignable, because the contract

---

[2]    "The court shall not refuse enforcement of a restrictive covenant on the ground that the person seeking enforcement is . . . an assignee or successor to a party to such contract, provided . . . the restrictive covenant expressly authorized enforcement by a party's assignee or successor."

[3]    California, for example, prohibits even the inclusion of non-competes in employment contracts. Cal. Bus. & Pro. Code § 16600.1. North Dakota prohibits enforcement of non-competes, N.D. Cent. Code § 9-08-06, as does Oklahoma. 15 Okla. St. § 219A.

[4]    Corbin on Contracts is cited approvingly in *Jones*, 186 N.E.2d at 693.

arises from the personal relationship between the contracting parties. *See First Cmty. Bank & Trust v. Kelley, Hardesty, Smith & Co.*, 663 N.E.2d 218, 223 (Ind. Ct. App. 1996) ("[A] claim arising out of contract for personal services . . . generally is not assignable"); *SDL Enters.*, 683 N.E.2d at 1349 ("Covenants not to compete are of a 'personal nature.' . . . As a general rule, personal service contracts are not assignable."), quoting *Jones*, 186 N.E.2d at 689; *Norlund v. Faust*, 675 N.E.2d 1142, 1151 (Ind. Ct. App. 1997).

Indiana courts have not discussed in-depth their rationale for considering a non-compete contract a generally unassignable personal services contract. Other jurisdictions taking the same view of these contracts, however, have considered this question in detail. Their analysis of this question shows that Indiana's rationale for limiting assignment of non-compete agreements does not apply in the instant case. *Smith, Bell & Hauck, Inc. v. Cullins*, 183 A.2d 528 (Vt. 1962) is instructive. In that case, Vermont concluded that a non-compete agreement for an insurance salesman was a personal services contract, and thus unenforceable by the company that bought the salesman's employer's business. The court observed that a central issue in the case was "whether the parties intended that the covenant which secured the employment can be uncoupled from the parent undertaking to be made an instrument of trade, available for sale to an outside competitor." *Id.* at 532. On this point, the "absence of words of assignability . . . [was] not of itself controlling," only evidence of the parties' intent. *Id.* And critically here, the court observed that the non-compete was based on a personal relationship between the insurance salesman and his former employer. Its reasoning is worth quoting at length:

> From its inception, the relationship between [employer and employee] was one of mutual confidence. The employer confided to the servant important customer relationships and business confidences. The employee entrusted to his employer the important privilege of discharging him at will and without cause. This eventuality would at once invoke the severe detriment of foreclosing him from employment elsewhere in that community in his chosen occupation. The restriction, in its own terms, was designed to protect a fiduciary relationship which emanated solely from the master and servant relationship.

> Knowing the character and personality of his master, the employee might be ready and willing to safeguard the trust which his employer had reposed in him by granting a restrictive covenant against leaving that employment. His confidence in his employer might be such that he could scarcely anticipate any rupture between them. As to that particular employer, if a break did occur, he might be willing to pledge that his fidelity would continue after the employment had ended, even at the cost of forsaking the vocation for which he was best suited. This does not mean that he was willing to suffer this restraint for the benefit of a stranger to the original undertaking.

*Id.*

To summarize, a non-compete agreement is a personal agreement between employer and employee: the employee agrees to certain restrictions in pursuing his chosen profession, in order to advance his relationship with his employer. The employee relies on the identity of the employer in entering into that relationship: both to maintain the working conditions that made him willing to sign the agreement in the first place, and to be reasonable in deciding whether or not to enforce it. Like other personal services contracts canonical in the law of contracts, such as a contract to write a book or paint a painting, when the identity of the contracting parties changes, the nature of the bargain changes.

Courts in other states that view non-competes as personal service contracts offer similar reasoning. *See Securitas Sec. Servs. USA, Inc. v. Jenkins*, No. 032950BLS, 2003 WL 21781385, at *5 (Mass. Super. Ct. July 18, 2003) (observing that the employee at issue in the case, "knowing the character and personality of [his employer], might be ready and willing to safeguard the trust which it imposed in him by granting a restrictive covenant against leaving his employment. This does not mean, however, that [the employee] would have been willing to suffer the same restraint for the benefit of a stranger to the original undertaking"); *Hess v. Gebhard & Co. Inc.*, 808 A.2d 912, 922 (Pa. 2002) ("The fact that an individual may have confidence in the character and personality of one employer does not mean that the employee would be willing to suffer a restraint on his employment for the benefit of a stranger to the original undertaking."); *Perthou v. Stewart*, 243 F. Supp. 655, 659 (D. Or. 1965) ("Sound authority supports the view that personal service contracts, such as [the non-

compete] under examination, cannot be assigned. . . . The fact that a person may have confidence in the character and personality of one employer does not mean that the employee would be willing to suffer a restraint on his freedom for the benefit of a *stranger to the original undertaking*.") (emphasis added) (citation omitted). And applying this logic, courts have reasoned that mergers do not necessarily prevent enforcement of a non-compete. *See UARCO Inc. v. Lam*, 18 F. Supp. 2d 1116, 1122 (D. Haw. 1998) (observing that non-compete agreements are generally not assignable, but that a merged company can succeed to one of the merging parties' non-compete rights; a merger is a "change in form in which the employer does business" which, "while involving a formal transfer from one entity to another, should not be seen as creating an assignment of personal services contracts") (quoting *Alexander & Alexander, Inc. v. Koelz*, 722 S.W.2d 311, 313 (Mo. Ct. App. 1986)).

The thrust of these cases is that non-compete agreements cannot be enforced by "stranger[s] to the original undertaking," *Hess*, 808 A.2d at 922. The implications of that logic here are twofold: first, when a non-compete expires prior to the change in control of the business, this rule should not forbid the successor company from recovering damages for breach of the non-compete, since the employee "suffer[ed no] restraint for the benefit of a stranger to the original undertaking." *See Smith, Bell & Hauck*, 183 A.2d at 532. During the span of the non-compete, when the employee in fact "suffer[ed] [the] restraint," it was for the benefit of the party with which the employee contracted. *Id.* The personal nature of the agreement—which gives rise to the restriction—comes from the fact that the employee is agreeing *not to work* in his chosen profession for the benefit of his former employer. When the change in control happens after expiration of the non-compete, the covenant benefited the predecessor business, with which the employee contracted.

The second implication of this logic is that when business formalities change but the essential identity of a business *does not change*, the reformed business can enforce its predecessor's non-compete. The case *TSG Finishing LLC v. Bollinger*, 2016 NCBC 65, (N.C. Super. Ct. Aug. 26,

9

2016) demonstrates the application of these principles. *TSG Finishing* involved an employee, Bollinger, of a furniture company, TSG Finishing LLC. *Id.* at *2. Bollinger was a longtime quality control manager for TSG Inc., who signed a two-year non-compete in 2008. *Id.* at *3. In 2009, TSG Inc. filed for bankruptcy and pursuant to a bankruptcy reorganization plan, transferred its assets in 2011 to TSG Finishing LLC, a wholly-owned subsidiary. *Id.* In 2013, Bollinger resigned and left to work for a nearby competitor, in violation of his non-compete. *Id.* The non-compete was governed by Pennsylvania law. *Id.* at *4 (citing *Hess*, 808 A.2d at 922). Bollinger argued strenuously that his non-compete was unenforceable because it had been assigned from TSG Inc. to TSG Finishing LLC. *Id.* The court rejected that argument, emphasizing the Pennsylvania Supreme Court's reasoning in *Hess* that it is inappropriate for a non-compete to be enforced by a "stranger to the original undertaking." *Id.* at *5 (quoting *Hess*, 808 A.2d at 922). Even though Pennsylvania had a general rule that assignments of non-competes were impermissible,[5] the court in *TSG* found that general rule inapplicable, because the successor entity—which was seeking to enforce the non-compete—was "essentially the same" as the predecessor entity:

> Th[e] case law points to the conclusion that, under Pennsylvania law, a restrictive covenant contained in an employment agreement is not assignable to a successor business entity, in the absence of a specific assignability provision, where the employee would be forced to suffer a restraint on his employment for the benefit of a stranger to the original agreement. Where the successor entity is *essentially the same*, however, such that the nature of the employment relationship does not change following the transaction, a specific assignability provision is not required to effectuate assignment of a restrictive covenant, regardless of the transaction's formal legal structure.

*Id.* at *6 (emphasis added).

---

[5]   It should be noted that this rule was stated in seemingly unequivocal language by the Pennsylvania Supreme Court. *Hess*, 808 A.2d at 922 ("[W]e hold that a restrictive covenant not to compete, contained in an employment agreement, is not assignable to the purchasing business entity, in the absence of a specific assignability provision, where the covenant is included in a sale of assets."). The Indiana Supreme Court has made no similar pronouncement.

**B.    The "strangers to the original undertaking" view explains relevant Indiana law.**

The caselaw above is not only relevant because it explains common-law principles that Indiana courts have endorsed, but also consistent with the relevant Indiana cases, which are otherwise contradictory in ways unexplained by Defendants' strict "no assignment" view. Defendants rely primarily on *SDL Enterprises*, 683 N.E.2d at 1348 and *Norlund*, 675 N.E.2d at 1551. As Defendants acknowledge, these are two non-compete cases involving assignment, which come out different ways. In *SDL Enterprises*, the court declined to enforce a non-compete agreement against two travel agents, Clark and DeReamer, after the travel agency for which they worked changed hands and the relevant non-competes were transferred with other company assets. 683 N.E.2d at 1348, 1350. Notably, the company had changed hands *twice* since Clark joined, and she had twice refused to sign a non-compete agreement with her new employer. *Id.* at 1348.

*Norlund v. Faust*, on the other hand, endorses *exactly the view Plaintiff asserts*, that a stranger to the undertaking cannot enforce a non-compete, but there is no strict prohibition on assignment. Defendants interpret *Norlund* to be a case primarily about an employee acquiescing to assignment (*see* Defs.' Br. at 14–15), but this is incorrect. Instead, the non-compete was enforceable in *Norlund* primarily because it was substantially the same entity attempting to enforce the non-compete that signed the agreement in the first place. 675 N.E.2d at 1152–53. *Norlund* involved a non-compete agreement signed by an optometrist, Norlund, with his employer, Faust Eye Center. *Id.* at 1146–47. After Norlund started at Faust, and signed his non-compete, Faust Eye Center converted from a sole proprietorship to a corporation, Faust Eye Center, P.C. *Id.* at 1147. Then, about two years later, after failed contract negotiations, Norlund left Faust, and worked with his wife to start an eye care business that competed with Faust. *Id.* at 1147–48.

The court in *Norlund* cited approvingly from an earlier Indiana case that stated: "We do not feel that an employee, who freely enters into an employment agreement containing an enforceable

11

covenant not to compete, should be relieved of his contractual obligations simply because his employer's name changed following a valid merger whereby the rights to the employment agreement are transferred." *Id.* at 1152 (quoting *Peters v. Davidson, Inc.*, 359 N.E.2d 556, 562 (Ind. Ct. App. 1977)). The court also quoted approvingly Justice Traynor of the California Supreme Court: "[I]f an assignment results merely from a change in the legal form of ownership of a business, its validity depends upon whether it affects the interests of the parties protected by the nonassignability of the contract." *Id.* (quoting *Trubowitch v. Riverbank Canning Co.*, 182 P.2d 182, 188 (Cal. 1947)). While the court observed that Norlund continued to work for Faust following its incorporation and thus "may not . . . claim that he oppose[d] said assignment [of his noncompete]," this was not the heart of its reasoning. *Id.* That comes in the following paragraph, which concludes the court's analysis of assignment:

> The only reason that the personal service contract was not assignable was based upon the principle that R. Norlund should be able to work for whomever he wished, i.e. Joseph Faust. That goal (of working for Faust) is not damaged by the assignment of the contract from Faust to Faust, P.C. Faust Eye Center and Faust Eye Center, P.C. are materially identical. R. Norlund has raised no concern which is relevant to Faust's incorporation. He appears to seek refuge in the mere technicality of Faust's incorporation to avoid the consequences of his covenant not to compete. This court holds that the assignment of R. Norlund's employment agreement from Faust to Faust, P.C. is valid.

*Id.* at 1153.

This exact language has been cited approvingly by a federal court applying Indiana law to employment agreements. *See Wells Fargo Ins., Inc. v. Heitkamp*, No. 1:06-cv-0397-WTL-LJM, 2007 WL 9811143, *3–4 (S.D. Ind. Jan. 17, 2007) (applying *Norlund* and finding non-compete agreement enforceable despite reincorporation of original employer).

**C.      Frost Solutions was not a "stranger to the undertaking."**

It is Defendants' burden in their motion to establish that they are entitled to summary judgment on Plaintiff's contract claims, and for the reasons explained above, they fail to do so. They

12

do not address relevant Indiana law, as they focus almost exclusively on Lareau's purported non-consent to assignment, rather than whether a "stranger to the undertaking" attempted to step into the shoes of Frost Control and enforce the non-compete agreement.[6]

Contrary to Defendants' argument, the principles limiting assignment of non-competes in Indiana do not apply to the facts here. First, the non-compete expired before Frost Control became Frost Solutions. The Lareau Agreement containing the non-compete provision is dated September 30, 2021. Under the Agreement, Lareau's Resignation Date was October 11, 2021. (*Id.* § 1.) And per the terms of the Agreement, Lareau agreed that for "a period of *six (6) months* after the Resignation Date," he would not "directly or indirectly serve as a founder, co-founder, executive officer, manager, consultant, or employee for any enterprise engaged in the manufacture or development of sensors and computer systems built for the analysis and/or reporting of road weather conditions[.]" (Lareau Agreement § 10 (emphasis added).) So, the term of the non-compete ran from October 11, 2021 until April 11, 2022.

The timing is critical. Frost Control faced significant difficulties throughout the winter and spring of 2022, but there was no significant change in its corporate form until, at the earliest, April 14, 2022. On that day, the board of directors of Frost Control passed a resolution that the company intended to dissolve. (*See* **Ex. 2**, Kirsh Dep. 20:02–24.) (As Kirsh testified at his deposition, however, that did not mean that the company had, in fact, ceased operations. (*Id.*) And Frost Solutions did not purchase Frost Control's assets until August 9, 2022, about four months after the non-compete expired. (*Id.* at 8:11–9:10.) Thus, during the six-month time period in which Lareau's non-compete was in effect, it was for the benefit of Frost Control rather than Frost Solutions.

---

[6]    Defendants also rely primarily on a declaration from Lareau, rather than citing to the more than fifteen depositions that have been taken in this case.

Accordingly, Frost Solutions is not suing to enforce Frost Control's non-compete—*i.e.* asking this Court for an injunction barring Lareau from working in the industry—but instead is exercising its right to Frost Control's damages for Lareau's breach. Under Indiana law, "[a] right to damages for breach of contract is assignable." *Essex v. Ryan*, 446 N.E.2d 368, 374 & n.3 (Ind. Ct. App. 1983) (distinguishing the "right to damages for breach of contract" from "contract rights," as "contract rights" can generally be assigned except when they "involv[e] personal trust or confidence"); *see also Armstrong v. Ill. Bankers Life Ass'n*, 217 Ind. 601, 619 (1940) ("Actions for breach of contact may be assigned.").

Second, the evidence adduced in this case shows Frost Control and Frost Solutions are sufficiently similar that Frost Solutions was not a "stranger to" Lareau's non-compete agreement and should be permitted to enforce it. Frost provides below a non-exclusive list of the relevant similarities. The through-line in this list is that Frost Control, the predecessor entity, and Frost Solutions, both had a close relationship with the Notre Dame IDEA Center. While various corporate formalities changed, the company remained connected to the Notre Dame IDEA Center and certain personnel there. For this reason, Frost Solutions was not a "stranger to" the non-compete agreement that Lareau signed with Frost Control.

- Both Frost Control and Frost Solutions had a close relationship with the University of Notre Dame and its IDEA Center, a start-up incubator. Throughout the existence of Frost Control and Frost Solutions, the Notre Dame IDEA Center has played an important role in the company. At Frost Control's inception, the IDEA Center helped it attract investment. (**Ex. 3**, Gallagher Dep. 7:07–8:08). Later, the IDEA Center was critical in transitioning the company to ownership by Michael Bott and Michael Kirsh. Kirsh testified he understood the IDEA Center to be the "custodian" of Frost Control before he and Bott took control of it. (Kirsh Dep. 8:20–25.) When Bott and Kirsh took over the company, they worked with

Notre Dame students and employees. (*Id.* at 25:09–17.) Several individuals affiliated with the Dame IDEA Center, including Matt Gardner, Michael Wicks, Ryan Kreager, and James Thompson, were involved with Frost Control and helped to shepherd it into the hands of its new owners, Bott and Kirsh. (*Id.* at 26:05–22, 27:06–17.) Despite changes in various corporate formalities, Frost Control, and subsequently Frost Solutions, was subject to some oversight from the IDEA Center both before and after its corporate form changed from Frost Control to Frost Solutions. During the time in summer 2022 before Bott and Kirsh officially purchased the business, the IDEA Center managed the business's accounts. (*Id.* at 47:12–17.) This was during the time after Bott and Kirsh signed an LOI for the business, but before they closed on it. (*Id.* at 53:19–22.)

- Bott was affiliated with the IDEA Center before he and Kirsh purchased the business. Before his involvement with the business, Bott had done consulting work for the IDEA Center, and he stayed connected to the IDEA Center afterward. (*See* **Ex. 4**, Bott Dep. 17:09–11.) Through his connection to the IDEA Center and Notre Dame, Kirsh first became aware of Frost Control as early as 2017 or 2018. (*Id.* at 15:06–13.)

- Ryan Kreager played a key role at both Frost Control and Frost Solutions. Kreager worked with the IDEA Center, was a key employee of Frost Control, and later spent significant time working with Kirsh and Bott during Frost's transition to new ownership. When Lareau was at Frost Control, Kreager supervised him. (*See* **Ex. 5**, Lareau Dep. 56:05–20 (explaining that Kreager "demoted" Lareau in May of 2021).) Kreager himself was eventually demoted from the CEO role, (**Ex. 6**, Gill Dep. 12:10–19), but stayed involved through his connection to the IDEA Center. When Kirsh and Bott came into the picture, Kreager—who was an employee of the IDEA Center—worked on the business "pretty much full-time." (*See* Kirsh Dep. 26:23–27:03; **Ex. 7** (Kirsh Dep. Ex. 2).)

15

**III.    Defendants fail to establish that Lareau's non-solicitation covenant is unenforceable.**

The Court should reject Defendants' argument that Lareau's non-solicitation agreement is unenforceable. First, Defendants fail to show that Indiana courts apply the same limitations on assignment of non-solicitation agreements that they apply to assignment of non-compete agreements. In fact, there is no reason to think Indiana courts would apply those same limitations. Second, even if the same limitations apply, Lareau's non-solicitation agreement is enforceable because of the substantial similarity between Frost Control and Frost Solutions, as explained above.

**A.    Frost may recover damages for Lareau's breach of his non-solicitation covenant for the reasons discussed above.**

First, Plaintiff may recover damages for Lareau's breach of his non-solicitation agreement because Lareau breached the agreement before Frost Control became Frost Solutions. Lareau's non-solicitation agreement was in effect for a period of one year following his Resignation Date. Thus, it expired on October 11, 2022. For a significant portion of that time, the non-solicitation agreement was for the benefit of Frost Control, and at a minimum, Frost Solutions may recover damages for Lareau's breach of the non-solicitation agreement during that time.

Second, as explained above, Indiana courts permit assignment of restrictive covenants where there is sufficient similarity between the predecessor and successor businesses. *See Norlund*, 675 N.E.2d at 1153. Such similarity exists here, where Notre Dame's IDEA Center and certain core personnel from Notre Dame's IDEA Center, were heavily involved in the business before, during, and after Frost's change in ownership. To the extent non-solicitation agreements are subject to the limitations on assignment discussed above as to non-competes, these limitations do not apply here because of the substantial similarity between Frost Control and Frost Solutions.

**B.    Non-solicitation covenants are not personal services contracts and thus are not subject to the same restrictions on assignment as non-compete covenants.**

Second, Defendants fail to establish that non-solicitation agreements are subject under

16

Indiana law to the same restrictions on assignment as non-compete agreements. Defendants argue this is the case because "the non-solicitation restrictions significantly purports [*sic*] to impede Mr. Lareau's freedom to perform services with other businesses." (Defs.' Br. at 16.) To the contrary, non-solicitation agreements differ significantly from non-competition agreements because they are less restrictive for the employee. As explained above, Indiana's restrictions on transferability of non-compete agreements arise from their being considered "personal services" contracts. *See Jones*, 186 N.E.2d at 693. The personal relationship relevant to non-compete agreements, discussed above in cases such as *Smith, Bell & Hauck* and *Hess*, is not necessarily present in non-solicitation agreements. For example, *Smith, Bell & Hauck* characterizes a non-compete agreement as a "pledge that [the employee's] fidelity would continue after the employment had ended, even at the cost of forsaking the vocation for which he was best suited." 183 A.2d at 532. A non-solicitation agreement—an agreement not to pursue existing customers of a given business—does not implicate the same issues. It is more similar to a confidentiality agreement, where an employee agrees not to breach his employer's confidences. *SDL Enterprises*, one of the cases cited by Defendants in this section of their brief (Defs.' Br. at 16) involved agreements not to compete rather than non-solicitation agreements. 683 N.E.2d at 1349.

The caselaw Defendants cite is not persuasive. *Heraeus Med., LLC v. Zimmer, Inc.*, 135 N.E.3d 150 (Ind. 2019), acknowledges that various types of restrictive covenants may be contained in agreements broadly characterized as non-compete agreements, and some legal rules apply to all such agreements, but it does not provided a strong indication that Indiana courts consider non-solicitation agreements the same as "prohibitions against working for a competitor" for purposes of assignment. *Id.* at 153. Just because the blue pencil doctrine applies to non-solicitation agreements in the same way as it applies to non-compete agreements does not mean other doctrines apply the same way. It is often said that restrictive covenants have been historically disfavored by courts "as a

trade restraint that prevents a former employee from earning a living." *Hess*, 808 A.2d at 917. That is true of non-compete agreements—which can prevent a former employee from working *at all*—but not true of non-solicitation agreements.

> ### C. There is a genuine dispute of material fact as to whether Lareau breached his non-solicitation covenant.

Defendants assert in their Motion that Frost "cannot adduce any evidence that Lareau breached the 'non-solicitation' restriction." (Defs.' Br. at 17.) Its support for this assertion is a statement that, "on information and belief, Frost will attempt to argue that Mr. Lareau violated the covenant by engaging in discussions with TAPCO, [a Frost distributor]." (*Id.*) Here, Defendants are wrong on the facts and the law.

The Court may grant summary judgment where "the moving party demonstrates that the opposing party has failed to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Duca v. Glamour Pools, Inc.*, 2025 DNH 133, at *1 (D.N.H. Nov. 13, 2025) (cleaned up). Defendants' showing on this point is plainly lacking. Lareau's non-solicitation agreement provided that for one year after his resignation, he would not "interfere with the relationship between any . . . distributor . . . and [Frost]." (Lareau Agreement § 11.) Defendants do not dispute that Lareau made extensive efforts to court TAPCO during the non-solicitation period, nor could they. (*See* **Exs. 8–12**, (Lareau Dep. Exs. 31–35).) Instead, they claim that it was impossible for Lareau to interfere with Frost's relationship with TAPCO as the relationship had already ended, because TAPCO was under the impression that Frost was ceasing operations. (Defs.' Br. at 17–18.) However, other competent evidence shows that in Spring and Summer 2022, Frost maintained a positive working relationship with TAPCO. (*See* Bott Dep. 255:07–16 ("Q. What was the status of the TAPCO relationship when you first became involved with Frost Control? A. It was fine. We had a number of conversations with them. They were excited about the direction we were going with the product. They introduced us to mutual

customers saying 'Hey, this is the new ownership group. We're excited to be working with them.'").) Bott's testimony constitutes competent evidence as to the state of Frost's relationship with TAPCO. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Accordingly, Defendants have not established that Frost and TAPCO's distributor relationship had "already ended" in April 2022 (Defs.' Br. at 18.).

Fundamentally, it is not Frost's burden at this stage of litigation to introduce facts that make its case that its relationship with TAPCO had not come to an end at the time that Lareau solicited TAPCO. It is Defendants' burden to show that, given the witnesses that Frost has disclosed, Frost *cannot* prove a breach of its non-solicitation agreement. In addition to the testimony cited above, Frost has disclosed TAPCO witnesses who can testify that the Frost-TAPCO relationship was alive at the time that Lareau interfered with it. In part because Defendants did not timely take those witnesses' depositions, Defendants cannot meet their burden on summary judgment.[7]

### D.    The non-solicitation covenant is not overbroad as a matter of law.

Defendants assert that Lareau's non-solicitation agreement cannot be enforced because it is overbroad. As to Defendants' theory of overbreadth, they contend the agreement is overbroad because it "extends beyond Frost Control's legitimate business interests" in that it "applies to all distributors with whom Frost Control[] does business during the 12-month post-employment restrictive period, including those with whom Lareau nor Baglien ever interacted." (Defs.' Br. at 19.)[8] Defendants fail to demonstrate that the non-solicitation agreement is overbroad under Indiana law.

---

[7]    The TAPCO deposition Defendants cite, (Defs. Br. at 17), was taken in separate litigation.

[8]    The suggestion that this restrictive covenant applies to a large number of distributors is misleading. In fact, this litigation focuses on only *one* distributor relationship—with TAPCO.

Under Indiana law, "[c]ovenants must be reasonable with respect to the legitimate interests of the employer, restrictions on the employee, and the public interest." *Burk v. Heritage Food Serv. Equip., Inc.*, 737 N.E.2d 803, 811 (Ind. Ct. App. 2000). "In determining the reasonableness of the covenant, [Indiana courts] examine at the outset whether the employer has asserted a legitimate interest that may be protected by a covenant. . . . If the employer has asserted a legitimate, protectible interest, then [the court] determine[s] whether the scope of the agreement is reasonable in terms of time, geography, and types of activity prohibited." *Id.* at 811. The employer bears the burden of showing the restrictive covenant is necessary under the circumstances. *Id.* Here, Frost has a legitimate interest in protecting the business relationships it cultivated in a small, niche industry. And the restriction itself—limited to only one year and excluding customers, as Defendants acknowledge—is reasonable.

Notably, the restrictive covenant affects only a relatively small, limited universe of companies. Frost did not have many distributor relationships in this small industry, nor were there many individuals in the other categories—employees, sales representatives, agents, consultants, and members. (Lareau Agreement § 11.) This distinguishes this covenant from the one at issue in *Heraeus*, 135 N.E.3d at 153,  one of the principal cases on which Defendants rely.  There, the court denied enforcement of a non-solicitation agreement preventing recruitment of any employees of a major medical distributor. *Id.* at 155–56. The court found it unenforceable because it applied to all of the distributor's employees. *Id.* Here, by contrast, the non-solicitation agreement is made by a small company serving a niche market. (**Ex. 13**, 2d Kreager Dep. 55:13–56:04.) And, unlike the way the non-solicitation provision was enforced in *Heraeus*, this case is in the heartland of the core, legitimate purpose of restrictive covenants, as explained by Indiana courts: "restrict[ing] former employees from using valuable information obtained during their employment—such as trade secrets or confidential client data—to harm their former employers." *Heraeus*, 135 N.E.3d at 152–53.

*Clark's Sales & Serv., Inc. v. Smith*, 4 N.E.3d 772, 781–82 (Ind. Ct. App. 2014), also relied on by Defendants, also involved a non-solicitation agreement affecting a larger universe than the one at issue in the instant case. That non-solicitation agreement covered customers, including past and prospective customers, which Indiana courts had previously said is a restriction "vague and too broad." *See id.* at 782. In fact, that case involved a restriction on contact with any of the plaintiff's customers over a fourteen-year period, a restriction so broad it was impossible to enforce. *Id.* The non-solicitation agreement at issue here does not cover customers; to emphasize again, it prevents Lareau from working with a small number of players in a niche, specialized industry.

### E.    The Lareau Agreement was supported by adequate consideration.

Finally, Defendants argue that the Lareau Agreement is invalid because it was not supported by adequate consideration. (Defs.' Br. at 19–20.) Their support for this assertion is the claim that the benefits Lareau received from the Agreement—including payment of commissions and the opportunity to take vacation time—were already owed to him. Contrary to Defendants' assertion, there is a genuine dispute of material fact on this point. To support their argument that certain commissions and vacation time were already owed, Defendants point only to a declaration Lareau provided. (*Id.*) However, after the many depositions taken in this case, there is more to the story than what Lareau offered in his declaration. For example, Victor Gill, the former chief executive of Frost Control, testified as follows: "Mr. Lareau had indicated that there was an interest in some commission structures that he believed were due. None of that was really well documented. So what we thought would be a good compromise was, look, we'll provide a separation package, and as part of the separation package there would be a noncompete. That was kind of the main point of the negotiation and it got brought up several times. . . . [T]here was no clear documentation that would have made the company absolutely responsible to pay a commission." (Gill Dep. 27:20–28:02, 87:21–22.) This was in large part because, as Gill testified, there was no well-documented

21

commission structure. Relying only on Lareau's declaration, which is contradicted by other deposition testimony, Defendants fail to show there is no genuine dispute as to what Lareau was owed prior to the Lareau Agreement.

## IV. Frost's tortious interference claim against Baglien should go to a jury.

Finally, Defendants rely on the above arguments to say that Frost's tortious interference with contract claims against Baglien (Count VI) must be dismissed, because Frost cannot enforce the Lareau Agreement. For the reasons stated above, Frost can enforce the Lareau Agreement. At a minimum, the tortious interference claim against Baglien cannot be dismissed because Defendants' argument does not address Frost's claims for breach of the confidentiality provisions of the Lareau Agreement.[9] (Lareau Agreement § 9). Because Defendants do not address Frost's claim for breach of the confidentiality provisions of the Lareau Agreement, and for the other reasons explained above, Frost's claim against Baglien for tortious interference with that agreement must survive.

## CONCLUSION

For the foregoing reasons, Defendants' motion for partial summary judgment should be denied.

Dated: March 19, 2026

Respectfully submitted,

**FROST SOLUTIONS, LLC,**

By its attorneys,

/s/ *Laura L. Carroll*
Laura L. Carroll (NH Bar No. 17444)
ARENTFOX SCHIFF LLP
800 Boylston Street, 32nd Floor
Boston, MA 02199
Tel:     (617) 973-6100
Email:  laura.carroll@afslaw.com

---

[9] With the exception of Defendants' argument regarding lack of consideration, which fails for the reasons explained in Section III.E.

Todd A. Rowden (admitted *pro hac vice*)
James L. Oakley (admitted *pro hac vice*)
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, IL 60601
Tel:    (312) 527-4000
Fax:    (312) 527-4011
Email:  trowden@taftlaw.com
        joakley@taftlaw.com

Amir R. Tahmassebi (admitted *pro hac vice*)
KONICEK & DILLON, P.C.
70 West Madison Street, Suite 2060
Chicago, IL 60602
Tel:    (312) 328-9166
Fax:    (630) 262-9659
Email:  amir@konicekdillonlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically served a copy of this document on all counsel of record via the Court's CM/ECF system, pursuant to Fed. R. Civ. P. 5(b)(2)(E).

Dated: March 19, 2026                          */s/ Laura L. Carroll*
                                               Laura L. Carroll

23