**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

FROST SOLUTIONS, LLC,

       Plaintiff,

       v.

PATRICK BAGLIEN, CHRISTOPHER
LAREAU, and VUE ROBOTICS, LLC,

       Defendants.

Case No. 1:22-cv-00401-SE

**RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AS TO PLAINTIFF'S TECHNOLOGY
AND CUSTOMER INFORMATION TRADE SECRET CLAIM
<u>(COUNTS I AND II OF THE AMENDED COMPLAINT)</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ........................................................................................................................ 1

RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS ..................................... 2

STATEMENT OF ADDITIONAL MATERIAL FACTS .................................................................. 4

LEGAL STANDARD .................................................................................................................. 14

ARGUMENT ............................................................................................................................. 14

I.  Frost's Customer Intelligence Trade Secrets ................................................................ 15

    A.  A reasonable jury could find the customer intelligence Defendants stole constitutes Frost's protectable trade secrets ................................................ 16

        1.  Customer identity and contact information, combined with Frost's non-public relationship intelligence, is protectable ........................................ 16

        2.  The customer feedback that Frost invested time, energy, and resources into collecting and compiling also constitutes a protectable trade secret ................................................................................................ 18

        3.  That some of Frost's customers were public entities does not automatically strip information of trade secret protection ........................... 20

        4.  Frost took reasonable measures to protect its customer intelligence ................................................................................................ 21

    B.  Defendants' misappropriation of Frost's customer intelligence is not in dispute ................................................................................................................ 23

II.  Frost's Technology Trade Secrets ................................................................................. 23

    A.  Frost's technology information qualifies as trade secrets ........................................... 24

        1.  Frost has identified its technology trade secrets with reasonable particularity .......................................................................................... 24

        2.  A reasonable jury could find Frost took reasonable measures to protect its technology information ....................................................... 26

        3.  Frost's trade secrets are not generally known or readily ascertainable .......................................................................................... 28

        4.  Defendants' suggestion that Frost's technology trade secrets were abandoned or shelved is irrelevant ................................................. 30

B. Genuine issues of material fact exist as to Defendants' misappropriations of Frost's technology trade secrets.................................................... 31

  1. Baglien and Lareau had deep knowledge of Frost's technology ................... 31

  2. A reasonable jury could find Defendants misappropriated Frost's product by integrating it into their competing product................................ 32

  3. Defendants' independent development defense is a disputed issue of material fact.......................................................................................... 34

  4. Circumstantial evidence of misappropriation is legally sufficient to defeat summary judgment........................................................................... 35

CONCLUSION ....................................................................................................................... 35

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*All West Pet Supply Co. v. Hill's Pet Prods. Div., Colgate-Palmolive Co.,*
    840 F. Supp. 1433 (D. Kan. 1993) ..........................................................18, 23, 29

*Allstate Ins. Co. v. Fougere,*
    79 F.4th 172 (1st Cir. 2023) ..................................................................... 16, 18

*Atlantic Wool Combing Co. v. Norfolk Mills, Inc.,*
    357 F.2d 866 (1st Cir. 1966) .............................................................................29

*AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.,*
    663 F.3d 966 (8th Cir. 2011) ................................................... 16, 17, 19, 22, 26

*Bankers Life & Cas. Co. v. Am. Senior Benefits, LLC,*
    No. 22 C, 50009, 2026 WL 184554 (N.D. Ill. Jan. 23, 2026) ...............................27, 35

*Broker Genius, Inc. v. Zalta,*
    280 F. Supp. 3d 495 (S.D.N.Y. 2017) ..............................................................27

*Catalyst Advisors, LP v. Catalyst Advisors Invs. Glob. Inc.,*
    No. 21 Civ. 4855, 2024 WL 522751 (S.D.N.Y. Feb. 9, 2024) ................ 22, 23, 26, 27

*Contour Design, Inc. v. Chance Mold Steel Co.,*
    794 F. Supp. 2d 315 (D.N.H. 2011) ..................................................................30

*Control Tech. & Sol., LLC v. Omni Energy Partners, LLC,*
    No. 4:21-cv-686, 2021 WL 6049812 (E.D. Mo. Dec. 21, 2021)..........................22, 26

*Curtis 1000, Inc. v. Pierce,*
    905 F. Supp. 898 (D. Kan. 1995) ....................................................................22, 26

*D Sys., Inc. v. Wynne,*
    No. 21-cv-1141, 2025 WL 886958 (S.D. Cal. Mar. 20, 2025) ...........................35

*Double Eagle Alloys, Inc. v. Hooper,*
    134 F.4th 1078 (10th Cir. 2025) .....................................................................25, 25

*Dreamcatcher Software Dev., LLC v. Pop Warner Little Scholars, Inc.,*
    298 F. Supp. 2d 276 (D. Conn. 2004) .............................................................26, 29

*Elmagin Cap., LLC v. Chen,*
    555 F. Supp. 3d 170 (E.D. Pa. 2021)................................................................29, 31

*Estes v. ECMC Grp., Inc.*,
     565 F. Supp. 3d 244 (D.N.H. 2021) ...................................................................................14

*Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*,
     147 F. Supp. 2d 1057 (D. Kan. 2001) ....................................................................16, 17, 18

*First Fin. Bank, N.A. v. Bauknecht*,
     71 F. Supp. 3d 819 (C.D. Ill. 2014) ...................................................................................35

*French v. Merrill*,
     15 F.4th 116 (1st Cir. 2021) .............................................................................................14

*Hertz v. Luzenac*,
     576 F.3d 1103 (10th Cir. 2009) ........................................................................................23

*Iconics, Inc. v. Massaro*,
     266 F. Supp. 3d 449 (D. Mass. 2017) .....................................................................25, 26, 29

*Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*,
     920 F.2d 171 (2d Cir. 1990) ........................................................................................27, 28

*InteliClear, LLC v. ETC Global Holdings, Inc.*,
     978 F.3d 653 (9th Cir. 2020) ...................................................................................15, 24, 25

*Jim Hawk Truck-Trailers of Sioux Falls, Inc. v. Crossroads Trailer Sales & Serv., Inc.*,
     655 F. Supp. 3d 825 (D.S.D. 2023) .........................................................................19, 21, 27

*Mattel, Inc. v. MGA Ent., Inc.*,
     782 F. Supp. 2d 911 (C.D. Cal. 2011) ...............................................................................35

*Meyer Grp., Ltd. v. Rayborn*,
     695 F. Supp. 3d 39 (D.D.C. 2023) .....................................................................................18

*Mickey's Linen v. Fischer, No. 17 C, 2154*,
     2017 WL 3970593 (N.D. Ill. Sept. 8, 2017) .......................................................................15

*Micronics Filtration Holdings, Inc. v. Miller*,
     2018 No. 18-cv-303, 2018 WL 4845749 (2018) ..................................................................14

*Minturn v. Monrad*,
     64 F.4th 9 (1st Cir. 2023) .................................................................................................14

*N. Atl. Instruments, Inc. v. Haber*,
     188 F.3d 38 (2d Cir. 1999) ...............................................................................................16

*NEXT Payment Sols., Inc. v. CLEAResult Consulting, Inc.*,
     163 F.4th 1091 (7th Cir. 2026) .........................................................................................15

*Niemi v. NHK Spring Co., Ltd.*,
    543 F.3d 294 (6th Cir. 2008)..................................................................................................23

*Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*,
    318 F.3d 1284 (11th Cir. 2003)..............................................................................................16

*PleasrDAO v. Shkreli*,
    804 F. Supp. 3d 362 (E.D.N.Y. 2025)...................................................................................23

*Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*,
    149 F.4th 1081 (9th Cir. 2025) ..............................................................................................26

*Sanchez v. Warden, FCI Berlin*,
    2023 No. 22-cv-231-SE, 2023 WL 3230034 (2023) ........................................................14

*ScentSational Techs., LLC v. PepsiCo, Inc.*,
    No. 13-CV-8645, 2017 WL 4403308 (S.D.N.Y. Oct. 2, 2017)......................................34

*SkinMedica, Inc. v. Histogen Inc.*,
    869 F. Supp. 2d 1176 (S.D. Cal. 2012) .................................................................................24

*Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Ltd.*,
    No. CIV.A. 02-12102-RWZ, 2006 WL 1766434 (D. Mass. June 28, 2006) ...............26

*Surgidev Corp. v. Eye Tech., Inc.*,
    828 F.2d 452 (8th Cir. 1987).........................................................................................22, 26

*Synopsys, Inc. v. Risk Based Security, Inc.*,
    2022 No. 21-cv-252, 2022 WL 3005990 (E.D. Va. July 28, 2022)...............................34

*Vendavo, Inc. v. Long*,
    397 F. Supp. 3d 1115 (N.D. Ill. 2019)............................................................................24, 28

*Vention Med. Advanced Components, Inc. v. Pappas*,
    171 N.H. 13 (2018) .........................................................................................................24, 25

*Wilcox Indus. Corp. v. Hansen*,
    870 F. Supp. 2d 296 (D.N.H. 2012) .....................................................................................30

**Statutes**

18 U.S.C.
    § 1836.........................................................................................................................................14
    § 1839 .................................................................................................14, 15, 20, 30, 32

New Hampshire
    N.H. Rev. Stat. 350-B .................................................................................14, 15, 20, 30, 32

**Federal Rules**

Fed. R. Civ. P.
     Rule 56 ................................................................................................................................14

D.N.H. Local R.
     Rule 2.5 ...............................................................................................................................4

**INTRODUCTION**

This case arises from the systematic misappropriation of Plaintiff Frost Solutions, LLC's most sensitive competitive assets by two of its trusted senior executives. Defendants Patrick Baglien (former Head of Sales, COO, and President) and Christopher Lareau (former Regional Vice President and Vice President of Sales) spent years at Frost cultivating customer relationships, attending product development meetings, and receiving detailed engineering updates on Frost's technology development. When they resigned in the fall of 2021, they did not leave empty-handed. They had already downloaded from Frost's secure systems every customer contact, deal, and relationship detail Frost had spent years compiling, and they had created a product description for a wireless camera and weather sensor system—a direct copy of what Frost was building—with the stated ambition to "start a new company."

The information Defendants took and used to compete against Frost in the environmental sensing market constitutes quintessential trade secrets. Frost's HubSpot CRM contained granular, non-public relationship intelligence—key contacts, pricing feedback, bidding strategies, purchasing history, and correspondence—compiled over years of sustained investment and protected by confidentiality agreements, NDAs, and access controls. Frost's technology, including the hardware specifications, software architecture, and development plans underlying its AIMS 2.0 device and related products, reflects years of engineering effort and significant competitive value.

In attempting to argue otherwise in their Motion for Partial Summary Judgment (ECF No. 117), Defendants cherry-pick deposition testimony from single individuals to draw sweeping and oversimplified conclusions about Frost's technology, its development history, and its alleged public disclosures, while ignoring the documentary record and the testimony of the many other witnesses whose accounts create numerous genuine issues of material fact. To support their argument regarding Frost's customer intelligence, they selectively target alleged deficiencies as to a subset of

customers rather than making arguments that could apply across Frost's customer base as a whole. These are not the makings of undisputed facts; they are genuine disputes that belong before a jury. Defendants' motion should be denied in its entirety.

## RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS

With respect to Defendants' LR 56.1(a) statement of what they claim to be undisputed material facts ("Defs.' SUMF"), Frost responds as follows. (*See* Defs.' Mem. of Law in Supp. of Their Mot. for Partial Summ. J. ("Defs.' Br."), ECF No. 117-1, at 2-16.)

1.      Frost disputes that Baglien and Lareau did not take any documents or files embodying any technological trade secret. (Defs.' Br. at 3, 4.) Strong circumstantial evidence exists that Defendants did, in fact, take or use Frost's proprietary technological information to integrate into their competing product. (*See* Pl.'s Statement of Additional Material Facts ("SAMF") ¶¶ 16-38, below.)

2.      Frost disputes Defendants' repeated suggestion that any one individual's deposition testimony defines or limits its trade secrets claims or the foundation thereof. (Defs.' Br. at 3, 7.) Frost identified its trade secrets (with specific document references) and its support for each element of these claims in its discovery responses. (*See* Decl. of J. Oakley ("Oakley Decl.")[1] ¶ 3, **Ex. 1** (Frost's 4th Supp. Resps. to Ints. Nos. 7–10); **Ex. 2** (Frost's 5th Supp. Resps. to Ints.  Nos. 5, 11).)

3.      Frost disputes that its trade secret claims are "based entirely on the belief that Vue's end product is 'similar.'" (Defs.' Br. at 4.) Instead, Frost relies on documents evidencing that Defendants drafted and circulated to a manufacturer a specification sheet for the design of a competing product while they were still employed with Frost (and thus had access to Frost's proprietary documents), as well as testimony from witnesses and experts. (*See* Pl.'s SAMF ¶ 27.)

---

[1]    The Oakley Declaration, attached hereto, discusses and authenticates Frost's exhibits. All "Ex." citations in this Memorandum are to the exhibits to Mr. Oakley's Declaration.

4.      Frost disputes all allegations that its trade secrets "did not exist" simply because they were in the developmental stages when Defendants were employed with Frost. (Defs.' Br. at 5.) Trade secret laws protect ideas, concepts, and plans, and are not restricted only to physical devices in the market. (*See infra*, Argument § II.A.4.) Similarly, Frost disputes that Frost's technology and trade secrets were "dead in the water" in 2021. (Defs.' Br. at 8.) Frost personnel continued to develop proprietary and cutting-edge technology in 2021, which was the foundation for products Frost later developed and deployed in the market. (*See* Pl.'s SAMF ¶¶ 18–24.)

5.      Frost disputes the allegation that there was nothing unique about Frost's product and that nothing set apart Frost's market or development products from its competitors. (Defs.' Br. at 6.) Frost's products were singular in the marketplace, with unique features and capabilities, and there were no true competitors for their offering. (*See* Pl.'s SAMF ¶ 2.)

6.      Frost disputes that Defendants were not involved in the development of the technology underlying Frost's trade secret claims. (Defs.' Br. at 6; *see* Pl.'s SAMF ¶¶ 18–25.)

7.      Frost disputes Defendants' contention that Frost's pitch deck or marketing materials contained sufficient detail about Frost's technology such that it waived the confidential or proprietary nature of the technology. (Defs.' Br. at 8–9.) Frost disputes Defendants' contention that it did not treat this information as secret. (*Id.* at 10; **Ex. 3**, Bott Dep. at 150:05–14; Pl.'s SAMF ¶¶ 7–9, 26.) Frost also disputes Defendants' contention that Frost did not mark any documents shared with its customers, including its public entity customers, as trade secrets or otherwise informed those entities that the documents should not be disclosed. (Defs.' Br. at 16.) Many of Frost's collaborators and customers signed nondisclosure agreements. (*See* Pl.'s SAMF ¶¶ 8–9.)

8.      Frost disputes Defendants' contention that Paragon's testimony amounts to incontrovertible proof that Frost's trade secrets were not used in developing Vue's products. (Defs.' Br. at 10–13.) Defendants did not have to show Paragon a copy of Frost's specifications, designs, or

3

devices in order for Defendants to have misappropriated Frost's proprietary technology, which Defendants accessed and misused before they left Frost's employment. (*See* Pl.'s SAMF ¶¶ 27–28.)

9.       Frost disputes Defendants' contention that the trade secrets related to its customer intelligence are publicly available through industry group lists, US Census data, FOIA requests, or public websites. (Defs.' Br. at 14–15.) Frost collected and stored in its customer relationship management ("CRM") system granular details about its interactions with customers and knowledge collected over time from years of financial and personnel investment. (*See* Pl.'s SAMF ¶¶ 3–6.)

10.      Similarly, Frost disputes Defendants' contention that its trade secrets related to its customers were built exclusively from publicly available information. (Defs.' Br. at 14.) Frost's customer intelligence included detailed transaction data and insights developed over years of collection and analysis. (*See* Pl.'s SAMF ¶¶ 3–6.)

## STATEMENT OF ADDITIONAL MATERIAL FACTS

1.       Frost Solutions, LLC, including its predecessors in interest, Frost Control Systems, Inc. and Frost Control Systems, LLC (collectively, "Frost"), designs, manufactures, and sells environmental and road weather information systems and related products and services, including a proprietary weather-security product called Advance Infrared Monitoring System ("AIMS"). (ECF No. 110, Defs.' Answer to Pl.'s 1st Am. Compl. ("Answer") ¶ 17; **Ex. 4**, Kirsh Dep.[2] 8:05–10; **Ex. 5**, Lareau Dep. 44:17–45:06.) Frost serves both the public and private sectors, from government entities to construction and commercial snow removal companies. ( Bott Dep. 179:10–180:01.) Within the subset of the environmental sensing market focused on road weather security, Frost provides unique devices and offers sophisticated advantages over other products on the market. (**Ex. 6**, 1st Kreager Dep. 88:12–89:04; Bott Dep. 151:14–16.) In September 2021, Frost operated in

---

[2]      The deposition exhibits submitted with this Memorandum include only the relevant testimony cited. Full deposition transcripts are available upon request, per Local Rule 2.5(b).

38 states and 7 Canadian provinces. (Bott Dep. 187:15–22.)

2.      Frost's products (across versions and iterations) were novel and unique, and the products did not have direct competition. (**Ex. 7**, 2d Kreager Dep. 55:13–56:04 ("No, there were not" other devices in the marketplace that addressed the market need that Frost addressed or had its key features and functionality; "we were ahead of the curve, even [ahead of] some of the larger players like Vaisala"); **Ex. 8**, Gill Dep. 114:06–19 ("We certainly positioned the system as being fully unique. . . . we did have a unique ability to establish ice formation or anticipate ice formation. That was like a novel thing"); **Ex. 10**, Bonardi Dep. 160:25–161:05 ("The entire concept of a mini RWIS [was unique] . . . the differentiator was the lower cost RWIS. So that was something somebody like Vaisala had not started doing prior to Frost").)

3.      Frost used a CRM software called HubSpot to track and store granular customer intelligence and deal specifics not publicly available, including current, former, or prospective customer names; contacts within the customer's business; work on prospective customers; customers' business needs and preferences; purchasing history, including number of products purchased, and contract/term length; reasons customer deals were won or lost; bidding strategies; proposal-response strategies; pricing feedback; correspondence history; financial information; record ID numbers; contact names; email addresses; phone numbers; job titles; associated company and company ID; subscriber dates; locations; contact owner information; sequence processes; dates of last activity, last contact, and last engagement; mobile phone numbers; numbers of sale activities; sequences enrolled; times contacted; original source information; recent sales email data; and first time seen data. (Lareau Dep. 23:02–24:10, 24:03–23, 200:19–201:13, 204:07–09 (confirming that he considered this information confidential); Ritchie Dep. 180:08–21; 2d Kreager Dep. 64:12–65:07, 65:22–66:01; Oakley Decl. ¶ 52.)

5

4.      The deal data collected in HubSpot encompassed record ID; number of sensors quoted; amounts; close dates; closed-lost and closed-won reasons; deal name; deal owner; deal probability; deal stage; deal type; forecast amount; last activity date; last contacted; last modified dates; latest source; next step; merged deal IDs; number of associated contacts; number of sales activities; pipeline data; systems counts; weighted amount; associated contact email addresses; associated company; and associated company IDs. (Oakley Decl. ¶ 52.) HubSpot also included information about prospective customers and other contacts. (Lareau Dep. 203:14–23.) Frost's sales reps used HubSpot as a "collection point" and put customer and other contact info into HubSpot. (*Id.* at 204:01–05; Ritchie Dep. 104:03–19.)

5.      Frost also gathered and analyzed customer feedback and product needs in the HubSpot CRM. (2d Kreager Dep. 65:22–66:01.) Former CEO Ryan Kreager met with Frost customers to gather feedback on their product needs. (1st Kreager Dep. 166:17–167:21.) Gathering and tracking this feedback over time gave Frost an advantage in understanding "unmet customer pain points," which it used to develop plans for future products and stay ahead of competitors. (2d Kreager Dep. 66:02–07; *see also* **Ex. 11** (Expert Report of K. McCarthy ("McCarthy Report")) at 5–6 (gaining insider knowledge about a product's deficiencies provides a "product development shortcut" that allows one to "bypass months or years of research and development and redesign their products to avoid expensively learned lessons" and beat competitors to market with an improved product)).

6.      One of the Frost sales team's key responsibilities was cultivating relationships with clients and compiling/recording information gleaned from these interactions in the HubSpot CRM. (2d Kreager Dep. 65:15–21.) This customer intelligence, developed over time and stored on HubSpot, was extremely valuable to Frost, and "the lifeblood of the company." (Ritchie Dep. 312:20–313:05.) Although competitors may know who a customer is, "know[ing] who to talk to"

there is incredibly valuable, and Frost included detailed information about specific customer contacts and prior interactions in the CRM. (Bott Dep. 152:12–13.) Frost never published its full customer list, and the vast majority of Frost's municipal customers did not want to be publicly identified or used in Frost's marketing materials. (*Id.* at 150:05–14; 152:17–21.)

7.       Frost kept the information confidential by using password protection and limiting access to only the sales employees and executives. (Ritchie Dep. 106:09–18, 311:22–313:05; Bonardi Dep. 167:14–21.)

8.       Frost required its employees to execute non-disclosure agreements and confidentiality agreements as an additional layer of protection for its trade secrets. (*See, e.g.*, Combined **Ex. 12** (**Ex. 12-A** (Gill Agreement); **Ex. 12-B** (Baglien Agreement); **Ex. 12-C** (Bonardi Agreement); **Ex. 12-D** (Weidler Agreement); **Ex. 12-E** (Moore Agreement))). Frost also required contractors and businesses it worked with to execute confidentiality agreements. (*See, e.g.*, Combined **Ex. 13** (**Ex. 13-A** (SNO Services Contract); **Ex. 13-B** (Mid-American Signal, Inc. Contract); **Ex. 13-C** (TAPCO Contract); **Ex. 13-D** (Martell Electric Contract); **Ex. 13-E** (Tomorrow Companies Contract))).

9.       Frost required many customers to execute confidentiality agreements protecting "any and all proprietary information, customer lists, customer requirements, trade secrets, know-how, processes, documentation, and all other information without limitation which is not generally known to, or readily ascertainable by proper means, by the public or which might reasonably be considered confidential, secret, sensitive, proprietary, or private[.]" (*See, e.g.*, Combined **Ex. 14** (**Ex. 14-A** (City of Wyoming Contract); **Ex 14-B** (City of Lincoln Agreement); **Ex. 14-C** (City of Battle Creek Contract)).)

10.      On August 9, 2022, Frost Solutions, LLC purchased the assets of Frost Control Systems, Inc., including, without limitation, all intellectual property, contract rights, and all

7

breach-of-contract and other claims that had accrued as of that date. (Kirsh Dep. 8:11–9:10; **Ex. 15** (Asset Purchase Agreement).)

11.     Defendant Patrick Baglien is a former Head of Sales, Chief Operating Officer, and President of Frost, employed from approximately March 2019 to October 20, 2021 (Answer ¶¶ 8, 36; **Ex. 16**, Baglien Dep. 20:02–17.) As Head of Sales, Baglien's job duties included learning about the products Frost sold, identifying prospective customers, interacting with customers, selling Frost's products and subscription-based services, and communicating with the engineering team and company leadership about customer feedback regarding Frost's products and services. (Baglien Dep. 24:04–26:03, 32:06–33:06, 39:13–41:16, 43:11–46:20, 54:17.)

12.     Baglien's title changed to Chief Operating Officer in the spring of 2020, at which point he supervised three salespeople and one marketing person while remaining involved in sales activities and directly interacting with customers. (*Id.* at 46:03–20, 51:01–22.)

13.     As part of his sales and management roles, Baglien had access to Frost's confidential customer and business information stored in HubSpot. (*Id.* at 166:18–167:14; Lareau Dep. 202:09.) Baglien also relayed customer feedback to lead engineer, Mario Bonardi, and the rest of the Frost engineering team, which was then incorporated into the Frost 2.0 product and user interface plans that Frost was developing. (Bonardi Dep. 24:04–26:03, 137:11–138:03.)

14.     As a condition of employment, Baglien was required to and did sign an Employee Confidential Information Invention Assignment Agreement (the "Baglien Agreement"). (Answer ¶ 32; Baglien Dep. 33:07–17; *see* **Ex. 12-B** (Baglien Agreement).) The Baglien Agreement required that Baglien sign upon termination a "Termination Certification" requiring Baglien to "preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information" including products, customer lists, and financial information. (*Id.*)

15.     Defendant Christopher Lareau is a former Regional Vice President and Vice President of Sales for Frost, employed from April 2020, to October 8, 2021. (Answer ¶¶ 7, 37, 41; Lareau Dep. 234:13–15.) As Regional Vice President of Sales for the Northeast region, Lareau sold Frost's sensor systems and camera-enabled systems through subscription contracts, working directly with customers and prospective customers to secure deals. (Lareau Dep. 40:16–23, 59:08–61:09.) Lareau's activities included cold outreach via phone and email, attending industry events and trade shows, and contracting with specific Frost customers. (*Id.* at 60:17–61:19.)

16.     As part of his sales role, Lareau had access to Frost's confidential customer and business information stored in HubSpot; he also relayed customer feedback to lead engineer Bonardi and the Frost engineering team, which was then incorporated into the Frost 2.0 product and user interface plans Frost was developing. (*Id.* at 202:04–06, 203:14–204:21; Bonardi Dep. 24:20–26:03.)

17.     Lareau acknowledged that, during his employment with Frost, he had "become familiar with the Trade Secrets and other Confidential Information of [Frost] and its customers and [agreed that his] services have been of special, unique and extraordinary value to [Frost]." (**Ex. 17**, Lareau Agreement § 10.)

18.     In 2020, Frost began to develop a new product in earnest—a device that was eventually called "AIMS 2.0." (Bonardi Dep. 27:12–29:23; **Ex. 18** (08/04/20 Easley email).) Baglien was involved in the development from the beginning, as evidenced by the reference that he would check with his team on a "wish list" of product improvements. (**Ex. 18**.)

19.     Frost's engineers, along with "oversight or insight" from Baglien, continued to advance their development of the 2.0 product in late 2020.[3] (Bonardi Dep. 73:11–16, 74:10–19; **Ex.**

---

[3]    The various product development communications and documents from 2020 and 2021 reference a "1.3" product and a "2.0" product. Different numbers were used during this time period to discuss changes between sales and technical teams, but the development of the 2.0 device was merged with other projects where possible, demonstrating some of the overlap and interchangeability. (2d Kreager Dep. at 14:18–15:03; **Ex. 21** (Mini RWIS 2.0 Project Definition).)

**19** (08/10/20 email); **Ex. 20** (10/13/20 email).)

20.     In 2021, Baglien regularly attended "Product Development" meetings with Bonardi and Kreager. (Bonardi Dep. 81:03–16; **Ex. 22** (product meeting invites).) Bonardi testified that he discussed the 2.0 system and improvements with Baglien when they met in 2021. (Bonardi Dep. 83:06–16.) Lareau also attended product update meetings and was aware of the features and specifications of the proprietary product. (**Ex. 23** (1/28/21 email); **Ex. 24** (08/19/21 slack conversation); Gill Dep. 80:25–81:03.)

21.     Bonardi sent detailed product updates to the sales team with what were, at the time, highly confidential information about ongoing research and development, product mechanics and electrical systems, software, and product components. (Bonardi Dep. 89:10–24; **Ex. 25** (Bonardi engineering progress update emails).) Baglien replied to one update, remarking it was "very informative. Appreciate this." (**Ex. 26** (02/26/21 Baglien reply).)

22.     Baglien played a particularly active role in the development of the new product, influencing the product's name and the shape of the device, and analyzing the types of sensors to include. (Bonardi Dep. 29:14–18, 77:10–19, 79:18–23; **Ex. 27** (04/08/21 email).) Baglien was also privy to communications regarding updates and specifications of the web app. (Bonardi Dep. 103:13–104:03; **Ex. 28** (09/16/21 Weidler email).)

23.     From the initial development phase emerged a document with the AIMS 2.0 hardware product requirements and software architecture and data processing ("AIMS 2.0 PRD"). (Defs.' Ex. U (AIMS 2.0 PRD); Bonardi Dep. 73:11–16, 77:06–19.) This document includes highly confidential information about the product: key features and functionality developed from "proprietary and confidential conversations . . . with early adopters, customers, key stakeholders"; financial information that "would not have been on any sales deck or on any information [Frost] would have given to clients" and that would not have been known in the marketplace; product

requirements and specifications developed based on "proprietary problem set information"; and confidential battery information that would explain the power requirements of the device and that give insight into the hardware and engineering, as well as confidential information about the related user interface. (2d Kreager Dep. 56:05–15, 58:07–16, 60:07-24, 62:02–63:24.) This information was not obvious to the general public or the market. (*Id.* at 59:02–15.)

24.    Frost continued to develop the firmware and advanced the new product such that the engineering team analyzed a potential bill of materials ("BOM")—which lists the components required to assemble the device—by September 2021. (Bonardi Dep. 76:07–25; **Ex. 29** (08/02/21 product update email); **Ex. 30** (09/07/21 BOM email); 2d Kreager Dep. 57:17–19.)

25.    Defendants, along with Bonardi, had advocated for continued progress on the 2.0 model. (Gill Dep. 69:05–18.)

26.    Access to the technical specifications of Frost's products and concepts was limited, with "barriers put in place necessary to make it difficult to steal that information,"—including physical security (like locked doors), passwords required to log in to the computers, and devices and applications, requiring authentication and encryption. (Gill Dep. 35:25–36:04; 136:16–137:02.) Frost also put tracking numbers in its equipment to monitor their physical location. (Bonardi Dep. 19:04–15.)

27.    On August 23, 2021, while still employed by Frost, Baglien sought a quote request from Glow Labs for help building a new product—a wireless camera and weather sensor—stating that he was "[a]bout to start a new company." (**Ex. 31** (8/23/21 Quote Request at GL_00004).)[4] Baglien then looped Lareau into the conversation and sent Glow Labs a product description that he described as an "outline for what we're looking for development help on." (*Id.* at GL_000012; **Ex.**

---

[4]    Notably, Defendants did not produce these emails in discovery, despite the documents being responsive to numerous document requests. Frost obtained the records directly from Glow Labs through a subpoena shortly before the close of discovery. (Oakley Decl. ¶ 53.)

**32** (9/28/21 Email).) The product description was a "wireless site monitoring system providing snow removal operators, building owners and property managers with atmospherics and images (day/night) every 10 minutes or less with the option to request a live update," and had specifications for the user interface, main gateway unit, sensors, satellite cameras, battery, communications, and design tenets. (**Ex. 33** (Product description).)

28.     On September 25, 2021, while still employed by Frost, Lareau downloaded information from Frost's HubSpot platform, including the entire list of Frost's contacts (7,033 records). (Lareau Dep. 207:01–209:06; **Ex. 34** (Lareau HubSpot Screenshot).)

29.     On September 27, 2021, Lareau informed Frost that he intended to resign his employment. (Answer ¶ 40.) Three days later, Lareau executed a Separation Agreement and Mutual Release (the "Lareau Agreement"), which listed his resignation date as October 8, 2021. (Answer ¶ 41; Lareau Dep. 234:15; *see* **Ex. 17** (Lareau Agreement).)

30.     On October 6, 2021, Baglien informed Frost that he intended to resign his employment, effective October 20, 2021. (**Ex. 35** (Baglien Resignation Email).)

31.     Frost's interim CEO emailed Defendants after their departure, reminding them to "return or destroy any information around contacts, customers, vendors, or partners that you may have obtained" from Frost. (**Ex. 36** (Email to Lareau); **Ex. 37** (Email to Baglien).)

32.     On or about October 8, 2021, Lareau registered the domain name "vuerobotics.io" and set up email accounts for himself and Baglien under that domain. (Answer ¶¶ 48–49; Lareau Dep. 85:05–19, 87:06–10; *see* **Ex. 38** (Vue Calendar Invite).)

33.     On October 11, 2021, while still employed by Frost, Baglien downloaded information from Frost's HubSpot platform, including a complete list of all of Frost's agreements with clients. (Baglien Dep. 166:20–167:14; **Ex. 39** (HubSpot Screenshots).) There was no legitimate business reason to make such a download at that time. (Gill Dep. at 23:18–24:01.)

34. On October 11, 2021, Lareau set up a new account on Slack (an online "platform for communication") called "Vue Robotics," and Baglien joined the Slack workspace two days later. (Answer ¶ 49; Lareau Dep. 80:02–14, 82:04–08; **Ex. 40** (Vue Slack Email).)

35. On or around October 19, 2021, Baglien and Lareau were drafting a product requirements document for Vue Robotics. (Answer ¶ 51.) It described the █████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ (**Ex. 41** (█████ █████████████████); Lareau Dep. 117:02–05.) Lareau then ████████████████ ████████████████████████████████████████████████████ (*Id.* at 144:21–146:23; **Ex. 42** (████████████).)

36. Baglien and Lareau co-founded Defendant Vue Robotics, LLC, a competitor to Frost in the road weather monitoring sector of the environmental sensing market. (Lareau Dep. 9:07–21; 35:02–15.) Vue's "cameras detect environmental and weather hazards": a customer logging into Vue's system can "understand road weather conditions," and Vue's product analyzes and reports "conditions," including "road weather conditions." (*Id.* at 9:06–09, 246:03–247:12.) Baglien is the CEO of Vue and Lareau is the Chief Operating Officer. (Answer ¶¶ 47, 53; Baglien Dep. 10:11–12; Lareau Dep. 9:04–05.) Vue was formed as a legal entity on January 24, 2022. (Answer ¶ 53; **Ex. 43** (Vue Formation Docs.); Lareau Dep. 13:11–12.)

37. In 2022, Defendants solicited several entities for Vue's services whose representatives Defendants had met while at Frost and whose contact and confidential information Defendants had taken from the Frost HubSpot platform. (Baglien Dep. 150:13–154:04, 164:19–165:22, 166:15–17; **Ex. 44** (SNO Services Email); Lareau Dep. 273:05–284:05; **Ex. 45** (Lareau Solicitations); **Ex. 46** (Baglien Solicitations).)

13

38.     It is improbable that Defendants could develop a product and bring it to market in the timeline they did without misappropriating Frost's trade secrets. (Ritchie Dep. 313:12–314:20; Bonardi Dep. 119:22–120:09, 174:13–23; McCarthy Report at 5–6.)[5]

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A material fact is one that 'carries with it the potential to affect the outcome of the suit.'" *Sanchez v. Warden, FCI Berlin*, No. 22-cv-231-SE, 2023 WL 3230034, at *1 (D.N.H. May 3, 2023) (quoting *French v. Merrill*, 15 F.4th 116, 123 (1st Cir. 2021)). A factual dispute is "genuine" if "a reasonable jury could resolve the point in the favor of the non-moving party." *Id.* (quoting *French*, 15 F.4th at 123). All facts and reasonable inferences are viewed in the light most favorable to the nonmoving party. *Estes v. ECMC Grp., Inc.*, 565 F. Supp. 3d 244, 249 (D.N.H. 2021); *Minturn v. Monrad*, 64 F.4th 9, 14 (1st Cir. 2023). Here, that is Frost.

## ARGUMENT

Defendants' motion concerns Counts I and II of Frost's Amended Complaint, alleging violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, and the New Hampshire Uniform Trade Secrets Act ("NHUTSA"), N.H. Rev. Stat. § 350-B *et seq.*, respectively. The two statutes' requirements are not meaningfully different for purposes of this case. *See Micronics Filtration Holdings, Inc. v. Miller*, No. 18-cv-303, 2018 WL 4845749, at *2 (D.N.H. Oct. 4, 2018).[6] And the Court may rely on case law from other jurisdictions analyzing the DTSA and applying similar

---

5    McCarthy has been personally involved in the research, development, design, testing, and marketing of multiple environmental sensing products as well as products from other industries, such as optical sensing instruments. (McCarthy Report at 5.)

6    The DTSA's and NHUTSA's definitions of misappropriation "differ only in form." *Micronics Filtration*, 2018 WL 4845749, at *2 n.2 (citing 18 U.S.C. § 1839; N.H. Rev. Stat. § 350-B:1) "The definitions of trade secret differ slightly, but have very similar requirements." *Id.*

trade secrets statutes that are based on the Uniform Trade Secrets Act. *See NEXT Payment Sols., Inc. v. CLEAResult Consulting, Inc.*, 163 F.4th 1091, 1096 n.2 (7th Cir. 2026); *Mickey's Linen v. Fischer*, No. 17 C 2154, 2017 WL 3970593, at *8 n.1 (N.D. Ill. Sept. 8, 2017) (collecting cases).

Two categories of trade secret information are at issue here. The first is Frost's customer intelligence, a compilation of granular, non-public information about current, former, and prospective customers accumulated over years of investment in relationship-building, and stored in Frost's password-protected HubSpot CRM system. The second is Frost's proprietary technology information, including the hardware specifications, software architecture, data processing requirements, component design, and development plans underlying the AIMS 2.0 device, Frost Tech UI, and Frost Vision AI model, all of which were in active development when Defendants left Frost in the fall of 2021. Frost addresses each category in turn.

## I.    Frost's Customer Intelligence Trade Secrets

"To prove ownership of a trade secret, plaintiffs must identify the trade secrets and carry the burden of showing they exist." *InteliClear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020) (cleaned up). Under both the DTSA and the NHUTSA, a trade secret is information that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. 18 U.S.C. § 1839(3); N.H. Rev. Stat. § 350-B:1(IV). The owner must take reasonable measures to keep trade secret information secret. *Id.*

Defendants argue that Frost's customer intelligence trade secret claims fail for two reasons: (1) customer identities and contact information for all customers are readily ascertainable from public sources; and (2) for public-entity customers, contracts, pricing, bids, communications, and other materials provided to those entities are generally subject to disclosure under public records laws. Both arguments fail.

15

**A reasonable jury could find the customer intelligence Defendants stole constitutes Frost's protectable trade secrets.**

Frost's customer intelligence is the product of years of time and investment into gathering relevant customer information, preferences, and deal specifics. It includes a multitude of information that is not publicly available, such as the best contacts, business needs, purchasing history, bidding strategies, pricing and product feedback; correspondence history; and financial information. (Pl.'s SAMF ¶¶ 3–5.) This data is Frost's lifeblood, and it was stored in a restricted, password-protected system. (*Id.* at ¶ 6.) Courts frequently afford trade secret protection to this type of data. *See, e.g.*, *Allstate Ins. Co. v. Fougere*, 79 F.4th 172, 198 (1st Cir. 2023). Additionally, "whether or not a customer list is a trade secret is generally a question of fact," *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999) (collecting cases), making summary judgment inappropriate.

### 1. Customer identity and contact information, combined with Frost's non-public relationship intelligence, is protectable.

Defendants argue that the identities and contact information of Frost's current, former, and prospective customers are not protectable trade secrets under the DTSA or NHUTSA because such information is readily ascertainable. (Defs.' Br. at 20–26.) But compilations and combinations of information may be protected even where individual elements are publicly available. The law does not focus on whether individual pieces of information could theoretically be found elsewhere. Rather, the question is whether the compilation as a whole derives independent economic value from not being generally known or readily ascertainable by proper means. *Allstate*, 79 F.4th at 198; *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 972 (8th Cir. 2011); *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1291 (11th Cir. 2003); *Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 147 F. Supp. 2d 1057, 1066 (D. Kan. 2001).

Frost's customer intelligence trade secrets go far beyond names and phone numbers. They include current, former, or prospective customer names; contacts within the customer's business;

16

customers' business needs and preferences; purchasing history; reasons customer deals were won or lost; bidding strategies; proposal-response strategies; pricing feedback; correspondence history; and financial information (Pl.'s SAMF ¶¶ 3–4.) The CRM data Lareau downloaded included record ID numbers; contact names; email addresses; phone numbers; job titles; associated company and company ID; subscriber dates; locations; contact owner information; sequence processes; dates of last activity, last contact, and last engagement; mobile phone numbers; numbers of sale activities; sequences enrolled; times contacted; original source information; recent sales email data; and first time seen data. (*Id.* ¶¶ 4, 28.) The deal data includes record ID; number of sensors quoted; amounts; close dates; closed-lost and closed-won reasons; deal name; deal owner; deal probability; deal stage; deal type; forecast amount; last activity date; last contacted; last modified dates; latest source; next step; merged deal IDs; number of associated contacts; number of sales activities; pipeline data; systems counts; weighted amount; associated contact email addresses; associated company; and associated company IDs. (*Id.*) This is the product of years of investment. (*Id.* ¶ 6); *see AvidAir Helicopter*, 663 F.3d at 972; *Fireworks Spectacular*, 147 F. Supp. 2d at 1066. As Ryan Kreager testified, one of the key things that the Frost sales team spent time on was cultivating relationships with clients and compiling/recording information gleaned from these interactions in the HubSpot CRM. (Pl.'s SAMF ¶ 6.) Lareau testified that while he was at Frost, HubSpot was primarily used to track these kinds of specific customer information, and Lareau agreed that customer data is considered confidential information. (*Id.* ¶ 3.)

None of this granular relationship intelligence is available from any industry list or public website. Michael Bott, Frost's principal, testified that Frost did not publish its customer lists, the hard part for any competitor would be "knowing who to talk to," and the vast majority of Frost's municipal customers did not want to be publicly identified in Frost's marketing materials. (Pl.'s SAMF ¶ 6.) A list of tradeshow attendees tells a salesperson who attended a conference. Frost's

CRM told Baglien and Lareau who the right contact was at each entity, what they cared about, how much they were willing to pay, when their contracts were up for renewal, and why Frost had won or lost their business in the past. (*Id.* ¶¶ 3–4.) Those are categorically different things.

Furthermore, this confidential information unquestionably derived independent economic value (actual and potential) from not being known by others outside Frost. Customer intelligence such as the company's relationship with a customer and the nature of the sales to a customer is "the lifeblood of the company." (Pl.'s SAMF ¶ 6.) Kreager explained that understanding unmet customer pain points was one of Frost's key learnings that allowed the development of plans for future, improved products and for Frost to stay ahead of competitors. (2d Kreager Dep. 66:02–11.) For example, conversations with clients led to an important development in AIMS 2.0's road surface temperature specifications and requirements. Frost knew from talking with current and potential customers that in order for the device to effectively address the needs of customers, it needed to be able to measure temperatures as low as negative 40 Celsius and as high as 70 degrees Celsius, and that measuring road surface temperature with accuracy was particularly important to customers because road salt only works above a certain temperature. (*Id.* at 60:07–24.)

For all of these reasons, Defendants have failed to show that they are entitled to judgment as a matter of law. At the very least, the foregoing creates genuine issues of material fact that render summary judgment inappropriate. *See Meyer Grp., Ltd. v. Rayborn*, 695 F. Supp. 3d 39, 63 (D.D.C. 2023).

> **2.  The customer feedback that Frost invested time, energy, and resources into collecting and compiling also constitutes a protectable trade secret.**

There is no question that customer intelligence and feedback can constitute a trade secret. *See, e.g., Allstate*, 79 F.4th at 197–98; *Meyer Grp.*, 695 F. Supp. 3d at 63; *Fireworks Spectacular*, 147 F. Supp. 2d at 1066; *All West Pet Supply Co. v. Hill's Pet Prods. Div., Colgate-Palmolive Co.*, 840 F. Supp.

18

1433, 1438 (D. Kan. 1993) (collecting cases). A compilation of information about many customers all in one place is "materially different from one individual customer theoretically disclosing their preferences." *Jim Hawk Truck-Trailers of Sioux Falls, Inc. v. Crossroads Trailer Sales & Serv., Inc.*, 655 F. Supp. 3d 825, 844–45 (D.S.D. 2023). Yet Defendants rehash an argument already discussed, asserting that because customers and users openly discuss the features and functionalities they desire in RWIS systems at trade shows and other industry events, such information cannot be a trade secret. (Defs.' Br. at 27–28.) Courts have long rejected this argument, holding that "[t]he fact that information can be ultimately discerned by others—whether through independent investigation, accidental discovery, or reverse engineering—does not make it unprotectable." *Jim Hawk*, 655 F. Supp. 3d at 844 (quoting *AvidAir Helicopter*, 663 F.3d at 973). "Instead, the relevant inquiry is whether acquiring this information would require a substantial investment of time, effort, and energy." *Id.* (cleaned up). Ultimately, "[c]ompilations derive their value not from the secretive information they contain, but the competitive advantage that they give by saving valuable time and resources." *Id.* at 845.

Here, Frost put in the legwork and made targeted efforts to collect and compile customer feedback. For example, Kreager testified that he set up meetings with current Frost customers to get direct feedback on their product needs. (Pl.'s SAMF ¶ 5.) And any issues or concerns that Frost identified from customers about Frost products or services were documented in Frost's HubSpot CRM. (*Id.*) The fact that stray pieces of feedback from random customers could be shared in public settings like trade shows does not diminish the time, effort, and resources Frost invested in specifically collecting the customer feedback most relevant to its products and beneficial for improving said products. (*Id.* ¶¶ 3–5.)

Moreover, this customer feedback affords Frost a huge advantage in the marketplace. Kreager explained that this feedback from customers and understanding "unmet customer pain

points" was one of the key elements the Frost team learned and used to develop plans for future products and stay ahead of competitors. (Pl.'s SAMF ¶ 5.) The value in this learned and compiled feedback is further supported by McCarthy's expert report, in which he opined that gaining insider knowledge about a product's deficiencies provides a "product development shortcut" that allows a company to "bypass months or years of research and development and redesign their products to avoid expensively learned lessons." (*Id.*) McCarthy also opined that "if this advantage is combined with knowledge of key customers for the product, the competitor can aggressively pursue those customers. Time to market is particularly valuable in that you can get to a competitor's customer before the competitor can improve their product." (*Id.*)

Viewing all facts and reasonable inferences in the light most favorable to Frost, the evidence in the record, including Kreager's testimony and McCarthy's expert report, creates a genuine issue of material fact as to whether the customer feedback collected and compiled by Frost is a protectable trade secret such that summary judgment is not appropriate.

### 3. That some of Frost's customers were public entities does not automatically strip information of trade secret protection.

Defendants contend that because many (but not all) of Frost's identified customers are public entities, information provided to them is generally subject to disclosure, and that Defendants obtained public-records responses from 19 public entities including contracts, proposals with pricing, invoices, purchase orders, emails, bid information, and marketing materials. (Defs.' Br. at 33–35.) However, the existence of a public records law does not make information readily ascertainable by proper means. *See* 18 U.S.C. § 1839(3); N.H. Rev. Stat. § 350-B:1(IV). Frost's non-public analyses of public entities' purchasing patterns, preferences, and pricing sensitivities are not available through a records request. (*See* Defs.' Ex. T.) Defendants' own exhibits show that the public records they obtained are limited and do not replicate Frost's proprietary customer intelligence. Put simply, what public records requests can produce is not what Frost's CRM contains.

20

Moreover, anything that can be gleaned from a public records request (a signed contract, a purchase order, an invoice) is a static procurement artifact. Frost's HubSpot CRM contained a living database of relationship intelligence accumulated over years: who within an organization was the right contact, what that customer had complained about, why deals were won or lost, what pricing they had accepted or rejected, when contracts were coming up for renewal, and what the customer's specific operational needs were. (Pl.'s SAMF ¶ 3.) These non-public details (renewal timing, internal pricing decisions, product upgrade narratives tailored to customer concerns, and installation constraints) are not captured by procurement forms.

Many public entity customers signed nondisclosure agreements. (Pl.'s SAMF ¶ 9.) Further, although some public-entity customers flagged that pricing and contract terms are subject to public records laws, they agreed to protect Frost's trade secrets, notify Frost of records requests, and not bring legal action to compel disclosure. (*See, e.g.*, **Ex. 47** (customer redline).) This acknowledgment assumes Frost's materials retained trade secret status even while in such customers' possession.

A claimed trade secret is not "readily ascertainable" merely because some information could theoretically be obtained through public records. Defendants had to submit requests to 19 different public entities across 25 jurisdictions and still could not come close to replicating the depth of Frost's compiled intelligence. The very effort required demonstrates there is at least a genuine dispute over whether the information was "readily ascertainable." *See Jim Hawk*, 655 F. Supp. 3d at 844 ("[T]he compilation of the lists required significant effort and thus there is a dispute over whether the lists are readily ascertainable."). Ultimately, "the relevant inquiry is whether acquiring this information would require a substantial investment of time, effort, and energy." *Id.* (cleaned up). This inquiry is a question of fact not properly resolved on summary judgment.

### 4. Frost took reasonable measures to protect its customer intelligence.

"[G]iven that trade secrets may appear in a wide variety of 'forms and types,' 'what measures

are reasonable' must depend in significant part on the nature of the trade secret at issue." *Catalyst Advisors, LP v. Catalyst Advisors Invs. Glob. Inc.*, No. 21 Civ. 4855, 2024 WL 522751, at *21 (S.D.N.Y. Feb. 9, 2024) (citations omitted). "Reasonable efforts to maintain secrecy need not be overly extravagant, and absolute secrecy is not required." *AvidAir Helicopter*, 663 F.3d at 974. Nor is it necessary for a trade secret owner to take "all conceivable efforts" to protect the confidentiality of their trade secrets. *Control Tech. & Sol., LLC v. Omni Energy Partners, LLC*, No. 4:21-cv-686, 2021 WL 6049812, at *8 (E.D. Mo. Dec. 21, 2021) (citation omitted); *Curtis 1000, Inc. v. Pierce*, 905 F. Supp. 898, 901 (D. Kan. 1995) (citation omitted); *Surgidev Corp. v. Eye Tech., Inc.*, 828 F.2d 452, 455 (8th Cir. 1987).

Frost implemented numerous protocols to protect its trade secrets. First, it required employees to execute confidentiality agreements at the start of employment, which expressly prohibited disclosure of Frost's proprietary information to third parties without written authorization and required assignment of rights to inventions made during employment. (Pl.'s SAMF ¶ 8.) The agreements required employees to return or destroy all company property and data upon termination. Frost personnel followed up, as they did with Defendants in this case, to confirm this was completed. (*Id.* ¶ 31.) Second, departing employees executed non-disclosure and non-compete agreements and Frost terminated their system access upon departure. (*Id.* ¶¶ 8, 29.) Third, Frost incorporated non-disclosure provisions into agreements with third-party vendors, suppliers, partners, and customers, including confidentiality language in customer-facing communications and a surviving trade secret confidentiality obligation in its Master Services Agreement. (*Id.* ¶¶ 8–9.) Fourth, Frost applied safeguards like password protections, restricted user access, and a system for tracking and auditing user activities like data downloads (the same system that captured the evidence of Defendants' pre-departure downloads). (*Id.* ¶¶ 7, 26.)

22

Defendants point to communications from five municipalities flagging potential public disclosure, and argue that Frost did not mark materials as trade secrets or invoke exemptions. But the focus here is on whether Frost maintained reasonable measures within its own control, which it did. The communications cited by Defendants reflect isolated, deal-level disclosures to specific counterparties regarding specific pricing terms, not a wholesale public release of Frost's CRM intelligence. (*See* Defs.' Br., Ex. S.) A company does not waive trade secret protection for its entire customer database by disclosing pricing to one customer in one contract negotiation.

Reasonableness of secrecy measures is a question of fact not properly resolved at summary judgment. *PleasrDAO v. Shkreli*, 804 F. Supp. 3d 362, 378 (E.D.N.Y. 2025); *Catalyst Advisors*, 2024 WL 522751, at *21; *All West*, 840 F. Supp. at 1438. Defendants do not contend Frost had zero protections. Their argument is one of degree, which is a jury question. *Hertz v. Luzenac*, 576 F.3d 1103, 1113 (10th Cir. 2009); *Niemi v. NHK Spring Co., Ltd.*, 543 F.3d 294, 303 (6th Cir. 2008).

**Defendants' misappropriation of Frost's customer intelligence is not in dispute.**

Defendants do not argue that they are entitled to summary judgment on this element with regard to Frost's customer intelligence. Nor could they, given the undisputed evidence that Baglien and Lareau downloaded thousands of items from Frost's HubSpot CRM shortly before resigning from Frost. (Pl.'s SAMF ¶¶ 28, 33.) Specifically, Lareau downloaded the entire list of Frost's contacts (7,033 records), and Baglien a complete list of all of Frost's agreements with customers. (*Id.*) They later solicited many of these customers for their new company. (*Id.* ¶¶ 37–38.)

## II.   Frost's Technology Trade Secrets

Frost Control's former executives and board members testified to the unique and proprietary nature of Frost's products, and—after working with Defendants—refuted the idea that Defendants were capable of independently designing and manufacturing a device so similar to Frost's without misappropriating Frost's trade secrets. Before Defendants resigned, Frost was developing a cutting-

edge product, and Defendants contributed to its research and development. Frost guarded the product's proprietary specifications from customers and investors, but could not guard against Defendants actively developing their own copycat product while they were still employed and had access to Frost's trade secrets. Numerous issues of material fact exist as to Frost's technology trade secret claims, and these claims must be decided by the jury.

### A. Frost's technology information qualifies as trade secrets.

#### 1. Frost has identified its technology trade secrets with reasonable particularity.

To survive summary judgment, a plaintiff need only identify its trade secrets in sufficient detail to provide a defendant with "concrete identification" to prepare a rebuttal and to allow the trier of fact to determine what information comprises the secret and whether it was kept confidential. *InteliClear*, 978 F.3d at 658; *Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1130 (N.D. Ill. 2019); *see Vention Med. Advanced Components, Inc. v. Pappas*, 171 N.H. 13, 25 (2018). At a more basic level, a "party's identification of its trade secret is sufficient where the identification clearly refers to trade secret material." *SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp. 2d 1176, 1190 n.6 (S.D. Cal. 2012) (cleaned up). Thus, the standard is not hyper-technical.

Frost identified as trade secrets AIMS, AIMS 2.0, Frost Tech UI, and Frost Vision, including blueprints, wireframes, development plans, data sources, testing history, and marketing plans and highlighted in its discovery responses the specific documents that support its trade secrets. (Resp. to Defs.' SUMF ¶ 2.) The references are not voluminous; Frost's response to Interrogatory No. 3 (which requests identification of Frost's trade secrets) cites approximately 40 documents. (*See* **Ex. 2** (5th Supp. at 16–20).) This hardly requires Defendants to "sift through[ ] voluminous documents in order to ascertain" Frost's trade secrets. (Defs.' Br. at 18–19.) And the AIMS 2.0 PRD—the foundation for the technology trade secrets at issue here—is only 11 pages. (*See* Defs.' Ex. U.) This case is nothing like those in which courts have found the "reasonable particularity" requirement

24

unsatisfied. *Cf., e.g.*, *Double Eagle Alloys, Inc. v. Hooper*, 134 F.4th 1078, 1091 (10th Cir. 2025).

Further, Frost directed Defendants to specific sets of documents related to "each trade secret [it] contends was misappropriated" by Defendants, the safeguards it used to maintain the secrecy of those trade secrets, and Frost's basis for contending Defendants had access to them. (**Ex. 1** (4th Supp. at Resp. at 27–47); **Ex. 2** (5th Supp. at Resp. at 31–35).) These cite to specific, particularized, and concrete trade secrets, not insufficient "catchall phrases," "categories of trade secrets" that Frost intends to pursue at trial, or "[l]ong lists of general areas of information containing unidentified trade secrets." *InteliClear*, 978 F.3d at 658 (citations omitted); *cf. Double Eagle*, 134 F.4th at 1091. That Defendants were intimately familiar with Frost's technology, plans, and devices while employed further undercuts their argument here. *Pappas*, 171 N.H. at 26.

Defendants claim the AIMS 2.0 PRD is "legally deficient" and overly inclusive, arguing without support that it contains information that "could never be a trade secret." (Defs.' Br. at 18–19; Defs.' Ex. U.) Not so. "A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Iconics, Inc. v. Massaro*, 266 F. Supp. 3d 449, 454 (D. Mass. 2017) (citation omitted). In fact, the AIMS 2.0 PRD included highly confidential information about the product: key features and functionality developed from "proprietary and confidential conversations . . . with early adopters, customers, key stakeholders"; financial information that "would not have been on any sales deck or on any information [Frost] would have given to clients" and that would not have been known in the marketplace; product requirements and specifications developed based on "proprietary problem set information"; and confidential battery information that would explain the device's power requirements and give insight into the hardware and engineering, as well as confidential information about the related user interface. (Pl.'s SAMF ¶ 23.) Frost's former CEO testified that this

information was not obvious to the general public or available in the market. (*Id.*)[7]

Frost's products (across versions and iterations) were novel and unique, and the products did not have direct competition. (*Id.* ¶ 2.) They were the result of the unique combination of characteristics and components of Frost's products and, as the voluminous testimony shows, afforded Frost a competitive advantage. (*Id.*) Thus, the AIM 2.0 PRD is the exact type of document and product that trade secret law protects. *See Iconics*, 266 F. Supp. 3d at 454. Drawing all reasonable inferences in Frost's favor, there is (at the very least) a genuine dispute of material fact as to whether Frost has identified its trade secrets with reasonable particularity. *See Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, 149 F.4th 1081, 1087 (9th Cir. 2025); *Dreamcatcher Software Dev., LLC v. Pop Warner Little Scholars, Inc.*, 298 F. Supp. 2d 276, 282 (D. Conn. 2004).

### 2. A reasonable jury could find Frost took reasonable measures to protect its technology information.

Frost treated its technology as confidential and took the required reasonable measures to protect its trade secret information. Again, whether efforts to protect trade secrets are reasonable depends on their specific nature, *Catalyst Advisors*, 2024 WL 522751, at \*21, and reasonable measures need not be "overly extravagant," *AvidAir Helicopter*, 663 F.3d at 974; *Control Tech.*, 2021 WL 6049812, at \*8; *Curtis 1000*, 905 F. Supp. at 901; *Surgidev*, 828 F.2d at 455. Additionally, "[t]he reasonableness determination is fact-specific and depends largely on the circumstances," making it unsuitable for disposition at summary judgment. *See Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Ltd.*, No. CIV.A. 02-12102-RWZ, 2006 WL 1766434, at \*9 (D. Mass. June 28, 2006).

---

[7] Defendants argue in a footnote that Frost did not treat its technology as a trade secret based on one June 28, 2022 email from Frost Control's attorney at the time stating that "[n]one of the intellectual property is protected." (Defs.' Br. at 8 n.9 (citing Defs.' Ex. H).) Yet the very next sentence presumes the existence of intellectual property. (*Id.*) Thus, the context of this communication clarifies that this is a reference to one person's opinion about the status of Frost's patents—not a blanket waiver of the confidentiality of Frost's trade secrets and proprietary technology. Instead, Frost implemented numerous safeguards to protect its technology trade secrets. (*See infra*, Argument § II.A.2.)

Frost met these standards. All Frost computers were password protected, Frost used tracking numbers to monitor equipment, and doors to the computer and server rooms were physically locked. (Pl.'s SAMF ¶ 26.) Frost implemented specific barriers to protect the technical product drawings on its servers, including applying password protections, required authentications, and encryptions. (*Id.*) Frost sales and product development information were also password-protected and subject to role-based, need-to-know access controls. (*Id.*) And Frost required employees, third parties, and customers to execute confidentiality agreements. (*Id.* ¶¶ 8–9.) These are "precisely the types of measures which courts have held are sufficiently reasonable to withstand . . . a motion for summary judgment." *Catalyst Advisors*, 2024 WL 522751, at *21 (citation omitted); *see also Jim Hawk*, 655 F. Supp. 3d at 846. Frost "need not monitor its employees like a police state to garner trade secret protection for its confidential information." *Bankers Life & Cas. Co. v. Am. Senior Benefits, LLC*, No. 22 C 50009, 2026 WL 184554, at *12 (N.D. Ill. Jan. 23, 2026) (citation omitted).

Contrary to Defendants' argument, courts routinely find that the use of pitch decks, marketing materials, and customer use of systems and websites do not strip trade secrets of their protection. *See, e.g.*, *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 518–19 (S.D.N.Y. 2017); *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990) ("[T]he limited information available in the promotional literature [does not contain] sufficient technical detail to constitute disclosure of the product's architecture."). The same is true here. Defendants argue that Frost's marketing materials "describe its features and functionalities." (Defs.' Br. at 10.) Indeed, the materials Defendants cite have high-level bullet points setting forth the capabilities of Frost's products. (*Id.* at Exs. L, M.) However, these documents do not disclose technical details of the products' architecture. (*Id.*) Instead, Frost's marketing materials provide only "a high-level overview of the capabilities of [Frost's] products and how they were a match to the different problems and difficulties" customers were facing. (2d Kreager Dep. 40:07–15.) Similarly, Frost's investor pitches

did not delve into the technical product components and design; they provided general information "about sales pipeline, market sizing, product market fit . . . sales projections, revenue projections, cost structures, [and] use of funds." (*Id.* at 40:19–41:06.) In sum, these categories of documents do not waive trade secret protection because the products' component combination and architecture were not disclosed. *See Integrated Cash*, 920 F.2d at 174; *Vendavo*, 397 F. Supp. 3d at 1135 (collecting cases).

Ultimately, whether Frost's protective measures were reasonable is a question for the jury and summary judgment is not appropriate.

### 3. Frost's trade secrets are not generally known or readily ascertainable.

Frost's trade secrets are not generally known in the industry, readily ascertainable, or obvious, nor were other competitors offering products like Frost's. Defendants frame Frost's identified trade secrets as claiming broad "features and functionality" rather than specific protectable "how-to" technical information. (Defs.' Br. at 21–22.) Not only is this view of Frost's claim too narrow, but Defendants cite no case law to support their suggestion that features and functionality of a device cannot be protected trade secrets, instead parroting the obvious rule that trade secrets cannot include what is generally known in the industry.

The "obvious" product features Defendants cite are incidental product elements, not the core combination of components, features, and architecture that make Frost's products novel and unique in the marketplace. Trade secret protection would cease to exist (and no product could be marketed) if a product's trade secret protection was stripped only because it contains a feature that is obvious or generally known. Frost's technology's specific combination of elements produced a device that distinguished itself in the market not only for its features and functions (which had no competition), but because it was successfully engineered to provide customers weather data and insights from a "smaller, less expensive, easier to deploy remotely piece of technology relative to the

incumbent solution."[8] (Pl.'s SAMF ¶ 2.) *See Dreamcatcher*, 298 F. Supp. 2d at 282 ("[A] plaintiff's ability to combine these elements into a successful process . . . is a trade secret entitled to protection" (cleaned up)); *see also All West*, 840 F. Supp. at 1438 ("Trade secrets often contain elements that by themselves may be in the public domain, but together nevertheless qualify as trade secrets."); *Iconics*, 266 F. Supp. 3d at 458 (quoting *Atlantic Wool Combing Co. v. Norfolk Mills, Inc.*, 357 F.2d 866, 868 (1st Cir. 1966)).

Frost has identified both features and functionalities *and* "how-to" technical information as protectable trade secrets. As discussed above, the AIMS 2.0 Product Requirements Document includes technical specifications that identify how the technology works and components that allow for insight into the hardware, engineering, and related user interface. (*See* Defs.' Ex. U; Pl.'s SAMF ¶ 23.) No other device in the market was designed to work like Frost's. (*Id.* ¶ 2.) Only later did a direct competitor enter the marketplace with a device that had the same features, same capabilities, same price point, same market sector, and same target industry as Frost—and it was Vue. (McCarthy Report at 6–7.)

Whether a trade secret is generally known or readily ascertainable is a question of fact. *Elmagin Cap., LLC v. Chen*, 555 F. Supp. 3d 170, 179 (E.D. Pa. 2021); *All West*, 840 F. Supp. at 1438. Viewing all facts and reasonable inferences in the light most favorable to Plaintiff, the deposition testimony—including Lareau admitting he considered similar elements of Vue's technology confidential—and McCarthy's expert report create a genuine issue of material fact precluding summary judgment. (*See* Lareau Dep. at 34:04–20.)

---

[8]    *See also* 2d Kreager Dep. 62:02–18 (product's battery information was confidential and proprietary); Gill Dep. 77:14–78:17 (testifying to Frost's sophisticated engineering process for addressing and managing the power for Frost's device); 1st Kreager Dep. 170:11–171:09 (testifying to the competitive edge developed related to re-engineering the device's camera capabilities).

### 4.    Defendants' suggestion that Frost's technology trade secrets were abandoned or shelved is irrelevant.

In their facts statement, Defendants argue Frost stopped AIMS 2.0 development and "other technology enhancements" in 2021, fired engineers, and redeployed resources, thereby abandoning its "in-development" secrets before Baglien and Lareau left Frost. (Defs.' Br. at 7–8.) Perhaps recognizing the weakness of this "defense," Defendants do not return to this in their argument, explain what relevance it has to Frost's trade secrets claims, or provide supporting caselaw.

Pausing development does not destroy trade secret status. A company does not lose trade secret protection simply because it has not yet commercialized the secret or has temporarily halted a project. Both the DTSA and NHUTSA explicitly recognize that independent economic value can be actual *or potential*. 18 U.S.C. § 1839(3)(B); N.H. Rev. Stat. Ann. § 350-B:1(IV)(a). Trade secret protections even extend to "confidential disclosures of concepts, or as yet-untested, ideas for a new product," and "a plaintiff who has not yet had an opportunity or acquired the means to put a trade secret to use." *Contour Design, Inc. v. Chance Mold Steel Co.*, 794 F. Supp. 2d 315, 321 (D.N.H. 2011) (citations omitted); *Wilcox Indus. Corp. v. Hansen*, 870 F. Supp. 2d 296, 309–10 (D.N.H. 2012).

Frost's technology trade secrets retained value regardless of whether development was active, as a competitor could use it to leapfrog Frost's development timeline—exactly what Defendants did here. (*See* McCarthy Report at 5–6.) Given the time needed to develop such technologies, Baglien and Lareau were aware of Frost's research and development of the AIMS 2.0 device and Frost Tech UI—R&D that encompassed years of engineering and design effort. (Pl.'s SAMF ¶¶ 18–24.) In short, Defendants' underdeveloped suggestion that Frost's technology trade secrets were abandoned or shelved is irrelevant and meritless.[9]

---

[9]    Further, Frost's principal testified that the research, development, and investment set forth in the AIMS 2.0 PRD was indeed utilized and incorporated into later versions of Frost's product. (**Ex. 48**, Frost 30(b)(6) Dep. at 78:12–19.)

**B.    Genuine issues of material fact exist as to Defendants' misappropriations of Frost's technology trade secrets.**

The record establishes that Defendants were intimately involved in the development of Frost's new technology, like the AIMS 2.0 device. Defendants then, while still employed with Frost, contacted a vendor to begin designing a competing product with nearly identical specifications to Frost's product. Just days after resigning from Frost, Defendants had created email addresses and company accounts for their new competing business. The device they brought to market is a direct competitor to Frost and mimics many of the features, capabilities, components, design structure, and materials that Frost's product used or planned to implement in its next iteration. Whether misappropriation has occurred is a fact question. *Elmagin Cap.*, 555 F. Supp. 3d at 180.

**1.    Baglien and Lareau had deep knowledge of Frost's technology.**

Baglien and Lareau had access to and made use of Frost's confidential information and trade secrets during their employments. (Pl.'s SAMF ¶¶ 27–28, 33.) They were involved in discussions about the development of Frost's AIMS 2.0 product and its technical specifications and provided feedback and advocacy for the continuation of the product's development (*Id.* ¶¶ 18–25.)

Baglien and Lareau worked closely with the engineering team. (*See, e.g.*, Pl.'s SAMF ¶¶ 11, 13, 16.) Multiple former Frost employees familiar with the product developments in 2021 confirmed that Defendants were familiar with the research and development and confidential specifications of Frost's products because technical development was tied to customer needs and feedback. (Bonardi Dep. 107:16–108:22; 2d Kreager Dep. 55:16–19, 66:02–11; Gill Dep. 79:10–80:08.) Indeed, Defendants were brought into the development of Frost's 2.0 product from the outset; when the engineers sought a preliminary "wish list" for the product's features, Baglien indicated he would "be getting with his team about it." (Pl.'s SAMF ¶ 18.) Both Defendants were included on emails updates with the subject line "Engineering Progress Report," in which Bonardi gave *detailed* product and engineering updates including ongoing research and development, product mechanics and

31

electrical systems, software, and product components. (*Id.* ¶ 21.)

As development of the 2.0 product continued over the next year, Defendants routinely attended product development meetings with the lead engineer and the CEO, including on April 7, 2021, April 20, 2021, and July 23, 2021. (Pl.'s SAMF ¶ 20.) Bonardi discussed the 2.0 product with Baglien in 2021 and testified that the 2.0 system was probably discussed during the product update meetings. (*Id.*) Baglien even proposed topics of discussions for the product development meetings, including the types of sensors he thought should be considered for updated products. (*Id.* ¶ 22.) He also gave input on the name and appearance of the new device. (*Id.*) The AIMS 2.0 PRD—with multiple categories of highly proprietary categories of information—was created before Defendants resigned from Frost. (Bonardi Dep. 139:14–25, 140:16–18; Defs.' Ex. U.)

### 2. A reasonable jury could find Defendants misappropriated Frost's product by integrating it into their competing product.

Both the DTSA and NHUTSA include use of another's trade secret as a form of misappropriation. 18 U.S.C. § 1839(5); N.H. Rev. Stat. § 350-B:1(II). Circumstantial evidence strongly suggests that Defendants used Frost's 2.0 Product Requirements document, along with the other confidential and proprietary research and development specifications to which they had access, to copy Frost's product and start a competing business, creating a genuine factual dispute.

Multiple Frost employees confirmed that Defendants had access to the documents on which Frost's trade secret claims rely (including the 2.0 Product Requirements). (Pl.'s SAMF ¶ 18–25.) While still employed at Frost with access to these systems, Baglien created a "Product Description" for a remarkably similar product and sent it to Glow Labs, an IoT design company, indicating that he was "[a]bout to start a new company . . . [h]ere is what I'd like help building. Wireless Camera + Weather Sensor." (*Id.* ¶ 27.) On September 23, 2021, four days *before* Lareau communicated his resignation to Frost, Baglien asked the Glow Labs representative: "Can we setup a zoom? I'd like my co-founder Chris Lareau to join as well." (*Id.*) A week later, Defendants had registered the domain

name "vuerobotics.io," set up Vue email accounts under it, created a Slack account for Vue, and drafted an updated product requirements document for Vue. (*Id.* ¶¶ 32, 34.)

Comparing Baglien's "Product Description" and the later developed Vue product requirements to Frost's 2.0 Product Requirements reveals the improbability of Defendants independently developing their product. Defendants' documents have extensive, detailed overlap with AIMS 2.0's specifications, ███████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████ (*Compare* **Exs. 33** and **41**, *with* Defs.' Ex. U.) Defendants' progression from the product description to the product requirements shows that Defendants directly copied not only Frost's product's technical features (████████████████████ ████████████████████), but also the addition of incremental "improvements" (e.g., ████ ██████████████████████████████████████████████) that do not materially change the device's overall architecture or intended function, strongly suggest Defendants' use of Frost's proprietary specifications. (*Id.*) The document Vue shared with Paragon to design and manufacture its product retains all the essential features of Frost's device—an unlikely occurrence if the product was independently designed. Revealingly, Defendants' product description stated they were not looking to "reinvent the wheel." (**Ex. 33**.)[10]

Further, both industry witnesses and Frost's expert have remarked on the improbable speed with which Defendants were able to develop the Vue product. Frost's former lead engineer testified that, based on his time working with Defendants, neither had the technical expertise required to

---

[10]   Expert McCarthy confirms that, upon analyzing Vue's design documents and development communications, there is no evidence that Vue developed or intended to develop a product that would be viable for any environmental sensing sectors other than the niche road condition sector that Frost's product already served. (McCarthy Report at 4.)

independently develop a design request for an RWIS type of system "from scratch." (Pl.'s SAMF ¶ 38.) Frost's former board member noted that "you don't start a company that technologically sophisticated with those kinds of customers with that kind of sale cycle that fast without getting a head start on taking something to make it happen." (*Id.*) Expert McCarthy opined that, given the time needed to develop such technologies, it is highly unlikely that Vue could have developed competing weather-security hardware and software technology so quickly without having taken proprietary trade secret information relating to Frost's technologies. (McCarthy Report at 5–6.) This timeline strongly suggests that Defendants misappropriated Frost's trade secrets.

### 3. Defendants' independent development defense is a disputed issue of material fact.

In light of the foregoing timeline and testimony, Defendants' independent development argument is riddled with genuine issues of material fact such that summary judgment is inappropriate. "It is a well-recognized principle that, where a defendant in a trade secret case claims independent development, the burden shifts to the defendant to show that this was in fact the case." *ScentSational Techs., LLC v. PepsiCo, Inc.*, No. 13-CV-8645, 2017 WL 4403308, at *16 (S.D.N.Y. Oct. 2, 2017) (citation omitted).[11]

Although Paragon may have believed it was designing Vue's ARC-1 "from scratch" as Defendants claim, the record shows that ARC-1 was rooted in the technology and concepts owned and protected by Frost. Baglien's own interrogatory response confirms that he and Lareau created the product requirements document for the ARC-1 themselves before handing it off to Paragon. (**Ex. 49** (Baglien's 3d Supp. Interrog. Resps. at 4).) Paragon did its work based on that requirements document. Baglien and Lareau were intimately familiar with Frost's technology architecture, and

---

[11]    Further, some courts consider "independent development" an affirmative defense to a trade secret claim. *See Synopsys, Inc. v. Risk Based Security, Inc.*, No. 21-cv-252, 2022 WL 3005990, *17 n.53 (E.D. Va. July 28, 2022). Defendants failed to raise this defense in their pleadings.

their knowledge cannot be cleanly compartmentalized from Paragon's work. The circumstances—including the speed of ARC-1's development, as questioned and assessed in McCarthy's Report and previously discussed—raise a triable inference of use. (McCarthy Report at 5–7.)

### 4. Circumstantial evidence of misappropriation is legally sufficient to defeat summary judgment.

Although some of Frost's evidence is circumstantial, the jury must decide whether the camera and weather sensor technology Defendants began developing for Vue before they left their employment with Frost (a camera and weather sensor company) was misappropriated from Frost's protected trade secrets. "It is well-established that circumstantial evidence can be used to prove misappropriation of trade secrets." *Bankers Life*, 2026 WL 184554, at \*13 (citation omitted). In fact, misappropriation and misuse can rarely be proved by convincing direct evidence, such that "circumstantial evidence is acceptable, indeed even expected, in trade secret misappropriation cases." *Id.* (citations omitted); *see also 3D Sys., Inc. v. Wynne*, No. 21-cv-1141, 2025 WL 886958, at \*7 (S.D. Cal. Mar. 20, 2025) ("Reliance upon circumstantial evidence is particularly appropriate in trade secret cases." (cleaned up)). Here, the circumstantial case is particularly strong.

Additionally, a reasonable jury can conclude that Defendants' misappropriation extends beyond stealing documents, to memorizing Frost's trade secrets. "Memorization is one manner in which a trade secret may be misappropriated." *First Fin. Bank, N.A. v. Bauknecht*, 71 F. Supp. 3d 819, 845 (C.D. Ill. 2014); *see also Mattel, Inc. v. MGA Ent., Inc.*, 782 F. Supp. 2d 911, 967 (C.D. Cal. 2011). The jury must be permitted to evaluate the evidence and decide if Defendants misappropriated Frost's trade secrets—including based on the knowledge "in Defendants' heads." (Defs.' Br. at 22.)

### CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be denied.

Dated: March 19, 2026

Respectfully submitted,

**FROST SOLUTIONS, LLC,**

By its attorneys,

/s/ *Laura L. Carroll*
Laura L. Carroll (NH Bar No. 17444)
ARENTFOX SCHIFF LLP
800 Boylston Street, 32nd Floor
Boston, MA 02199
Tel:    (617) 973-6100
Email:  laura.carroll@afslaw.com

Todd A. Rowden (admitted *pro hac vice*)
James L. Oakley (admitted *pro hac vice*)
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, IL 60601
Tel:    (312) 527-4000
Fax:    (312) 527-4011
Email:  trowden@taftlaw.com
        joakley@taftlaw.com

Amir R. Tahmassebi (admitted *pro hac vice*)
KONICEK & DILLON, P.C.
70 West Madison Street, Suite 2060
Chicago, IL 60602
Tel:    (312) 328-9166
Fax:    (630) 262-9659
Email:  amir@konicekdillonlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically served a copy of this document on all counsel of record via the Court's CM/ECF system, pursuant to Fed. R. Civ. P. 5(b)(2)(E).

Dated: March 19, 2026

/s/ *Laura L. Carroll*
Laura L. Carroll