# Exhibit 16

**CONFIDENTIAL – ATTORNEYS' EYES ONLY – CONFIDENTIAL**    1

Volume I
Pages 1 - 183

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

CASE NO. 22CV401SE(D.N.H.)

\* \* \* \* \* \* \* \* \* \* \* \*
\*
FROST SOLUTIONS, LLC,          \*
Plaintiff                      \*
\*
versus                         \*
\*
PATRICK BAGLIEN, CHRISTOPHER    \*
LAREAU, and VUE ROBOTICS, LLC,  \*
Defendants                     \*
\*
\* \* \* \* \* \* \* \* \* \* \* \*


VIDEO DEPOSITION OF PATRICK BAGLIEN

FRIDAY, JULY 18, 2025

10:04 a.m. to 3:38 p.m.


Sheehan Phinney Bass & Green PA
1000 Elm Street, 17th Floor
Manchester, New Hampshire 03101


Stenographer:   Kathryn R. Sweeney, FAPR, RDR, CRR
NH LCR #00166


**CONNELLY REPORTING & VIDEO SERVICES, INC.**
32 Gault Road
Bedford, New Hampshire 03110
(603) 472-5745

CONFIDENTIAL – ATTORNEYS' EYES ONLY – CONFIDENTIAL    2

APPEARANCES:


        TODD A. ROWDEN, ESQUIRE
        JAMES L. OAKLEY, ESQUIRE
              Taft Stettinius & Hollister LLP
              111 East Wacker Drive, Suite 2600
              Chicago, Illinois 60601
              (312) 527-4000
              trowden@taftlaw.com
              joakley@taftlaw.com
              Appearing for Plaintiff


        DAVID W. McGRATH, ESQUIRE
        ABBYGALE MARTINEN DOW, ESQUIRE
              Sheehan Phinney Bass & Green, PA
              1000 Elm Street, 17th Floor
              Manchester, New Hampshire 03101
              (603) 627-8255
              dmcgrath@sheehan.com
              adow@sheehan.com
              Appearing for Defendant


        VIDEOGRAPHER:  Bryant Ragas


        ALSO PRESENT:  Christopher Lareau
                       Michael Bott
                       Michael Kirsch
                       Gracie Lowe
                       Robert Cowan

I N D E X

WITNESS -- PATRICK M. BAGLIEN                    Page

Examination By Mr. Rowden                          8

CONFIDENTIAL – ATTORNEYS' EYES ONLY – CONFIDENTIAL   10

A.   That sounds fair.

Q.   And if you need to take a break at any time, let me know.  I just ask that you don't do that during -- between a question and an answer.

Do you understand that?

A.   I do.

Q.   Would you give us your home address, please?

A.   51351 Hidden Pines Court, Granger, Indiana 46530.

Q.   And what is your present occupation, sir?

A.   I'm the CEO of Vue Robotics.

Q.   How long have you had that position?

A.   Since January of 2022.

Q.   What are your duties and responsibilities as CEO of Vue?

A.   It varies day-to-day.  Generally speaking, you know, I lead or direct all company functions.

Q.   What are those?

A.   Some may include sales, marketing, product management.  You know, could be fundraising. Could be working with distribution or

CONFIDENTIAL – ATTORNEYS' EYES ONLY – CONFIDENTIAL    20

BY MR. ROWDEN:

Q.    Mr. Baglien, you previously worked for Frost Control; correct?

A.    I worked for Frost Control Systems, yes.

Q.    And I think you worked for Frost Controls from 2019 through October of 2021.

Does that sound correct?

MR. McGRATH:  Objection.

BY MR. ROWDEN:

Q.    Excuse me, March of 2019.

MR. McGRATH:  It was more the word "through."

MR. ROWDEN:  Okay.

BY MR. ROWDEN:

Q.    From approximately March 2019 through approximately mid October 2021?

A.    Approximately, that's right.

Q.    Were you familiar with Frost Control's customers during your employment with Frost Controls?

A.    A little confused about the term "familiar."

Q.    Did you know what types of customers Frost Controls had?

CONNELLY REPORTING & VIDEO SERVICES, INC.

**CONFIDENTIAL – ATTORNEYS' EYES ONLY – CONFIDENTIAL**   24

Starting with college, would you walk me through your educational background?  And let me know where you went to college, what degrees, and what years you obtained them.

A.   Yes.  I graduated from Michigan State University in 2005, bachelor of arts from the communications school.

Q.   Any post-graduate degrees or study?

A.   No.

Q.   Can you walk me through your employment background?  And why don't we start after you graduated from MSU.

A.   Sure.  Well, got a dream job out of college. I worked for the Chicago Bulls right away, selling season tickets and suites and group packages to corporations, individuals.

Q.   How long did you do that?

A.   I did that for a little less than a year.

And then stayed in the professional sports industry for, call it, a little less than another year, working for the Phoenix Coyotes, selling hockey in the desert.  So I moved out to Phoenix.  And then --

Q.    What do you mean by selling hockey in the desert?  What did you sell?

A.    Well, they were a professional hockey team, so I was selling season tickets, group packages, suites, things like that.

Q.    Thank you.

A.    Uh-huh.

Q.    What years did you do that?

A.    I'm a little fuzzy on the exact dates, but you know, I graduated in the spring of '05, worked for the Bulls until the spring of '06, and then I worked for the Coyotes in Phoenix until, I'm going to say, near the end of '06.

Q.    What you did do next?

A.    Then I moved back to Chicago that winter, I don't remember exactly when, and I worked for an electrical energy solutions company called E. Sam Jones.

      We sold technology to, primarily, you know, real estate stakeholders, actually, again.  You know, kind of high-tech lighting solutions to drive energy demand down.

      So I did that -- did that job for, I

CONFIDENTIAL – ATTORNEYS' EYES ONLY – CONFIDENTIAL    26

can't remember, say three years, maybe a little bit more.

And then I stayed on that path working for a company that went on to be AEP Energy.  The company at the time was called Blue Star Energy.  Same line of work, except a larger scope.

(Michael Bott left the deposition.)

So I was working to sell technology to real estate facility companies all over the country, kind of indoor and outdoor lighting tech, and some HVAC technologies as well.  Trying to manage energy management for those clients.

Q.    Was that from approximately 2009 through 2011?

A.    The AEP/Blue Star?

Q.    Yes.

A.    I think so.

Q.    Okay.  What'd you do next?

A.    Thanks.  That's helpful.

Next, I worked for a company called UL, which is short for Underwriters

CONFIDENTIAL – ATTORNEYS' EYES ONLY – CONFIDENTIAL    32

A.    I don't know that I had formalized duties from Brad, that I recall.

Yeah, to the best of my knowledge, I don't remember the exact description of what he meant by that when he hired me.

Q.    What do you recall doing as the head of sales and marketing for Frost?

A.    Well, I -- when I started -- you know, the functions and what I did over my time there changed, but when I started, it was pretty basic stuff.

We needed to stand up a -- I think I website or helped Brad try and raise some money; although, he had pretty much done that by the time I got there.

And really, I think the core of it really was to try and identify customers who were interested in procuring Frost Control service.

Q.    What were you selling?

A.    Well, at that time, the business model was unclear.  We both sold product, like classic selling it, and we also did some contracts

CONFIDENTIAL – ATTORNEYS' EYES ONLY – CONFIDENTIAL      33

that were subscription.  And what the customers were buying was access to, you know, a cloud-based platform.

And what that really entailed, at that time, was basic information, a couple environmental data points.  That's about it.

Q.    Okay.  When you joined Frost in 2019, were you asked to sign any agreements?

A.    Yeah, I think so.

Q.    What did you say?

A.    I don't remember what was signed, but I do recall, you know, having been asked to sign some agreements.

Q.    Do you recall ever signing a confidential information and invention assignment agreement?

A.    I believe that I did sign that.

Q.    Do you understand generally what a confidential information agreement is?

A.    I would say only generally, because that is a big term that --

Q.    What's your understanding of that?

A.    Confidential information generally means

A.   I was not.

Q.   But you were head of sales and, at all times during your tenure with Frost, you were responsible, in some fashion, for sales of their products; correct?

A.   No.

Q.   When were you no longer responsible for sales?

A.   I was not always wholly responsible for sales during my tenure.  I had -- I played a role in sales, but I wasn't always responsible for the organization.

Q.   Correct.  But you always -- from the time you started in 2019, until you left in 2021, you knew the products that Frost was selling; correct?

A.   Yeah, I did know the products they were selling.

Q.   Right.  And I'm not asking you for the technical engineering minutia of what happened --

A.   Sure.

Q.   -- but describe for us how what you were

CONFIDENTIAL – ATTORNEYS' EYES ONLY – CONFIDENTIAL    40

selling changed during the time you were at Frost.

A.    It's difficult to recall the exact timeline of these events, but I would just say about a year and a half or so after I started at Frost, so if we speed up to 2020, mid 2020, there's a version of the Frost system that has a camera as part of the system.

That -- the iteration of this product that also included a camera continued to change over the next year, on how that looked.  The design seemed to change.

So that's the hardware element.  I don't recall, like, much of the -- I don't really recall much of the way it worked or communicated changing.

At one point, Frost added an external battery pack to try and find more, I guess, power capacity, is the way I'd describe it.

And in terms of the other side of the product, which is the software interface, what customers interacted with, I don't recall a lot of changes in those first couple

CONFIDENTIAL – ATTORNEYS' EYES ONLY – CONFIDENTIAL   41

years.

There was -- I think it was hosted by another company.  And so it changed.  I don't remember when, but the UI, the customer interface changed at some point as well.  The details, I'm -- hard to remember.

Q.   Am I correct that the way these devices work is they -- generally speaking, they gather information where they're located -- and you've described some of it, temperature, et cetera, maybe some photographs -- and then they deliver that information to the customer?

Is that kind of a simplistic way of how these devices work?

A.   Very simplistic.

Q.   In 2019, who were the customers that purchased the Frost product and subscriptions?

A.   I don't remember who was a customer at that time.

Q.   Were they state and local governments?

A.   I think so.

Q.   Were they real estate industry companies?

CONFIDENTIAL – ATTORNEYS' EYES ONLY – CONFIDENTIAL    43

Q.   Okay.

A.   Of which, you know, there are hundreds of thousands of companies.

Q.   Okay.  How about others?  Construction?

A.   What about it?  Sorry, did --

Q.   Did Frost sell into that industry?

A.   No, I don't think so, but I can't recall, as I sit here today.

Q.   How about critical infrastructure?

A.   Not that I recall.

Q.   During your time at Frost, did you have any role in the improvement of the Frost product or subscriptions?

A.   I'm not sure what you mean by improvement of subscriptions.

Q.   Well, you describe that there were two revenue streams for Frost Control; right? Selling the product and selling the subscriptions, which is a lease mechanism of the product.

     So my question is, did you have any role in improving either or both of those items, with respect to Frost?

A.   I don't recall if I played a role in determining which business model to use.  It may have come at the direction of the CEO or the board.  I can't recall.

Q.   How about improvements to the product itself?

A.   No, I didn't play a direct role in improving the product.

Q.   Did you play an indirect role?

A.   I would describe that as vaguely.  I, when asked, offered, I would say, anecdotal feedback from customers on their experience with the product.

Q.   Describe for us what you mean by that, please.

A.   What I mean is a customer might say "Your product isn't working.  It died," or "It's not connecting.  You should do better."

Q.   You would relay that to the engineering team?

A.   I would.

Q.   Any other improvements that you recall receiving from customers and relaying to the engineering department at Frost?

          MR. McGRATH:  Objection.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – CONFIDENTIAL    45

A.    Well, I relayed this information, just to be clear, to more than just the engineering team.  To leadership as well, beyond the engineering team.

Other customer feedback, I'm sure there was a bunch.  Generally speaking, the product wasn't working well, and everyone knew that.

BY MR. ROWDEN:

Q.    You communicated routinely with Frost customers; correct?

A.    What's "routinely."

Q.    As part of your everyday or every week responsibilities at Frost?

A.    I'd say there were fits and starts with that.  Not always, no.  I mean --

Q.    Well, as head of sales, I would assume you had quite a bit of customer contact; right?

A.    Yes, but I wasn't always the head of sales.

Q.    Okay.  Then you're the chief operating officer; correct?

A.    It was my understanding that I was the chief operating officer.  That, I guess, promotion

CONFIDENTIAL – ATTORNEYS' EYES ONLY – CONFIDENTIAL     46

was made via email, not really formalized, yet again.

Q.    And as chief operating officer, what role did you have with respect to Frost sales?

A.    I was -- let's see.  That timeline is -- still involved in sales, but not with the -- it wasn't my only focus in that job.

Q.    Right.  Understood.

A.    Yeah.

Q.    So how often, generally speaking, would you communicate with customers as the chief operating officer?

A.    That could change week by week, month by month.  It'd be difficult to say.  I don't know.

Q.    Can you give me an idea?

A.    I'd say that some weeks I probably didn't talk to a customer, and other weeks I may have been at a tradeshow talking to tens or hundreds of customers.  It really varied.

Q.    If those customers voiced a concern or a request about the Frost product, you would relay that to the appropriate individual at

CONFIDENTIAL – ATTORNEYS' EYES ONLY – CONFIDENTIAL    51

Q.   When your position changed to chief operating officer, who reported to you?

A.   I don't recall the exact timing of who was there during that change, so I can't say for certain.

Q.   Generally, who reported to you?

A.   Shortly -- there were -- I'm going to just say in the spring of 2020, around the time of my, you know, change to chief operating officer from Brad, there was a marketing person.  I don't remember her title.  Sarah Richards, I think, was her name.

And then we hired two salespeople in, I want to say, March or April of that year, and a third in, I think, May.  April or May.

And so that's -- you know, by the end of the spring, there's, I think, three salespeople and one marketing person.

Q.   Did anyone else report to you, other than the sales and marketing individuals?

A.   Let me think about that.  There may have been, but not as I recall today.

Q.   How about engineering?

CONFIDENTIAL – ATTORNEYS' EYES ONLY – CONFIDENTIAL    54

at Frost?

A. I would say it did.

Q. When?

A. In the summer of 2021.

Q. How did it change?

A. Ryan Kreager told me that I was being sent -- in his words, demoted to an individual sales contributor, a sales rep, and that that was my -- to be my only focus, was on selling.

Q. When was that?

A. I can tell you on or around, mostly because I just had a child at that time. So it was, I'm going to say -- I don't know the exact date -- June of '21.

Q. How did your duties and responsibilities change at that time?

A. I was directed to only focus on selling.

Q. Did you do that?

A. I -- to the extent I recall, I did. Now, I will say that they continued to ask me to help, occasionally, on other items beyond sales, so I helped where I could.

Q. What types of items were you asked to help on

CONFIDENTIAL – ATTORNEYS' EYES ONLY – CONFIDENTIAL    150

basically enable our user interface on a mobile and web application.

Q.    When did Vue start working with them?

A.    I'm not sure of the exact date. 2022-something.

Q.    Does -- and I think you testified, Vue continues to work with them today?

A.    I did, yes.

Q.    How are they compensated?  Do they send you a monthly bill?

A.    Yeah, they do send us a monthly bill.

(Pause.)

Q.    Mr. Baglien, I'm showing you Plaintiff's Exhibit 16, which is an email dated March 15th, 2022, from you to Jason Vesko at Snow Services.

Do you see those documents, sir?

I can speed this up greatly for us.

You see the documents I just handed you; correct?

A.    I do, yeah.

Q.    So I'll just show this to you.

A.    Okay.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – CONFIDENTIAL    151

Q.    VUE-01705 [sic] Bates number within the exhibit, it refers to "Leverage referencable customers to expand within each customer vertical.  Acquire new early adopter customers."

            Do you see that?

            MR. McGRATH:  What's the number?

            MR. ROWDEN:  VUE-10705.

A.    Got it.

BY MR. ROWDEN:

Q.    You have that in front of you?

A.    Now I do, yeah.

Q.    It says "Go to market plan."

            Do you see that, sir?

A.    Yes.

Q.    Underneath that, it says "Leverage existing relationships."

            Do you see that?

A.    Yes.

Q.    What existing relationships were you referring to?

A.    Is there a date on this doc?

Q.    Well, the email was --

A.    3/15?

CONFIDENTIAL – ATTORNEYS' EYES ONLY – CONFIDENTIAL   152

Q.   -- March 15, 2022.

A.   I do think that was a little bit aspirational.

One of the things that comes to mind is Amazon.  We had been talking with them at a high level about the concepts we were hoping to build.

Q.   Well, let's be clear, though.  As of March 15, 2022 --

A.   Yeah.

Q.   -- Vue Robotics did not have any existing customer relationships, did it?

A.   It says "relationships," not "customer relationships."  "Leverage existing relationships."

Q.   Okay.  Well, as of March 15, 2022, was Vue Robotics an organized and operating company?

A.   Yes.

Q.   So what existing relationships did that refer to?

A.   Well, I just gave you one example that comes to mind.

Q.   Amazon?

A.   Yeah.

Q.    What was the relationship with Amazon?

A.    It was high level in nature, but we had talked to their corporate development team or a couple of their teams at this point, just to get their feedback on where we were headed with our vision.

Q.    Who did you send this material to?

A.    It looks like I sent it to Jason Vesko, Mark Supanick, Chris Lareau.

Q.    What was the purpose of sending this material?

A.    Because we were preparing to have a conversation with Jason and Mark the next day.

Q.    Who were Jason and Mark?

A.    Jason and Mark are two guys that work at Snow Services.

Q.    What was Snow Services?

A.    Snow Services is a facility services company based in Pennsylvania.

Q.    Did Frost Control do any business with Snow Services?

A.    They did at one time.  I don't know the status of that relationship.

CONFIDENTIAL - ATTORNEYS' EYES ONLY - CONFIDENTIAL    154

Q.   How were you familiar with those individuals at Snow Services?  Is that through your employment with Frost?

A.   Yeah.  I had met Jason and Mark at Frost.

     (Pause.)

     (Exhibit No. 66, PowerPoint deck, marked for identification.)

Q.   Mr. Baglien, I'm showing you an exhibit that's been marked Plaintiff's Exhibit 66.

     Do you have that in front of you, sir?

A.   Yes.

Q.   What is this exhibit?

A.   I don't know yet.

Q.   It says "Vue Robotics investor overview"?

A.   Yes.

Q.   Is this something that you prepared?

A.   I don't remember this one.  We've done many of these.

Q.   Well, if we turn to VUE-154 -- 15543, it says "Founding team, Patrick Baglien."

     That's you; right?

A.   It is.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – CONFIDENTIAL    164

Q.   Okay.  By -- I'll take your date.

          By September 2022 --

A.   Best as I can remember, yeah.

Q.   Let me finish.

          By September 2022, Vue Robotics and TAPCO had entered into an agreement; correct?

A.   I believe it was sometime in September of 2022.

Q.   By that agreement, TAPCO sold Vue Robotics products to third parties; correct?

A.   Yes.

Q.   TAPCO was a suppli -- excuse me -- a distributor of Vue Robotics products; correct?

A.   That's correct.

          (Exhibit No. 70, email dated 9/23/22 with attachment, marked for identification.)

Q.   Mr. Baglien, I'm showing you Plaintiff's Exhibit 70.  It's a -- first page is an email from you to avis@wyomingmi.gov.

          Do you see that, sir?

A.   Yes.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – CONFIDENTIAL   165

Q.   Who was avis@wyomingmi.gov?

A.   Aaron -- I don't know how to pronounce his last name.  Aaron Vis, Wyoming, Michigan, is a municipality in the Grand Rapids area.

Q.   And if we page through this exhibit --

A.   Uh-huh.

Q.   -- there are several emails from you to different individuals at municipalities; correct?

A.   Municipalities and counties, it looks like. Maybe other agencies -- government agencies.

Q.   These are all emails you sent on or about the dates indicated on the emails; correct?

A.   That's correct.

Q.   And you sent materials on the Vue Robotics products that you were attempting to sell; correct?

A.   Yes.  Though at this time, the sale would have gone through TAPCO.

Q.   Under --

A.   But we included information on what our service is, that's correct.

Q.   Where did you get the individuals to whom you

CONFIDENTIAL – ATTORNEYS' EYES ONLY – CONFIDENTIAL    166

addressed these emails?  Their email information.

A.    I believe I got it from TAPCO or --

Q.    Did you take any of that information from Frost?

MR. McGRATH:  Were you done with your answer?

THE WITNESS:  No, I wasn't.

BY MR. ROWDEN:

Q.    Okay.  Go ahead.

A.    No, I didn't take any information from Frost.

And I was going to say, or I could have got it off any number of publicly available websites for these customers.

Q.    These were all individuals with whom you had worked at Frost; correct?

A.    Yes.

(Exhibit No. 71, screenshots, marked for identification.)

Q.    I'm showing you Plaintiff's Exhibit 71, Mr. Baglien.

This is a document reflecting downloads made by individuals on the dates

CONFIDENTIAL - ATTORNEYS' EYES ONLY - CONFIDENTIAL    167

and of the information reflected in the
exhibit, for your information.

Would you turn to Frost -- 08 are the
last numbers.

Do you have that in front of you,
sir?

A.    I do.

Q.    Do you see, near the top of the exhibit, it
indicates that you, on October 11, 2021,
downloaded all deals of Frost?

Do you see that, sir?

A.    Yes.

Q.    Do you recall downloading that information?

A.    I do.

Q.    Why did you download that information?

A.    That was in preparation for a handoff
discussion with Victor Gill.

Q.    Who asked you to download that information?

A.    Victor.

Q.    When did he ask you that?

A.    Before that time.

Q.    Before October 11, 2021?

A.    And he may have asked for an update on the