**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| FROST SOLUTIONS, LLC, | ) |
| | ) |
| Plaintiff, | ) Civ. Action No. 1:22-CV-00401-SE |
| | ) |
| v. | ) |
| | ) **ORAL ARGUMENT REQUESTED** |
| PATRICK BAGLIEN, CHRISTOPHER | ) |
| LAREAU, and VUE ROBOTICS, LLC, | ) |
| | ) |
| Defendants. | ) |

# PROVISIONALLY FILED UNDER SEAL

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR OBJECTION
TO PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT ON CONTRACT
ISSUES**

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 1

II.   MATERIAL  FACTS ......................................................................................... 2

    A.    Baglien's Employment with Frost Control. .............................................. 2

    B.    Lareau's Employment with Frost Control. ................................................ 4

        1.    Lareau Accepts Frost Control Offer Letter .................................... 4

        2.    Lareau Resigns from Frost Control. ............................................... 4

        3.    Lareau Signs Misleading and One-Sided Separation Agreement .................. 5

        4.    The Separation Agreement Provided No Additional Consideration to Lareau ............. 5

        5.    Restrictive Covenants in Lareau's Separation Agreement ............................... 6

        6.    Lareau's Separation Agreement Has No Assignment Clause ........................ 7

    C.    Pre-Resignation Downloads. ..................................................................... 7

    D.    Post-Employment Activities ...................................................................... 8

    E.    Vue Robotics' Relationship with TAPCO. ................................................ 9

    F.    The "Confidentiality" of Frost's Customers. ............................................ 10

III.  STANDARD OF REVIEW ............................................................................... 14

IV.   LEGAL ARGUMENT ....................................................................................... 14

    A.    Frost is Not Entitled to Summary Judgment on the Issue of Enforceability and Validity 14

        1.    The Noncompete and Non-solicit Covenants in Lareau's Separation Agreement are Not Assignable Under Indiana Law ......................... 15

        2.    The Restrictive Covenants in Lareau's Separation Agreement Are Overbroad, Unreasonable, and Unenforceable. ......................... 16

        3.    The Separation Agreement Fails for Lack of Consideration. .................... 21

        4.    The Separation Agreement Fails Under the Doctrine of Unconscionability. .............. 22

        5.    Frost is Not Entitled to Summary Judgment on the Non-solicitation Provisions in the Baglien Agreement. ......................... 23

        6.    The Confidentiality Provisions Are Unreasonably Overbroad and Not Enforceable. ... 23

        7.    The Baglien Termination Certificate is Not Enforceable. ........................... 24

    B.    Frost Solutions is Not Entitled to Summary Judgment on the Issue of Breach. .............. 24

        1.    Lareau Did Not Breach the Noncompetition Covenant. ............................ 25

        2.    Baglien and Lareau Have Not Violated Their Confidentiality Obligations. ............... 27

        3.    Baglien and Lareau Did Not Breach the Non-Solicitation Covenants. ....................... 29

V.    CONCLUSION ................................................................................................. 30

I.    **INTRODUCTION**

Frost Control Systems, Inc. ("Frost Control") was a technology company that manufactured weather sensor systems. Following the collapse of Frost Control's business in 2022, and the surrender of its assets to its lender, Plaintiff Frost Solutions, LLC ("Frost Solutions") purchased Frost Control's assets in an August 2022 sale ▮▮▮▮▮▮▮▮▮▮▮▮. Shortly after that purchase, in October 2022, Frost Solutions brought this action against Defendants Patrick Baglien, Christopher Lareau, and their company Vue Robotics, alleging, among other things, that Defendants had breached restrictive covenants in the contracts that Frost Solutions purchased.

In its Motion for Summary Judgment, Frost Solutions seeks partial summary judgment on two discrete issues. First, it requests that this Court grant it summary judgment on the enforceability and validity of a confidentiality agreement Baglien executed at the beginning of his employment, a separation agreement that Lareau executed when he resigned from Frost Control, and each of the restrictive covenants in those agreements. Second, Frost Solutions requests summary judgment on the issue of whether Baglien and Lareau breached those agreements, arguing that there are no disputed issues of material fact on that question.

Frost's Motion should be denied. Contrary to the Motion's arguments, there are several reasons why the agreements between Frost Control and Baglien and Lareau (and the restrictive covenants therein) cannot be enforced. *First*, the separation agreement between Frost Control and Lareau—the only agreement containing a covenant not to compete—is unenforceable because: (a) it was not validly assigned to Frost Solutions; (b) the only "consideration" Lareau received was wages already owed him; and (c) the agreement was both procedurally and substantively unconscionable. *Second*, the pertinent restrictive covenants in both Lareau and Baglien's agreements are overbroad and unenforceable. And *third*, Plaintiff is not entitled to summary judgment on the validity of restrictive covenants in Baglien's agreement that are neither pled in the complaint nor alleged to have been

1

breached in this case.

Frost Solutions is also not entitled to summary judgment on the issue of breach of the agreements. After three years of discovery, Plaintiff has been unable to identify any "surefire" breaches that it can assert at summary judgment. Instead, Plaintiff asserts three categories of breaches, none of which warrants summary judgment for the following reasons:

- Plaintiff argues that Lareau breached his noncompetition covenant because he set up email accounts with the name Vue Robotics and, with Baglien, identified the basic features he would want in a potential weather sensor product. But this preliminary activity occurred months before Vue Robotics was formed and they hired independent developers for the purpose of building a competing product, and is not unlawful in any event.

- Frost Solutions also contends that Baglien and Lareau violated their confidentiality obligations under the agreements by reaching out to Frost Control's customers, the identity and contact information of which Frost Solutions contends were confidential. Frost Solutions does so despite (a) virtually all of these customers being public entities, and (b) the well-known, finite, and easily identifiable customer base in the weather sensor industry.

- Frost Solutions argues that Lareau breached his non-solicitation covenant when Vue Robotics began discussions of doing business with Traffic and Parking Control, Co, Inc., ("TAPCO"), a former Frost Control distributor. Frost Solutions argues that Lareau and Vue Robotics interfered with Frost Control's TAPCO relationship, even though TAPCO, months before talking with Vue Robotics, cancelled its outstanding business with Frost Control because of Frost Control's "disappearance" and was then promptly told by Frost Control representatives that Frost Control was being liquidated and was up for sale.

Defendants respectfully contend that no reasonable factfinder could conclude that the above-mentioned conduct constitutes a breach under the relevant agreements or, let alone, a breach in which no disputed issues of material fact remain. For these reasons, Plaintiff's Motion for Summary Judgment should be denied.

## II.   MATERIAL FACTS

### A.   Baglien's Employment with Frost Control.

On March 15th, 2019, Frost Control Systems ("Frost Control") provided Baglien with a letter offering him employment at the company. Frost Solutions Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment ("Frost Mem."), Ex. 10. In connection with his employment, Baglien entered into a Confidential Information and Invention Assignment Agreement with Forst

Control (the "Baglien Agreement").  Frost Mem. Ex. 9.

The Baglien Agreement contained a "Confidential Information" provision in which Baglien

agreed to ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████. *See id.* at § 3(a). The Baglien Agreement defines "Confidential

Information" to mean ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████ *Id.* at §3(b).

Section 8 of the Baglien Agreement also contains provisions ████████████████████████

████████████████████████████████████ In Section 8(a), Baglien agreed ████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████. Section 8(b),

although awkwardly worded, appears to ████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

*Id.* Section 8(b) does not ███████████████████████████████████████████

████████████████████████

The Baglien Agreement also contains the following provision requiring Baglien to sign a

termination certificate upon the termination of his employment:

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████

*Id.* at § 6. The Termination Certification in Exhibit B of the Baglien Agreement required Baglien to,

among other things, ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

3

███████████████████████████████████. *Id.* at Ex. B. The Termination Certification in Exhibit B

contains ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████. *See generally id.*

Baglien resigned in October of 2021, after Lareau resigned. Baglien Dep. 61, excerpts attached

hereto at Exhibit to Memorandum ("Mem. Ex.") 1. Baglien has no recollection of the Termination

Certification existing or it being presented to him upon his departure, and he did not sign it. *Id.* at

89-90.

### B.    Lareau's Employment with Frost Control.

#### 1.    Lareau Accepts Frost Control Offer Letter

On April 8, 2020, Lareau accepted a written offer of employment with Frost Control as a

Regional Vice President. *Declaration of Christopher Lareau* (submitted on behalf of Lareau and

Baglien's Motion for Summary Judgment on Claims III and VI), ("Lareau Affirmative Decl.") at ¶ 4

and Ex. 1.[1] The terms of Lareau's employment included, among other things, a ████████████

████████████████████████████████████████████████████████████████ *Id.* In or around

May 2021, Lareau's position changed to Vice President of Sales. *Id.* at ¶ 5. This position change did

not result in a compensation increase or a change in commission structure or benefits. *Id.* at ¶ 6.

#### 2.    Lareau Resigns from Frost Control

Frost Control struggled to remain viable through Lareau's tenure with the company. Lareau

Affirmative Decl. at ¶ 7. On or about September 23, 2021, Frost Control's then chief executive

officer, Victor Gill ("Gill"), ██████████████████████████████████████████████████

██████████████████████████. *Id.* at ¶ 8 and Ex. 2. On September 27, 2021, Lareau notified

Frost Control's Board of Directors (the "Frost Control Board") that he was resigning from Frost

---

[1] The Lareau Affirmative Declaration has been re-filed with this Motion.

Control effective October 11, 2021 (the "Notice of Resignation"). *Id.* at ¶ 9 and Ex. 3. In his Notice

of Resignation, Lareau also added that he had ████████████████████████████████████████

████████████████████████████ *Id.* at Ex. 3. Lareau was, in fact, owed these amounts based on

the commission he earned and the amount of unused vacation that he had accrued while working at

Frost Control. *See* Declaration of Christopher Lareau in Support of Defendants' Objection to

Plaintiff's Partial Motion for Summary Judgment ("Lareau Objection Declaration") at ¶ 15.

### 3.    Lareau Signs Misleading and One-Sided Separation Agreement

On September 29, 2021, Gill circulated by email to the Frost Control Board a draft separation

agreement for Lareau, which he created ████████████████████████████████████████

████████████████████████████ Mem. Ex. 25 at p. 1. Specifically, in the email

attaching the draft agreement, Gill explained that he had ████████████████████████

████████████████████████████████████████████████████ *Id.*

Tener's separation agreement is entitled ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████ *See* Mem. Ex. 25, Tener Separation Agreement at p. 1, ¶ II(4)(a)-(b). When

revising ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████. Mem. Ex. 2, at pp. 1-3. On September 30, Lareau, concerned about receiving his

earned wages and vacation benefit, executed the version of the separation agreement attached as

Exhibit C to the complaint filed in this action.  Frost Mem., Ex. 12. That version, ████████████

████████████████████████████████████████████████████. *See* Frost

Mem., Ex. 12 at p. 1-2, ¶¶ I, II(2). The Separation Agreement is governed by Indiana law. *Id.* at ¶ 18.

### 4.    The Separation Agreement Provided No Additional Consideration to Lareau

The Separation Agreement provided no additional consideration to Lareau. Section II(1), ████

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████ *See* Frost Mem., Ex. 12 at ¶

II(1). And, as discussed above, the Separation Agreement contains ████████████████████ .

Thus, the only consideration that Frost Control provided to support the agreement was

compensation that it **already** owed Lareau.

### 5.     Restrictive Covenants in Lareau's Separation Agreement

The Separation Agreement contains a noncompetition clause, non-solicitation clause, and

confidentiality provision, all of which Frost Control relies on its Motion.

The non-compete clause (styled a "Covenant Not to Compete") provides, in part, as follows:

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████

*See* Frost Mem., Ex. 12 at ¶ 10.

The relevant part of the non-solicitation clause provides that Lareau, ████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████ *Id.* at ¶ 11. The non-solicitation restriction ████████████

███████████████████████████████ *Id.*

The Separation Agreement also contains a confidentiality provision which ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Frost Mem., Ex. 12 at ¶ 9. That

same section requires Lareau ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* Paragraph 9 further

explains that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ *Id.* at ¶ 9(e).

### 6.   Lareau's Separation Agreement Has No Assignment Clause

The Separation Agreement ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Frost Mem., Ex. 12. It does,

however, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at ¶ 20. Lareau never consented to assignment of the

Separation Agreement to Frost Solutions or any other party, Lareau Aff. Decl. at ¶¶ 11-13, and Frost

Solutions ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮. *See* Deposition of Michael Bott (personally and on behalf of Frost Solutions) (1/8/26) at 47-

48, excerpts attached at Mem. Ex. 3 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

### C.   Pre-Resignation Downloads.

In its Motion, Frost relies several times on downloads made by Baglien and Lareau from Frost

Control's CRM system. As Lareau and Baglien testified, however, the downloads were for legitimate

Frost Control business purposes. Mem. Ex. 1, Baglien Dep. 167-169; Deposition of Christopher

Lareau at 207-212, 215, 216, 223-224, excerpts attached at Mem. Ex. 5. Indeed, Frost Solutions cites

to no evidence to demonstrate that the information ever left Frost Control. Further, evidence that

potentially could corroborate Baglien and Lareau's testimony—specifically their work laptops that

both returned to Frost Control upon their resignation—appears to have been destroyed by Frost Solutions.[2]

### D.    Post-Employment Activities

Frost appears to contend that Lareau breached his separation agreement because by October 2021 he was involved with an *enterprise*, Vue Robotics, that was engaged in the development of sensors or computer systems for the analysis and reporting of road weather conditions. Frost Mem. at 23. But the Vue Robotics *enterprise* was not formed until January 2022, and did not become commercialized or operational until June 2022. Mem. Ex. 4, Lareau Dep. 9 ███████████████

████████████████████████████████████████████████████████

████████████████████████████ ); Deposition of Vue 30(b)(6) at 129-130, excerpts attached at Mem. Ex. 6; Mem. Ex. 1, Baglien Dep. at 108. In October 2021, following Lareau's resignation, he was not sure what he was going to do for employment and began applying for jobs. Mem. Ex. 4, Lareau Dep. 75-77. In late 2021, Lareau and Baglien worked on a business plan and investor deck. *Id.* at 88. But any discussions happening in 2021 were ██████████████

████████████████████████████ Mem. Ex. 6, Vue 30(b)(6) Dep. 130:12-131:3. Lareau further testified that there was ███████████████████████

████████████████████████████████████████████████

█████████████████ Mem. Ex. 6, Vue 30(b)(6) Dep. 130-31.

Nor was any enterprise, even to the extent one existed, involved with any development of weather stations during 2021. Lareau has testified ████████████████████

███████████ Mem. Ex. 4, Lareau Dep. 87:15-88:19, 91-92. In its Motion, Frost cites a product requirements document that Lareau and Baglien worked on in October 2021. Frost Mem. at p. 14, ¶

---

[2] Although Frost Solutions had admitted in its Complaint in this matter that it was in possession of Baglien and Lareau's work laptops and was going to run forensic imaging and analysis on those laptops, ECF No. 1 at ¶ 49, █████████ ███████████████████████ , *see* Deposition of Michael Bott (personally) at 116-117, excerpts attached at Mem. Ex. 5.

32 and Ex. 18. But that document only identifies high-level features that a weather sensor product could have. Frost Mem. Ex. 18. There is no dispute that Baglien and Lareau did not have the engineering or manufacturing capabilities or technical background required to design or develop a weather sensor system. Deposition of Mario Bonardi at 10-11, 119-120, 136, excerpts attached at Mem. Ex. 7. Consistent with this fact, the product requirement document Frost cites was only created for the purpose of approaching independent development companies to determine whether those companies could develop a camera system at a reasonable budget and timeline for Baglien and Lareau. Lareau Obj. Decl. at ¶ 5. Indeed, months later, Vue Robotics did hire independent development firms, who later developed Vue's product offerings. Mem. Ex. 4, Lareau Dep. 26, 91-92, 132, 150-51. At least one of those developers, Paragon Innovations, through its corporate designee, described the product requirements that he received from Lareau and Baglien as on the lower end of sophisticated spectrum of preliminary product requests he had seen in his career. Deposition of Allan Rich (Paragon) at 53, excerpts attached at Mem. Ex. 8.

### E.    Vue Robotics' Relationship with TAPCO.

TAPCO is a distributor that previously worked with Frost Control. Declaration Patrick Baglien in Support of Defendants' Objection to Plaintiff's Partial Motion for Summary Judgment ("Baglien Decl.") at ¶ 5. The terms of that relationship were non-exclusive, meaning that TAPCO could also sell other companies' weather sensors. *Id.* at ¶¶ 5-6. Under the terms of the arrangement, TAPCO sought to sell, and did sell, weather technology services on Frost Control's behalf. *Id.* at ¶ 7. Frost Control's relationship with TAPCO was not confidential, as that would have defeated the purpose of TAPCO seeking to sell Frost Control products. *Id.*

In March 2022, essentially all of Frost Control's employees resigned their position. Deposition of Ryan Kreager at 18-21, excerpts attached at Mem. Ex. 9 ███████████████████████████ ████████████████); Deposition of Michael Gallagher at 134-142, excerpts attached at Mem. Ex.

10 (detailing multiple staff resignations in March of 2022). Frost Control's stockholders signed a resolution just days later in which ██████████████████████████████████ ███████████████████████████████. *See* Mem. Ex. 11, Resolutions of the Stockholders of Frost Control Systems, Inc. The TAPCO-Frost Control relationship ended in April 2022, when ███████████████████████████████████████ Mem. Ex. 12, April 2022 email chain; Mem. Ex. 13, Blanket Purchase Order. Very shortly thereafter, an authorized agent of Frost Control wrote to TAPCO to let them know that ██████████████ ███████████████████████████████. Mem. Ex. 12. When asked at deposition, Bryan Everard, a TAPCO manager, confirmed that TAPCO had decided to look for other companies to offer a weather sensing product because Frost Control had "disappear[ed] . . . for months." Deposition of Bryan Everard, excerpts attached at Mem. Ex. 14, at 32-33.

Months after Frost Control stopped servicing the TAPCO relationship and decided to liquidate, in July 2022, Everard reached out to Baglien, Everard Dep. 44, and Baglien and TAPCO discussed setting up a meeting to discuss a ███████████████████████ Mem. Ex. 15, July 2022 email chain. In September of 2022, Vue Robotics and TAPCO entered into a Sales Representation and Distribution Agreement. *See* Frost Mem. Ex. 29. Vue Robotics' relationship with TAPCO was non-exclusive, meaning that nothing prevented TAPCO from selling any other company's products, even if those products competed with Vue. *See id.* at § 2.1; Baglien Decl. at ¶ 9.

F.     The "Confidentiality" of Frost's Customers.

In its Motion, Frost Solutions contends that the identity of Frost Control's customers and the emails associated with each customer was confidential and only available through its CRM database, Hubspot. Frost Mem. at 23-25. Yet, Frost Solutions, whose principals have no first-hand knowledge of how Frost Control operated or how it identified customers, cites no affirmative evidence in

support of this assertion. The factual record shows otherwise.

As an initial matter, Frost is incorrect to assert that Baglien and Lareau obtained the contact information of the identified customers from Frost Control's customer database. In fact, incontrovertible evidence demonstrates that both Lareau and Baglien received the contact information associated with nearly all of the customers Plaintiff claims are confidential from TAPCO, Vue Robotics' distributor. *See* Mem. Ex. 16 Sept. 20, 2022, Email Chain Between Lareau and TAPCO; Mem. Ex. 17 September 23, 2022 Email Chain Between Baglien and TAPCO.

In any event, the identity of customers in the weather technology industry is not confidential. Frost Control, Frost Solutions, and Vue Robotics each sell weather technology services. Lareau Obj. Aff. at ¶¶ 6-7. The customer base for weather technology services is well known, consisting primarily (but not exclusively) of distinct customer groups: public entities (like municipalities) and large commercial snow removal or property management companies. Lareau Obj. Aff. at ¶ 8; Mem. Ex. 18, 2021 Sales and Marketing Strategy at 2 (███████████████████████████████). Prior to Lareau and Baglien's departure, most of Frost Control's customers were public entities, like cities, counties, and towns. *See* Mem. Ex. 18 at 3 (██████████████████████████████ ████████████████████); Frost Mem. Ex. 7, attaching Exhibit A (██████████████████ ████████████████████████████████).

Frost Solutions argues that the identity of Frost Control's customers and their contact information constitute confidential information that is not generally knowable to the public. As highlighted below, at best for Frost the factual record is in dispute on this point:

- ***Municipalities are subject to open records laws.*** As discussed in detail in Defendants' motion for summary judgment on its trade secret claims, municipalities are subject to public record laws, meaning that any information pertaining to a municipality's relationship with Frost Control cannot, as a matter of law, be confidential. *See* ECF No. 117-1 pp. 14-16, 31-35.

11

- ***The Identities of Customers in the Market are Easily Ascertainable.*** The identity of municipal customers is publicly available and easily obtainable through a number of sources, including census data, trade association member lists, state procurement portals, and commercially available aggregations of public procurement and contract data. Lareau Obj. Aff. at ¶ 9. In fact, both Frost Control and Vue Robotics used census data to identify prospective municipal customers based on population and region. *Id.*; Mem. Ex. 18. The municipal cities or towns on which Frost Solutions bases its breach claim were identified on census data compiled by Frost Control. *See* Mem. Ex. 19, Census Data (truncated per Local Rule 2.5).

- ***Identity of Public Customers is Easily Obtainable in Trade Literature.*** Potential public and commercial customers alike can also frequently be identified through trade publications, like ASCA's Snow Magazine, and trade groups like the American Public Works Association (APWA) and the Snow & Ice Management Association (SIMA), both of which hold relevant trade shows and publish lists of their attendees. *See* Lareau Obj. Decl. at ¶¶ 8-9. Indeed, this was a method of lead generation used by Frost Control itself. Mem. Ex. 19. At least 12 of the 14 customers that Frost Solutions contends were "confidential," were previously disclosed in data provided by trade organizations and trade publications. *See* Mem. Ex. 20, APWA Data Containing Customers Frost Contends Are Confidential (truncated per L.R. 2.5); Mem. Ex. 21, SIMA Data (truncated per L.R. 2.5). And for 11 of these customers, trade show data identifies the specific customer contact that Frost contends was confidential. *See* Mem. Ex. 20.

- ***Individual Contacts within Customers is Easily Obtainable.*** The appropriate customer contact for potential customers (as well as their contact information) can ordinarily be easily identified with minimal effort. Lareau Obj. Aff. at ¶¶ 10-13. Public entities almost always disclose the identity of their employees on their website, and can also be contacted directly by

12

phone to identify relevant departments within the organization. *See id.* at ¶ 12.[3] Moreover, the relevant person to speak with about sales of weather sensors can be easily identified by identifying those who work for public works departments, transportation departments, or highway and roads departments. *Id.*; Mem. Ex. 22, 2020 Sales Strategy at p. 9 (███████████ ████████████████████████). For private entities, the appropriate person to contact in the business is also usually ascertainable through public sources. *Id.* That is true for Sno Services, the private entity whose identity Frost claims is confidential in its Motion. *See* Lareau Obj. Decl. at ¶ 14, Ex. A (showing the publicly available email address of Sno Services employee that Frost Solutions contends is confidential).

- ***Public Entities Put Their Jobs Out to Bid.*** Many potential public customers are also easily identifiable because they publicly put their jobs out to bid. For example, Kent County opened its weather sensor project to a public bidding process. Public records obtained from that public bidding process identify two of the supposedly confidential customer contacts identified in Frost's Motion. *See* Mem. Ex. 23, FOIA Records, at VUE0194706.

- ***Frost Control Attempted to Publicize its Customer Base.*** Frost Control was also willing to publicize the customers with whom it worked in an effort to increase its business opportunities. For example, two news articles, including an interview with Frost Control's founder Brad Tener, publicly disclosed Frost Control and several of its relationships with customers. *See* Lirette Decl. ¶ 5, Ex. B (Chicago tribune article) and ¶ 6, Ex. C (M Live Article). Remarkably, at least three of the customer relationships that Frost Solutions now contends are confidential were disclosed as customers or prospective customers in these articles. *Id.* at Ex. B (identifying Lincoln, Nebraska and Wyoming, Michigan as customers);

---

[3] Indeed, even years after the events at issue, many of the customers that Frost claims are "confidential" are easily identifiable through public websites. *See* Declaration of Ryan P. Lirette at ¶ 4, Ex. A.

Mem. Ex. C (identifying Kent County Road Commission as being looked at as a "pilot program").

- ***The Identities of Customers and Contacts Was Not Kept Confidential Within Frost Control.*** Finally, while Frost Solutions cites to evidence suggesting that HubSpot, which contained customer deal information, was password protected, *see* Frost Memo., Statement of Facts at ¶¶ 2-3, it cites to no evidence suggesting that customer identity and contact information was treated as confidential within Frost Control and restricted to a limited group of parties. Indeed, evidence shows that this information was not, as Frost suggests, kept segregated and secure in HubSpot. *See, e.g.,* Mem. Ex. 24, FROST_0109018 ( ██████████ ██████████████████████████████████████ ).

## III.    <u>STANDARD OF REVIEW</u>

A party is entitled to summary judgment when it shows "that there is no genuine dispute as to any material fact" and that the party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A dispute is genuine "if the evidence would enable a reasonable factfinder to decide the issue in favor of either party." *Alicea v. Cincinnati Inc.*, 166 F.4th 245 (1st Cir. 2026) (internal quotations omitted). And a "fact is 'material' if it 'has the capacity to change the outcome of the [factfinder's] determination.'" *Id.* All facts must be construed in favor of the non-moving party and all reasonable inference from those facts must be construed in the non-movant's favor. *Id.* Whether a breach of contract has occurred is generally a question of fact. *Doe v. Trs. of Dartmouth Coll.*, 731 F. Supp. 3d 222, 244-245(D.N.H. 2024) (internal quotations omitted).

## IV.    <u>LEGAL ARGUMENT</u>

### A.    Frost is Not Entitled to Summary Judgment on the Issue of Enforceability and Validity

As explained below, Frost Solutions is not entitled to summary judgment on the issue of enforceability or validity of the Baglien Agreement or Separation Agreement.

### 1.  The Noncompete and Non-solicit Covenants in Lareau's Separation Agreement are Not Assignable Under Indiana Law.

Frost Solutions cannot enforce the Separation Agreement against Lareau because that agreement was never validly assigned from Frost Control to Frost Solutions. As explained in detail in Lareau's and Baglien's Motion for Summary Judgment on Counts III and VI ("Defendants' Contract MSJ"), the analysis of which Lareau and Baglien hereby incorporate in this Objection, Frost Solutions cannot enforce the Separation Agreement because those agreements contain restrictive covenants that are personal in nature, which under applicable Indiana law cannot be assigned without the consent of the employee. *See* ECF No. 116-1 at 11-16. *SDL Enterprises, Inc. v. DeReamer*, 683 N.E. 2d 1347, 1349-50 (Ind. Ct. App. 1997) (refusing to enforce assignment of non-compete provision without consent of employee). The same rule covers the Separation Agreement's non-solicitation provision, which—like the noncompete—purports to significantly impede Lareau's freedom to performs services with other businesses.[4]

The Separation Agreement is not assignable under Indiana law because Lareau did not consent to its assignment. *See* Lareau Aff. Decl. at ¶¶ 10-11. The Separation Agreement itself . Lareau testified that he never consented to the assignment of his Separation Agreement and indeed was never even asked for such consent. Finally, Frost Solutions concedes that it never asked Lareau for consent to receive his Separation Agreement through assignment. Therefore, Frost Solutions cannot enforce the Separation Agreement against Lareau. *SDL Enterprises,* 683 N.E. 2d at 1349-50.

---

[4] *Heraeus Med., LLC v. Zimmer, Inc.*, 135 N.E.3d 150, 153 (Ind. 2019) (treating employee non-solicitation covenant as a "Noncompetition" provision); *USI Ins. Servs. LLC v. Ryan*, Civil Action No. 1:14-CV-151 JVB, 2015 U.S. Dist. LEXIS 181614, at *12 (N.D. Ind. May 21, 2015) (analyzing employment agreement containing non-solicitation restriction, but no non-compete restriction, as a "non-competition agreement consistent with the assignability analysis in SDL Enters.); *Norlund v. Faust*, 675 N.E.2d 1142, 1146-47, 1151 (Ind. Ct. App. 1997) (analyzing assignability of noncompetition agreement containing non-solicitation provision as personal services contract).

### 2.  The Restrictive Covenants in Lareau's Separation Agreement Are Overbroad, Unreasonable, and Unenforceable.

Frost Solutions is not entitled to summary judgment on the validity of the restrictive covenants in the Separation Agreement because, contrary to Indiana law, both covenants are overbroad, unreasonable, and not enforceable. Indiana "[p]ublic policy prohibits any unnecessary interference with a person's calling for which he is fitted and from which he may earn a livelihood." *Wagler Excavating Corp. v. McKibben Constr.,* 679 N.E.2d 155, 157 (Ind. Ct. App. 1997). As a result, Indiana courts "disfavor covenants which restrict a person's liberty of action in his business or trade" and "will not hesitate to strike down any [] restrictive covenants which are the least bit overly broad with respect to the 'protectible interest' at stake." *Buffkin v. Glacier Grp.*, 997 N.E.2d 1, 11 (Ind. Ct. App. 2013). And "where the underlying protectible interest is minimal, courts will closely scrutinize the terms of the restraint." *Id.* As explained below, the Separation Agreement's non-solicitation covenant and its noncompete covenant both fail this test.

      a.  The Non-Solicitation Provision is Overbroad, Illegal, and Unenforceable.

The non-solicitation covenant in the Separation Agreement is unenforceable as a matter of law because (1) it is impermissibly overbroad and (2) cannot be rehabilitated under Indiana law's strict blue penciling requirements.

**The Non-solicitation Provision is Impermissibly Overbroad.** The non-solicitation provision in the Separation Agreement—which purports to restrict Lareau from ██████████████████ ████████████████████████████████████████████████████████████—is plainly overly broad on its face. Indiana courts have consistently held that restrictive covenants seeking to prohibit an employee from soliciting or doing business with all of an employer's future business partners are unreasonably broad. *See Seach v. Richards, Dieterle & Co.*, 439 N.E.2d 208, 214 (Ind. Ct. App. 1982) (holding that non-solicitation covenant extending to past and prospective customers was too broad and vague); *Sharvelle v. Magnante*, 836 N.E.2d 432, 440 (Ind. Ct. App. 2005)

16

(non-customer non-solicitation covenant overbroad for extending to past and future employees and other business partners).

In *Seach*, for example, the court concluded that a customer non-solicitation covenant extending to past and prospective customers was overbroad. 439 N.E.2d at 214. In doing so, the court reasoned that the non-solicitation provision improperly extended to prospective customers who might have had no connection to the employee because they were contacted "prior to [employee's] association with the [employer] and without his knowledge." *Id.* The *Seach* court also observed that the provision was flawed with respect to notice because it expected an employee to be acquainted with all past or prospective employees. *Id.* Given these factors, the *Seach* court observed that a "non-competition agreement drafted so broadly as to prohibit seemingly harmless conduct" is not reasonable. *Id.* Relying on *Seach*, the Indiana Court of Appeals in *Sharvelle* held that a non-solicitation covenant extending to any past, current, or future "employee, direct agent, manager, consultant, [or] director" was overbroad because it too covered past and future counterparties. *Sharvelle*, 836 N.E.2d at 440.

The Separation Agreement's non-solicitation provision is overbroad based on the reasoning set forth in *Seach* and *Sharvelle*. Section 11(i) of the Separation Agreement prohibits Lareau, ███████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████ Frost Mem. at 20. But, by barring Lareau from ████████████ ███████████████████████████████████, the non-solicitation provision necessarily prohibits Lareau from soliciting *future* Frost business partners as that concept is defined in *Seach* and *Sharvelle*—i.e., those Frost Control business partners who had no relationship with Frost Control at the time Lareau signed the non-solicitation covenant but who later became Frost Control partners after his termination.

In so doing, the covenant purportedly restricts Lareau from soliciting a whole class of Frost business partners, regardless of whether those business partners worked with Frost (or Lareau for that matter) when Lareau was employed there. Thus, just like the non-solicitation provisions in *Seach* and *Sharvelle*, Lareau's non-solicitation covers a whole range of "seemingly harmless activity" that has no direct connection to Frost Control's legitimate business interest. Further, just like the agreement in *Seach*, the clause suffers from a notice problem because it purports to require Lareau to keep abreast of Frost Control's business to avoid interfering with any relationships that Frost Control might commence in the 12 months following his employment. Put simply, because Lareau's non-solicitation covenant extends to future business partners with whom he had no contact at Frost Control, and about whom he could not have possibly learned any confidential information, it is plainly overbroad.

**The Non-solicitation Provision Cannot Be Saved by "Blue Penciling."** In its Memo, Frost Solutions suggests that any problems with overbreadth can simply be cured by blue penciling. Memo. 22-23. That is not so here. Under Indiana law, the blue pencil doctrine "is really an eraser." *Heraeus Med., LLC v. Zimmer, Inc.*, 135 N.E.3d 150, 151 (Ind. 2019). As such, a court may only "excise unreasonable, divisible language from a restrictive covenant—by erasing those terms—until only reasonable portions remain." *Heraeus Med., LLC*, 135 N.E.3d at 153. The doctrine "does not allow a court to rewrite a noncompetition agreement by adding, changing, or rearranging terms." *Id.* If an overbroad clause cannot be reformed by erasing divisible language, it must be struck down. *Id.*

In *Heraeus*, the Indiana Supreme Court refused to enforce an overbroad non-solicitation covenant that could not be saved by blue penciling. The clause in *Heraeus* used the broad and indivisible word "any" to define the class of parties that the employee could not solicit. *Id.* at 135 N.E. 3d at 154-56. The *Heraeus* court concluded that blue penciling was inapplicable because the clause did not use "clearly divisible" language that could be excised from the provision to make it

18

reasonable. *Id.* So too here. The non-solicit clause in the Separation Agreement, which like *Hereaus* uses the descriptor "any," does not contain clearly divisible language that can be excised to render it reasonable. Thus, the non-solicitation clause cannot be salvaged and Frost's motion on the non-solicit should be denied.

b.  The Noncompete Covenant is Overbroad and Unenforceable.

The covenant not to compete is overbroad and must be struck down because it seeks to restrict Lareau, a salesman with limited technical ability and limited access to confidential technical information, from being associated with a company engaged in the development sensors or computer systems for the analysis and reporting of road weather conditions. A covenant not to compete is reasonable "only when the restraint is necessary to protect the employer, is not unreasonably restrictive of the employee, and is not against public policy." *Press-A-Dent, Inc. v. Weigel*, 849 N.E.2d 661, 669 (Ind. Ct. App. 2006) (quoting *Ackerman v. Kimball Int'l, Inc.*, 652 N.E.2d 507, 509 (1995)). To be enforceable, an employer "must have an interest that it legitimately is trying to protect." *Id.* (internal citations omitted). An employer is only entitled to the enforcement of a restrictive covenant if "he can show that the former employee gained a unique competitive advantage or ability to harm the employer during their relationship." *Wagler Excavating Corp. v. McKibben Constr.*, 679 N.E.2d 155, 157-58 (Ind. Ct. App. 1997) (internal quotations omitted).

As a result, Indiana courts have been skeptical of clauses seeking to prohibit an employee from participating in any competing business. An employer may not simply forbid an employee from participating in any competing business. *Buffkin v. Glacier Group*, 997 N.E. 2d 1, 11-12 (2013) (citing *Norlund v. Frost*, 675 N.E. 2d 1142 1154 (Ind. Ct. App. 1997)). Instead, an employer must have some interest that it is "trying to legitimately protect." *Id.* And where that interest is to protect confidential information, an employer has the burden of showing that the employee had access to proprietary information that would actually give him some advantage at the employer's expense in the

19

marketplace. *Id.*

Frost Solutions has asserted that the Separation Agreement's noncompete covenant is designed to protect its goodwill. Frost Mem. at 14-15, 17. But the noncompete covenant prohibits Lareau from ██████████████████████████████████████████████████, regardless of whether that business enterprise has a finished product and regardless of whether it is actually selling weather sensors in competition with Frost Control. *Id.* at Ex. 12, § 10. Because of that, the noncompete covenant was not tailored to protect Frost Control's legitimate business interest in protecting its goodwill with customers.

Accordingly, the only remaining interest that the provision could be designed to protect is Frost Control's interest to maintain and protect its confidential information. But the noncompete fails there too. To begin with, the noncompete is overbroad to protect Frost Control's confidential information because ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

The noncompete is also invalid because Frost Solutions has failed to meet its burden of showing that Lareau had access to any confidential information that would conceivably put Frost Control at an unfair advantage when it comes to the development or manufacture of weather sensor systems. *See Buffkin v. Glacier Group*, 997 N.E. 2d at 11-12. It is undisputed that Lareau's role was in sales and that he was not involved with the technical development of Frost Control's product. *See* Lareau Dep. 40-45; Frost Memo., Statement of Facts at ¶ 17 (describing Lareau's role as passing on customer feedback to technical developers). The only evidence that Frost Solutions can muster on this point is that Lareau "relayed customer feedback to Mario Bonardi and the rest of the Frost engineering team" when the team was working on developing new products. Frost Memo., Statement Facts at ¶ 17. But Frost has put forth no evidence showing that this "customer feedback"

20

involved confidential and technical information that would put Lareau at an unfair advantage over Frost Control in the marketplace (as opposed to merely general knowledge that Lareau learned during the course of his job or information that could be easily obtained from publicly available sources). In fact, the only examples Frost has adduced are general and obvious knowledge that is in no way technical, such as proposing a non-fixed camera that can point at different locations. *See* Frost Memo. Ex. 6 at 26; 138 (describing Lareau's involvement on feedback as only providing "general" feedback about the way it looked or the information displayed). Given the lack of Lareau's access to any truly confidential information relating to the development of weather sensors, the noncompete is unreasonable and overbroad to protect Frost Control's business interest.

Because the noncompete is unreasonable and overbroad and not tailored to protect a goodwill or confidential information legitimate business interest, it is unenforceable as written and under Indiana Law cannot be reformed. *Heraeus Med., LLC*, 135 N.E.3d at 153.

### 3.   The Separation Agreement Fails for Lack of Consideration.

The Separation Agreement also fails for lack of consideration. Under Indiana law, "[c]onsideration is a requirement for a valid contract." *Jackson v. Luellen Farms, Inc.*, 877 N.E.2d 848, 857 (Ind. Ct. App. 2007) (internal citation omitted). Consideration is defined as "something of value . . . received by a promisor from a promise." *Id.* (internal citation omitted). Past consideration, however, "can generally not support a new obligation or promise." *Id.* (citing *Field v. Alexander & Alexander of Ind., Inc.*, 503 N.E.2d 627, 631 (Ind. Ct. App. 1987)). In the employment context, this rule precludes an employer from supporting the enforceability of a promise with an employee by pointing to consideration that it already owed the employee. *Am Gen. LLC v. Armour*, 46 N.E.3d 436, 442 (Ind. 2015).

The Separation Agreement is unenforceable because the only consideration cited—and indeed the only "consideration" provided to Lareau—was compensation that Frost already owed to

21

Lareau. The Separation Agreement explains that the consideration given to Lareau ███

████████████████████████████████████████████████████████████████████

████████████████. *See* Frost Mem. Ex. 12 at § 1. Lareau has testified that at the time of his

separation from Frost Control he was owed the commission paid to him and 3 weeks' vacation.

Lareau Obj. Decl. at ¶ 15. And Indiana law is consistent with the proposition that both commissions

and accrued vacation time constitute wages that were owed Lareau at the time of his resignation. *Ind.*

*Heart Assocs. v. Bahamonde*, 714 N.E.2d 309, 312 (Ind. Ct. App. 1999) ("Vacation pay is additional

wages, earned weekly, where only the time of payment is deferred" and thus an employee (absent an

agreement to the contrary) is entitled to his accrued vacation upon termination). By only paying

Lareau the commissions owed to him and forcing him to take less value for his accrued vacation

time by using just one week, the consideration Frost Control provided was only a diminished

version of what it actually already owed Lareau. That is not sufficient consideration for a new

restrictive covenant. *Armour*, 46 N.E.3d at 442.

### 4. The Separation Agreement Fails Under the Doctrine of Unconscionability.

Lareau's Separation Agreement is not enforceable because the agreement was unconscionable. A

contract is unconscionable "if a great disparity in bargaining power exists between the parties, such

that the weaker party is made to sign a contract unwillingly or without being aware of its terms."

*Brumley v. Commonwealth Bus. College Educ. Corp.*, 945 N.E.2d 770, 777 (Ind. Ct. App. 2011). To be

unconscionable, "the contract must be 'such as no sensible man not under delusion, duress or in

distress would make, and such as no honest and fair man would accept." *Sanford v. Castleton Health*

*Care Ctr., LLC*, 813 N.E. 2d 411 (Ind. Ct. App. 2004). There are two branches of unconscionability.

"Substantive unconscionability refers to oppressively one-sided and harsh terms of a contract, while

procedural unconscionability involves the manner and process by which the terms become part of

the contract." *Missler v. State Farm Ins. Co.*, 41 N.E.3d 297, 303 (Ind. Ct. App. 2015).

22

The record demonstrates that the Separation Agreement was both procedurally and substantively unconscionable and thus unenforceable. The evidence shows that Lareau was owed wages in earned commissions and vacation time and that Frost Control used those owed wages as a means to extract benefits to which it was not entitled. Further, the evidence demonstrates that Frost Control, through its CEO Victor Gill, manipulated the Separation Agreement so that it misleadingly suggested that Lareau was receiving a release from Frost Control when the release in the agreement was unilateral. Finally, there should be little doubt that the agreement was substantively unconscionable—Frost Control unlawfully leveraged payment of Lareau's owed wages to get him to sign the Separation Agreement, with its misleadingly one directional release and onerous, overbroad restrictive covenants. Because these facts demonstrate that the Separation Agreement was unconscionable, the Court should find the agreement unconscionable and decline to grant Frost Solution's Motion.

### 5. Frost is Not Entitled to Summary Judgment on the Non-solicitation Provisions in the Baglien Agreement.

Frost moves for summary judgment on the issue of whether the non-solicitation provisions in the Baglien Agreement are enforceable. Frost is not entitled to summary judgment on this issue because it is not an issue that is relevant in the case. Frost's First Amended Complaint does not mention these provisions, which concern ███████████████████████████ ████████████████████████████████████████████████ ██████████████. Further, there is no allegation in the complaint (or evidence in the record) that Baglien did anything that would come close to violating these provisions. Frost is not entitled to summary judgment on issues that are not pled or supported by evidence.

### 6. The Confidentiality Provisions Are Unreasonably Overbroad and Not Enforceable.

Frost Solutions is not entitled to summary judgment concerning the enforceability of Lareau and Baglien's respective confidentiality agreements. Under Indiana law, the enforceability of

23

confidentiality covenants is assessed under the same standards as other restrictive covenants. *William Bodemer & Innovative Bev. v. Swanel Bev.*, 884 F. Supp. 2d 717, 734-735 (N.D. Ind. 2012). As explained in detail below, Frost Solutions advances an interpretation of the confidentiality covenants that would prohibit Lareau and Baglien from using publicly available information and general skills knowledge acquired during employment with Frost Control. Because those prohibitions do not, as a matter of law, protect legitimate business interests (*see infra* at § IV(C)(2)), the Court should deny Frost Solutions' Motion for summary judgment declaring that the confidentiality agreements are valid and enforceable.

### 7.  The Baglien Termination Certificate is Not Enforceable.

Frost also contends that it is entitled to summary judgment on the issue of whether the termination certificate in the Baglien Agreement is enforceable. These are losing arguments too. There is no dispute that Baglien did not execute the Termination Certificate upon his departure. Nor is there any evidence that Frost Control ever asked Baglien to execute and deliver the Termination Certificate. Under basic contract law principles, the unsigned Termination Certificate cannot bind Baglien without his assent to its terms. *Fiederlein v. Boutselis*, 952 N.E.2d 847, 856 (Ind. Ct. App. 2011). Further, the Baglien Agreement makes it clear that in the event Baglien fails to deliver the Termination Certificate, the certificate is not deemed to be binding on him. Instead, the Baglien Agreement states that failure to sign the Termination Certificate ██████████████████ ███████████████████████████ It does not say that he will also be bound by the terms of the Termination Certificate. Finally, the Termination Certificate is not enforceable for an independent reason: because the Termination Certificate contains restrictive covenants that are personal in nature, to the extent the Termination Certificate is a valid contract, Baglien's consent is still needed for the contract to be assigned and enforced against him.

### B.      Frost Solutions is Not Entitled to Summary Judgment on the Issue of Breach.

Frost Solutions seeks to establish on summary judgment that Defendants have breached their

24

respective restrictive covenants. As an initial matter, and as discussed above, most of the restrictions that Lareau and Baglien are alleged to have breached are not enforceable and thus claims for breach of those agreements must fail. *See supra* at IV(A). But even if each of the covenants on which Frost relies is enforceable, Frost has still failed to muster sufficient evidence to obtain summary judgment on any of the alleged breaches that it cites in its Memorandum.

In short, the alleged "breaches" cited in Frost's motion are not breaches at all—and certainly cannot be proven to be so beyond any genuine issue of material fact.  For example, registering a domain, setting up email and slack accounts, and drafting an initial product requirement document—all months before Vue Robotics was even formed as an entity, many months before Vue Robotics began developing a product, and more than a year before Vue Robotics sold a product—does not violate Lareau's six-month noncompetition restriction. Further, signing a non-exclusive agreement with TAPCO, after Frost had publicly announced its illiquidity and after TAPCO had already moved on from Frost Control, did not violate either Lareau or Baglien's non-solicitation provision. Contacting well-known distributors and potential customers, including public municipalities, is not using "confidential" information. Frost's summary judgment motion concerning breaches of restrictive covenants should be denied.

### 1. <u>Lareau Did Not Breach the Noncompetition Covenant.</u>

To prove a breach of the Separation Agreement, Frost must show (among other things) that Lareau was (a) serving a "business enterprise" that was (b) "engaged" in the development or manufacture of sensors or computer systems for the analysis and reporting of road weather conditions. Frost Mem., Ex. 12 at ¶ 10 (Separation Agreement). Frost Solutions is not entitled to summary judgment on whether Lareau breached the noncompetition covenant because it cannot make either showing beyond any material factual dispute.

Frost appears to contend that in October 2021, shortly after his resignation date, Lareau had

already founded Vue Robotics. Factual disputes abound. To begin, the evidence cited by Frost Solutions—pointing to events occurring in the fall of 2021—is months before Vue Robotics was even formed. And it is many more months before Vue Robotics began competing against Frost Solutions in the marketplace in June 2022. Further, while Baglien and Lareau were having discussions in the fall of 2021, Lareau described those discussions as ███████████████ Frost 30(b)(6) Dep. 130-131. While it is true that Lareau set up email and slack accounts bearing the Vue Robotics name, Frost cites no additional evidence identified showing that Lareau and Baglien took any concrete steps at that time toward establishing a business enterprise. Because email and slack accounts do not constitute a business enterprise, Frost's argument must fail.

Frost Solutions also points to a "product requirements document" that Lareau and Baglien worked on in October-November 2021, arguing—presumably—that this effort constitutes "development" of sensors or computer systems for the analysis and reporting of road weather conditions. Lareau testified that no product development was occurring at this time, and the surrounding circumstances plainly support that conclusion. Only Lareau and Baglien worked on the document, *see* Frost Memo., Statement of Fact at ¶ 32, and it is undisputed that both lacked the technological skills to develop a product. The product requirements document is simply a list of features that Lareau and Baglien would expect in a weather sensor system. *See* Frost Memo. Ex. 18. Indeed, the document was for the limited purpose of trying to determine whether any independent development companies could eventually develop a weather product for Lareau and Baglien. Lareau Obj. Decl. at ¶ 5. It is undisputed that Baglien and Lareau, after Vue Robotics was formed, did indeed hire independent developers to actually develop their product, one of whom described the final version of the product requirement documents as essentially unsophisticated. Frost Solutions cannot prove that there are no material issues of fact remaining to be tried on its claims for breach

of the noncompete.[5]

### 2. Baglien and Lareau Have Not Violated Their Confidentiality Obligations.

Frost Solutions contends that Baglien and Lareau violated the confidentiality obligations in their respective agreements by contacting TAPCO and other former Frost Control customers that they met through their work at Frost Control. Frost goes on to argue that because the contact information for these parties existed in their CRM, Baglien and Lareau must have breached their respective confidentiality obligations. Frost is wrong on both the facts and the law.

To begin with, Frost cites no evidence that Baglien or Lareau took with them any information from the CRM database upon departing Frost Control. Both Baglien and Lareau have testified that any use of the Frost Control CRM data was for legitimate Frost Control business purposes. Accordingly, there is at least a genuine issue of material fact about whether Baglien or Lareau used or possessed confidential information in the first place.

Beyond that, there is a genuine issue of material fact concerning whether the information Frost contends that Baglien and Lareau used is even confidential at all. A confidentiality agreement "cannot make secret that which is not secret." *William Bodemer & Innovative Bev. v. Swanel Bev.*, 884 F. Supp. 2d 717, 734-735 (N.D. Ind. 2012). Under Indiana law, an employer's customer list and customer contact information is not confidential when that information is accessible through publicly available means, such as a phone book or a trade publication. *American Shippers Supply Co. v. Campbell*, 456 N.E.2d 1040, 1044 (1983). Further, to be considered confidential, there must be some evidence that the customer information "could not easily have been duplicated by alternate means, such as a telephone canvass of the market area" or that the information provided to an employee

---

[5] Indeed, if Frost contends that the noncompete actually bars Lareau from preparing to compete, then that would render the noncompete unenforceable given the lack of legitimate business interest Frost has in stopping such preparation. *See Potts v. Review Bd. of Ind. Emp't Sec. Div.*, 475 N.E.2d 708, 712 (Ind. Ct. App. 1985) (discussing in different context the right employee have to make arrangements to compete).

27

was "novel or unique" to the employer. *Licocci v. Cardinal Associates, Inc.*, 445 N.E.2d 556, 561 (1983). The information on which Frost bases its Motion is largely publicly available.

Finally, restrictive covenants, including confidentiality provisions, cannot be used to prevent an employee from using "the general knowledge, information or skills gained by the employee in the course of his employment." *Bodemer*, 884 F. Supp. 2d at 734-735 (internal quotations omitted). This "[k]knowledge, skill and information (except trade secrets and confidential information) become a part of the employee's personal equipment" and they "belong to him as an individual . . . just the same as any part of the skill, knowledge, information or education that was received by him before entering the employment." *American Shippers Supply Co.*, 456 N.E.2d at 1043 (*quoting Donahue v. Permacel Tape Corporation*, 234 Ind. 398 (1955)).

Frost Solutions argues that the identity of its customers and their contact information is confidential based on the customer's status as a customer and the fact that the customer's contact information was contained in Frost Control's CRM. This is woefully insufficient to demonstrate confidentiality, let alone to do so beyond any material factual dispute. As described above, the customer base in the relevant market is generally limited to certain public entities and commercial snow removal and facilities management companies. Like the customers in *American Shippers*, the potential customers in this market can be easily identified through reference to generally available information, such as public record searches, trade shows, and other search methods. What is more, the individual client contacts are easily identifiable and often readily accessible through trade show literature. And, Frost Control itself undertook the same basic search methods to identify its customers, using public records and trade show literature, among other things to grow its customer base. These points are corroborated by the fact that the actual information that Frost contends was confidential here, can also be compiled by publicly available means.

### 3. **Baglien and Lareau Did Not Breach the Non-Solicitation Covenants.**

Frost Solutions also contends that both Lareau and Baglien have violated the non-solicitation provisions in their respective agreements. Frost is not entitled to summary judgment on either issue.

***Lareau did not Breach the Non-Solicitation Covenant.*** The Separation Agreement only prohibits Lareau from ███████████████████████████████████████████████████████

███████████████████████████████████████████ The only alleged conduct that could conceivably violate the terms of Lareau's non-solicitation provision is Vue's discussions with TAPCO in the summer of 2022, which ultimately led to the parties signing a contract in September 2022.

Yet, the evidence does not show that this conduct violated Lareau's non-solicitation obligations, and it certainly does not show that beyond any disputed issue of material fact. Under the non-solicitation provision, Lareau was barred from ████████████████████████████████████

████████████████████████████████████████. There is no evidence that any defendant attempted to induce TAPCO to cease doing business with Frost Control. Frost Control's agreement with TAPCO was a non-exclusive distributor relationship, and Vue's agreement with TAPCO was likewise non-exclusive. Both companies could have continued working with TAPCO in 2022, assuming Frost Control was operational and not illiquid.

The evidence shows, however, that TAPCO decided to cease doing business with Frost Control because it had "disappeared" for months. The evidence also shows that when TAPCO canceled its outstanding orders with Frost Control in April 2022, Frost Control confirmed the death of the relationship by informing TAPCO that it was liquidating and asking whether TAPCO was interested in acquiring it. These events all occurred months before TAPCO and Vue Robotics began discussing a potential partnership in July. Finally, Vue and TAPCO did not even finalize an agreement until September 2022, when Frost Control had ***already*** disappeared as a result of being

29

forced to surrender its assets to its lender, who then sold those assets to Frost Solutions. Given the circumstances, it is at least a question of material fact as to whether Lareau violated the obligations of his non-solicitation agreement. As explained in Vue's motion for summary judgment on Frost Solutions' claims under the Separation Agreement, *see* ECF No. 116-1 at pp. 16-19, Defendants are entitled to summary judgment on this issue because no reasonable factfinder could conclude that Lareau violated any non-solicitation obligations in his Separation Agreement.[6]

**Baglien did not breach the non-solicitation covenant.**  With respect to Baglien, there is no conduct alleged in Frost's Motion that comes close to breaching either of Baglien's non-solicitation provisions. Section 8(a) applies ██████████████████████████████████████, which Frost Solutions does not contend occurred. Further, Section 8(b) restricts Baglien from ███████████████████████████████████████████. Again, there is not even an allegation in Frost's Motion that this occurred. *See* Frost Mem. at 23 (arguing Baglien breached non-solicit covenants by soliciting customers and taking confidential information). Finally, to the extent that the Court concludes that the unsigned Termination Certificate in the Baglien Agreement is enforceable against Baglien, Frost would not be entitled to summary judgment on that issue here because the Termination Certificate's non-solicitation provision only prohibits Baglien from ████████████████████████████████████. But as discussed above, Frost Solution is not entitled to any summary judgment relief on the issue of whether Baglien used confidential information.

## V. <u>CONCLUSION</u>

For the foregoing reasons, Frost's Motion for Summary Judgment should be denied.

---

[6] In its Motion, Frost contends that Lareau somehow violated the non-solicitation covenant in the Separation Agreement by contacting municipal customers. This argument fails because customers are not covered by the non-solicitation clause in the Separation Agreement. *See* Frost Mem. Ex. 12 at § 11 (Separation Agreement).

Respectfully submitted,

PATRICK BAGLIEN, CHRISTOPHER LAREAU
AND VUE ROBOTICS, LLC,

By their attorneys,

SHEEHAN PHINNEY BASS & GREEN, P.A.

Dated: March 19, 2026          */s/ Ryan P. Lirette*
                               David W. McGrath (NH Bar No. 9347)
                               James P. Harris (NH Bar No. 15336)
                               Ryan P. Lirette (NH Bar No. 19561)
                               Abbygale M. Dow (NH Bar No. 272938)
                               1000 Elm Street, 17th Floor
                               Manchester, NH 03101
                               (603) 627-8255
                               dmcgrath@sheehan.com
                               jharris@sheehan.com
                               rlirette@sheehan.com
                               adow@sheehan.com

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically served copies of the foregoing on all counsel of record via the Court's CM/ECF system.

Dated:  March 19, 2026          */s/ Ryan P. Lirette*

31