**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| FROST SOLUTIONS, LLC, | ) | |
| | ) | Civ. Action No. 1:22-CV-00401-SE |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **ORAL ARGUMENT REQUESTED** |
| PATRICK BAGLIEN, CHRISTOPHER LAREAU, and VUE ROBOTICS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

# PROVISIONALLY FILED UNDER SEAL

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR PARTIAL
SUMMARY JUDGMENT AS TO PLAINTIFF'S TECHNOLOGY AND CUSTOMER
INFORMATION TRADE SECRET CLAIMS
<u>(COUNTS I AND II OF THE FIRST AMENDED COMPLAINT)</u>**

**TABLE OF CONTENTS**

I.    FROST FAILS TO CARRY ITS BURDEN TO DEFEAT SUMMARY
        JUDGMENT ..................................................................................................1

II.   FROST'S TECHNOLOGY TRADE SECRET CLAIM ....................................2

        A. The AIMS 2.0 PRD Contains No Information on the Frost Tech UI
            or Frost Vision................................................................................................2

        B. Only One Page of the AIMS 2.0 PRD Arguably Contains "How-To"
            Information .....................................................................................................3

        C. Frost Overstates the Purported Similarities Between the Products ...............4

        D. Exhibits 33 and 41 Described a Different Target User and Different
            Use Case .........................................................................................................7

        E. Frost Publicized Information from the AIMS 2.0 PRD .................................8

III.  FROST'S CUSTOMER INFORMATION CLAIM............................................9

IV.   CONCLUSION................................................................................................10

I.    **FROST FAILS TO CARRY ITS BURDEN TO DEFEAT SUMMARY JUDGMENT**

Because Plaintiff, Frost Solutions, LLC ("Frost Solutions") bears the burden of persuasion at trial, it must make a showing at this stage sufficient to establish the existence of elements essential to its case. *Carriage Hill Health Care, Inc. v. Hayden*, No. CIV. 96-101-SD, 1997 WL 833131, at *2 (D.N.H. Apr. 30, 1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). It is not sufficient for Frost to "rest upon mere allegation[s] or denials of [its] pleading." *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir.1993) (quotation omitted). Rather, to establish a trial-worthy issue, there must be enough competent evidence "to enable a finding favorable to the non-moving party." *Id.* at 842 (citations omitted). Even if one assumes all of the "facts" presented in Frost's Objection (Doc. 129) are true (despite the evidence to the contrary), Frost fails to carry this burden.

Federal courts grant summary judgment when plaintiffs cannot prove that the defendants actually used the alleged trade secret. *See GE Betz, Inc. v. Moffitt-Johnson*, 885 F.3d 318 (5th Cir. 2018). As is the case here, GE Betz alleged the "downloading" of data, but provided no evidence of its actual use, so summary judgment was granted to the defendant. *Id.* at 327 (refusing to "collapse the improper-acquisition prong and the use prong of the misappropriation of trade secrets cause of action").[1]

Frost also fails to demonstrate that Vue Robotics, LLC's ("Vue") ARC-1 was not independently derived or developed. 18 U.S.C. § 1839(6)(B) ("improper means" explicitly "does not include reverse engineering, independent derivation, or any other lawful means of

---

[1] Without evidence of actual misappropriation, Frost points to what it claims is a comparatively short time to develop a product, but such an argument has been rejected under similar circumstances. *Coda Dev. s.r.o. v. Goodyear Tire & Rubber Co.*, 160 F.4th 1350, 1359 (Fed. Cir. 2025) ("We do not agree with Coda that the timing of Goodyear's project launch alone constitutes sufficient evidence from which a reasonable jury could find Goodyear's usage of TS 23, especially when there is no evidence tying TS 23 to the project and no evidence indicating all the information in TS 23 was conveyed to Goodyear.").

acquisition"); *Harbor Business Compliance Corporation v. Firstbase.io, Inc.*, 152 F.4th 516 (2025) ("So it is necessary to disprove independent development—when raised—in order to meet the burden of proving the element of use."); *Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal.App.4th 1658 (2003) (affirming a verdict). Frost says next to nothing about the third-party developer Vue hired to design the ARC-1, Paragon Innovations, and that silence is revealing.

Although required, Frost does not parse the publicly available information (including information about public sector clients subject to transparency laws), which is unquestionably the bulk of its compilation of customer data, from what could even arguably be non-public. Courts grant summary judgment in such circumstances. *See*, *e.g.*, *DeWolff, Boberg & Assocs. Inc. v. Pethick*, 133 F.4th 448, 453 (5th Cir. 2025) (affirming summary judgment).

## II.    FROST'S TECHNOLOGY TRADE SECRET CLAIM

Frost has finally focused its purported technology trade secret claim to its AIMS 2.0 Product Requirements document, Ex. U (the "AIMS 2.0 PRD") (Doc.117-26). *See* Pl.'s Obj. at 24 (describing the AIMS 2.0 PRD as "the foundation for the technology trade secrets at issue here.").[2] Frost provides only conclusory statements about the AIMS 2.0 PRD and avoids any detailed analysis of it. Vue hereby assists the Court with that evaluation.

### A.    *The AIMS 2.0 PRD Contains No Information on the Frost Tech UI or Frost Vision.*

Even a cursory examination of the AIMS 2.0 PRD reveals the total absence of any treatment of two purported trade secrets, the so-called Frost Tech UI or Frost Vision.[3] *See* Ex. U. There certainly is no information about *how* either of those purported trade secrets would

---

[2] Frost still does not sort through the AIMS 2.0 PRD to identify the parts of it that are not generally known or readily ascertainable, and for that reason, summary judgment is appropriate. *TLS Mgmt. & Mktg. Servs., LLC v. Rodriguez-Toledo*, 966 F.3d 46, 54 (1st Cir. 2020).

[3] Frost defines the Frost Tech UI as a platform for customers to utilize, manage and gather data from the AIMS 2.0 device and Frost Vision as a weather detecting AI image recognition model. Pl.'s First Am. Compl. ("FAC") at ¶¶ 24-26.

function in the future, if Frost Control Systems ("Frost Control") ever restarted its development program (which it did not).[4]  Whereas the AIMS 2.0 PRD is the embodiment of the technology at issue, summary judgment is appropriate to trim from this litigation any claim based on the Frost Tech UI or Frost Vision.

### B.  Only One Page of the AIMS 2.0 PRD Arguably Contains "How-To" Information.

The AIMS 2.0 PRD merely itemizes components, features and functionalities that were publicly known or readily ascertainable, so Frost now claims vaguely that its combination of publicly available and known components is the trade secret at issue. Pl.'s Obj. at pg. 28.  Frost posits, without any analysis, that the AIMS 2.0 PRD describes the "how-to" (*id*. at pg. 29) that was secret and would be advantageous for a future product that did not exist when Baglien and Lareau worked for Frost Control.  In reality, there is almost no "how-to" in the AIMS 2.0 PRD. It is truly a list of components that were apparent to anyone capable of observing Frost's product. The only "how-to" arguably present in the AIMS 2.0 PRD is the electrical diagram found at page 6, which depicts how to connect the various components Frost chose for its system.

Even assuming this diagram is itself a trade secret (despite not being specifically identified as such by Frost at any point in this litigation), Frost would have to show that Patrick Baglien ("Baglien") and Christopher Lareau ("Lareau") memorized this diagram, transmitted its contents to a third-party firm engaged to develop Vue's ARC-1 system, and that the third-party firm actually used that same configuration to connect the components.  Frost does none of this. The only "evidence" Frost identifies to suggest any misappropriation is the product requirements

---

[4] Frost claims that the abandonment of development of the AIMS 2.0 is "irrelevant," but it shows what was possibly available to Baglien and Lareau when they left.  Mario Bonardi, Frost Control's former VP of Engineering and Operations, testified that once the engineers were fired, development "essentially ended."  *See* Def.'s Memo of Law (Doc. 117-1) at pg. 7.  Contrary to Frost's present assertion, the AIMS 2.0 was not "successfully engineered" when Baglien and Lareau left (pg. 28).  Frost took a year after the acquisition of Frost Control (more than a year and a half after Baglien and Lareau departed) to solve the engineering problems and "unify the process."  *Id*. at pg. 8.

3

documents Baglien and Lareau provided Glow Labs and Paragon Innovations, Exhibits 33 (Doc 129-34) and 41 (Doc 129-42).  Even a quick glance at those documents reveals that neither document contains any information on how to connect components or anything like the electrical diagram in the AIMS 2.0 PRD.[5]  Frost therefore provides no evidence of actual misappropriation and summary judgment is warranted.

### C. Frost Overstates the Purported Similarities Between the Products.

In the face of these obstacles, Frost repeatedly falls back to the contention that Vue's ARC-1 deploys similar features and functionalities, which is incongruous with its claim that its trade secret is the "how-to" combine feature and functionalities.  For Frost, the purported similarities between the products constitutes "circumstantial evidence" of misappropriation of "concepts."  Frost's claim relies upon its contention that when Baglien and Lareau approached two third-party consulting firms to help them manifest what later became Vue's ARC-1, they described a product with "extensive, detailed overlap with AIMS 2.0's specifications."  *Id*. at 33.  For this, Frost points to Ex. 33,[6] which was provided to Glow Labs, and Ex. 41, which was provided to Paragon Innovations.

Frost never lines up the AIMS 2.0 PRD (Ex. U) with Exs. 33 and 41, however, and for good reason – there are so many material differences between them that it is evident that

---

[5] The absence of any such technical data in what Baglien and Lareau provided to the third-party developers is consistent with the testimony in the record that neither Baglien nor Lareau had the kinds of technical skills to utilize the electrical diagram.  Mario Bonardi Depo. Tr. at 119-20, attached as Exhibit A. (Baglien and Lareau had no engineering capabilities).  Moreover, because the third parties were being asked to develop a different system with different components and power capabilities, how Frost Control intended to connect its components was of no utility to them.

[6] Frost's reliance on Ex. 33 is odd in that Glow Labs was not retained to do any work, so there is no possible misappropriation through Glow Labs on which a claim could rest.

Defendants pursued a very different system to deploy in the market, rather than replicate Frost's.[7]  Defendants hereby undertake the comparison Frost avoided.[8]  The differences include:

- The AIMS 2.0 would ████████████████████████.  Ex. U, pg. 1.  Glow Labs was asked to develop a product that would take images "every 10 minutes or less with the option to request a live update."  Ex. 33, pg. GL_000015.  Paragon was asked to develop a system that provided users "████████████████████████████████████ ████████████████████████.'"  Ex. 41, pg. 27263.

- The AIMS 2.0 would ████████████.  Ex. U, pg.3.  Glow Labs and Paragon were asked to develop a system with ████████████████████████ ████████████████████████.  Ex. 33, pg. GL_000015; Ex. 41, pg. 27263.

- The AIMS 2.0 enclosure would be rated to "████."  Ex. U, pg. 7.  Baglien and Lareau pursued with Glow Labs and Paragon a more rigorous rating of "████".[9]  Ex. 33, pg. GL_000015; Ex. 41, pg. 27264.

- The AIMS 2.0 included ████████████████████████████████████ ████████████████████████.  Ex. U, pg.7.  Baglien and Lareau desired two additional sensors to measure ████████████.  Ex. 33, pg. GL_000015; Ex. 41, pg. 27264.  It is notable that although Baglien and Lareau requested six total sensors, they ***did not*** specify the accuracy or tolerances of any of them in Exs. 33 and 41, except to

---

[7] Frost resorts to trying to prevent Defendants from using "concepts," which is insufficient to sustain a trade secret claim.  Pl.'s Obj. at pg. 34 ("[T]he record shows that ARC-1 was rooted in the technology and concepts owned and protected by Frost.").

[8] Attached hereto as Addendum 1 is an annotated version of the product description document provided to Glow Labs (Ex. 33).  Addendum 2 is an annotated version of the product requirements document provided to Paragon, the third-party firm that actually developed the ARC-1, and Addendum 3 is an annotated version of the AIMS 2.0 PRD (Ex. U).  The annotations highlight the distinctions between what Baglien and Lareau hoped a third party could develop and the AIMS 2.0 Frost Control hoped to someday develop.

[9] For an explanation of the "ingress protection" (or IP) enclosure rating system, *see* https://www.iec.ch/ip-ratings (last visited Mar. 26, 2026).

note that the camera would be an ███████████ camera (*id*.), as opposed to the ███

camera noted in the AIMS 2.0 PRD (Ex. U, pg. 7).

- Baglien and Lareau pursued with Paragon a more advanced camera system, one with ████

  ███████████████████████████████████████████████

  ███. Ex. 41, pg. 27264. Frost Control's AIMS 2.0 PRD called for a camera with a field

  of vision of ███████████████████████████████████. Ex. U, pg.

  11.

- The AIMS 2.0 product would be ████████████████████████████

  ███████████████, just like its predecessor. Ex. U, pg. 9. Baglien and Lareau sought

  to advance the technology to use ████████████████ when they described the system

  to Glow Labs. Ex. 33, pg. GL_000015; Ex. 41, pg. 27264.

- The AIMS 2.0 was to be designed for an operating temperature range of ████████████

  ████████████. Ex. U, pg. 3. Glow Labs was asked to develop a product capable of

  operating at lower temperatures, from -40°F. Ex. 33, pg. GL_000015. Baglien and Lareau

  did not specify such tolerances in Ex. 41 for Paragon.

- The AIMS 2.0 would continue to rely on ████████████████. Ex. U, pgs. 2, 9. Glow

  Labs was asked to develop a system that would communicate over the more advanced 5G

  band, and rather than reveal anything proprietary about the way Frost Control handled

  communications, Baglien and Lareau pointed Glow Labs to a commercially available SIM

  card product. Ex. 33, pg. GL_000016 (providing a link to a product from Sierra Wireless).

  Ex. 41 does not address the manner of connectivity.

- While Baglien and Lareau provided very little specificity as to the sensors and technical

  capabilities of the system it wanted Paragon to design, they did provide a fair amount of

6

detail on what they wanted from the user interface.  Ex. 41, pg. 27265.  Notably, the AIMS 2.0 PRD provides next to no information about the user interface.  *See* Ex. U.

Several conclusions can be drawn from even a cursory comparison of the AIMS 2.0 PRD and Exs. 33 and 41: (1) Baglien and Lareau sought to develop a different product; (2) where the AIMS 2.0 PRD provided specific details (such as for the sensors), Baglien and Lareau did not provide equivalent information to the third-party developers; (3) the AIMS 2.0 PRD lacks detail about the Frost user interface, but Baglien and Lareau did provide some detail to developers about what they wanted to develop for a user experience; and (4) although Frost now contends that is specific combination of components is its trade secret, there is ***absolutely nothing*** in Exs. 33 or 41 that reveal ***how*** to combine any of the components.

### D.  *Exhibits 33 and 41 Described a Different Target User and Different Use Case.*

Frost also leans heavily on the notion that Baglien and Lareau targeted the same market, as if Frost somehow can prevent anyone from entering the same space.  Once again, however, the documents on which Frost relies do not support its contention.  In the AIMS 2.0 PRD, Frost Control identified the target users as "███████████████████████████████████ ███████████████████████" and identified the target purchaser as ██████████████████ ███████████████████████████████████████" *Id*.  The evidence cited by Frost for misappropriation identifies a different cadre of stakeholders: "███████████████████ ███████████████████████████████████████." Ex. 41, pg. 27263.  Exhibits 33 and 41 also broadened the use-case beyond just snow removal and salt application to "██ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████" *Id*.  There is a disconnect between the evidence Frost presents and its

conclusory claim, because Exs. 33 and 41 identified a different problem than the one on which Frost Control was focused.

### E. Frost Publicized Information from the AIMS 2.0 PRD.

The publicly distributed "pitch deck" referred to in Defendant's Memo of Law revealed to recipients not bound by any confidentiality obligation many aspects of the planned AIMS 2.0, including: the input/sensor requirements, output/actuator requirements, communication requirements and power requirements found at Ex. U, pg. 7; the interoperability specifications found at Ex. U, pg. 2; and the battery specifications found at Ex. U, pg. 9. The cases Frost cites do not support Frost's attempt to avoid the consequences of publicizing the future development plans for the AIMS 2.0. *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495 (S.D.N.Y. 2017) is a case about reverse engineering software, which is distinct from the hardware trade secrets Frost asserts in this case. Because of that distinction, the court found that publishing screen shots of the user interface did not reveal the software architecture that was the trade secret. *Id*. at 518. In this case, Frost continuously wanders back to features and functionalities, which it repeatedly disclosed to the public.

*Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990) is also a software case, but that trial court made a factual finding that the particular marketing materials did not disclose the trade secret; it does not stand for the proposition that marketing materials can never disclose a trade secret. Here, to the extent Frost contends its features and functionalities are trade secrets, its promotional (marketing) materials, including in particular the pitch deck's roadmap for future product enhancements, vitiate its claim. *See Take It Away, Inc. v. Home Depot, Inc.*, 374 F. App'x 47, 49 (1st Cir. 2010) ("Teaser" materials provided to Home Depot describing a proposed concept undercut the trade secret claim).

8

### III.    FROST'S CUSTOMER INFORMATION CLAIM

#### A.    *The Reports "Downloaded" Do Not Contain the Purported Trade Secrets.*

Frost characterizes its important customer information as "current, former, or prospective customer names; contacts within the customer's business;[10] customers' business needs and preferences; purchasing history; reasons customer deals were won or lost; bidding strategies; proposal-response strategies; pricing feedback; correspondence history; and financial information."  Pl.'s Obj. at 15-16.

Frost's claim is based on downloading specific reports from Frost Control's CRM system, called Hubspot, on specific dates.  The downloaded reports included particular columns of information, which Frost lists in its Objection. Upon closer inspection it is clear that the report Lareau downloaded ***did not*** include customer needs and preferences, reasons why deals were won or lost, bidding strategies, proposal-response strategies, pricing feedback or the like. Rather, even as Frost itself describes it, the report Lareau downloaded consisted of simple contact information: "record ID numbers; contact names; email addresses; phone numbers; job titles; associated company and company ID; subscriber dates; locations; contact owner information; sequence processes; dates of last activity, last contact, and last engagement; mobile phone numbers; numbers of sale activities; sequences enrolled; times contacted; original source information; recent sales email data; and first time seen data." Pl.'s Obj. at pg. 17.  Even taking all of Frost's factual allegations as true, including the unconnected leap from "downloading" to misappropriating,[11] the categories of information in the report Lareau downloaded cannot

---

[10] The first two categories identified by Frost (current, former, or prospective customer names; contacts within the customer's business) are nothing more than contact information, most of which was for public entities, and is therefore not protectable trade secret information.  *See* Def's Memo. of Law (Doc 117-1) at pg. 31-32.

[11] All Frost can muster is that Baglien and Lareau downloaded reports with thousands of records prior to leaving Frost Controls.  Frost does not allege, let alone demonstrate, that those thousands of rows of information ever left Frost Controls or were used at Vue.  In other words, there is no evidence those report files were misappropriated, so the claim is limited to what Baglien and Lareau allegedly could have remembered many months after leaving Frost.

9

constitute a trade secret, particularly as to the public entities in that report.  Def.'s Memo. of Law

(Doc. 117-1) at pg. 31-32.

Frost does not carry its burden to parse the public information from any purported non-

public information in the reports its claims are its trade secrets, including for the so-called "All-

Deals" report, which consists of scores of information about public sector entities – information

that is through public means easily available.  Frost attempts to counter the fact that its

purportedly sensitive information is freely obtainable from its many public sector clients by

pointing to the City of Wyoming, which Frost indicates signed a confidentiality agreement.  That

agreement apparently signed yielded to the right-to-know laws, however, because that

municipality responded to a public records request by producing "all contracts, purchase orders

and invoices" as well as over 1,500 emails.  *See* Sept. 10, 2025 Email (Vue 0211856), attached

as Exhibit B.  This example proves that requiring public customers to sign confidentiality

agreements does not afford meaningful protection and what Frost claims is secret is freely

available to anyone who asks for it.[12]

## IV.  <u>CONCLUSION</u>

For the reasons stated, Defendants are entitled to summary judgment as to Counts I and II

of Plaintiff's First Amended Complaint.

---

Frost incredibly claims that "misappropriation is not in dispute," when it has no evidence the Hubspot downloads ever even left Frost Controls.  *GE Betz, Inc. v. Moffitt-Johnson*, 885 F.3d 318, 327 (5th Cir. 2018) (refusing to conflate misappropriation and mere downloading).

[12] Frost also relies upon its efforts to cause Baglien and Lareau to sign agreements containing restrictive covenants. For the reasons stated in Defendants' Memo. of Law in Support of their Objection to Plaintiff's Partial Motion for Summary Judgment on Contract Issues (Doc. 132) and Defendants' Memo. of Law in Support of their Motion for Partial Summary Judgment (Doc.116-1) the agreements on which Frost relies are unenforceable and otherwise do not support their contention that these agreements demonstrate that Frost took appropriate steps to reasonably safeguard their purportedly confidential information.  Indeed, in Lareau's agreement any information that is merely "generally available" to the public, whether easy or onerous to obtain, is excluded from the definition of Confidential Information Lareau Separation Agreement and Mutual Release at section 9(e)ii.  Doc. 113-15.

Respectfully submitted,

PATRICK BAGLIEN, CHRISTOPHER LAREAU
AND VUE ROBOTICS, LLC,

By their attorneys,

SHEEHAN PHINNEY BASS & GREEN, P.A.

Dated: March 26, 2026                    /s/ James P. Harris
                                         David W. McGrath (NH Bar No. 9347)
                                         James P. Harris (NH Bar No. 15336)
                                         Ryan P. Lirette (NH Bar No. 19561)
                                         Abbygale M. Dow (NH Bar No. 272938)
                                         1000 Elm Street, 17th Floor
                                         Manchester, NH 03101
                                         (603) 627-8255
                                         dmcgrath@sheehan.com
                                         jharris@sheehan.com
                                         rlirette@sheehan.com
                                         adow@sheehan.com

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically served copies of the foregoing on all counsel of record via the Court's CM/ECF system.

Dated:  March 26, 2026                   /s/ James P. Harris

11