UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Frost Solutions, LLC,

        v.

Patrick Baglien, Christopher
Lareau, and Vue Robotics, LLC,

Case No. 22-cv-401-SE
Opinion No. 2026 DNH 030

**O R D E R**

Frost Solutions, LLC filed suit in October 2022 against two of its former employees, Christopher Lareau and Patrick Baglien, as well as Vue Robotics, LLC, the company that Lareau and Baglien co-founded after they resigned from Frost Control, plaintiff Frost's predecessor company, in 2021. Frost asserts a variety of claims against the defendants, including violation of the New Hampshire Uniform Trade Secrets Act, breach of contract, breach of fiduciary duty, and tortious interference with contract.

In response, Lareau and Vue[1] (Counterclaim-Plaintiffs) assert several counterclaims against Frost, including negligent infliction of emotional distress, tortious interference with contractual relations and prospective contractual relations, and civil conspiracy. Doc. no. 100. Frost moves to dismiss all of the counterclaims, arguing that the Counterclaim-Plaintiffs have failed to state plausible claims for relief.[2] Doc. no. 102. The Counterclaim-Plaintiffs object. Doc. no. 103.

---

[1] Baglien does not assert any counterclaim.

[2] While Frost's motion to dismiss was pending, the court granted Frost's assented-to motion to amend its complaint. Doc. no. 106 & November 6, 2025 Endorsed Order. The Counterclaim-Plaintiffs did not reallege their counterclaims in their answer to the amended complaint. See doc. no. 110. The parties have subsequently cross-moved for summary judgment

Standard of Review

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a plaintiff must make factual allegations sufficient to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible if it pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. This standard "demands that a party do more than suggest in conclusory terms the existence of questions of fact about the elements of a claim." A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 81 (1st Cir. 2013). To test a complaint's sufficiency, the court must employ a two-step approach. First, it must identify and disregard statements that "merely offer 'legal conclusions couched as fact' or 'threadbare recitals of the elements of a cause of action.'" Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (quoting Iqbal, 556 U.S. at 678 (alterations omitted)). Second, the court must credit as true all nonconclusory factual allegations and the reasonable inferences drawn from those allegations. See id. Only then can the court determine whether the "combined allegations, taken as true,. . . state a plausible, not a merely conceivable, case for relief." Id. (quotation omitted).

---

a number of bases. See doc. nos. 113, 115, 116, and 117. Frost has argued that it is entitled to summary judgment on the counterclaims, in part, because the Counterclaim-Plaintiffs waived these claims by failing to reassert them in their answer to the amended complaint. Though the court is not inclined to impose such a harsh result under the procedural posture of this case, it reserves its decision on that and Frost's other arguments in favor of summary judgment on the counterclaims until it issues an order on Frost's motion for summary judgment.

Background

Accepting the factual allegations set forth in the Counterclaim-Plaintiffs' Amended Counterclaims as true, the relevant background is as follows.

The facts alleged in the Amended Counterclaims generally arise out of three separate "campaigns" that Frost purportedly waged in its efforts to put Vue out of business. The first of those campaigns concerns efforts that Frost took to deprive Vue of insurance coverage for litigation-related expenses. The second relates to the improper access of Vue's systems, at Frost's behest, by a former employee of Vue customer East End Group, who had subsequently been hired by Frost. The third involves Frost's interference in Vue's relationship with its preferred dealer, TAPCO, through a settlement agreement in a separate suit between Frost and TAPCO.

I.      Frost's Actions Relating to Insurance Coverage

Lareau and Baglien previously worked for Frost Control, plaintiff Frost's predecessor company. Lareau tendered his resignation on September 27, 2021, and Baglien tendered his resignation on October 6, 2021. The two then co-founded Vue, which provides site monitoring services for weather and other environmental conditions through its ARC1 hardware and OmniVue software platform.

On January 5, 2022, Baglien received a letter from Frost Control's lawyers alleging that Baglien "may have violated duties of loyalty, care and good faith during [his] employment with Frost" by spending inappropriately on "travel, entertainment and dining," and paying unapproved and inappropriate bonuses. Doc. no. 100, ¶¶ 39-40. Presumably, however, Frost

Control either determined that the allegations in the letter were baseless or made the decision that the allegations were not worth pursuing, because nothing further came of those January 5 allegations.

Frost Control ceased business operations in April 2022 and took steps to liquidate its assets. Then, on June 8, 2022, Frost Control's lawyers sent Lareau and Baglien a demand letter. The contentions in that demand letter—that Lareau and Baglien had misappropriated trade secrets, and that Lareau had breached his separation agreement with Frost Control— correlate to Frost's allegations later set forth in the complaint filed in this action. The June 2022 demand letter states that Frost Control had discovered Lareau's and Baglien's conduct "last week" (on or around June 2, 2022). The plaintiff Frost claims that it acquired Frost Control's assets on a later date. Frost then filed this action alleging that it had discovered Baglien's and Lareau's misappropriation of trade secrets and confidential information in June 2022.[3]

In the course of discovery, the Counterclaim-Plaintiffs produced a copy of the insurance policy they intended to use "to satisfy all or part of a possible judgment" in this action. Doc. no. 100, ¶ 88. The Counterclaim-Plaintiffs designated the policy as "Confidential Information," which is defined by the protective order entered by the court in this action. See doc. no. 28. That protective order prohibits Frost from using the policy "for any purpose whatsoever other than to prepare for and conduct discovery, hearings and trial in this action, including any appeal thereof." Id., ¶ 5(a).

---

[3] Similarly, in its interrogatory responses, Frost wrote that it "did not discover until 'on or around June 2, 2022,' that 'Baglien and Lareau had [purportedly] stolen information from Frost to start a competing business.'" Id., ¶ 78. Additional discovery further confirmed that the January 5 allegations are not related to those that gave rise to the present litigation.

On November 30, 2023, the Counterclaim-Plaintiffs' insurance carrier received a phone call from a person identifying himself as "Mike," calling from a mobile phone number associated with Michael Kirsh, a principal of Frost. Mike told the insurance carrier that he was adverse to Vue in litigation, and that the Counterclaim-Plaintiffs had received a letter from "Frost" dated January 5, 2022, that accused them of "bad stuff." Doc. no. 100, ¶¶ 97, 99. While Kirsh knew that the allegations in that letter were wholly unrelated to the litigation, he was attempting to "persuade the insurance carrier that the Counterclaim-Plaintiffs had omitted material information from their insurance application," so that the carrier would withdraw its coverage for the present action. Id., ¶ 98. Without insurance coverage, Kirsh believed, the Counterclaim-Plaintiffs would be unable to afford the costs of defending themselves against Frost and would be driven out of business.

As a result of Kirsh's phone call, in early January 2024, the Counterclaim-Plaintiffs received a letter from their insurance carrier. That letter stated that coverage "may be in jeopardy because of the allegations in the [January] 5 letter." Doc. no. 100, ¶ 105. Kirsh had successfully "triggered an investigation into whether Counterclaim-Plaintiffs had withheld material information during the insurance application process," even though Kirsh was aware that the January 5 allegations were "entirely unrelated to the allegations and claims asserted in the Complaint." Id., ¶¶ 106-107.

Frost did not know that Kirsh's efforts had already successfully triggered an investigation by the insurance carrier. So, the company devised an additional plan to undermine the Counterclaim-Plaintiffs' insurance coverage. A few days later, on January 11, 2024, Frost's counsel sent a letter to the Counterclaim-Plaintiffs' counsel stating:

> …we have serious concerns as to the extent of coverage. We have requested any reservations of rights letter. As you know, your client was put on notice of this

> claim on January 5, 2022. It appears the insurance company was not notified until sometime after. As such, there may be a coverage issue and we would like to know if that is the case.

Doc. no. 100, ¶ 110. Frost's counsel expressly requested that the Counterclaim-Plaintiffs share his letter with their insurance carrier. Like Kirsh, Frost's counsel knew that the allegations in the January 5 letter were wholly unrelated to the allegations and claims asserted in Frost's complaint. And, like Kirsh's phone call, counsel's January 11 letter was intended to "relay false information [to the insurance carrier] intended to provoke an investigation into whether Counterclaim-Plaintiffs withheld information from their insurance application, thereby jeopardizing Counterclaim-Plaintiffs' insurance policy and coverage." Id., ¶ 111.

As a result of Frost's actions, the Counterclaim-Plaintiffs incurred substantial legal fees, both in this case and because they were required to retain separate coverage counsel to oppose Frost's intentional misstatements to their insurance carrier. Without the insurance coverage, the Counterclaim-Plaintiffs would be unable to afford the cost of defending Frost's lawsuit and would have been exposed to personal liability. Moreover, the Counterclaim-Plaintiffs allege that Lareau, who has a history of psychiatric treatment, experienced, and continues to experience, severe emotional distress as a result of Frost's misconduct. After receiving the January 2024 letter from the insurance carrier, Lareau began suffering from symptoms of emotional and mental harm, including anxiety, loss of appetite, loss of interest in activities, and insomnia. Despite seeking treatment from a psychiatrist, Lareau's symptoms persist.

II.     Frost and the East End Group

In November 2022, Vue entered into an agreement to provide its ARC1 system and monitoring services to the East End Group. Pursuant to the agreement's terms and conditions,

East End agreed, <u>inter alia</u>, that it would not disclose Vue's confidential information, would refrain from reverse engineering Vue's products or services, would not make Vue's products and services available to third parties for the third parties' business operations, and would use Vue's products and services only as permitted by the contract. At that time, East End's Chief Operating Officer was Jason Ostrander, and as an East End employee, Ostrander was assigned unique log-in credentials to access Vue's software platform, OmniVue.

In or around October 2024, Ostrander left East End and began working for Frost as its Vice President of Commercial Operations. On November 26, 2024, Vue discovered that—despite no longer working for East End—Ostrander had utilized his East End log-in credentials to access Vue's platform and East End's confidential site information. Following an investigation, Vue determined that Ostrander had improperly utilized his log-in credentials on at least eight separate occasions in the previous 30 days. Some or all of those occasions occurred after Ostrander began working for Frost. Ostrander was able to access key components of Vue's interface and functionalities of the ARC1 system, which Frost can utilize "to gain an unfair advantage in modifying its own products and systems and when pitching its competitive products and services to potential customers." Doc. no. 100, ¶ 150.

Vue notified Frost that Ostrander had used his East End log-in information to access Vue's systems while working for Frost. Frost admitted that Ostrander had accessed Vue's system and did not deny that the company had received information about Vue's systems as a result.

III.     <u>Frost, TAPCO and the Moore Litigation</u>

TAPCO is a company that markets and resells goods in the transportation and government services industry. It has sold Vue's products and services to public entities across

the country. In March 2024, TAPCO and Vue entered into a sales representation and distribution agreement, pursuant to which Vue identified TAPCO as its preferred dealer, and TAPCO agreed to market and sell Vue's products. Frost was aware of TAPCO's agreement with Vue.

Around the same time that Frost initiated this action, it filed a similar lawsuit against Cory Moore, another former Frost employee ("Moore litigation"). Moore had left Frost and begun working for TAPCO. In the Moore litigation, Frost alleged that Moore had stolen Frost's trade secrets and confidential information to solicit Frost's customers on TAPCO's behalf. Frost later added TAPCO as a defendant, alleging that TAPCO was a competitor who had tortiously interfered with Frost's contracts and prospective business relations. The action was settled in October or November 2024 and, as part of the settlement, Frost "required TAPCO to terminate [its] agreement with Vue, cease its dealings with Vue and commence a new relationship with Frost." Doc. no. 100, ¶¶ 165-166.

On November 6, 2024, TAPCO sent correspondence to Vue purporting to terminate the agreement between the companies. TAPCO claimed that it was terminating the agreement because it discovered that Moore had an unspecified financial relationship with Vue, and because Vue had violated the covenant of good faith and fair dealing implied in the contract between the companies. According to the Counterclaim-Plaintiffs, those reasons were pretextual. Instead, TAPCO attempted to terminate the contract as a result of Frost's inducement. The Counterclaim-Plaintiffs allege that the termination was ineffective and that TAPCO remained bound by its agreement with Vue.

Since purporting to terminate its agreement with Vue, TAPCO has joined with Frost to engage "in a campaign to cause customers to cease doing business with Vue." Doc. no. 100, ¶ 172. TAPCO has disclosed and used Vue's confidential information for the benefit of Frost, and

"spread falsehoods" concerning Vue's products "in a targeted effort to benefit Frost." Id., ¶ 174. TAPCO will also, due in part to Frost's interference, fail to achieve the minimum performance levels set by its agreement with Vue. Id.

The Counterclaim-Plaintiffs also allege that Frost has taken additional steps to undermine Vue's relationships with its potential clients. For example, Frost served its complaint on Lareau in front of several potential customers while he was working at a trade show booth on behalf of Vue. Frost also informed Vue's potential partners about this litigation to dissuade those partners from working with Vue. Lastly, the Counterclaim-Plaintiffs allege that Frost's interference with Vue's and TAPCO's contract consequently interfered with contracts with those customers who purchased or would have purchased Vue's products and services through TAPCO.

Discussion

Lareau asserts a claim for negligent infliction of emotional distress (Count I). Vue asserts the following: tortious interference with the TAPCO contract (Count II); tortious interference with contractual relations with customers (Count III); tortious interference with prospective customer relations (Count IV); tortious interference with the East End contract (Count V); and civil conspiracy (Count VI). Frost moves to dismiss all of the counterclaims.

I.    Negligent Infliction of Emotional Distress (Count I)

To state a claim for negligent infliction of emotional distress, a plaintiff must allege "(1) causal negligence of the defendant; (2) foreseeability; and (3) serious mental and emotional harm accompanied by objective physical symptoms." Tessier v. Rockefeller, 162 N.H. 324, 342 (2011). Frost contends that the court must dismiss the claim for negligent infliction of emotional

9

distress because Lareau fails to allege plausibly that Frost—as Lareau's adversary in litigation—owed Lareau a duty of care. Intertwined with that argument, Frost argues that Lareau fails to allege sufficient facts to demonstrate that any emotional distress he suffered was foreseeable.

The Counterclaim-Plaintiffs respond that Frost "voluntarily undertook the duty to maintain the confidentiality" of the Counterclaim-Plaintiffs' information and "to not use that information for any purpose other than litigating this action." Doc. no. 103 at 21. The court agrees that Frost did so when it filed a motion asking the court to enter a proposed protective order to that effect, which the court granted.[4] See doc. nos. 26 & 28. And, citing Tessier, the Counterclaim-Plaintiffs argue that the New Hampshire Supreme Court has more generally held that adversaries, at least in pre-litigation disputes, may have a duty to refrain from "improper conduct that will foreseeably cause emotional distress." Doc. no. 103 at 21.

Even if Frost had not voluntarily assumed the duty to keep the Counterclaim-Plaintiffs' information confidential, the court could find on the facts alleged that Frost owed Lareau a duty not to use that information as alleged and that the harm alleged was foreseeable. As the New Hampshire Supreme Court explained in Manchenton v. Auto Leasing Corp., 135 N.H. 298, 304 (1992):

> Generally, persons will not be found negligent if they could not reasonably foresee that their conduct would result in an injury to another or if their conduct was reasonable in light of the anticipated risks. See Goodwin [v. James], 134 N.H. [579, 583 (1991)]. Thus, "[d]uty and foreseeability are inextricably bound together." Corso v. Merrill, 119 N.H. 647, 651 (1979). As noted recently in Goodwin, we derive our concepts of duty and foreseeability from Chief Justice Cardoza's majority opinion in Palsgraf v. Long Island Railroad Co., 248 N.Y. 339 (1928). See Goodwin, 134 N.H. at 583. "The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension." Palsgraf, 248 N.Y. at 344. Thus,

---

[4] Whether the violation of the protective order could also support a motion for contempt or a claim for breach of contract does not, under the circumstances of this case, undermine the court's determination that Frost owed such a duty.

persons owe a duty of care "only to those who are foreseeably endangered by [their] conduct and only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous." Corso, 119 N.H. at 651 (quoting 2 F. Harper & F. James, The Law of Torts § 18.2, at 1018 (1956)).

Lareau alleges that Frost violated its duty to him when Kirsh (on Frost's behalf) provided misleading information about the Counterclaim-Plaintiffs' confidential information to the Counterclaim-Plaintiffs' insurance carrier and when Frost's counsel endeavored to provide the carrier with the same. Lareau alleges that Frost took those actions to convince the insurance carrier to revoke coverage, which would then imperil the Counterclaim-Plaintiffs' litigation defense and, ultimately, Vue's viability. See, e.g., doc. no. 100, ¶¶ 103, 121.

Given the exorbitant costs that may reasonably be associated with defending high-stakes, complex litigation, it is hardly a stretch to state that the threatened cancellation of an insurance policy funding one's legal defense (as well as that cancellation's concomitant effects) would likely cause any litigant stress and anxiety. Thus, it was within the "range of apprehension," Palsgraf, 248 N.Y. at 344, that Frost's actions—sharing confidential information and making misrepresentations about the information in an effort designed to cancel coverage and put Lareau's company out of business—would foreseeably result in Lareau's emotional distress.

In Tessier, the defendants accused the plaintiff's husband, an attorney, of misusing and converting a former client's assets. The defendants met with the plaintiff's husband several times, "demanding an immediate return of the misappropriated assets." Tessier, 162 N.H. at 328. Otherwise, the defendants threatened, they would report the plaintiff's husband to the attorney discipline committee, and criminal proceedings would be instituted. As a result of the defendants' threats, the plaintiff entered into an agreement stripping her of her interest in all of her tangible assets. Then, despite that agreement, the defendants reported her husband's actions to the attorney discipline office, and others. As a result, the plaintiff suffered severe emotional

11

and physical distress. She filed suit, asserting multiple claims against the defendants, including negligent infliction of emotional distress. The Tessier defendants moved to dismiss, arguing that the plaintiff failed to allege an underlying tort. The New Hampshire Supreme Court held that the plaintiff had adequately stated a claim for negligent infliction of emotional distress, noting that it was foreseeable that the defendants' fraudulent misrepresentations that induced behavior on the part of the plaintiff would reasonably result in emotional harm to the plaintiff. Id. at 342.

Here, taking the facts in the light most favorable to Lareau, Frost's fraudulent promise that it would keep the Counterclaim-Plaintiffs' information confidential, coupled with its decision to make fraudulent statements about that information in an attempt to cause foreseeable emotional harm, states a claim for negligent infliction of emotional distress. See doc. no. 103 at 22. For that reason, Frost's motion to dismiss Lareau's claim for negligent infliction of emotional distress is denied.

II.    Tortious Interference with TAPCO Agreement (Count II)

Frost argues that Vue's claim for tortious interference with the TAPCO contract must be dismissed for three reasons, though they overlap in substance. First, Frost argues that the Counterclaim-Plaintiffs have not plausibly alleged that Frost wrongfully interfered with Vue's agreement with TAPCO. Second, and along those same lines, Frost argues that its conduct was not tortious because Frost was protecting its own legitimate business interests by enforcing its protective covenant in the Moore litigation. Finally, Frost contends that its conduct is protected by the Noerr-Pennington doctrine.[5] The court addresses each argument in turn.

---

[5] See Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961); United Mine Workers of Am. v. Pennington, 381 U.S. 657 (1965).

A.    Plausibility of Allegations

"To establish liability for intentional interference with contractual relations, a plaintiff must show: (1) the plaintiff had an economic relationship with a third party; (2) the defendant knew of this relationship; (3) the defendant intentionally and improperly interfered with this relationship; and (4) the plaintiff was damaged by such interference." Hughes v. N.H. Div. of Aeronautics, 152 N.H. 30, 40–41 (2005). Frost does not dispute that the Counterclaim-Plaintiffs allege an economic relationship with TAPCO, that Frost knew of that relationship, or that Vue was damaged by Frost's interference in the relationship between Vue and TAPCO. Instead, Frost argues in its motion to dismiss that the Counterclaim-Plaintiffs have not plausibly alleged sufficient facts to satisfy the third prong, that Frost intentionally and improperly interfered with Vue's relationship with TAPCO. Frost argues that they fail to allege that the "mental" and "moral" character of Frost's conduct was unjustified because the allegations show that Frost's conduct occurred in the context of Frost's claims against its former employee, Moore, and his new employer, TAPCO.

In response to Frost's argument that they have not sufficiently alleged that Frost's interference with the TAPCO contract was wrongful, the Counterclaim-Plaintiffs rely on the factors identified by the New Hampshire Supreme Court and the Restatement 2d of Torts, pointing out that Frost's motivation, the interests it sought to advance, and the proximity between Frost's conduct and the TAPCO contract's termination strongly support a finding that Frost's interference was improper. See doc. no. 103 at 4-5 (citing Roberts v. Gen. Motors Corp., 138 N.H. 532 (N.H. 1994) and Restatement (Second) of Torts § 767). They contend that such a finding is buttressed by the Amended Counterclaims' factual allegations demonstrating that Frost

13

was motivated to harm Vue and its principals, including allegations that Frost waged a coordinated campaign with TAPCO to harm Vue in the marketplace, attempted to undermine Vue's insurance coverage, and utilized the litigation process to "embarrass and disparage Vue." Id. at 5-6. They further contend that it is reasonable to infer that "Frost provided a benefit to TAPCO—dropping its claims against TAPCO—in exchange for TAPCO's promise to sever its relationship with Vue." Id. at 4. Because the Counterclaim-Plaintiffs allege that TAPCO's cancellation of its contract with Vue was ineffectual, the court is not necessarily persuaded that they plausibly allege Vue's claim on the basis that Frost required TAPCO to sever its relationship with Vue. But the Amended Counterclaims allege sufficient facts at this stage to find that Frost required TAPCO to breach its existing obligations to Vue. See doc. no. 100, ¶¶ 174-75.

The Counterclaim-Plaintiffs allege that Vue and TAPCO had a contractual relationship, that Frost was aware of that contractual relationship, and that Frost conditioned settlement of its lawsuit against TAPCO and Moore upon TAPCO's severance or breach of the terms of its contractual relationship with Vue in order to put Vue, its competitor, out of business. Those allegations suffice, at this stage, to establish a cause of action against Frost for tortious interference with contract. See, e.g., Restatement (Second) of Torts § 768, comment h (1979) ("when B is legally obligated to deal with C, A is not justified by the mere fact of competition in inducing B to commit a breach of his legal duty").

### B.     Frost's Legally Protected Interest

Frost argues that it cannot have acted wrongfully because it was asserting its "legally protected interest" in the Moore litigation. Frost is correct that a party may avoid liability if, in interfering, it is "asserting in good faith a legally protected interest of his own or threatening in

14

good faith to protect the interest by appropriate means . . . if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction." Emery v. Merrimack Valley Wood Prods., Inc., 701 F.2d 985, 988-89 (1st Cir. 1983) (applying New Hampshire law) (quoting Restatement (Second) of Torts § 773).

However, in so arguing, Frost is asserting an affirmative defense. See Emery, 701 F.2d at 989 ("To prevail on this affirmative defense . . . . (quoting Restatement (Second) of Torts § 773)); e.g., Donovan v. Digital Equip. Corp., 883 F. Supp. 775, 788 (D.N.H. 1994) ("a defendant who successfully invokes the affirmative defense [of legally protected interest] is found to have acted properly as a matter of law"). And it is "well settled that, for dismissal to be allowed on the basis of an affirmative defense, the facts establishing the defense must be clear on the face of the plaintiff's pleadings." Blackstone Realty LLC v. F.D.I.C., 244 F.3d 193, 197 (1st Cir. 2001) (quotations omitted). Thus, the court cannot grant Frost's motion to dismiss Count II on the basis that Frost was acting to protect its legal interest unless it is evident from the allegations in the Amended Counterclaims that: "(1) [Frost] had a legally protected interest; (2) it acted in good faith to protect this interest; and (3) it acted by appropriate means." Donovan, 883 F. Supp. at 788.

The court cannot conclude based only on the pleadings that Frost is entitled to a defense based on its "protected legal interest." The Amended Counterclaims do not specifically establish that Frost had a legally protected interest that necessitated interference with Vue's contract with TAPCO. Nor do they establish that Frost's efforts to protect its purported interest were taken in good faith. Indeed, with respect to good faith, the Amended Counterclaims allege the contrary: that Frost was motivated to eliminate a competitor in the marketplace in furtherance of its own financial interests. See, e.g., doc. no. 100, ¶¶ 106, 125-126, 131, 151, 175.

15

Because Frost's affirmative defense is not clear from the face of the Amended Counterclaims, consideration of the defense is more properly reserved for summary judgment.

### C. Applicability of Noerr-Pennington Doctrine

Finally, Frost argues that Vue's claim alleging tortious interference with the TAPCO contract must be dismissed because it is barred by the Noerr-Pennington doctrine. Frost argues that Noerr-Pennington prohibits civil liability when the wrongful act alleged amounts to petitioning activity protected by the First Amendment, including petitioning the courts by filing and litigating a lawsuit. Because Count II is based on conduct occurring within the Moore litigation, Frost argues that Noerr-Pennington bars the counterclaim. The Counterclaim-Plaintiffs respond that, even assuming that the New Hampshire Supreme Court would apply the doctrine outside of the antitrust or consumer protection realm, courts have routinely held that "private settlement agreements like the one alleged in the Amended Counterclaim do not qualify for Noerr-Pennington protection." Doc. no. 103 at 10 (citing cases).

The Noerr-Pennington doctrine provides individuals and entities with immunity from liability based on activities that arise out of efforts to influence the passage or enforcement of particular laws. See Pennington, 381 U.S. at 669-72; Noerr Motor Freight, Inc., 365 U.S at 135. "The Supreme Court has extended the immunity to those who bring petitions or claims before administrative agencies and the courts." Skinder–Strauss Assocs. v. Massachusetts Continuing Legal Education, Inc., 870 F. Supp. 8, 9 (D. Mass. 1994); accord Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 56-59 (1993). "This immunity is grounded in the First Amendment right to petition the government." EmblemHealth, Inc. v. Alexion Pharms., Inc., No. CV 25-10985-BEM, 2025 WL 3687761, at *6 (D. Mass. Dec. 19, 2025) (citing United

Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Novartis Pharms. Corp., 902 F.3d 1, 4–5 (1st Cir. 2018)).

Frost's motion to dismiss Count II based on application of the Noerr-Pennington doctrine is unavailing. Because "the Noerr-Pennington doctrine functions as an affirmative defense," several "courts have concluded the Noerr-Pennington defense is typically only properly analyzed through a consideration of evidence outside of the pleadings and as such, is usually not appropriately considered in a Rule 12(b)(6) context." EmblemHealth, 2025 WL 3687761, at *10 (quotations omitted); see MJ's Mkt., Inc. v. Jushi Holdings, Inc., 766 F. Supp. 3d 197, 210 (D. Mass. 2025) (collecting cases). That principle holds true here, where the tortious conduct alleged by the Counterclaim-Plaintiffs arose in the context of a separate lawsuit involving Moore and TAPCO, who are not parties here.

Moreso, the allegations involve a private settlement agreement, which generally falls outside of the Noerr-Pennington doctrine. See, e.g., Toyo Tire & Rubber Co. v. Atturo Tire Corp., No. 14 C 0206, 2017 WL 1178224, at *7 (N.D. Ill. Mar. 30, 2017) ("[T]he settlement agreements were the product of negotiations between private parties, and the nature of the agreements is much the same: private contracts entered into between private parties. Such private settlement agreements fall outside of Noerr-Pennington immunity . . . . This is because, in such cases, the parties dictate the terms of the settlement and their actions are not intended to persuade a judicial officer to obtain a redress of grievances." (citing Andrx Pharm., Inc. v. Biovail Corp. Intl., 256 F.3d 799, 818–19 (D.C. Cir. 2001); In re Nexium Antitrust Litig., 968 F. Supp. 2d 367, 395, 396-97 (2013))). Frost's argument in response to this concern is largely undeveloped, especially given the complexity of the doctrine and the question of its application. See Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988) ("a litigant has an obligation 'to spell out its arguments

17

squarely and distinctly,' or else forever hold its peace." (quoting Paterson-Leitch Co. v. Massachusetts Municipal Wholesale Elec. Co., 840 F.2d 985, 990 (1st Cir. 1988) (cleaned up)). Accordingly, the court declines to rule on the applicability of the Noerr-Pennington doctrine to Count II at this juncture and denies Frost's motion to dismiss Count II on the basis of the doctrine.

III.     Interference with Contractual Relations with Customers and Prospective Customers (Counts III and IV)

Frost's arguments in support of its motion to dismiss the Counterclaim-Plaintiffs' third and fourth counterclaims are similar. Frost argues that the counterclaims for tortious interference with contractual relations with customers (Count III) and with prospective business relations (Count IV) fail because both claims are vague, conclusory, and not pleaded with any degree of specificity or detail. More specifically, Frost argues that the counterclaim for interference with contractual relationships with customers must be dismissed because the Counterclaim-Plaintiffs have not alleged details regarding Vue's alleged customers, their contracts, the breach of those contracts, or how Frost interfered utilizing Vue's confidential information. And, with respect to Vue's prospective customers, Frost largely repeats its arguments and further contends that the Counterclaim-Plaintiffs fail to allege sufficiently that Vue had an expectation of prospective customers becoming actual customers.

The court agrees that both Count III and Count IV suffer from the same infirmity: the Counterclaim-Plaintiffs fail to allege the factual support necessary to state either claim. As mentioned, to state a claim for intentional interference with existing contractual relations under New Hampshire law, a plaintiff must allege that the "defendant intentionally and improperly interfered with" a contractual relationship. Hughes, 152 N.H. at 41. Here, the Counterclaim-

18

Plaintiffs fail to allege sufficient facts to show that Frost wrongfully caused any of Vue's customers to breach their contracts with Vue.

As discussed above, the Counterclaim-Plaintiffs allege that Frost required TAPCO to terminate or breach TAPCO's agreement with Vue as part of the Moore litigation settlement agreement. But they do not allege that the settlement agreement required TAPCO to interfere with Vue's relationships with its customers. Rather, to support their claim against Frost for interfering with Vue's contractual relations with customers, the Counterclaim-Plaintiffs allege simply that TAPCO interfered with Vue's customers based on Frost's "inducement." Doc. no. 100, ¶ 174. Such a vague allegation cannot support a tortious interference claim.[6] See generally JTH Tax, Inc. v. Williams, 310 F. Supp. 3d 648, 658 (E.D. Va. 2018) ("The statements that Mr. Williams 'intentionally interfered with the [f]ranchise [a]greements with the aim of ending' them, and 'intentionally induced Tiffany Williams not to perform her obligations' are conclusory legal statements, and a mere recitation of the elements of a tortious interference claim. Such 'formulaic recitation of the elements of a cause of action will not do.'" (citing Twombly, 550 U.S. at 555) (further citations omitted)).

Further, the Counterclaim-Plaintiffs provide sparse, if any, allegations regarding Vue's customers, stating only that Frost, through TAPCO, "misus[ed] Vue's confidential information to cause the customers to break their contracts with Vue." Doc. no. 100, ¶ 195. But to state a claim for tortious interference, a complaint must "furnish enough detail about the obligations of the alleged contracts" to allow the court to determine whether the plaintiff has sufficiently alleged all elements of the claim. Conformis, Inc. v. Aetna, Inc., 58 F.4th 517, 538 (1st Cir. 2023) ("Where

---

[6] To the extent that the Counterclaim-Plaintiffs contend that TAPCO was acting as Frost's agent, they fail to allege facts that are sufficient to support that inference.

the gist of the action, whatever its form and however stated, is failure to perform a duty arising out of a contract, . . . it is essential to state with substantial certainty the facts showing the existence of the contract and the legal effect thereof.") (quotation and citation omitted) (analyzing tortious interference with contractual relations claim under Massachusetts law). The Counterclaim-Plaintiffs have not done so here, and their claim for tortious interference with existing contractual relationships (Count III) is dismissed.

The Counterclaim-Plaintiffs' claim for interference with prospective business relations in Count IV fares no better. "To state a claim for tortious interference with a prospective contractual relationship under New Hampshire law the plaintiff must show that the defendant 'induce[d] or otherwise purposely cause[d] a third person not to . . . enter into or continue a business relation with another' and thereby caused harm to the other." Campbell v. CGM, LLC, No. 15-CV-088-JD, 2017 WL 78474, at *15 (D.N.H. Jan. 9, 2017) (quoting Sarah's Hat Boxes, L.L.C. v. Patch Me Up, L.L.C., No. 12–cv–399–PB, 2013 WL 1563557, at *13 (D.N.H. Apr. 12, 2013)). "'[T]he scope of actionable conduct is narrower' in a case involving a prospective contractual relationship than an existing contractual relationship." Planet Fitness Intl. Franchise v. JEG-United, LLC, 633 F. Supp. 3d 484, 501–02 (D.N.H. 2022) (quoting Wilcox Indus. Corp. v. Hansen, 870 F. Supp. 2d 296, 307 (D.N.H. 2012)). The "use of ordinary means of persuasion or the exertion of limited economic pressure will not, by itself, be sufficient" to establish tortious interference with a prospective contractual relationship. Wilcox, 870 F. Supp. 2d at 307.

Again, the Counterclaim-Plaintiffs fail to allege facts to show that Frost intentionally and improperly interfered with Vue's existing or prospective business relations. At best, they allege that TAPCO interfered with those business relations. While they claim that Frost "induced" or "caused" TAPCO to do so, doc. no. 100, ¶ 175, they offer no facts to support that conclusory

20

allegation. Therefore, the court grants Frost's motion to dismiss Count IV, the Counterclaim-Plaintiffs' claim for tortious interference with prospective business relations.[7]

IV.    Tortious Interference with East End Group Contract (Count V)

The Counterclaim-Plaintiffs allege in Count V that Frost tortiously interfered with Vue's contract with East End when it "utilize[ed] Mr. Ostrander, Frost Solutions' Vice President, to log into Vue's systems using login credentials that were provided to him solely for the benefit of East End Group when his purpose was to advance Frost Solutions' interest." Doc. no. 100, ¶ 207. They allege that Frost's use of Ostrander's login credentials after he left East End tortiously interfered with East End's contractual promises to Vue to keep Vue's information confidential and to refrain from allowing access to Vue's system for use by third parties for the third parties' business operations.

Frost argues that Count V should be dismissed because it fails to allege a plausible claim that East End breached its contract with Vue. Frost states that Ostrander's actions cannot be attributed to East End, his former employer, because Ostrander's alleged conduct occurred after his employment with East End ended. Thus, according to Frost, Ostrander was not acting on behalf of East End, or with its authority when he allegedly accessed Vue's platform. But, Frost

---

[7] While Frost does not raise the issue, the court notes that had Counts III and IV survived Frost's motion, the court may have required the parties to address potential preemption concerns under New Hampshire's Uniform Trade Secrets Act to the extent that those claims were premised on the use Vue's confidential information. Both claims allege that Frost misused Vue's confidential information through TAPCO. The Act "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." N.H. Rev. Stat. Ann. § 350-B:7. "[C]laims based on unauthorized use of information are preempted even if the information at issue is not a trade secret." Wilcox, 870 F. Supp. 2d at 303; see also Mortg. Specialists, Inc. v. Davey, 153 N.H. 764, 778 (2006) (A "claim is preempted when it is based solely on, or to the extent that it is based on, the allegations or the factual showings of unauthorized use of information or misappropriation of a trade secret.") (cleaned up).

further contends, if Ostrander's misconduct occurred while he was employed by East End, then the Counterclaim-Plaintiffs fail to allege plausibly that Ostrander acted within the scope of his employment.

Frost's argument seems to misapprehend the allegations underlying Count V. The Counterclaim-Plaintiffs allege that East End was obligated by its contract with Vue to safeguard its information and prevent unauthorized access. That obligation persisted pursuant to the contract whether or not Ostrander continued in East End's employ. When East End failed to prevent Ostrander from improperly accessing Vue's systems, which he did in service to Frost and at Frost's request, it breached those contractual obligations. Thus, the Counterclaim-Plaintiffs have adequately alleged that East End breached its contractual obligations with Vue at the behest of Frost.

Because the Counterclaim-Plaintiffs have plausibly alleged that Frost tortiously interfered with Vue's contractual relationship with East End, Frost's motion to dismiss the claim is necessarily denied.

V.    Civil Conspiracy (Count VI)

Under New Hampshire law, the "essential elements" of civil conspiracy are: (1) two or more persons (including corporations); (2) an object to be accomplished (i.e., an unlawful object to be achieved by lawful or unlawful means, or a lawful object to be achieved by unlawful means); (3) an agreement on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof. Jay Edwards, Inc. v. Baker, 130 N.H. 41, 47 (1987). The Counterclaim-Plaintiffs allege that Frost and TAPCO engaged in a conspiracy to

harm Vue by, among other things, misusing Vue's confidential information and spreading false information about Vue.

Frost moves to dismiss the Counterclaim-Plaintiffs' claim for civil conspiracy because TAPCO is not named as a defendant. Frost argues that, because a conspiracy necessarily involves two or more persons, and the Amended Counterclaims name only Frost as a party, the claim fails.

Frost fails to cite any legal authority that supports its argument that, in order to state a claim for civil conspiracy, all members of a conspiracy must be named as parties to the lawsuit. And, while the New Hampshire Supreme Court has not directly confronted the issue, courts that have addressed similar arguments have rejected them. See, e.g., AWP, Inc. v. Commonwealth Excavating, Inc., No. 5:13CV031, 2013 WL 3830500, at *5 (W.D. Va. July 24, 2013) ("It is axiomatic that not all members of a conspiracy must be named as parties to a lawsuit."); see also Dream Kitchen & Bath Shop, LLC v. Kitchen & Bath Shop, LLC, No. 2:22-CV-184, 2023 WL 6192722, at *6 (E.D. Va. June 21, 2023) ("[A] conspiracy claim can survive notwithstanding the plaintiff's failure to name a party that is essential to the conspiracy as a party to the suit."); Stillwagon v. Innsbrook Golf & Marina, LLC, No. 2:11-CV-1338, 2013 WL 1180312, at *13 (W.D. Pa. Mar. 20, 2013) ("in order for one member of a civil conspiracy to be liable, not all members of the conspiracy need be named as defendants or joined as defendants") (quotations omitted).

While it is clear that a litigant must necessarily allege that a conspiracy is comprised of more than one party, the court cannot conclude that all members of a conspiracy must necessarily be named as parties to a lawsuit in order to state a claim. Cf. Temple v. Synthes Corp., 498 U.S. 5, 7, (1990) ("It has long been the rule that it is not necessary for all joint tortfeasors to be named

as defendants in a single lawsuit."). For those reasons, Frost's motion to dismiss Count VI is denied.

Conclusion

For the foregoing reasons, Frost's motion to dismiss the Counterclaim-Plaintiffs' claims (doc. no. 102) is denied as to Counts I, II, V, and VI, but granted as to Counts III and IV.

SO ORDERED.

_____

Samantha D. Elliott
United States District Judge

March 30, 2026

cc:    Counsel of Record