# EXHIBIT A

## PROVISIONALLY FILED UNDER SEAL

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

FROST SOLUTIONS, LLC,

              Plaintiff,

      v.

PATRICK BAGLIEN, CHRISTOPHER LAREAU,
and VUE ROBOTICS, LLC,

              Defendants.

Civ. Action No. 1:22-cv-00401-SE

## SECOND AMENDED COUNTERCLAIM AND JURY DEMAND

Defendants and Counterclaim-Plaintiffs Christopher Lareau ("Lareau") and Vue Robotics, LLC ("Vue Robotics") (collectively, "Counterclaim-Plaintiffs"), through undersigned counsel, bring this counterclaim against Plaintiff and Counterclaim- Defendant Frost Solutions, LLC ("Frost Solutions"). As detailed more fully herein, to the extent Frost Solutions ever intended to use the civil justice system to resolve a good-faith commercial dispute, that objective is long gone and has been replaced by a desire to use the process to crush a competitor at any cost – including by "dropping a dime" on Counterclaim-Plaintiffs by calling their insurance carrier and claiming – fraudulently – that Counterclaim-Plaintiffs had omitted important information from their insurance application, seeking to strip Counterclaim-Plaintiffs of their coverage and bankrupt them with legal fees. Frost Solution's scheme caused Lareau to suffer severe emotional distress, for which Frost Solutions should be held responsible.

Further, as set forth herein, unable or unwilling to compete with Vue through legitimate means in the marketplace, Frost Solutions has resorted to corporate espionage. A Frost Solutions Vice President used credentials he obtained from a prior employer and Vue customer to log into

Vue's systems without authorization and surreptitiously gather intelligence about Vue's product capabilities and offerings. Frost Solutions' endeavors to gain an unfair advantage, and skirt the confidentiality protections governing discovery imposed by this Court. Vue is entitled to injunctive relief and damages as a result of Frost Solutions' unlawful conduct.

As another part of Frost Solutions' scheme to avoid legitimate competition, Frost Solutions has unlawfully interfered with a key Vue business relationship. Frost Solutions has induced Traffic and Parking Control, Inc. ("TAPCO") to attempt to terminate its contract with Vue well before its natural expiration, induced TAPCO to cause Vue customers to break their contracts with Vue, induced TAPCO to divert business away from Vue and to Frost Solutions (despite TAPCO's contractual obligations to promote Vue), and induced TAPCO to break promises to keep confidential Vue's business information. Frost Solutions should be held accountable for the damages it has caused and will cause Vue.

### THE PARTIES

1. Lareau is an individual residing in Portsmouth, New Hampshire. He is the Co-Founder of Vue Robotics.

2. Lareau is a former employee of Frost Control Systems, Inc. d/b/a Frost Technologies ("Frost Control").

3. Lareau, a veteran, is a former military intelligence officer who served honorably in Iraq and Afghanistan.

4. Vue Robotics is a limited liability company having a principal place of business 36 Maplewood Avenue, Portsmouth, New Hampshire 03801.

5. Frost Solutions is a limited liability company with a principal place of business at 44 Farnham Lane, Lake Forest, Illinois 60045.

6.      Frost Solutions was formed on July 12, 2022.

7.      Upon information and belief, the sole member of Frost Solutions is Clashmore Ventures, LLC ("Clashmore Ventures"), whose two members, in turn, are Michael Kirsh ("Kirsh") and Michael Bott ("Bott").

## JURISDICTION AND VENUE

8.      On October 5, 2022, Frost Solutions commenced a civil action (the "Action") by filing a complaint against Counterclaim-Plaintiffs asserting claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq* (Count I – against all Defendants), the New Hampshire Uniform Trade Secrets Act, N.H. RSA § 350-B *et seq* (Count II – against all Defendants), breach of Separation Agreement (Count III – against Lareau), breach of Confidentiality Agreement (Count IV – against Baglien), and breach of fiduciary duties (Count V – against Baglien and Lareau) (the "Complaint").

9.      On November 7, 2025, Frost Solutions filed its First Amended Complaint, adding claims for tortious interference with contract (Count VI – against Baglien and Count VII – against Lareau) and an alternative count seeking a declaration that Vue's products constitute "Inventions" as defined in Baglien's confidentiality agreement.

10.     This Court has subject matter jurisdiction over the Counterclaim under 28 U.S.C. § 1367 because the claims asserted in the Counterclaim are so related to the claims asserted in the Complaint (for which there is original jurisdiction) such that they form part of the same case or controversy under Article III of the U.S. Constitution.

11.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial portion of the acts, omissions and transactions giving rise to Counterclaim-Plaintiffs' injury occurred in this judicial district.

12.  The Court has personal jurisdiction over Frost Solutions because Frost Solutions filed the Complaint in this judicial district and/or otherwise has constitutionally sufficient contacts in this judicial district to empower this Court to exercise personal jurisdiction over Frost Solutions.

## FACTUAL BACKGROUND

13.  Patrick Baglien ("Baglien") and Lareau are former employees of Frost Control; they both left Frost Control in the fall of 2021.

14.  Baglien was also an investor in Frost Control through Calvera Ventures LLC and thus received all Frost Control investor updates and related documents.

15.  Baglien and Lareau are the co-founders of Vue Robotics, which offers its ARC1 hardware and accompanying OmniVue software platform to deliver site monitoring services for weather and other environmental conditions.

### Lareau Resigns from Frost Control and Executes
### a Separation Agreement that Cannot Be Assigned without His Consent

16.  On or about September 27, 2021, Lareau tendered his notice of resignation from Frost Control.

17.  Frost Control and Lareau entered into the Separation Agreement attached as Exhibit C to the Complaint, effective September 30, 2021. *See* ECF No. 1 at Exh. C.

18.  Although the Separation Agreement was to be treated confidentially, Frost Solutions publicly disclosed the document by attaching it as an exhibit to the Complaint. ECF No. 1 at Exh. C.

19.  Victor Gill ("Gill"), one of Frost Control's former CEOs, drafted the Separation Agreement by revising a previous separation agreement used for another former Frost Control CEO, Bradley Tener ("Tener").

20.     Although the Separation Agreement is entitled, "Separation Agreement and Mutual Release," and Paragraph 2 is entitled, "Mutual General and Special Release," there is no mutual release in the Separation Agreement.  Rather, the only release is from Lareau to Frost Control.

21.     The Separation Agreement does not contain a release from Frost Control to Lareau.

22.     Gill never informed Lareau that there was no mutual release in the Separation Agreement and, instead, he provided Lareau with an agreement that expressly states it contains a "mutual release."

23.     Accordingly, there was no meeting of the minds between Frost Control and Lareau concerning the terms of the Separation Agreement.

24.     The Separation Agreement is also not supported by adequate consideration. The only consideration for the Separation Agreement is recited in Paragraph 1, which consists of sales commissions and vacation time already owed to Lareau under the terms of his employment.

25.     In the paragraph entitled, "Breach of Agreement," the Separation Agreement expressly acknowledges that the consideration provided by Frost Control under the agreement is set forth in Paragraphs 1 and 2.b.  *See* ECF No. 1 at Exh. C at ¶ 15.

26.     There is no paragraph 2.b. in the Separation Agreement.  *See* ECF No. 1 at Exh. C at ¶ 2.

27.     In the prior Tener separation agreement, Paragraph 2.b. was the release from Frost Control to Tener.  Gill deleted this provision when drafting Lareau's Separation Agreement.

28.     The Separation Agreement is thus void for lack of consideration.

29.     Upon information and belief, Frost Solutions was aware that the Separation

6

Agreement was void for lack of consideration when it filed the Complaint and commenced the Action. At a minimum, Frost Solutions became aware during the Action that the Separation Agreement is void for lack of consideration, and yet it continued (and continues) to pursue contract-based claims against Lareau, including filing a First Amended Complaint.

30.     The Separation Agreement also lacks a provision authorizing assignment of the agreement from Frost Control to Frost Solutions or any other party.

31.     The Separation Agreement contains a non-solicitation clause (the "Non-Solicit"). The Non-Solicit does not prohibit contact with Frost Control customers or prospects. *See* ECF No. 1 at Exh. C at ¶ 11.

32.     Lareau did not consent to assignment of the Separation Agreement from Frost Control to Frost Solutions or any other party.

33.     No one from Frost Control or Frost Solutions ever requested Lareau to consent to assignment of the Separation Agreement to Frost Solutions or any other party.

34.     Under Indiana law (which governs the Separation Agreement), a non-competition agreement ("non-compete") cannot be assigned without express consent from the employee.

35.     Frost Solutions cannot enforce the non-compete agreement against Lareau because Lareau never consented to assignment of that agreement to Frost Solutions or any other party.

36.     The same principle applies to the entire Separation Agreement – which contains more than one unenforceable restrictive covenant – and thus Frost Solutions similarly cannot enforce the entire Separation Agreement because Lareau never consented to assignment of that agreement to Frost Solutions or any other party.

37.     At the time it filed the Complaint and its First Amended Complaint, Frost

Solutions knew or should have known that Lareau did not consent to the assignment of the Separation Agreement from Frost Control to Frost Solutions and that Frost Solutions was therefore barred from enforcing any of the restrictive covenants contained in the Separation Agreement against Lareau.

38.    Frost Solutions became aware during the Action that Lareau did not consent to assignment of the Separation Agreement to Frost Solutions and that Frost Solutions therefore cannot enforce any of the restrictive covenants contained in the Separation Agreement against Lareau, and yet it continued (and continues) to pursue this claim against Lareau.

**Baglien Resigns from Frost Control and Is Sent
a Warning Letter Entirely Unrelated to the Claims Asserted in the Action**

39.    Baglien tendered his resignation from Frost Control on or about October 6, 2021.

40.    On or about January 5, 2022, Baglien received a letter from Frost Control's law firm, Ray Quinney & Nebeker P.C. (the "Jan 5 Letter"), alleging that Baglien "may have violated duties of loyalty, care and good faith during [his] employment with Frost Control." (emphasis added). *See* Exh. F attached hereto.

41.    The Jan 5 Letter was drafted based on a timeline of facts prepared by Gill. Specifically, on or about December 21, 2021, Gill sent an email to Ray Quinney & Nebeker P.C. (the "Dec 21 Email") asserting that "[w]e've found several actions by [Baglien] *during his employee [sic] at Frost [Control] very concerning* and we are working on a detailed review of his behavior *including inappropriate spending on [sic] concerning travel, entertainment and dining. Payment of inappropriate unapproved bonuses, and other actions detrimental to the business*." (emphasis added) (collectively, the "Jan 5 Letter Grievances"). The email proceeds to lay out a timeline of events from when Baglien started at Frost Control in 2019 through December 7, 2021.

42. Frost Solutions produced the Dec 21 Email in the Action on or about September 15, 2023 and, when later given the opportunity, affirmatively chose not to designate the document as privileged and claw it back.

43. The Jan 5 Letter Grievances do not include any allegations or claims concerning purported wrongdoing by Baglien *after* he resigned from Frost Control. Nor do the Jan 5 Letter Grievances include any alleged misappropriation of trade secrets or confidential information.

44. Baglien did not respond to the Jan 5 Letter, and Frost Control did not send any further communications to Baglien concerning the Jan 5 Letter Grievances.

45. The Jan 5 Letter triggered a duty for Frost Control to preserve all information relating to the Jan 5 Letter Grievances, including without limitation a duty to preserve Baglien's Frost Control laptop, Baglien's Frost Control emails, all Slack messages to/from/concerning Baglien, and any other devices or accounts to which Baglien had access while at Frost Control (the "Baglien Materials Relevant to the Jan 5 Letter Grievances").

46. Frost Control did not preserve all of the Baglien Materials Relevant to the Jan 5 Letter Grievances.

47. Frost Solutions similarly did not preserve all of the Baglien Materials Relevant to the Jan 5 Letter Grievances after it subsequently acquired Frost Control's assets.

### Frost Control Ceases Business Operations and 1st Source Bank Acquires Frost Control's Assets

48. By Resolution of the Frost Control Stockholders on or about April 15, 2022 (the "April 15 Resolution"), it was decided that Frost Control would cease all business operations and notify its customers, creditors, and other stakeholders of the cessation of Frost Control's business operations. It was further decided that Frost Control would take whatever steps were necessary to liquidate Frost Control's assets and terminate all of the company's contracts, collect its

receivables, and thereafter liquidate its assets.

49.     Nearly two months after the April 15 Resolution and the cessation of Frost Control's business operations, on or about June 8, 2022, Frost Control, through its new law firm Ice Miller, sent Counterclaim-Plaintiffs the demand letter attached as Exhibit D to the Complaint (the "June 8 Letter"). *See* ECF No. 1 at Exh. D.

50.     The allegations in the June 8 Letter are based on information that Frost Control "*learned last week*" – on or around June 2, 2022 – and track the allegations asserted in the Complaint and First Amended Complaint, including, for example, allegations that Baglien and Lareau purportedly downloaded contact and deal information from Frost Control's HubSpot platform shortly before leaving Frost Control, and a claim that Lareau purportedly breached his Separation Agreement. *See* ECF No. 1 at Exh. D (emphasis added).

51.     On or about July 5, 2022, Counterclaim-Plaintiffs responded, through counsel, to the June 8 Letter, denying all substantive allegations (the "July 5 Response Letter"). The July 5 Response Letter explained that Baglien and Lareau downloaded certain information from Frost Control's HubSpot platform as part of their routine job responsibilities and to assist the company in its transition to a new software platform, and further asserted that Baglien and Lareau each returned their Frost Control laptops at their time of departure and took no Frost Control information with them. *See* ECF No. 1 at Exh. E.

52.     On or about June 23, 2022, Frost Control – which had ceased operations and was actively looking to liquidate – acknowledged that 1st Source Bank had a perfected security interest in Frost Control's assets (the "Frost Control Assets"). Frost Control then surrendered the Frost Control Assets to 1st Source Bank in partial satisfaction of Frost Control's debt.

53.     Specifically, on or about June 23, 2022, Frost Control, through its counsel Ice

10

Miller, sent a letter to Baglien's attention via Calvera Ventures LLC (the "June 23 Letter"). The June 23 Letter states, "[p]ursuant to the [April 15 Resolution], a majority of the stockholders of Frost [Control] determined and resolved, inter alia, that Frost [Control] would immediately cease business operations and begin liquidation of Frost [Control's] assets for the benefits of its creditors and other stockholders." It describes the assets to be liquidated, including without limitation "[c]laims against Messrs. P. Baglien and Lareau for damages to Frost [Control] caused by or resulting from alleged conversion of certain Frost [Control]'s intellectual property rights, breach of contract and tortious interference with contract." (the "June 23 Letter Claims"). *See* Exh. G (attached hereto) (emphasis added).

54.    The June 23 Letter Claims track the allegations and claims set forth in the June 8 Letter and, subsequently, the Complaint and First Amended Complaint.

55.    The June 23 Letter Claims do not refer to the Jan 5 Letter Grievances.

**Frost Solutions Acquires Certain Frost Control Assets from 1st Source Bank**

56.    Frost Solutions purports to have acquired certain Frost Control Assets ██ █ ████████████████████████████████ ████████████████ the April 15 Resolution by which Frost Control declared it was immediately ceasing operations.

57.    Frost Solutions' members are sophisticated investors, and thus Frost Solutions undoubtedly performed due diligence ██████████████████████.

58.    Accordingly, Frost Solutions learned, or should have learned, that Frost Control did not preserve all evidence relating to the claims asserted in the June 8 Letter, including without limitation Baglien and Lareau's Frost Control laptops, Baglien and Lareau's Frost Control email and Slack accounts, and/or Baglien and Lareau's contemporaneous downloads

from HubSpot, Frost Control's CRM database (the "Evidence Relevant to the June 8 Letter").

59.    At a minimum, Frost Solutions had an obligation – prior to commencing litigation against Counterclaim-Plaintiffs – to investigate the defenses/explanations provided by Baglien and Lareau in the July 5 Response Letter and to preserve the Evidence Relevant to the June 8 Letter, such as Baglien and Lareau's Frost Control laptops, so that the evidence would later be available for forensic analysis by all interested parties.

**Frost Solutions Commences the Action Without Performing a Reasonable
or Sufficient Pre-Filing Investigation and Without Having Preserved Critical Evidence**

60.    On October 5, 2022, without performing a sufficient pre-filing investigation, Frost Solutions commenced the Action.

61.    The Complaint alleges that, after purchasing the Frost Control Assets on or about August 9, 2022, Frost Solutions, "[t]hrough its counsel, . . . retained a forensics consultant *to image Baglien's and Lareau's company [Frost Control] laptops, perform an analysis of the underlying metadata activity on the laptops*, and perform a forensic analysis on Frost Solutions' and Frost Control's cloud-based systems to determine what else, if anything was taken by Baglien and/or Lareau." ECF No. 1 at ¶ 49 (emphasis added).

62.    The Complaint further alleges that "[t]hrough this investigation," Frost Solutions purportedly confirmed that "Lareau had downloaded the entire list of Frost Control's contacts from its CRM database, and Baglien had downloaded a complete list of all Frost Control's agreements with clients." ECF No. 1 at ¶ 50. *See also* ECF No. 108, ¶ 61.

63.    The "investigation" referenced in ¶ 50 of the Complaint (¶ 61 of the First Amended Complaint) refers to the forensic investigation conducted by a consultant at the request of Frost Solutions' counsel, as alleged in ¶ 49 of the Complaint (¶ 60 of the First Amended Complaint). ECF No. 1 at ¶¶ 49 and 50; ECF No. 108, ¶¶ 60, 61.

64.     Discovery has established that Frost Solutions included these allegations in the Complaint even though – at the time it commenced the Action – it did *not* have within its possession, custody, or control: (1) Baglien's Frost Control laptop; (2) Lareau's Frost Control laptop; (3) the contemporaneous files associated with Lareau's purported download of Frost Control's contacts; or (4) the contemporaneous files associated with Baglien's purported download of Frost Control's customer agreements.

65.     Discovery has established that Frost Solutions included these allegations in the Complaint even though – at the time it commenced the Action – it *knew it did not have* within its possession, custody, or control: (1) Baglien's Frost Control laptop; (2) Lareau's Frost Control laptop; (3) the contemporaneous files associated with Lareau's purported download of Frost Control's contacts; or (4) the contemporaneous files associated with Baglien's purported download of Frost Control's customer agreements.

66.     In fact, as of the filing date of this Second Amended Counterclaim, Frost Solutions still cannot produce or even state the whereabouts of Baglien's Frost Control laptop or Lareau's Frost Control laptop, despite alleging in the Complaint that a consultant hired by its counsel "*image[d] Baglien's and Lareau's company [Frost Control] laptops, [and] perform[ed] an analysis of the underlying metadata activity on the laptops.*" ECF No. 1 at ¶ 49 (emphasis added).

67.     Upon information and belief, prior to filing the Complaint, Frost Solutions did not investigate the statements Counterclaim-Plaintiffs made in the July 5 Response Letter and took no steps to investigate whether Baglien and Lareau had returned their Frost Control laptops upon their respective departures from Frost Control.

68.     After months of discovery and repeated requests from Counterclaim-Plaintiffs

13

that Frost Solutions produce all of this information, Frost Solutions has now admitted that it does not have in its possession or control: (1) Baglien's Frost Control laptop; (2) Lareau's Frost Control laptop; (3) any of the contemporaneous files associated with Lareau's purported downloads from Frost Control's HubSpot platform; (4) any of the contemporaneous files associated with Baglien's purported downloads from Frost Control's HubSpot platform; (5) Baglien's Frost Control email archive; or (6) Lareau's Frost Control email archive.

69.     Though Frost Solutions utterly failed to preserve critical sources of potential evidence, it continues to pursue its claims against Counterclaim-Plaintiffs.

70.     Paragraphs 49 and 50 of the Complaint are not accurate.

**Frost Solutions Admits that the Complaint Is Based on Information First Learned in June 2022 and Is Entirely Unrelated to the Jan 5 Letter**

71.     The Complaint alleges that "[i]n June 2022, Frost Control learned from a press release that Baglien and Lareau had co-founded Vue Robotics and had developed the ARC1 technology. Frost Control suspected that [Counterclaim-Plaintiffs] may have misappropriated Frost [Control]'s trade secrets and confidential information in order to develop the technology and solicit Frost Control's customers." ECF No. 1 at ¶ 43. *See also* ECF No. 108, ¶54.

72.     Neither Baglien nor Lareau is subject to an agreement that prohibits them from soliciting Frost Control customers, so long as no confidential information is improperly used in the process.

73.     Though Frost Control had ceased business operations as of April 15, 2022, the Complaint alleges that Frost Control "then discovered" (in or after June 2022) purported evidence that Baglien and Lareau downloaded information from Frost Control's HubSpot platform prior to their respective resignations. ECF No. 1 at ¶¶ 44-45. *See also* ECF No. 108, ¶¶ 55-56.

14

74.    Baglien routinely downloaded information from Frost Control's HubSpot platform as part of his job responsibilities at Frost Control.

75.    Lareau routinely downloaded information from Frost Control's HubSpot platform as part of his job responsibilities at Frost Control.

76.    The Complaint further alleges that "[o]n June 8, 2022, counsel for Frost Control sent Baglien and Lareau a letter demanding that they cease using any trade secrets or confidential information belonging to Frost Control." ECF No. 1 at ¶ 46 and Exh. D. *See also* ECF No. 108, ¶ 57 and Exh. D.

77.    Paragraph 46 of the Complaint (and 57 of the First Amended Complaint) is a reference to the June 8 Letter.

78.    The Complaint (nor the First Amended Complaint) does not reference the Jan 5 Letter or the Jan 5 Letter Grievances. The Complaint (nor the First Amended Complaint) also does not attach the Jan 5 Letter as an exhibit.

79.    On or about May 22, 2023, in response to an interrogatory asking Frost Solutions to describe with specificity its pre-filing investigation (the "May 22 Interrogatory Response"), Frost Solutions confirmed that it did not discover until "on or around June 2, 2022" that "Baglien and Lareau had [purportedly] stolen information from Frost to start a competing business." *See* Exh. H at 6 (attached hereto).

80.    The May 22 Interrogatory Response further states that "[o]n or before June 2, 2022, Frost [Control] contacted counsel to advise them of the situation and seek legal advice. On or around September 6, 2022, Plaintiff's counsel retained Digital Intelligence to perform digital forensics work." *Id.* at 7.

81.    The "digital forensics work" referenced in the May 22 Interrogatory Response

15

corresponds to the work described in ¶¶ 49 and 50 of the Complaint (and ¶¶ 60 and 61 of the First Amended Complaint).

82.     Kirsh, a principal of Frost Solutions through his interest in Clashmore Ventures, verified the May 22 Interrogatory Response. *See id.*

83.     The May 22 Interrogatory Response does not reference the Jan 5 Letter or the Jan 5 Letter Grievances. *See id.*

84.     The May 22 Interrogatory Response confirms that the Jan 5 Letter Grievances are *entirely unrelated* to the allegations and claims asserted in the Action. Indeed, according to a sworn admission, neither Frost Control nor Frost Solutions began conducting its pre-filing investigation until on or around June 2, 2022, *nearly five months after the Jan 5 Letter*.

85.     On or about August 1, 2023, Frost Solutions supplemented the May 22 Interrogatory Response (the "Aug 1 Supplemental Interrogatory Response") to add that the law firm Ice Miller "participat[ed] in the investigation of Defendants' actions prior to Frost [Solutions'] retention of Taft, Stettinius & Hollister LLC, and by sending to Baglien and Lareau the cease and desist letter attached to the Complaint as Exhibit D: Ice Miller, LLP." *See* Exh. I at 4-5 (attached hereto).

86.     Kirsh, a principal of Frost Solutions through his interest in Clashmore Ventures, verified the Aug 1 Supplemental Interrogatory Response under oath. *See id.*

87.     The Aug 1 Supplemental Interrogatory Response further confirms that the Jan 5 Letter Grievances are *entirely unrelated* to the to the allegations and claims asserted in the Complaint because the response: (1) does not identify the law firm which sent the Jan 5 Letter as being involved with any pre-filing investigation for the Complaint; and (2) does not reference the Jan 5 Letter.

88.     Frost Solutions also produced the Dec 21 Email in this Action on or about September 15, 2023, which specifically limits the basis of the Jan 5 Letter to Baglien's alleged actions *during* his employment at Frost Control and says nothing about trade secrets or confidential information.

**Frost Solutions Attempts to Put Its Competitor Out of Business By Violating the Protective Order and then Using Fraud to Strip Counterclaim-Plaintiffs of Their Insurance Coverage**

89.     As part of their Fed. R. Civ. P. 26(a)(1) disclosures, Counterclaim-Plaintiffs produced on or about April 21, 2023 a copy of an insurance policy that may be used to satisfy all or part of a possible judgment in the Action (the "Insurance Policy").

90.     Counterclaim-Plaintiffs designated the Insurance Policy as Confidential Information pursuant to the Protective Order governing the confidentiality of information produced in the Action (the "Protective Order") (ECF No. 28) by marking each page "Confidential."

91.     Frost Solutions never challenged the Confidential designation of the Insurance Policy pursuant to the procedure set forth in the Protective Order.

92.     The Protective Order expressly provides that "Confidential Information or Highly Confidential Information under this Order shall not be used or disclosed by the parties, counsel for the parties or any other persons identified in Paragraph 5(b) or (c) *for any purpose whatsoever other than to prepare for and to conduct discovery, hearings and trial in this action, including any appeal thereof.*" *See* ECF No. 28 at ¶ 5.a. (emphasis added).

93.     On October 23 and November 27, 2023, the parties participated in two days of mediation, which did not succeed in resolving the Action.

94.     Curiously, despite having received a copy of the Insurance Policy months earlier, shortly after the first day of mediation, counsel for Frost Solutions began demanding that the

Counterclaim-Plaintiffs produce a copy of the Insurance Policy and any reservation of rights letters issued by the insurance carrier. Frost Solutions' counsel began demanding this information – as well as the remaining limits on the policy – on October 27, 2023.

95.    On November 1, 2023, counsel for the Counterclaim-Plaintiffs informed counsel for Frost Solutions that the Insurance Policy was produced to them on April 21, 2023 and identified the production number assigned to the document.

96.    Three days after the second day of mediation, on November 30, 2023, Counterclaim-Plaintiffs' insurance carrier received a phone call from a person who identified himself only as "Mike," and who called from the mobile number ███████████.

97.    Because the Insurance Policy was marked "Confidential," Frost Solutions was barred from using the document "*for any purpose whatsoever other than to prepare for and conduct discovery, hearings and trial in this action, including any appeal thereof.*" See ECF No. 28 at ¶ 5.a. (emphasis added).

98.    Counterclaim-Plaintiffs' insurance carrier returned "Mike's" call. "Mike" told the insurance carrier: (1) he was in litigation with Vue Robotics; (2) he was aware the Counterclaim-Plaintiffs had received a letter from "Frost" *dated January 5, 2022* accusing them of "bad stuff"; and (3) that the Jan 5 Letter was attached as an exhibit to the mediation brief.

99.    The purpose of "Mike's" call was to persuade the insurance carrier that the Counterclaim-Plaintiffs had omitted material information from their insurance application, thereby triggering an investigation that would lead the carrier to withdraw coverage for the Action.

100.    As verified by publicly available information, the mobile number used by "Mike" belongs to Michael Kirsh, a principal of Frost Solutions through his interest in Clashmore

Ventures.

101.    Kirsh is the person who called Counterclaim-Plaintiffs' insurance carrier on or about November 30, 2023 and identified himself as "Mike."

102.    Despite verifying the May 22 Interrogatory Response and the Aug 1 Supplemental Interrogatory Response and knowing that the Jan 5 Letter Grievances were entirely unrelated to the allegations and claims asserted in the Complaint based, in part, on the Dec 21 Email Frost Solutions itself produced in the Action, Kirsh contacted Counterclaim-Plaintiffs' insurance carrier and provided a knowingly false description of the Jan 5 Letter for the purpose of persuading the carrier to withdraw its coverage of Counterclaim-Plaintiffs.

103.    Kirsh called the Counterclaim-Plaintiffs' carrier and tried to strip Counterclaim-Plaintiffs of their insurance coverage *by relaying information he knew to be false*.

104.    Kirsh did this because he believed that – without the benefit of their insurance coverage — Counterclaim-Plaintiffs would be unable to defend themselves in the Action and they would be driven out of business.

105.    Kirsh violated the Protective Order by using the information he learned from the Insurance Policy – designated as Confidential Information – for a purpose unrelated to preparing for and conducting discovery, hearings, or trial in the Action.

106.    On or about January 5, 2024, Counterclaim-Plaintiffs received a letter from their insurance carrier indicating that their coverage may be in jeopardy because of the allegations raised in the Jan 5 Letter (the "Insurance Reconsideration Letter").

107.    The first step of Kirsh's plan to destroy a competitor had worked. By knowingly providing the carrier with false information, Kirsh had triggered an investigation into whether Counterclaim-Plaintiffs had withheld material information during the insurance application

process.

108.    By deceiving Counterclaim-Plaintiffs' insurance carrier, Kirsh caused the carrier to erroneously suspect that the Jan 5 Letter had put Counterclaim-Plaintiffs on notice of the claims asserted in the Action. Kirsh did so even though he knew that the Jan 5 Letter Grievances were entirely unrelated to the allegations and claims asserted in the Complaint.

109.    However, Frost Solutions was unaware that Kirsh's plan had succeeded because no one was providing ongoing information to Frost Solutions about the status of Counterclaim-Plaintiffs' insurance coverage and whether the carrier had taken any action in response to Kirsh's call.

110.    Apparently believing that Kirsh's "anonymous" telephone call had not worked, Frost Solutions decided to again bring the Jan 5 Letter – and the fraudulent argument that that letter had put Counterclaim-Plaintiffs on notice of the claims of the Action – to the insurance carrier's attention. This time Frost Solutions would use one of its attorneys to peddle the false narrative.

111.    On or about January 11, 2024, Frost Solutions, through one of its attorneys of record and agent (the "Frost Solutions Attorney"), sent a letter to counsel for Counterclaim-Plaintiffs (the "Jan 11 Letter") in which he stated, "we have serious concerns as to the extent of coverage. We have requested any reservations of rights letter. *As you know, your client was put on notice of this claim on January 5, 2022.[1] It appears that the insurance company was not notified until sometime after. As such, there may be a coverage issue and we would like to know if that is the case. . . .*" (Emphasis added.) The Frost Solutions Attorney also expressly requested

---

[1] Tellingly, Frost Solutions' counsel sent two versions of the Jan 11 Letter. The first asserted that "your client was put on notice of this claim on June 8, 2022," which refers to the letter attached as Exhibit D to the Complaint. Shortly thereafter, a "corrected version" of the letter was sent that changed June 8, 2022 to January 5, 2022.

that his Jan 11 Letter be shared with Counterclaim-Plaintiffs' insurance carrier.

112. The purpose of the Jan 11 Letter was to establish an indirect conduit to Counterclaim-Plaintiffs' insurance carrier so Frost Solutions could relay false information intended to provoke an investigation into whether Counterclaim-Plaintiffs withheld information from their insurance application, thereby jeopardizing Counterclaim-Plaintiffs' insurance policy and coverage.

113. Upon information and belief, the Frost Solutions Attorney knew that his assertion that Counterclaim-Plaintiffs were put on notice of "this claim" – *i.e.*, the claims in the Action – on January 5 (based on the Jan 5 Letter) was false based on, at a minimum, the allegations in the Complaint, the May 22 Interrogatory Response, the Aug 1 Supplemental Interrogatory Response, and the Dec 21 Email – all of which were known to the Frost Solutions Attorney, as counsel of record for Frost Control in the Action.

114. Upon information and belief, prior to his decision to send the Jan 11 Letter, the Frost Solutions Attorney was aware that Kirsh had called Counterclaim-Plaintiffs' insurance carrier.

115. When he insisted that counsel share the Jan 11 Letter with Counterclaim-Plaintiffs' insurance carrier, the Frost Solutions Attorney – as an agent of Frost Solutions –he knew that the Jan 5 Letter Grievances were entirely unrelated to the allegations and claims asserted in the Complaint.

116. The Frost Solutions Attorney, as an agent of Frost Solutions, misled the insurance carrier through his Jan 11 Letter.

117. On or about January 15, 2024, Counterclaim-Plaintiffs' counsel responded to the Jan 11 Letter noting that reference to the Jan 5 Letter and a potential "coverage issue" suggested

21

that someone may have taken steps to encourage the insurance carrier to reconsider its coverage position (the "Jan 15 Letter"). Counsel also reiterated that the Jan 5 Letter has no bearing on the underlying litigation, as supported by the Dec 21 Email, other than to reinforce that Frost Control and Frost Solutions engaged in spoliation. Counterclaim-Plaintiffs' counsel requested that Frost Solutions repair the damage it had caused by acknowledging in a stipulation that the Jan 5 Letter did not – and could not have – put Counterclaim-Plaintiffs on notice of any of the claims in the Action.

118.    On or about January 24, 2024, Frost Solutions' counsel responded to the Jan 15 Letter accusing Counterclaim-Plaintiffs of trafficking in a *Through the Looking-Glass*-style "conspiracy theory," falsely denying that anyone from Frost Solutions had contacted Counterclaim-Plaintiffs' insurance carrier.

119.    As a direct and proximate result of Frost Solutions' false statements and improper conduct, Counterclaim-Plaintiffs were forced to: (1) incur substantial additional defense counsel legal fees to address the interference; and (2) retain separate coverage counsel to expose and counteract the lies that Frost Solutions had fed the insurance carrier.

**Frost Solutions' Actions Have Caused Lareau to Suffer Severe Emotional Distress**

120.    As a direct and proximate result of Frost Solutions' false statements and improper contact with Counterclaim-Plaintiffs' insurance carrier, Counterclaim-Plaintiff Lareau, who served his country honorably in Iraq and Afghanistan, experienced and continues to experience severe emotional distress.

121.    Following Lareau's discharge from the military, he began seeing a psychiatrist as an outlet to discuss his service in Iraq and Afghanistan. This course of treatment had proven successful.

122.    The Insurance Policy has allowed Counterclaim-Plaintiffs to defend themselves against Frost Solutions, whose pockets are far deeper than theirs. Without the Insurance Policy, Counterclaim-Plaintiffs would have been buried by the Action because they simply could not afford the cost of defense.

123.    Upon receipt of the Insurance Reconsideration Letter, which announced that the carrier was reconsidering its coverage position, Lareau began suffering from serious mental and emotional harm accompanied by anxiety, loss of appetite, loss of interest in activities, and insomnia. The emotional distress has impacted his personal relationships. The timing and severity of these conditions are documented.

124.    As a result of the mental and emotional harm and accompanying physical symptoms proximately caused by Frost Solutions' tortious interference, Lareau's psychiatrist altered his medications because the long-term treatment plan that had been working was no longer effective. Lareau remains on this altered medical treatment plan, but symptoms persist nonetheless.

125.    It was foreseeable that Frost Solutions' actions to strip Counterclaim-Plaintiffs' insurance coverage (which, if successful, would have put Counterclaim-Plaintiffs out of business and expose Lareau to personal liability without any insurance coverage) would cause Lareau to suffer emotional distress.

126.    In fact, upon information and belief, the point of Kirsh "dropping a dime" with Counterclaim-Plaintiffs' carrier in the first place was to put Counterclaim-Plaintiffs out of business.

127.    The only reason Frost Solutions would seek to strip Counterclaim-Plaintiffs of the insurance coverage protecting them in the Action is to put Counterclaim-Plaintiffs out of

business, which would foreseeably cause Lareau significant mental anguish.

128. There can be no doubt that Kirsh and Frost Solutions appreciated the potential impact of Kirsh's actions, and the subsequent related actions of their attorney and agent, when they decided to take those actions.

129. The actions of Frost Solutions and Kirsh and their attorney and agent inflicted emotional distress on Lareau. Lareau has been harmed – and continues to be harmed – by those actions in an amount to be determined at trial.

## Frost Solutions Engages in Other Unseemly Practices

130. Notably, Frost Solutions' tortious interference with the Insurance Policy and Defendants' insurance coverage is not the first time Frost Solutions attempted to disrupt Counterclaim-Plaintiffs' business.

131. While Vue Robotics and Frost Solutions offer competing products and services, Vue Robotics' products and services are far superior.

132. From the beginning of this dispute, Frost Solutions has made clear that it would use the litigation process to embarrass, disparage, pummel, and, eventually, destroy its start-up competitor Vue Robotics.

133. Frost Solutions did not wait long to make known its true motive. Specifically, on October 20, 2022, both Vue Robotics and Frost Solutions were exhibiting at the same trade show, Equip Exposition 2022, in Louisville, Kentucky.

134. At approximately 3:30 p.m. on October 20, someone affiliated with Frost Solutions – upon information and belief – provided a process server with trade show access credentials so that she could access the exhibition floor and serve the Complaint on Lareau while he was at the Vue Robotics booth exhibiting a prototype to potential customers. *See* ECF No. 6

(Affidavit of Service on Lareau).

135.    The process server, donning her trade show credentials lanyard, stood in a line of people waiting to speak with Lareau at the Vue Robotics booth. Once the process server was at the front of the line, she served the Complaint on Lareau – in front of other people, including potential customers.

136.    Frost Solutions' goal was to make a spectacle of Lareau getting served with the Complaint. Indeed, Frost Solutions facilitated service of the Complaint on Lareau in the middle of a trade show to embarrass and harass Lareau and to interfere with Counterclaim-Plaintiffs' business and their efforts to promote their products and establish commercial relationships.

137.    As another example, Frost Solutions' representatives have actively promoted its litigation against Counterclaim-Plaintiffs and used the Action to dissuade at least one potential commercial partner from working with Counterclaim-Plaintiffs.

138.    Specifically, in early 2023, Counterclaim-Plaintiffs were in discussions with Sitefotos to form a partnership that would allow their respective products and services to work with one another. Frost Solutions also met with Sitefotos to inquire about a potential partnership. When Sitefotos told Frost Solutions that it was already in discussions with Vue Robotics, Frost Solutions, upon information and belief, proceeded to let Sitefotos know about Frost Solutions' lawsuit against Counterclaim-Plaintiffs to, upon information and belief, discourage Sitefotos from working with Counterclaim-Plaintiffs.

139.    Sitefotos is not a partner of Vue Robotics. Upon information and belief, Sitefotos partnered with Frost Solutions instead.

140.    Moreover, during the September 28-30, 2022 Western Snow and Ice Conference in Loveland, Colorado, Bott, a principal of Frost Solutions through his interest in Clashmore

25

Ventures, verbally accosted Cory Moore, who worked for Vue Robotics' (now former) partner TAPCO and who was working at Vue Robotics' exhibitor booth during the conference, and threatened him in front of other vendors and prospective customers.

141.    Upon information and belief, Frost Solutions has engaged – and will continue to engage – in other actions to interfere with Defendants' business, including touting this lawsuit as a basis for potential prospects to avoid doing business with Defendants. Defendants' investigation into such actions is ongoing.

142.    Frost Solutions has also abused the discovery process during the Action, using it to bludgeon Counterclaim-Plaintiffs. Despite repeated requests from Counterclaim-Plaintiffs, it took Frost Solutions the better part of a year to finally admit that it does not have: (1) Baglien's Frost Control laptop; (2) Lareau's Frost Control laptop; (3) any of Lareau's contemporaneous downloads from Frost Control's HubSpot platform; (4) any of Baglien's contemporaneous downloads from Frost Control's HubSpot platform; (5) Baglien's Frost Control email archive; (6) Lareau's Frost Control email archive; or (7) slack messages between Baglien and key Frost personnel.

### Frost Solutions Resorts to Corporate Espionage

143.    In November 2022, Vue sold its ARC1 system and monitoring services to a customer headquartered in New York called the East End Group.

144.    East End Group's Chief Operating Officer was Jason Ostrander ("Ostrander").

145.    East End Group agreed to Vue's terms and conditions as part of its purchase of Vue's ARC1 system and monitoring subscription.  Among those terms and conditions was a promise by East End Group that it, among other things: (a) would use Vue's products and services only as permitted by the terms and conditions; (b) would refrain from making Vue's

26

products and services available to third parties for the third parties' business operations; (c) would refrain from reverse engineering any of Vue's products or services; and (d) would not disclose Vue's confidential information.

146.    While he was employed by East End Group, Vue allowed Mr. Ostrander to create unique log-in credentials so he could access OmniVue, Vue's software platform.

147.    According to publicly available information, including Mr. Ostrander's LinkedIn profile, Mr. Ostrander left East End Group and was hired by Frost Solutions in October 2024.  It is unknown when Mr. Ostrander started talking to Frost Solutions about employment.  Mr. Ostrander was ultimately hired as Frost Solutions' Vice President of Commercial Operations.

148.    On November 26, 2024, Vue learned that Mr. Ostrander, after becoming Frost Solutions' Vice President of Commercial Operations and his employment with East End Group ended, utilized his log-in credentials to surreptitiously access Vue's platform and East End Group's confidential site information.

149.    Upon discovering Mr. Ostrander's unauthorized and unlawful access, Vue examined log in data for his account and realized that Mr. Ostrander entered Vue's systems eight separate times in the 30 days prior to the discovery of his unlawful activities.  The logs also indicate that Mr. Ostrander accessed the Vue network in September 2024.

150.    In the process of accessing Vue's systems, Mr. Ostrander ignored warnings appearing throughout Vue's systems that those who access the systems without authorization will be prosecuted.  Those warnings read:

> *Application copyright © Vue Robotics. Platform copyright © ObjectSpectrum, LLC. All rights reserved worldwide. WARNING: Unauthorized access is prohibited. This system is for use only by authorized users for authorized purposes, and any unauthorized access will be prosecuted to the fullest extent of the law. All activity is monitored and logged for security and administrative purposes.*

27

*By proceeding, you are acknowledging that you have read and understood this notice and that you consent to such monitoring. Version: 3.1.2 Build 3222*

151.    The logs indicate that Ostrander spent time rooting around in Vue's network and systems, during which time he was able to access key components of the OmniVue interface and functionalities of the ARC1 system.  Ostrander's unauthorized access was intentional and premeditated.  Ostrander breached both the desktop and mobile applications, executing a rapid and unauthorized exfiltration of data.  He also had access to upgrades and new functionalities that Vue had delivered to its customers within the weeks prior to his unlawful entry into the system.  Mr. Ostrander's new employer, Frost Solutions, can use that intelligence to gain an unfair advantage in modifying its own products and systems and when pitching its competitive products and services to potential customers.

152.    There is no legitimate reason for Frost Solution's Vice President of Commercial Operations to access Vue's proprietary systems – certainly not through login credentials provided pursuant to a subscription agreement with his former employer.  Ostrander's improperly motivated misuse of his login credentials is part of Frost Solutions' calculated, orchestrated corporate espionage campaign to seek an unfair advantage in the marketplace.

153.    The clandestine access into Vue's systems was also intended to skirt the Protective Order issued by this Court to govern discovery.  Vue has utilized the Protective Order as it was intended – to produce some materials marked as "Confidential" so they could be shared with Frost Solutions and other materials as "Highly Confidential – Attorneys' Eyes Only" so those materials could be produced to Frost Solutions' counsel, but would not be shared with the principals of Frost Solutions.  Mr. Ostrander's abuse of his log-in credentials allowed Frost Solutions to get access to information that is similar to, if not identical to, information that Vue

28

has or will designate in discovery as "Highly Confidential – Attorneys' Eyes Only." By using Mr. Ostrander's log-in credentials to allow Frost Solutions' employees to access information that otherwise would have been limited to just their attorneys, Frost Solutions once again improperly sought to avoid the limitations of the Protective Order.

154.    Within days of discovering that a Frost Solutions Vice President had abused his log-in credentials, Vue, through counsel, sent a letter dated November 27, 2024 to counsel for Frost Solutions demanding that Frost Solutions cease all efforts to hack into Vue's systems. Vue also requested that Frost Solutions preserve information relating to Ostrander's access and cooperate in employing a forensic technical specialist to search for and remove any information or files that Ostrander obtained during his unlawful entry into Vue's systems.

155.    Given the gravity of the situation and the need to prevent the further distribution of Vue's information throughout Frost Solutions' company, Vue insisted that Frost Solutions respond by December 4, 2024. Frost Solutions did not respond by December 4, 2024.

156.    Rather, on December 5, 2024, counsel for Frost Solutions sent a one sentence response stating that Frost Solutions had decided, unilaterally, that it would respond "by December 11, 2024." Frost Solutions did not respond by December 11, 2024.

157.    Frost Solutions eventually responded through counsel by letter dated December 14, 2024. In that letter, Frost Solutions admitted that Mr. Ostrander accessed Vue's systems after he was hired as Frost Solutions' Vice President of Commercial Operations. Frost Solutions neither denied that it had received information about Vue's systems as a result of Mr. Ostrander's access nor provided any assurances that it would refrain from using information Mr. Ostrander accessed.

29

**Frost Solutions Interferes with Vue's Relationship with TAPCO**

158.    TAPCO is a marketer and reseller of goods in the Transportation and Government Services industry.  As to Vue, TAPCO served an important role in selling Vue's products and services to public entities throughout the country.  TAPCO represented approximately ■% of Vue's sales in a given year.

159.    In March 2024, TAPCO and Vue entered into a Sales Representation and Distribution Agreement (the "TAPCO Agreement").  Under the TAPCO Agreement, TAPCO was identified as Vue's preferred dealer for the government market (i.e. to public entities).  TAPCO agreed to market and sell Vue's products and services to public entity customers throughout the country.  In return, TAPCO would be paid a fee based on the Vue products and services sold.

160.    Pursuant to this agreement, Vue invested significant time, resources, and effort into developing the TAPCO relationship.  Vue also forewent opportunities to develop relationships with other similar parties because it had entered into the TAPCO Agreement.

161.    In the TAPCO Agreement, TAPCO promised to use commercially reasonable efforts to market and promote Vue's products and services, to establish and maintain a sales and marketing organization sufficient to market and sell Vue's products and services, to keep secret Vue's confidential information, and to achieve certain minimum market and sales performance metrics.

162.    The term of the TAPCO Agreement runs until ▬▬▬▬▬, unless it is sooner terminated due to a party's material breach that could not be cured or was not cured within 10 days after receiving notice of the breach.

163.    Frost Solutions knew that TAPCO had entered into an agreement with Vue under

30

which TAPCO was marketing and selling Vue's products and services

164.    In parallel with this Action, on December 8, 2022, Frost Solutions initiated a lawsuit against Cory Moore ("Moore"), another former Frost Control employee, who subsequently was employed by TAPCO, in the United States District Court for the Northern District of Illinois, *Frost Solutions, LLC v. Cory Moore*, 1:22-cv-06910 (the "Moore Action"). Frost Solutions alleged in the Moore Action that Moore had stolen trade secrets and confidential information to solicit Frost Solutions customers on behalf of TAPCO.

165.    Two years later, on October 7, 2024, Frost Solutions amended its complaint in the Moore Action to name TAPCO itself as a defendant and allege that TAPCO had tortiously interfered with Frost Solutions' contracts and prospective business relations.  In the Moore Action, Frost Solutions characterized TAPCO as a competitor.

166.    Just 10 days after being sued, on October 17, 2024, Frost Solutions and TAPCO began discussing (in writing) elements of a business relationship between Frost Solutions and TAPCO. In fact, that same day and after meeting, Bott sent TAPCO's general counsel a list of proposed terms for settlement of Frost Solutions' claims against TAPCO.

167.    On information and belief, TAPCO and Frost Solutions began discussions about settlement much earlier than the written communications demonstrate and, likely, before Frost Solutions sued TAPCO.

168.    Frost Solutions' October 17 settlement proposal to TAPCO included, among other things, ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

31

169.     Frost Solutions has confirmed that ███████ was an important part of any agreement with TAPCO.

170.     On October 18, 2024, Bott sent TAPCO the proposed terms in a draft agreement.

171.     In addition to the above provisions, the draft settlement agreement contained a ████████████████████████████████████████████████

172.     While TAPCO's attorneys were reviewing the draft agreement, on October 22, 2024, TAPCO's CEO reached out to Bott and Kirsh ███████████████████████ ██████████████████████

173.     On October 29, 2024, TAPCO's general counsel sent Bott and Kirsh a redlined version of the settlement agreement and communicated ███████████████ ████████████████████████████████████████████████ ███████████████████████

174.     Frost Solutions and TAPCO signed the settlement agreement via Docusign on October 30, 2024.

175.     Contained within a different Docusign envelope, and apparently signed on October 28, 2024, Frost and TAPCO entered into a "Dealer Agreement," which is referenced as Exhibit A through the settlement agreement.

176.     In the Dealer Agreement, TAPCO committed to the partnership efforts outlined in Schedule 3 and to abruptly cease all dealings with Vue. The Dealer Agreement required TAPCO to ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

████████████████████████████████████████████. TAPCO also agreed ████████████

████████████████████████████████████

177.    Schedule 4 of the Dealer Agreement contained ████████████████████████

████████████████████████████████████████████████

178.    Upon information and belief, while not expressly provided in the settlement agreement, TAPCO agreed to terminate Moore's employment with TAPCO because TAPCO could not continue to employ Moore while also working exclusively with Frost Solutions.

179.    Upon information and belief, at the time of the settlement with TAPCO, Frost Solutions knew that the TAPCO Agreement would not validly expire until ███████████

180.    As part of the settlement agreement, Frost Solutions required TAPCO to terminate the TAPCO Agreement with Vue, cease its dealings with Vue and commence a new relationship with Frost Solutions.

181.    From at least October 11, 2024, through November 6, 2024, Vue did not hear from TAPCO.

182.    On November 6, 2024, TAPCO sent an email and letter to Baglien purporting to terminate the TAPCO Agreement with immediate effect.

183.    TAPCO identified as the "primary basis" for the termination that TAPCO recently discovered that its now former employee, Moore, suffered from a conflict of interest because of an unspecified "financial relationship" with Vue.  TAPCO did not identify any clause in the TAPCO Agreement that prohibited or even addressed whether employees of TAPCO could have a "financial relationship" with Vue.  As such, TAPCO failed to identify a contractual obligation breached by Vue or allow Vue an opportunity to attempt to cure a breach (if one occurred, which it did not).

33

184.    TAPCO contended that Vue violated the covenant of good faith and fair dealing implied in the TAPCO Agreement, but it did not identify any clause within the TAPCO Agreement from which such a covenant could extend that related to Moore's "financial relationship" with Vue. Again, TAPCO did not afford Vue an opportunity to attempt to cure whatever breach allegedly supported terminating the TAPCO Agreement.

185.    TAPCO did not identify or even suggest that it actually suffered any harm as a result of Moore's allegedly improper "financial relationship." TAPCO's proffered reasons for prematurely terminating the TAPCO Agreement with Vue are pretextual, and as outlined above, Frost Solutions was instrumental in inducing and effectuating TAPCO's unlawful breach of the TAPCO Agreement with Vue.

186.    As such, TAPCO's attempted termination of the TAPCO Agreement, which was imposed on TAPCO by Frost Solutions, was ineffective. At most, the November 6, 2024 letter constituted notice that TAPCO would not renew the TAPCO Agreement when it expires on ███████████ As such, TAPCO remained obligated to fulfill the TAPCO Agreement until ███████████. TAPCO's insistence that it had terminated the TAPCO Agreement and its conduct consistent with that position constitutes a breach of the TAPCO Agreement.

187.    Shortly after TAPCO transmitted its faulty November 6, 2024 termination notice, Vue learned that TAPCO was actively engaging with Frost Solutions in a campaign to cause customers to cease doing business with Vue—as was contemplated, if not required, by the TAPCO-Frost Solutions Settlement Agreement. TAPCO targeted customers that were then under contract with Vue, those who recently renewed their contracts with Vue, those customers that are approaching renewal with Vue, and customers that submitted purchase orders for Vue services through TAPCO months earlier but about which TAPCO neglected to inform Vue.

TAPCO attempted to induce those customers to not renew with Vue but to purchase equipment and services from Frost Solutions.

188.    Because TAPCO's attempted termination was ineffective and it remained obligated under the TAPCO Agreement at the time of these actions, TAPCO breached the TAPCO Agreement, with the inducement and assistance of Frost Solutions.

189.    More specifically, TAPCO promised to use commercially reasonable efforts to further the promotion, marketing, sale and distribution of Vue's products, but, as a result of Frost Solutions' inducement, TAPCO has done the opposite—it has tried to steer customers away from Vue's products and to Frost Solutions' services. TAPCO promised to establish and maintain a sales and marketing organization sufficient to successfully market and sell Vue's products, but, as a result of Frost Solutions' interference, TAPCO abandoned its efforts to sell Vue's products and instead engaged its personnel to carry out a campaign to cause Vue harm in the marketplace. TAPCO promised not to make any materially misleading or untrue statements concerning Vue's products, but it has instead spread falsehoods in a targeted effort to benefit Frost Solutions, all as a result of Frost Solutions' interference. Finally, TAPCO did not achieve the Minimum Market and Sales Performance Levels set in the Agreement, due in part to Frost Solutions' interference.

190.    Frost Solutions also induced TAPCO to share Vue's confidential information, information that TAPCO promised in the TAPCO Agreement not to share or use for the benefit of third parties. Frost Solutions has caused TAPCO to disclose and use for the benefit of Frost Solutions confidential information about Vue's customers and prospective customers. Frost Solutions has used this confidential information to steal business away from Vue and otherwise to further its campaign to unlawfully crush a competitor and cause substantial harm, economic and emotional.

191.    Vue felt the effects of TAPCO's improper termination and it and Frost Solutions' campaign against Vue almost immediately upon termination and as late as September of 2025.

192.    In fact, Vue has lost at least six customers so far that were previously serviced by TAPCO as a result of Frost's unlawful interference with Vue's relationship with TAPCO and TAPCO's improper termination.

193.    On November 6, 2024, Vue sent an email to its TAPCO-serviced customers about transitioning directly to Vue.  In response to that email, Polk County notified Vue that it was going a different route.  Polk County ████████████████████████████████████ ████████████████████████████████████ .

194.    On November 12, 2024, Vue received an email from Auglaize County that Auglaize decided to use another company.  Auglaize ████████████████████████ ████████████████████████████████ .  In fact, Bott admitted in discovery ████████████████████████████████████ .

195.    On January 27, 2025, Vue received an email from Portage that Portage did not intend to stay with Vue.  Portage ████████████████████████████ ████████████████████████████ .  In fact, on or before November 18, 2024, Kirsh spoke with Portage about moving to Frost.  And, subsequently, Frost used Portage to solicit other Vue customers.

196.    On May 6, 2025, Vue received an email from Washington County with the subject, "Termination of Contract," and written in the body of the email, "Just making sure TAPCO notified you."  The email attached a Notice of Termination, which referenced the fact that TAPCO was no longer a distribution partner of Vue.  Washington County ████████████ ████████████████████████████████████████████ .

And, in April 2025, Washington County and Frost Solutions entered into a 3-year agreement through May 1, 2028.

197.    On August 6, 2025, Vue received an email from Muskegon County stating that it was looking to cancel its contract with Vue in the next fiscal year.  Muskegon ███████████████████████████████████████. And, on November 21, 2024, Kirsh reached out to Muskegon about Frost's "new partnership" with TAPCO.

198.    On September 24, 2025, Vue received an email from Ottawa County stating that it was not going to renew its contract. Ottawa ██████████████████████████ ██████████████████████████████████████.

199.    Each of these customers were listed on the Dealership Agreement attached as Exhibit A to the Frost Solutions-TAPCO Settlement Agreement as a Vue contract not to be renewed and failed to renew with Vue. And one of these six customers entered into a 3-year agreement with Frost Solutions the month before notifying Vue that it was not renewing its contract, citing the fact that TAPCO was no longer a distribution partner with Vue.

200.    Frost Solutions therefore has unlawfully and without a privilege interfered with the TAPCO Agreement and with Vue's contracts and advantageous business relationships with the customers who had purchased or were going to purchase Vue's products and services through TAPCO.

## COUNT I
### (Negligent Infliction of Emotional Distress)

201.    Counterclaim-Plaintiffs restate and incorporate by reference the preceding paragraphs of the Counterclaim as though fully set forth herein.

202.    Frost Solutions, through Kirsh, misused Confidential Information produced by

Counterclaim-Plaintiffs in the Action, in violation of the Protective Order, to contact Counterclaim-Plaintiffs' insurance carrier to alert them to the existence of the Jan 5 Letter, the basis for which Kirsh and Frost Solutions knowingly misrepresented.

203.    Based on, at a minimum, the Complaint, the May 22 Interrogatory Response, the Aug 1 Supplemental Interrogatory Response, and the Dec 21 Email produced by Frost Solutions in the Action, Frost Solutions, including Kirsh and its agent the Frost Solutions Attorney, knew that the Jan 5 Letter Grievances were entirely unrelated to the allegations and claims raised in the Complaint but misrepresented the basis of the Jan 5 Letter to induce the insurance carrier to reconsider its coverage position.

204.    Frost Solutions has a duty to exercise reasonable care towards Counterclaim-Plaintiff Lareau.

205.    Frost Solutions breached that duty by, among other things, "dropping a dime" on Counterclaim-Plaintiffs by calling their insurance carrier and knowingly misrepresenting the basis of the Jan 5 Letter for the purpose of inducing the carrier to withdraw coverage. Despite knowing that the Jan 5 Letter was entirely unrelated to the claims asserted in the Action, Frost Solutions told the carrier otherwise.  Frost Solutions also violated the protective order by misusing information that was designated as confidential. In taking these actions, Frost Solutions knew or should have known that Counterclaim-Plaintiff Lareau would experience severe emotional distress.

206.    It was foreseeable that Frost Solutions' negligent actions would cause Counterclaim-Plaintiff Lareau to suffer emotional distress.

207.    As a result of Frost Solutions' negligent conduct, Counterclaim-Plaintiff Lareau has suffered serious mental and emotional harm accompanied by objective physical symptoms,

including without limitation anxiety, loss of appetite, loss of interest in activities, and insomnia. The emotional distress has also impacted his personal relationships.

208.    As a result of Frost Solutions' actions, Counterclaim-Plaintiff Lareau has suffered, and continues to suffer from, severe emotional distress, for which he is entitled to damages in an amount to be determined at trial.

209.    Frost Solutions acted in a wanton, malicious, and oppressive manner entitling Counterclaim-Plaintiff Lareau to enhanced compensatory damages.

## COUNT II
### (Tortious Interference with TAPCO Agreement)

210.    Counterclaim-Plaintiffs restate and incorporate by reference the preceding paragraphs of the Counterclaim as though fully set forth herein.

211.    Counterclaim-Plaintiff Vue had a contractual and economic relationship with TAPCO.

212.    Frost Solutions was aware of this relationship between Counterclaim-Plaintiff Vue and TAPCO.

213.    Frost Solutions tortiously interfered with the contractual and economic relationship between Counterclaim-Plaintiff Vue and TAPCO by inducing TAPCO to attempt to terminate the TAPCO Agreement without justification and contrary to its terms; causing TAPCO to fail to use reasonable efforts to market and promote Vue products and services as required by the TAPCO Agreement; causing TAPCO to dismantle the sales and marketing organization that TAPCO promised to maintain; inducing TAPCO to share Vue's confidential information; and causing TAPCO to fall short of the sales and performance metrics stated in the TAPCO Agreement.

214.    As a result of Frost Solutions' actions, Counterclaim-Plaintiffs were, and continue

to be, harmed, and they are entitled to damages in an amount to be determined at trial.

215.    Vue will suffer irreparable harm as a result of Frost Solutions' tortious interference with Vue's contract with TAPCO without an injunction.

## COUNT III
### (Interference with Contractual Relations with Customers)

216.    Counterclaim-Plaintiffs restate and incorporate by reference the preceding paragraphs of the Counterclaim as though fully set forth herein.

217.    Counterclaim-Plaintiff Vue had a contractual and economic relationship with customers that purchased products and services through TAPCO.

218.    Frost Solutions was aware of these customers' contracts to purchase goods and services from Vue through TAPCO, as evidenced by Frost Solutions' request that TAPCO

██████████████████████████████████████████████████████

████████████████████████████████████ .

219.    Frost Solutions tortiously interfered with the contractual and economic relationship between Counterclaim-Plaintiff Vue and these customers by inducing TAPCO to breach its obligations to Vue to promote, market, sell, and distribute Vue's products by requiring that TAPCO ████████████████████████████████████

█████████████████████████ .

220.    Vue can tie the loss of at least six customers/prospective customers, as outlined above, to Frost Solutions' tortious interference with Vue's contract with TAPCO.

221.    As a result of Frost Solutions' actions, Counterclaim-Plaintiff Vue was, and continues to be, harmed, and it is entitled to damages in an amount to be determined at trial.

222.    Vue will suffer irreparable harm as a result of Frost Solutions' tortious interference with Vue's contractual relations with its customers without an injunction.

## COUNT IV
### (Interference with Prospective Business Relations)

223.    Counterclaim-Plaintiffs restate and incorporate by reference the preceding paragraphs of the Counterclaim as though fully set forth herein.

224.    Frost Solutions knew of Vue's prospective business relations because TAPCO provided Frost Solutions with a list of Vue's customers and those customers' contract terms.

225.    Vue customers coming up for renewal, in addition to TAPCO's extensive customer network, constituted Vue's prospective customers with which Frost Solutions improperly interfered.

226.    Frost Solutions induced TAPCO to breach its agreement with Vue to promote, market, sell, and distribute Vue's products by requiring that TAPCO ███████████████

████████████████████████████████████████████████████████████

████

227.    Vue can tie the loss of at least six customers/prospective customers, as outlined above, to Frost Solutions' tortious interference with Vue's contract with TAPCO.

228.    As a result of Frost Solutions' actions, Counterclaim-Plaintiff Vue was, and continues to be, harmed, and it is entitled to damages in an amount to be determined at trial.

229.    Vue will suffer irreparable harm as a result of Frost Solutions' tortious interference with Vue's relationships with its prospective business relations without an injunction.

## COUNT V
### (Tortious Interference with East End Group Contract)

230.    Counterclaim-Plaintiffs restate and incorporate by reference the preceding paragraphs of the Counterclaim as though fully set forth herein.

41

231.    Counterclaim-Plaintiff Vue has a contractual and economic relationship with East End Group.

232.    Frost Solutions was aware of this relationship between Counterclaim-Plaintiff Vue and East End Group, particularly because Frost Solutions had hired East End Group's former Chief Operating Officer, Mr. Ostrander.

233.    In its contract with Counterclaim-Plaintiff Vue, East End Group promised that it, among other things: (a) would use Vue's products and services only as permitted by the terms and conditions; (b) would refrain from making Vue's products and services available to third parties for the third parties' business operations; (c) would refrain from reverse engineering any of Vue's products or services; and (d) would not disclose Vue's confidential information.

234.    Frost Solutions tortiously interfered with East End Group's contractual promises by utilizing Mr. Ostrander, Frost Solutions' Vice President, to log into Vue's systems using login credentials that were provided to him solely for the benefit of East End Group when his purpose was to advance Frost Solutions' interest.

235.    Frost Solutions tortiously interfered with East End Group's contractual promises to refrain from allowing access by third parties by utilizing Mr. Ostrander, Frost Solutions' Vice President, to obtain access to Vue's systems to advance Frost Solutions' business operations.

236.    Frost Solutions tortiously interfered with East End Group's contractual promises to refrain from reverse engineering Vue's products and services by utilizing Mr. Ostrander, Frost Solutions' Vice President, to obtain access to Vue's systems to allow Frost Solutions to obtain important intelligence about Vue's products and services.

237.    Frost Solutions tortiously interfered with East End Group's contractual promises to keep secret Vue's confidential information by utilizing Mr. Ostrander, Frost Solutions' Vice President, to obtain access to Vue's systems to allow Frost Solutions to obtain access to information Vue keeps

42

confidential and from which Vue derives economic benefit.As a result of Frost Solutions' actions, Counterclaim-Plaintiffs were, and continue to be, harmed, and they are entitled to damages in an amount to be determined at trial.

238.    Vue will suffer irreparable harm as a result of Frost Solutions' tortious interference with Vue's contract with East End Group without an injunction.

### COUNT VI
### (Civil Conspiracy)

239.    Counterclaim-Plaintiffs restate and incorporate by reference the preceding paragraphs of the Counterclaim as though fully set forth herein.

240.    Frost Solutions and TAPCO jointly engaged in a conspiracy to achieve the unlawful object of causing harm to Counterclaim-Plaintiff Vue's business operations by misusing Vue's confidential information, breaching the trust embodied in the TAPCO Agreement, and spreading false information about Vue.

241.    Frost Solutions and TAPCO jointly engaged in a conspiracy to commit a lawful act by unlawful means, including, but not limited to, engaging in what otherwise could be legitimate competition in the marketplace, by inducing TAPCO to breach its agreement with Vue.

242.    Frost Solutions and TAPCO entered into an agreement as to the course of action to achieve their unlawful purpose and to cause harm to Vue.

243.    Frost Solutions and TAPCO engaged in one or more unlawful overt acts such as, but not limited to, inducing Vue's customers to reduce their business with Vue or cease doing business with Vue altogether; soliciting Vue's prospective customers utilizing Vue's confidential information against Vue in the process; and spreading false information about Vue in the marketplace.

244. As a result of Frost Solutions' actions, Counterclaim-Plaintiffs were, and continue to be, harmed, and they are entitled to damages in an amount to be determined at trial.

245. Vue will suffer irreparable harm as a result of Frost Solutions' civil conspiracy with TAPCO without an injunction.

## PRAYER FOR RELIEF

**WHEREFORE**, Counterclaim-Plaintiffs respectfully pray that the Court:

(1) Enter judgment in their favor on each of the claims asserted in this Counterclaim;

(2) Find that Frost Solutions has engaged in tortious interference with contractual relations;

(3) Find that Frost Solutions is liable for negligent infliction of emotional distress against Counterclaim-Plaintiff Lareau;

(4) Enter a preliminary and permanent injunction to prevent and remedy the irreparable harm Vue has suffered and will suffer as a result of Frost Solutions' tortious interference with Vue's contract with TAPCO, Vue's contracts with its customers, Vue's relationships with its prospective customers, Vue's contract with East End Group, and Frost Solutions' conspiracy with TAPCO; and

(5) Grant such other and/or further relief as the Court deems just and equitable.

## JURY DEMAND

Counterclaim-Plaintiffs demand a trial by jury on each and every claim and defense in this Counterclaim so triable.

Respectfully submitted,

**PATRICK BAGLIEN, CHRISTOPHER LAREAU, AND VUE ROBOTICS, LLC,**

By their attorneys

Sheehan Phinney Bass & Green, P.A.

Dated:  April 8, 2026                By: */s/ James P. Harris*
                                         David W. McGrath (# 9347)
                                         James P. Harris (# 15336)
                                         Ryan Lirette (# 19561)
                                         Abbygale M. Dow (# 272938)
                                         1000 Elm Street, P.O. Box 3701
                                         Manchester, NH 03105-3701
                                         603-627-8255
                                         dmcgrath@sheehan.com
                                         jharris@sheehan.com
                                         rlirette@sheehan.com
                                         adow@sheehan.com

## CERTIFICATE OF SERVICE

I hereby certify that this pleading was served on this date on all parties of record through the Court's electronic filing system.

*/s/ James P. Harris*
James P. Harris

45