**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

FROST SOLUTIONS, LLC,

       Plaintiff,

    v.

PATRICK BAGLIEN, CHRISTOPHER
LAREAU, and VUE ROBOTICS, LLC,

       Defendants.

Case No. 1:22-cv-00401-SE

**PLAINTIFF'S ANSWER AND AFFIRMATIVE DEFENSES TO**
**DEFENDANTS LAREAU AND VUE ROBOTICS, LLC'S**
**FIRST AMENDED COUNTERCLAIM AND JURY DEMAND**

Plaintiff/Counter-Defendant Frost Solutions, LLC ("Frost"), by and through its attorneys, hereby answers and asserts affirmative defenses to Defendants/Counter-Plaintiffs Christopher Lareau ("Lareau") and Vue Robotics, LLC's ("Vue Robotics") (collectively, "Counterclaim-Plaintiffs") First Amended Counterclaim and Jury Demand. (ECF No. 100.) Any allegations contained in the Amended Counterclaim not specifically admitted herein are expressly denied. Further, the Amended Counterclaim's argumentative subheadings are not reproduced herein. To the extent any response to the allegations contained in them is required, Frost denies them.

In submitting this answer, Frost does not waive and explicitly preserves and reasserts its argument that the Amended Counterclaim has been forfeited because Defendants failed to plead it in response to Frost's First Amended Complaint. (*See* Plaintiff's pending Motion for Summary Judgment on Defendants' Amended Counterclaims, ECF No. 115, at 1.)

## THE PARTIES

1.      Lareau is an individual residing in Portsmouth, New Hampshire. He is the Co-Founder of Vue Robotics.

**Answer:**      Admitted.

2.      Lareau is a former employee of Frost Control Systems, Inc. d/b/a Frost Technologies ("Frost Control").

**Answer:**      Admitted.

3.      Lareau, a veteran, is a former military intelligence officer who served honorably in Iraq and Afghanistan.

**Answer:**      Admitted that Lareau is a former member of the armed forces. Frost lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 3, and therefore denies them.

4.      Vue Robotics is a limited liability company having a principal place of business 36 Maplewood Avenue, Portsmouth, New Hampshire 03801.

**Answer:**      Admitted.

5.      Frost Solutions is a limited liability company with a principal place of business at 44 Farnham Lane, Lake Forest, Illinois 60045.

**Answer:**      Admitted that Frost Solutions, LLC is a limited liability company with its principal place of business in Illinois.

6.      Frost Solutions was formed on July 12, 2022.

**Answer:**      Admitted that Frost Solutions was formed as a limited liability company organized under the laws of Delaware on June 2, 2022, and became registered to conduct business in Illinois on July 12, 2022. Frost denies any remaining allegations of paragraph 6.

7.    Upon information and belief, the sole member of Frost Solutions is Clashmore Ventures, LLC ("Clashmore Ventures"), whose two members, in turn, are Michael Kirsh ("Kirsh") and Michael Bott ("Bott").

**Answer:**    Admitted.

## JURISDICTION AND VENUE

8.    On October 5, 2022, Frost Solutions commenced a civil action (the "Action") by filing a complaint against Counterclaim-Plaintiffs asserting claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq* (Count I — against all Defendants), the New Hampshire Uniform Trade Secrets Act, N.H. RSA § 350-B *et seq* (Count II — against all Defendants), breach of Separation Agreement (Count III — against Lareau), breach of Confidentiality Agreement (Count IV — against Baglien), and breach of fiduciary duties (Count V — against Baglien and Lareau) (the "Complaint").

**Answer:**    Admitted.

9.    This Court has subject matter jurisdiction over the Counterclaim under 28 U.S.C. § 1367 because the claims asserted in the Counterclaim are so related to the claims asserted in the Complaint (for which there is original jurisdiction) such that they form part of the same case or controversy under Article III of the U.S. Constitution.

**Answer:**    Admitted that the Court has subject-matter jurisdiction over Defendants'

counterclaims.

10.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial portion of the acts, omissions and transactions giving rise to Counterclaim-Plaintiffs' injury occurred in this judicial district.

**Answer:**    Admitted that venue is proper in this judicial district. Frost denies any

remaining allegations of paragraph 10.

11.    The Court has personal jurisdiction over Frost Solutions because Frost Solutions filed the Complaint in this judicial district and/or otherwise has constitutionally sufficient contacts in this judicial district to empower this Court to exercise personal jurisdiction over Frost Solutions.

**Answer:**    Admitted that the Court has personal jurisdiction over Frost.

## FACTUAL BACKGROUND

12.     Patrick Baglien ("Baglien") and Lareau are former employees of Frost Control; they both left Frost Control in the fall of 2021.

**Answer:**     Admitted.

13.     Baglien was also an investor in Frost Control through Calvera Ventures LLC and thus received all Frost Control investor updates and related documents.

**Answer:**     Admitted that the Baglien family invested in Frost Control through an entity called Calvera Investments. Frost denies any remaining allegations of paragraph 13.

14.     Baglien and Lareau are the co-founders of Vue Robotics, which offers its ARC1 hardware and accompanying OmniVue software platform to deliver site monitoring services for weather and other environmental conditions.

**Answer:**     Admitted that Baglien and Lareau co-founded Defendant Vue Robotics, LLC and that Vue is a competitor to Frost in the road weather monitoring sector of the environmental sensing market.

15.     On or about September 27, 2021, Lareau tendered his notice of resignation from Frost Control.

**Answer:**     Admitted that on or around September 27, 2021, Lareau sent an email to Frost Control's management stating that he intended to resign his employment with Frost Control effective October 11, 2021, and that Lareau worked for Frost Control until October 11, 2021.

16.     Frost Control and Lareau entered into the Separation Agreement attached as Exhibit C to the Complaint, effective September 30, 2021. *See* ECF No. 1 at Exh. C.

**Answer:**     Admitted.

17.     Although the Separation Agreement was to be treated confidentially, Frost Solutions publicly disclosed the document by attaching it as an exhibit to the Complaint. ECF No. 1 at Exh. C.

**Answer:**        Admitted that Frost attached a copy of the Separation Agreement to its Complaint in this case. Frost denies any remaining allegations of paragraph 17.

18.    Victor Gill ("Gill"), one of Frost Control's former CEOs, drafted the Separation Agreement by revising a previous separation agreement used for another former Frost Control CEO, Bradley Tener ("Tener").

**Answer:**        Denied.

19.    Although the Separation Agreement is entitled, "Separation Agreement and Mutual Release," and Paragraph 2 is entitled, "Mutual General and Special Release," there is no mutual release in the Separation Agreement. Rather, the only release is from Lareau to Frost Control.

**Answer:**        Denied.

20.    The Separation Agreement does not contain a release from Frost Control to Lareau.

**Answer:**        Denied.

21.    Gill never informed Lareau that there was no mutual release in the Separation Agreement and, instead, he provided Lareau with an agreement that expressly states it contains a "mutual release."

**Answer:**        Denied.

22.    Accordingly, there was no meeting of the minds between Frost Control and Lareau concerning the terms of the Separation Agreement.

**Answer:**        Denied.

23.    The Separation Agreement is also not supported by adequate consideration. The only consideration for the Separation Agreement is recited in Paragraph 1, which consists of sales commissions and vacation time *already owed* to Lareau under the terms of his employment.

**Answer:**        Denied.

24.    In the paragraph entitled, "Breach of Agreement," the Separation Agreement expressly acknowledges that the consideration provided by Frost Control under the agreement is set forth in Paragraphs 1 and 2.b. *See* ECF No. 1 at Exh. C at ¶ 15.

**Answer:**        The allegations in paragraph 24 refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the terms of the referenced document, such allegations are denied.

25.        There is no paragraph 2.b. in the Separation Agreement. *See* ECF No. 1 at Exh. C at ¶ 2.

**Answer:**        The allegations in this paragraph refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the terms of the referenced document, such allegations are denied.

26.        In the prior Tener separation agreement, Paragraph 2.b. was the release from Frost Control to Tener. Gill deleted this provision when drafting Lareau's Separation Agreement.

**Answer:**        Denied.

27.        The Separation Agreement is thus void for lack of consideration.

**Answer:**        Denied.

28.        Upon information and belief, Frost Solutions was aware that the Separation Agreement was void for lack of consideration when it filed the Complaint and commenced the Action. At a minimum, Frost Solutions became aware during the Action that the Separation Agreement is void for lack of consideration, and yet it continued (and continues) to pursue contract-based claims against Lareau.

**Answer:**        Denied.

29.        The Separation Agreement also lacks a provision authorizing assignment of the agreement from Frost Control to Frost Solutions or any other party.

**Answer:**        The allegations in this paragraph refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the terms of the referenced document, such allegations are denied.

6

30.     The Separation Agreement contains a non-solicitation clause (the "Non-Solicit"). The Non-Solicit does not prohibit contact with Frost Control customers or prospects. *See* ECF No. 1 at Exh. C at ¶ 11.

**Answer:**     The allegations in this paragraph refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the terms of the referenced document, such allegations are denied. Answering further, admitted that the Separation Agreement includes a non-solicitation covenant.

31.     Lareau did not consent to assignment of the Separation Agreement from Frost Control to Frost Solutions or any other party.

**Answer:**     Denied.

32.     No one from Frost Control or Frost Solutions ever requested Lareau to consent to assignment of the Separation Agreement to Frost Solutions or any other party.

**Answer:**     Denied.

33.     Under Indiana law (which governs the Separation Agreement), a non-competition agreement ("non-compete") cannot be assigned without express consent from the employee.

**Answer:**     Admitted that the Separation Agreement includes a "Governing Law" provision stating that the agreement is governed by Indiana law. Frost denies any remaining allegations of paragraph 33.

34.     Frost Solutions cannot enforce the non-compete agreement against Lareau because Lareau never consented to assignment of that agreement to Frost Solutions or any other party.

**Answer:**     Denied.

35.     The same principle applies to the entire Separation Agreement — which contains more than one unenforceable restrictive covenant — and thus Frost Solutions similarly cannot enforce the entire Separation Agreement because Lareau never consented to assignment of that agreement to Frost Solutions or any other party.

**Answer:**     Denied.

7

36.    At the time it filed the Complaint, Frost Solutions knew or should have known that Lareau did not consent to the assignment of the Separation Agreement from Frost Control to Frost Solutions and that Frost Solutions was therefore barred from enforcing any of the restrictive covenants contained in the Separation Agreement against Lareau.

**Answer:**    Denied.

37.    Frost Solutions became aware during the Action that Lareau did not consent to assignment of the Separation Agreement to Frost Solutions and that Frost Solutions therefore cannot enforce any of the restrictive covenants contained in the Separation Agreement against Lareau, and yet it continued (and continues) to pursue this claim against Lareau.

**Answer:**    Denied.

38.    Baglien tendered his resignation from Frost Control on or about October 6, 2021.

**Answer:**    Admitted that Baglien worked for Frost Control until on or about October

20, 2021. Frost denies any remaining allegations of paragraph 38.

39.    On or about January 5, 2022, Baglien received a letter from Frost Control's law firm, Ray Quinney & Nebeker P.C. (the "Jan 5 Letter"), alleging that Baglien "may have violated duties of loyalty, care and good faith *during [his] employment with Frost Control."* (emphasis added). *See* Exh. F attached hereto.

**Answer:**    The allegations in this paragraph refer to a written document, the contents of

which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize

the terms of the referenced document, such allegations are denied.

40.    The Jan 5 Letter was drafted based on a timeline of facts prepared by Gill. Specifically, on or about December 21, 2021, Gill sent an email to Ray Quinney & Nebeker P.C. (the "Dec 21 Email") asserting that "[w]e've found several actions by [Baglien] *during his employee [sic] at Frost [Control] very concerning* and we are working on a detailed review of his behavior *including inappropriate spending on [sic] concerning travel, entertainment and dining. Payment of inappropriate unapproved bonuses, and other actions detrimental to the business."* (emphasis added) (collectively, the "Jan 5 Letter Grievances"). The email proceeds to lay out a timeline of events from when Baglien started at Frost Control in 2019 through December 7, 2021.

**Answer:**    The allegations in this paragraph refer to a written document, the contents of

which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize

the referenced document, such allegations are denied. Frost denies any remaining allegations of

paragraph 40.

41. Frost Solutions produced the Dec 21 Email in the Action on or about September 15, 2023 and, when later given the opportunity, affirmatively chose not to designate the document as privileged and claw it back.

**Answer:** Admitted that Frost produced in discovery the document referenced in paragraph 41. Frost denies any remaining allegations of paragraph 41.

42. The Jan 5 Letter Grievances do not include any allegations or claims concerning purported wrongdoing by Baglien *after* he resigned from Frost Control. Nor do the Jan 5 Letter Grievances include any alleged misappropriation of trade secrets or confidential information.

**Answer:** The allegations in this paragraph refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the referenced document, such allegations are denied.

43. Baglien did not respond to the Jan 5 Letter, and Frost Control did not send any further communications to Baglien concerning the Jan 5 Letter Grievances.

**Answer:** Denied.

44. The Jan 5 Letter triggered a duty for Frost Control to preserve all information relating to the Jan 5 Letter Grievances, including without limitation a duty to preserve Baglien's Frost Control laptop, Baglien's Frost Control emails, all Slack messages to/from/concerning Baglien, and any other devices or accounts to which Baglien had access while at Frost Control the (the "Baglien Materials Relevant to the Jan 5 Letter Grievances").

**Answer:** Denied.

45. Frost Control did not preserve all of the Baglien Materials Relevant to the Jan 5 Letter Grievances.

**Answer:** Denied.

46. Frost Solutions similarly did not preserve all of the Baglien Materials Relevant to the Jan 5 Letter Grievances after it subsequently acquired Frost Control's assets.

**Answer:** Denied.

47.     By Resolution of the Frost Control Stockholders on or about April 15, 2022 (the "April 15 Resolution"), it was decided that Frost Control would cease all business operations and notify its customers, creditors, and other stakeholders of the cessation of Frost Control's business operations. It was further decided that Frost Control would take whatever steps were necessary to liquidate Frost Control's assets and terminate all of the company's contracts, collect its receivables, and thereafter liquidate its assets.

**Answer:**     The allegations in this paragraph refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the referenced document, such allegations are denied. Answering further, Frost admits that the "Resolutions of the Stockholders of Frost Control Systems, Inc." signed on or around April 15, 2022, included that the Stockholders would cause Frost Control "to cease all business operations, to notify all customers that the platform and services provided by [Frost Control] will be shut down and no longer available for use effective immediately, to notify all creditors and other stakeholders of [Frost Control] (including customers) of these actions, to liquidate [Frost Control's] assets and apply the proceeds therefrom net of administrative fees and expenses, to the obligations due and owing to the creditors of [Frost Control] as their interests and priorities may appear or may be determined, and to dissolve the corporate existence of" Frost Control.

48.     Nearly two months after the April 15 Resolution and the cessation of Frost Control's business operations, on or about June 8, 2022, Frost Control, through its new law firm Ice Miller, sent Counterclaim-Plaintiffs the demand letter attached as Exhibit D to the Complaint (the "June 8 Letter"). *See* ECF No. 1 at Exh. D.

**Answer:**     The allegations in this paragraph refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the referenced document, such allegations are denied. Answering further, admitted that Frost Control's counsel sent a letter to Defendants on June 8, 2022, a copy of which was attached as Exhibit D to the initial complaint in this action. Frost denies any remaining allegations of paragraph

48.

49.     The allegations in the June 8 Letter are based on information that Frost Control *"learned last week"* — on or around June 2, 2022 — and track the allegations asserted in the Complaint, including, for example, allegations that Baglien and Lareau purportedly downloaded contact and deal information from Frost Control's HubSpot platform shortly before leaving Frost Control, and a claim that Lareau purportedly breached his Separation Agreement. *See* ECF No. 1 at Exh. D (emphasis added).

**Answer:**     The allegations in this paragraph refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the referenced document, such allegations are denied. Answering further, admitted that Baglien and Lareau wrongfully downloaded contact and deal information from Frost's HubSpot platform shortly before leaving Frost, and that Lareau breached his Separation Agreement. Frost denies any remaining allegations of paragraph 49.

50.     On or about July 5, 2022, Counterclaim-Plaintiffs responded, through counsel, to the June 8 Letter, denying all substantive allegations (the "July 5 Response Letter"). The July 5 Response Letter explained that Baglien and Lareau downloaded certain information from Frost Control's HubSpot platform as part of their routine job responsibilities and to assist the company in its transition to a new software platform, and further asserted that Baglien and Lareau each returned their Frost Control laptops at their time of departure and took no Frost Control information with them. *See* ECF No. 1 at Exh. E.

**Answer:**     The allegations in this paragraph refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the referenced document, such allegations are denied. Answering further, Frost admits that Defendants' counsel sent a letter to Frost Control's counsel on July 5, 2022, a copy of which was attached as Exhibit E to the initial complaint in this action. Frost denies any remaining allegations of paragraph 50.

51.     On or about June 23, 2022, Frost Control — which had ceased operations and was actively looking to liquidate — acknowledged that 1st Source Bank had a perfected security interest in Frost Control's assets (the "Frost Control Assets"). Frost Control then surrendered the Frost Control Assets to 1st Source Bank in partial satisfaction of Frost Control's debt.

**Answer:**    The allegations in this paragraph refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the referenced document, such allegations are denied.

52.    Specifically, on or about June 23, 2022, Frost Control, through its counsel Ice Miller, sent a letter to Baglien's attention via Calvera Ventures LLC (the "June 23 Letter"). The June 23 Letter states, "[p]ursuant to the [April 15 Resolution], a majority of the stockholders of Frost [Control] determined and resolved, *inter alia,* that Frost [Control] *would immediately cease business operations and begin liquidation of Frost [Control's] assets* for the benefits of its creditors and other stockholders." It describes the assets to be liquidated, including without limitation "[c]laims against Messrs. P. Baglien and Lareau for damages to Frost [Control] caused by or resulting from alleged conversion of certain Frost [Control]'s intellectual property rights, breach of contract and tortious interference with contract." (the "June 23 Letter Claims"). *See* Exh. G (attached hereto) (emphasis added

**Answer:**    The allegations in this paragraph refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the referenced document, such allegations are denied. Answering further, Frost admits that Frost Control's counsel sent a letter to Calvera Ventures, Jerome Baglien, and Patrick Baglien on June 23, 2022, a copy of which was attached as Exhibit G to the Amended Counterclaim in this action. Frost denies any remaining allegations of paragraph 52.

53.    The June 23 Letter Claims track the allegations and claims set forth in the June 8 Letter and, subsequently, the Complaint.

**Answer:**    Denied.

54.    The June 23 Letter Claims do not refer to the Jan 5 Letter Grievances.

**Answer:**    Denied.

55.    Frost Solutions purports to have acquired certain Frost Control Assets from 1St Source Bank pursuant to an asset purchase agreement (the "APA") on or about August 1, 2022 — nearly four months after the April 15 Resolution by which Frost Control declared it was immediately ceasing operations.

**Answer:**         Admitted that on August 9, 2022, Frost Solutions purchased the assets of

Frost Control. Frost denies any remaining allegations of paragraph 55.

56.      Frost Solutions' members are sophisticated investors, and thus Frost Control undoubtedly performed due diligence prior to executing the APA.

**Answer:**         Admitted that Frost Solutions' sole member is Clashmore Ventures, LLC,

and that Clashmore Ventures and its members are investors. Frost denies any remaining allegations

of paragraph 56.

57.      Accordingly, Frost Solutions learned, or should have learned, that Frost Control did not preserve all evidence relating to the claims asserted in the June 8 Letter, including without limitation Baglien and Lareau's Frost Control laptops, Baglien and Lareau's Frost Control email and Slack accounts, and/or Baglien and Lareau's contemporaneous downloads from HubSpot, Frost Control's CRM database (the "Evidence Relevant to the June 8 Letter").

**Answer:**      Denied.

58.      At a minimum, Frost Solutions had an obligation — prior to commencing litigation against Counterclaim-Plaintiffs — to investigate the defenses/explanations provided by Baglien and Lareau in the July 5 Response Letter and to preserve the Evidence Relevant to the June 8 Letter, such as Baglien and Lareau's Frost Control laptops, so that the evidence would later be available for forensic analysis by all interested parties.

**Answer:**      Denied.

59.      On October 5, 2022, without performing a sufficient pre-filing investigation, Frost Solutions commenced the Action.

**Answer:**         Admitted that Frost filed its initial complaint in this action on October 5,

2022. Frost denies any remaining allegations of paragraph 59.

60.      The Complaint alleges that, after purchasing the Frost Control Assets on or about August 9, 2022, Frost Solutions, "[t]hrough its counsel, . . . retained a forensics consultant *to image Baglien's and Lareau's company [Frost Control] laptops, perform an analysis of the underlying metadata activity on the laptops,* and perform a forensic analysis on Frost Solutions' and Frost Control's cloud-based systems to determine what else, if anything was taken by Baglien and/or Lareau." ECF No. 1 at ¶ 49 (emphasis added).

13

**Answer:** The allegations in this paragraph refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the referenced document, such allegations are denied. Answering further, the operative complaint is Frost's Amended Complaint at ECF No. 108.

61. The Complaint further alleges that "[t]hrough this investigation," Frost Solutions purportedly confirmed that "Lareau had downloaded the entire list of Frost Control's contacts from its CRM database, and Baglien had downloaded a complete list of all Frost Control's agreements with clients." ECF No. 1 at ¶ 50.

**Answer:** The allegations in this paragraph refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the referenced document, such allegations are denied. Answering further, the operative complaint is Frost's Amended Complaint at ECF No. 108.

62. The "investigation" referenced in ¶ 50 of the Complaint refers to the forensic investigation conducted by a consultant at the request of Frost Solutions' counsel, as alleged in ¶ 49 of the Complaint. ECF No. 1 at ¶¶ 49 and 50.

**Answer:** The allegations in this paragraph refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the referenced document, such allegations are denied. Answering further, the operative complaint is Frost's Amended Complaint (ECF No. 108).

63. Discovery has established that Frost Solutions included these allegations in the Complaint even though — at the time it commenced the Action — it did *not* have within its possession, custody, or control: (1) Baglien's Frost Control laptop; (2) Lareau's Frost Control laptop; (3) the contemporaneous files associated with Lareau's purported download of Frost Control's contacts; or (4) the contemporaneous files associated with Baglien's purported download of Frost Control's customer agreements.

**Answer:** Denied.

64. Discovery has established that Frost Solutions included these allegations in the Complaint even though — at the time it commenced the Action — it *knew it did not have* within its possession, custody, or control: (1) Baglien's Frost Control laptop; (2) Lareau's Frost Control laptop;

(3) the contemporaneous files associated with Lareau's purported download of Frost Control's contacts; or (4) the contemporaneous files associated with Baglien's purported download of Frost Control's customer agreements.

**Answer:**   Denied.

65.   In fact, as of the filing date of this Counterclaim, Frost Solutions still cannot produce or even state the whereabouts of Baglien's Frost Control laptop or Lareau's Frost Control laptop, despite alleging in the Complaint that a consultant hired by its counsel *"image[d] Baglien's and Lareau's company [Frost Control] laptops, [and] perform led] an analysis of the underlying metadata activity on the laptops."* ECF No. 1 at 1149 (emphasis added).

**Answer:**   Denied.

66.   Upon information and belief, prior to filing the Complaint, Frost Solutions did not investigate the statements Counterclaim-Plaintiffs made in the July 5 Response Letter and took no steps to investigate whether Baglien and Lareau had returned their Frost Control laptops upon their respective departures from Frost Control.

**Answer:**   Denied.

67.   After months of discovery and repeated requests from Counterclaim-Plaintiffs that Frost Solutions produce all of this information, Frost Solutions has now admitted that it does not have in its possession or control: (1) Baglien's Frost Control laptop; (2) Lareau's Frost Control laptop; (3) any of the contemporaneous files associated with Lareau's purported downloads from Frost Control's HubSpot platform; (4) any of the contemporaneous files associated with Baglien's purported downloads from Frost Control's HubSpot platform; (5) Baglien's Frost Control email archive; or (6) Lareau's Frost Control email archive.

**Answer:**   Denied.

68.   Though Frost Solutions utterly failed to preserve critical sources of potential evidence, it continues to pursue its claims against Counterclaim-Plaintiffs.

**Answer:**   Denied.

69.   Paragraphs 49 and 50 of the Complaint are not accurate.

**Answer:**   Denied. Answering further, the operative complaint is Frost's Amended

Complaint at ECF No. 108.

70.    The Complaint alleges that "[i]n June 2022, Frost Control learned from a press release that Baglien and Lareau had co-founded Vue Robotics and had developed the ARC1 technology. Frost Control suspected that [Counterclaim-Plaintiffs] may have misappropriated Frost [Control]'s trade secrets and confidential information in order to develop the technology and solicit Frost Control's customers." ECF No. 1 at ¶ 43.

**Answer:**    The allegations in this paragraph refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the referenced document, such allegations are denied. Answering further, the operative complaint is Frost's Amended Complaint (ECF No. 108).

71.    Neither Baglien nor Lareau is subject to an agreement that prohibits them from soliciting Frost Control customers, so long as no confidential information is improperly used in the process.

**Answer:**    Denied.

72.    Though Frost Control had ceased business operations as of April 15, 2022, the Complaint alleges that Frost Control "then discovered" (in or after June 2022) purported evidence that Baglien and Lareau downloaded information from Frost Control's HubSpot platform prior to their respective resignations. ECF No. 1 at ¶¶ 44-45.

**Answer:**    The allegations in this paragraph refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the referenced document, such allegations are denied. Answering further, the operative complaint is Frost's Amended Complaint (ECF No. 108).

73.    Baglien routinely downloaded information from Frost Control's HubSpot platform as part of his job responsibilities at Frost Control.

**Answer:**    Denied.

74.    Lareau routinely downloaded information from Frost Control's HubSpot platform as part of his job responsibilities at Frost Control.

**Answer:**    Denied.

75.     The Complaint further alleges that "[o]n June 8, 2022, counsel for Frost Control sent Baglien and Lareau a letter demanding that they cease using any trade secrets or confidential information belonging to Frost Control." ECF No. 1 at ¶ 46 and Exh. D.

**Answer:**      The allegations in this paragraph refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the referenced document, such allegations are denied. Answering further, the operative complaint is Frost's Amended Complaint (ECF No. 108).

76.     Paragraph 46 of the Complaint is a reference to the June 8 Letter.

**Answer:**      Admitted. Answering further, the operative complaint is Frost's Amended Complaint (ECF No. 108).

77.     The Complaint does not reference the Jan 5 Letter or the Jan 5 Letter Grievances. The Complaint also does not attach the Jan 5 Letter as an exhibit.

**Answer:**      The allegations in this paragraph refer to a written document, the attachments and contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the referenced document, such allegations are denied. Answering further, the operative complaint is Frost's Amended Complaint (ECF No. 108).

78.     On or about May 22, 2023, in response to an interrogatory asking Frost Solutions to describe with specificity its pre-filing investigation (the "May 22 Interrogatory Response"), Frost Solutions confirmed that it did not discover until "on or around June 2, 2022" that "Baglien and Lareau had [purportedly] stolen information from Frost to start a competing business." *See Exh.* H at 6 (attached hereto).

**Answer:**      The allegations in this paragraph refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the referenced document, such allegations are denied.

79.     The May 22 Interrogatory Response further states that "[o]n or before June 2, 2022, Frost [Control] contacted counsel to advise them of the situation and seek legal advice. On or around September 6, 2022, Plaintiff's counsel retained Digital Intelligence to perform digital forensics work." *Id.* at 7.

17

**Answer:**     The allegations in this paragraph refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the referenced document, such allegations are denied.

80.     The "digital forensics work" referenced in the May 22 Interrogatory Response corresponds to the work described in ¶¶ 49 and 50 of the Complaint.

**Answer:**     The allegations in this paragraph refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the referenced document, such allegations are denied. Answering further, the operative complaint is Frost's Amended Complaint at ECF No. 108.

81.     Kirsh, a principal of Frost Solutions through his interest in Clashmore Ventures, verified the May 22 Interrogatory Response. *See id.*

**Answer:**     Admitted.

82.     The May 22 Interrogatory Response does not reference the Jan 5 Letter or the Jan 5 Letter Grievances. *See id.*

**Answer:**     The allegations in this paragraph refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the referenced document, such allegations are denied.

83.     The May 22 Interrogatory Response confirms that the Jan 5 Letter Grievances are *entirely unrelated* to the allegations and claims asserted in the Action. Indeed, according to a sworn admission, neither Frost Control nor Frost Solutions began conducting its pre-filing investigation until on or around June 2, 2022, *nearly five months after the Jan 5 Letter.*

**Answer:**     Denied.

84.     On or about August 1, 2023, Frost Solutions supplemented the May 22 Interrogatory Response (the "Aug 1 Supplemental Interrogatory Response") to add that the law firm Ice Miller "participat[ed] in the investigation of Defendants' actions prior to Frost [Solutions'] retention of Taft, Stettinius & Hollister LLC, and by sending to Baglien and Lareau the cease and desist letter attached to the Complaint as Exhibit D: Ice Miller, LLP." *See* Exh. I at 4-5 (attached hereto).

**Answer:** Admitted that Frost supplemented its responses to Defendants' Second Set of Interrogatories on August 1, 2023. Answering further, the allegations in this paragraph refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the referenced document, such allegations are denied.

85. Kirsh, a principal of Frost Solutions through his interest in Clashmore Ventures, verified the Aug 1 Supplemental Interrogatory Response under oath. *See id.*

**Answer:** Admitted.

86. The Aug 1 Supplemental Interrogatory Response further confirms that the Jan 5 Letter Grievances are *entirely unrelated* to the to the allegations and claims asserted in the Complaint because the response: (1) does not identify the law firm which sent the Jan 5 Letter as being involved with any pre-filing investigation for the Complaint; and (2) does not reference the Jan 5 Letter.

**Answer:** Denied.

87. Frost Solutions also produced the Dec 21 Email in this Action on or about September 15, 2023, which specifically limits the basis of the Jan 5 Letter to Baglien's alleged actions *during* his employment at Frost Control and says nothing about trade secrets or confidential information.

**Answer:** Denied.

88. As part of their Fed. R. Civ. P. 26(a)(1) disclosures, Counterclaim-Plaintiffs produced on or about April 21, 2023 a copy of an insurance policy that may be used to satisfy all or part of a possible judgment in the Action (the "Insurance Policy").

**Answer:** Denied. Answering further, Defendants were required under Fed. R. Civ. P. 26(a)(1)(A)(iv) to disclose, as part of their initial disclosures, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in this action or to indemnify or reimburse for payments made to satisfy the judgment. Defendants did not produce a copy of the Insurance Policy or inform Frost of its existence when they first served their initial disclosures on December 22, 2022, in violation of Rule 26(a)(1)(A)(iv). Admitted that Defendants did not produce a copy of the Insurance Policy until on or about April 21, 2023—more than six

months after this action was filed—and did not amend their initial disclosures to identify the

Insurance Policy until January 12, 2024, after Frost confronted Defendants regarding their failure to

disclose it and more than a year after their initial disclosures were due.

89.    Counterclaim-Plaintiffs designated the Insurance Policy as Confidential Information pursuant to the Protective Order governing the confidentiality of information produced in the Action (the "Protective Order") (ECF No. 28) by marking each page "Confidential."

**Answer:**    Admitted.

90.    Frost Solutions never challenged the Confidential designation of the Insurance Policy pursuant to the procedure set forth in the Protective Order.

**Answer:**    Admitted.

91.    The Protective Order expressly provides that "Confidential Information or Highly Confidential Information under this Order shall not be used or disclosed by the parties, counsel for the parties or any other persons identified in Paragraph 5(b) or *(c)for any purpose whatsoever other than to prepare for and to conduct discovery, hearings and trial in this action, including any appeal thereof" See* ECF No. 28 at ¶ 5.a. (emphasis added).

**Answer:**    The allegations in this paragraph refer to a written document, the contents of

which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize

the referenced document, such allegations are denied.

92.    On October 23 and November 27, 2023, the parties participated in two days of mediation, which did not succeed in resolving the Action.

**Answer:**    Admitted.

93.    Curiously, despite having received a copy of the Insurance Policy months earlier, shortly after the first day of mediation, counsel for Frost Solutions began demanding that the Counterclaim-Plaintiffs produce a copy of the Insurance Policy and any reservation of rights letters issued by the insurance carrier. Frost Solutions' counsel began demanding this information — as well as the remaining limits on the policy — on October 27, 2023.

**Answer:**    Denied.

20

94.     On November 1, 2023, counsel for the Counterclaim-Plaintiffs informed counsel for Frost Solutions that the Insurance Policy was produced to them on April 21, 2023 and identified the production number assigned to the document.

**Answer:**     The allegations in this paragraph refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the referenced document, such allegations are denied.

95.     Three days after the second day of mediation, on November 30, 2023, Counterclaim-Plaintiffs' insurance carrier received a phone call from a person who identified himself only as "Mike," and who called from the mobile number 312-825-3155.

**Answer:**     Admitted in part and denied in part. While this litigation was pending, Michael Kirsh discovered that Vue's insurer was paying for Defendants' defense. Curious as to the type of coverage that would defend or indemnify a company in this type of litigation, Kirsh called Frost's insurer to inquire as to whether Frost had similar coverage. Unsatisfied with the result of that call, Kirsh called Vue's insurer to request information about Vue's policy, and identified himself as an adverse party in litigation with Vue during that call. Frost denies any remaining allegations of paragraph 95.

96.     Because the Insurance Policy was marked "Confidential," Frost Solutions was barred from using the document *for any purpose whatsoever other than to prepare for and conduct discovery, hearings and trial in this action, including any appeal thereof." See* ECF No. 28 at ¶ 5.a. (emphasis added).

**Answer:**     The allegations in this paragraph refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the referenced document, such allegations are denied.

97.     Counterclaim-Plaintiffs' insurance carrier returned "Mike's" call. "Mike" told the insurance carrier: (1) he was in litigation with Vue Robotics; (2) he was aware the Counterclaim-Plaintiffs had received a letter from "Frost" *dated January 5, 2022* accusing them of "bad stuff'; and (3) that the Jan 5 Letter was attached as an exhibit to the mediation brief.

**Answer:**     Admitted in part and denied in part. Kirsh identified himself as an adverse party in litigation with Vue during that call. Kirsh had no reason to know that Defendants had not

21

already submitted the January 5 Letter as part of Vue's insurance application. The remaining

characterizations in this paragraph, including the alleged use of the phrase "bad stuff" and the

allegation regarding the mediation brief, are denied.

98.     The purpose of "Mike's" call was to persuade the insurance carrier that the Counterclaim-Plaintiffs had omitted material information from their insurance application, thereby triggering an investigation that would lead the carrier to withdraw coverage for the Action.

**Answer:**     Denied.

99.     As verified by publicly available information, the mobile number used by "Mike" belongs to Michael Kirsh, a principal of Frost Solutions through his interest in Clashmore Ventures.

**Answer:**     Admitted that Kirsh called Vue's insurer, that the sole member of Frost

Solutions is Clashmore Ventures LLC, whose members are Michael Kirsh and Michael Bott, and

that Kirsh functions as co-CEO of Frost Solutions and is involved in its day-to-day operations.

Frost denies any remaining allegations of paragraph 99.

100.    Kirsh is the person who called Counterclaim-Plaintiffs' insurance carrier on or about November 30, 2023 and identified himself as "Mike."

**Answer:**     Admitted that Kirsh called Vue's insurer. Frost denies any remaining

allegations of paragraph 100.

101.    Despite verifying the May 22 Interrogatory Response and the Aug 1 Supplemental Interrogatory Response and knowing that the Jan 5 Letter Grievances were entirely unrelated to the allegations and claims asserted in the Complaint based, in part, on the Dec 21 Email Frost Solutions itself produced in the Action, Kirsh contacted Counterclaim-Plaintiffs' insurance carrier and provided a knowingly false description of the Jan 5 Letter for the purpose of persuading the carrier to withdraw its coverage of Counterclaim-Plaintiffs.

**Answer:**     Denied.

102.    Kirsh called the Counterclaim-Plaintiffs' carrier and tried to strip Counterclaim-Plaintiffs of their insurance coverage *by relaying information he knew to be false.*

**Answer:**     Denied.

103.     Kirsh did this because he believed that — without the benefit of their insurance coverage — Counterclaim-Plaintiffs would be unable to defend themselves in the Action and they would be driven out of business.

**Answer:**     Denied.

104.     Kirsh violated the Protective Order by using the information he learned from the Insurance Policy — designated as Confidential Information — for a purpose unrelated to preparing for and conducting discovery, hearings, or trial in the Action.

**Answer:**     Denied.

105.     On or about January 5, 2024, Counterclaim-Plaintiffs received a letter from their insurance carrier indicating that their coverage may be in jeopardy because of the allegations raised in the Jan 5 Letter (the "Insurance Reconsideration Letter").

**Answer:**     Admitted that on or about January 5, 2024, Counterclaim-Plaintiffs received

a letter from Vue's insurance carrier informing them that it was opening an investigation into their

insurance application. Frost denies any remaining allegations of paragraph 105.

106.     The first step of Kirsh's plan to destroy a competitor had worked. By knowingly providing the carrier with false information, Kirsh had triggered an investigation into whether Counterclaim-Plaintiffs had withheld material information during the insurance application process.

**Answer:**     Denied.

107.     By deceiving Counterclaim-Plaintiffs' insurance carrier, Kirsh caused the carrier to erroneously suspect that the Jan 5 Letter had put Counterclaim-Plaintiffs on notice of the claims asserted in the Action. Kirsh did so even though he knew that the Jan 5 Letter Grievances were entirely unrelated to the allegations and claims asserted in the Complaint.

**Answer:**     Denied.

108.     However, Frost Solutions was unaware that Kirsh's plan had succeeded because no one was providing ongoing information to Frost Solutions about the status of Counterclaim-Plaintiffs' insurance coverage and whether the carrier had taken any action in response to Kirsh's call.

**Answer:**     Denied.

109.     Apparently believing that Kirsh's "anonymous" telephone call had not worked, Frost Solutions decided to again bring the Jan 5 Letter — and the fraudulent argument that that letter had put Counterclaim-Plaintiffs on notice of the claims of the Action — to the insurance carrier's attention. This time Frost Solutions would use one of its attorneys to peddle the false narrative.

**Answer:**     Denied.

110.     On or about January 11, 2024, Frost Solutions, through one of its attorneys of record and agent (the "Frost Solutions Attorney"), sent a letter to counsel for Counterclaim-Plaintiffs (the "Jan 11 Letter") in which he stated, "we have serious concerns as to the extent of coverage. We have requested any reservations of rights letter. *As you know, your client was put on notice of this claim on January* 5*, 2022.[1] It appears that the insurance company was not notified until sometime after. As such, there may be a coverage issue and we would like to know if that is the case. . . ."* (Emphasis added.) The Frost Solutions Attorney also *expressly* requested that his Jan 11 Letter be shared with Counterclaim-Plaintiffs' insurance carrier.

**Answer:**     The allegations in this paragraph refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the referenced document, such allegations are denied. Frost denies any remaining allegations of paragraph 110.

111.     The purpose of the Jan 11 Letter was to establish an indirect conduit to Counterclaim-Plaintiffs' insurance carrier so Frost Solutions could relay false information intended to provoke an investigation into whether Counterclaim-Plaintiffs withheld information from their insurance application, thereby jeopardizing Counterclaim-Plaintiffs' insurance policy and coverage.

**Answer:**     Denied.

112.     Upon information and belief, the Frost Solutions Attorney knew that his assertion that Counterclaim-Plaintiffs were put on notice of "this claim" — *i.e.,* the claims in the Action — on January 5 (based on the Jan 5 Letter) was false based on, at a minimum, the allegations in the Complaint, the May 22 Interrogatory Response, the Aug 1 Supplemental Interrogatory Response, and the Dec 21 Email — all of which were known to the Frost Solutions Attorney, as counsel of record for Frost Control in the Action.

---

[1] Tellingly, Frost Solutions' counsel sent two versions of the Jan. 11 Letter. The first asserted that "your client was put on notice of this claim on June 8, 2022," which refers to the letter attached as Exhibit D to the Complaint. Shortly thereafter, a "corrected version" of the letter was sent that changed June 8, 2022 to January 5, 2022.

   **Answer:**  The allegations in this footnote refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the referenced document, such allegations are denied.

**Answer:**    Denied.

113.    Upon information and belief, prior to his decision to send the Jan 11 Letter, the Frost Solutions Attorney was aware that Kirsh had called Counterclaim-Plaintiffs' insurance carrier.

**Answer:**    Denied.

114.    When he insisted that counsel share the Jan 11 Letter with Counterclaim- Plaintiffs' insurance carrier, the Frost Solutions Attorney — as an agent of Frost Solutions —he knew that the Jan 5 Letter Grievances were entirely unrelated to the allegations and claims asserted in the Complaint.

**Answer:**    Denied.

115.    The Frost Solutions Attorney, as an agent of Frost Solutions, misled the insurance carrier through his Jan 11 Letter.

**Answer:**    Denied.

116.    On or about January 15, 2024, Counterclaim-Plaintiffs' counsel responded to the Jan 11 Letter noting that reference to the Jan 5 Letter and a potential "coverage issue" suggested that someone may have taken steps to encourage the insurance carrier to reconsider its coverage position (the "Jan 15 Letter"). Counsel also reiterated that the Jan 5 Letter has no bearing on the underlying litigation, as supported by the Dec 21 Email, other than to reinforce that Frost Control and Frost Solutions engaged in spoliation. Counterclaim-Plaintiffs' counsel requested that Frost Solutions repair the damage it had caused by acknowledging in a stipulation that the Jan 5 Letter did not — and could not have — put Counterclaim-Plaintiffs on notice of any of the claims in the Action.

**Answer:**    The allegations in this paragraph refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the referenced document, such allegations are denied.

117.    On or about January 24, 2024, Frost Solutions' counsel responded to the Jan 15 Letter accusing Counterclaim-Plaintiffs of trafficking in a *Through the Looking-Glass-style* "conspiracy theory," falsely denying that anyone from Frost Solutions had contacted Counterclaim-Plaintiffs' insurance carrier.

**Answer:**    The allegations in this paragraph refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the referenced document, such allegations are denied. Frost denies any remaining allegations of

25

paragraph 117.

118.    As a direct and proximate result of Frost Solutions' false statements and improper conduct, Counterclaim-Plaintiffs were forced to: (1) incur substantial additional defense counsel legal fees to address the interference; and (2) retain separate coverage counsel to expose and counteract the lies that Frost Solutions had fed the insurance carrier.

**Answer:**    Denied.

119.    As a direct and proximate result of Frost Solutions' false statements and improper contact with Counterclaim-Plaintiffs' insurance carrier, Counterclaim-Plaintiff Lareau, who served his country honorably in Iraq and Afghanistan, experienced and continues to experience severe emotional distress.

**Answer:**    Admitted that Lareau is a former member of the armed forces. Frost denies

any remaining allegations of paragraph 119.

120.    Following Lareau's discharge from the military, he began seeing a psychiatrist as an outlet to discuss his service in Iraq and Afghanistan. This course of treatment had proven successful.

**Answer:**    Admitted that Lareau is a former member of the armed forces, that medical

records show that Lareau has been on a treatment plan for several years, and that Lareau has

designated Nurse Practitioner Daniel Salazar, PMHNP-BC as his treating healthcare professional.

Frost denies any remaining allegations of paragraph 120.

121.    The Insurance Policy has allowed Counterclaim-Plaintiffs to defend themselves against Frost Solutions, whose pockets are far deeper than theirs. Without the Insurance Policy, Counterclaim-Plaintiffs would have been buried by the Action because they simply could not afford the cost of defense.

**Answer:**    Frost lacks knowledge or information sufficient to form a belief as to the

truth of the specific allegations in paragraph 121, and therefore denies them.

122.    Upon receipt of the Insurance Reconsideration Letter, which announced that the carrier was reconsidering its coverage position, Lareau began suffering from serious mental and emotional harm accompanied by anxiety, loss of appetite, loss of interest in activities, and insomnia. The emotional distress has impacted his personal relationships. The timing and severity of these conditions are documented.

**Answer:**    Denied.

123.    As a result of the mental and emotional harm and accompanying physical symptoms proximately caused by Frost Solutions' tortious interference, Lareau's psychiatrist altered his medications because the long-term treatment plan that had been working was no longer effective. Lareau remains on this altered medical treatment plan, but symptoms persist nonetheless.

**Answer:**    Denied.

124.    It was foreseeable that Frost Solutions' actions to strip Counterclaim-Plaintiffs' insurance coverage (which, if successful, would have put Counterclaim-Plaintiffs out of business and expose Lareau to personal liability without any insurance coverage) would cause Lareau to suffer emotional distress.

**Answer:**    Denied.

125.    In fact, upon information and belief, the point of Kirsh "dropping a dime" with Counterclaim-Plaintiffs' carrier in the first place was to put Counterclaim-Plaintiffs out of business.

**Answer:**    Denied.

126.    The only reason Frost Solutions would seek to strip Counterclaim-Plaintiffs of the insurance coverage protecting them in the Action is to put Counterclaim-Plaintiffs out of business, which would foreseeably cause Lareau significant mental anguish.

**Answer:**    Denied.

127.    There can be no doubt that Kirsh and Frost Solutions appreciated the potential impact of Kirsh's actions, and the subsequent related actions of their attorney and agent, when they decided to take those actions.

**Answer:**    Denied.

128.    The actions of Frost Solutions and Kirsh and their attorney and agent inflicted emotional distress on Lareau. Lareau has been harmed — and continues to be harmed — by those actions in an amount to be determined at trial.

**Answer:**    Denied.

129.    Notably, Frost Solutions' tortious interference with the Insurance Policy and Defendants' insurance coverage is not the first time Frost Solutions attempted to disrupt Counterclaim-Plaintiffs' business.

**Answer:**    Denied.

130.    While Vue Robotics and Frost Solutions offer competing products and services, Vue Robotics' products and services are far superior.

**Answer:**    Admitted that Vue is a direct competitor of Frost and offers competing

products and services. Frost denies any remaining allegations of paragraph 130.

131.    From the beginning of this dispute, Frost Solutions has made clear that it would use the litigation process to embarrass, disparage, pummel, and, eventually, destroy its start-up competitor Vue Robotics.

**Answer:**    Denied.

132.    Frost Solutions did not wait long to make known its true motive. Specifically, on October 20, 2022, both Vue Robotics and Frost Solutions were exhibiting at the same trade show, Equip Exposition 2022, in Louisville, Kentucky.

**Answer:**    Admitted that representatives of Frost attended the Equip Exposition trade

show in Louisville, Kentucky in 2022. Frost denies any remaining allegations of paragraph 132.

133.    At approximately 3:30 p.m. on October 20, someone affiliated with Frost Solutions — upon information and belief — provided a process server with trade show access credentials so that she could access the exhibition floor and serve the Complaint on Lareau while he was at the Vue Robotics booth exhibiting a prototype to potential customers. *See* ECF No. 6 (Affidavit of Service on Lareau).

**Answer:**    Frost admits that Lareau was served with the summons and a copy of the

initial complaint in this action in accordance with the Federal Rules of Civil Procedure. Frost denies

any remaining allegations of paragraph 133.

134.    The process server, donning her trade show credentials lanyard, stood in a line of people waiting to speak with Lareau at the Vue Robotics booth. Once the process server was at the front of the line, she served the Complaint on Lareau — in front of other people, including potential customers.

**Answer:**    Frost admits that Lareau was served with the summons and a copy of the

initial complaint in this action in accordance with the Federal Rules of Civil Procedure. Frost denies

any remaining allegations of paragraph 134.

135.    Frost Solutions' goal was to make a spectacle of Lareau getting served with the Complaint. Indeed, Frost Solutions facilitated service of the Complaint on Lareau in the middle of a trade show to embarrass and harass Lareau and to interfere with Counterclaim-Plaintiffs' business and their efforts to promote their products and establish commercial relationships.

**Answer:**    Denied.

136.    As another example, Frost Solutions' representatives have actively promoted its litigation against Counterclaim-Plaintiffs and used the Action to dissuade at least one potential commercial partner from working with Counterclaim-Plaintiffs.

**Answer:**    Denied.

137.    Specifically, in early 2023, Counterclaim-Plaintiffs were in discussions with Sitefotos to form a partnership that would allow their respective products and services to work with one another. Frost Solutions also met with Sitefotos to inquire about a potential partnership. When Sitefotos told Frost Solutions that it was already in discussions with Vue Robotics, Frost Solutions, upon information and belief, proceeded to let Sitefotos know about Frost Solutions' lawsuit against Counterclaim-Plaintiffs to, upon information and belief, discourage Sitefotos from working with Counterclaim-Plaintiffs.

**Answer:**    Admitted that Frost Solutions and Sitefotos do business with one another.

Frost denies any remaining allegations of paragraph 137.

138.    Sitefotos is not a partner of Vue Robotics. Upon information and belief, Sitefotos partnered with Frost Solutions instead.

**Answer:**    Admitted that Frost Solutions and Sitefotos do business with one another.

Frost denies any remaining allegations of paragraph 138.

139.    Moreover, during the September 28–30, 2022 Western Snow and Ice Conference in Loveland, Colorado, Bott, a principal of Frost Solutions through his interest in Clashmore Ventures, verbally accosted Cory Moore, who works for Vue Robotics' partner TAPCO and who was working at Vue Robotics' exhibitor booth during the conference, and threatened him in front of other vendors and prospective customers.

**Answer:**    Admitted that representatives of Frost attended the 2022 Western Snow and

Ice Conference in Loveland, Colorado and that Michael Bott had a short conversation with Cory

Moore. Frost denies all remaining allegations of paragraph 139.

140.    Upon information and belief, Frost Solutions has engaged — and will continue to engage — in other actions to interfere with Defendants' business, including touting this lawsuit as a basis for potential prospects to avoid doing business with Defendants. Defendants' investigation into such actions is ongoing.

**Answer:**    Denied.

141.    Frost Solutions has also abused the discovery process during the Action, using it to bludgeon Counterclaim-Plaintiffs. Despite repeated requests from Counterclaim-Plaintiffs, it took Frost Solutions the better part of a year to finally admit that it does not have: (1) Baglien's Frost Control laptop; (2) Lareau's Frost Control laptop; (3) any of Lareau's contemporaneous downloads from Frost Control's HubSpot platform; (4) any of Baglien's contemporaneous downloads from Frost Control's HubSpot platform; (5) Baglien's Frost Control email archive; (6) Lareau's Frost Control email archive; or (7) slack messages between Baglien and key Frost personnel.

**Answer:**    Denied.

142.    In November 2022, Vue sold its ARC1 system and monitoring services to a customer headquartered in New York called the East End Group.

**Answer:**    Admitted that in November 2022, a company called East End Group, Inc.

ordered a unit of Vue's ARC 1 System and signed Quotation #S00024.

143.    East End Group's Chief Operating Officer was Jason Ostrander ("Ostrander").

**Answer:**    Admitted that Jason Ostrander served as East End Group's Chief Operating

Officer in November 2022.

144.    East End Group agreed to Vue's terms and conditions as part of its purchase of Vue's ARC1 system and monitoring subscription. Among those terms and conditions was a promise by East End Group that it, among other things: (a) would use Vue's products and services only as permitted by the terms and conditions; (b) would refrain from making Vue's products and services available to third parties for the third parties' business operations; (c) would refrain from reverse engineering any of Vue's products or services; and (d) would not disclose Vue's confidential information.

**Answer:**    Denied.

30

145.     While he was employed by East End Group, Vue allowed Mr. Ostrander to create unique log-in credentials so he could access OmniVue, Vue's software platform.

**Answer:**     Admitted.

146.     According to publicly available information, including Mr. Ostrander's LinkedIn profile, Mr. Ostrander left East End Group and was hired by Frost Solutions in October 2024. It is unknown when Mr. Ostrander started talking to Frost Solutions about employment. Mr. Ostrander was ultimately hired as Frost Solutions' Vice President of Commercial Operations.

**Answer:**     Admitted that Jason Ostrander resigned from full-time employment with East End Group in the fall of 2024, but stayed on part-time at East End Group until April 2025; that on or around September 30, 2024, Ostrander joined Frost as its Vice President of Commercial Operations; and that Ostrander's employment with East End Group and Frost overlapped for approximately seven months.

147.     On November 26, 2024, Vue learned that Mr. Ostrander, after becoming Frost Solutions' Vice President of Commercial Operations and his employment with East End Group ended, utilized his log-in credentials to surreptitiously access Vue's platform and East End Group's confidential site information.

**Answer:**     Admitted that Ostrander accessed Vue's platform in connection with performing his job duties for East End Group. Frost denies any remaining allegations of paragraph 147.

148.     Upon discovering Mr. Ostrander's unauthorized and unlawful access, Vue examined log in data for his account and realized that Mr. Ostrander entered Vue's systems eight separate times in the 30 days prior to the discovery of his unlawful activities. The logs also indicate that Mr. Ostrander accessed the Vue network in September 2024.

**Answer:**     Admitted that Ostrander accessed Vue's platform in connection with performing his job duties for East End Group. Frost denies any remaining allegations of paragraph 147.

149.     In the process of accessing Vue's systems, Mr. Ostrander ignored warnings appearing throughout Vue's systems that those who access the systems without authorization will be prosecuted. Those warnings read:

*"Application copyright © Vue Robotics. Platform copyright © ObjectSpectrum, LLC. All rights reserved worldwide. WARNING: Unauthorized access is prohibited. This system is for use only by authorized users for authorized purposes, and any unauthorized access will be prosecuted to the fullest extent of the law. All activity is monitored and logged for security and administrative purposes. By proceeding, you are acknowledging that you have read and understood this notice and that you consent to such monitoring. Version: 3.1.2 Build 3222"*

**Answer:**    Denied.

150.    The logs indicate that Ostrander spent time rooting around in Vue's network and systems, during which time he was able to access key components of the OmniVue interface and functionalities of the ARC1 system. Ostrander's unauthorized access was intentional and premeditated. Ostrander breached both the desktop and mobile applications, executing a rapid and unauthorized exfiltration of data. He also had access to upgrades and new functionalities that Vue had delivered to its customers within the weeks prior to his unlawful entry into the system. Mr. Ostrander's new employer, Frost Solutions, can use that intelligence to gain an unfair advantage in modifying its own products and systems and when pitching its competitive products and services to potential customers.

**Answer:**    Denied.

151.    There is no legitimate reason for Frost Solution's Vice President of Commercial Operations to access Vue's proprietary systems — certainly not through login credentials provided pursuant to a subscription agreement with his former employer. Ostrander's improperly motivated misuse of his login credentials is part of Frost Solutions' calculated, orchestrated corporate espionage campaign to seek an unfair advantage in the marketplace.

**Answer:**    Denied.

152.    The clandestine access into Vue's systems was also intended to skirt the Protective Order issued by this Court to govern discovery. Vue has utilized the Protective Order as it was intended — to produce some materials marked as "Confidential" so they could be shared with Frost Solutions and other materials as "Highly Confidential — Attorneys' Eyes Only" so those materials could be produced to Frost Solutions' counsel, but would not be shared with the principals of Frost Solutions. Mr. Ostrander's abuse of his log-in credentials allowed Frost Solutions to get access to information that is similar to, if not identical to, information that Vue has or will designate in discovery as "Highly Confidential — Attorneys' Eyes Only." By using Mr. Ostrander's log-in credentials to allow Frost Solutions' employees to access information that otherwise would have been limited to just their attorneys, Frost Solutions once again improperly sought to avoid the limitations of the Protective Order.

**Answer:**    Denied.

153.    Within days of discovering that a Frost Solutions Vice President had abused his log-in credentials, Vue, through counsel, sent a letter dated November 27, 2024 to counsel for Frost Solutions demanding that Frost Solutions cease all efforts to hack into Vue's systems. Vue also requested that Frost Solutions preserve information relating to Ostrander's access and cooperate in employing a forensic technical specialist to search for and remove any information or files that Ostrander obtained during his unlawful entry into Vue's systems.

**Answer:**    Admitted that Vue's counsel sent a letter to Frost's counsel on or about

November 27, 2024, concerning the allegations in paragraph 153. Frost denies any remaining

allegations of paragraph 153.

154.    Given the gravity of the situation and the need to prevent the further distribution of Vue's information throughout Frost Solutions' company, Vue insisted that Frost Solutions respond by December 4, 2024. Frost Solutions did not respond by December 4, 2024.

**Answer:**    Admitted that Vue's counsel sent a letter to Frost's counsel on or about

November 27, 2024, concerning the allegations in paragraph 153. Frost denies any remaining

allegations of paragraph 154.

155.    Rather, on December 5, 2024, counsel for Frost Solutions sent a one sentence response stating that Frost Solutions had decided, unilaterally, that it would respond "by December 11, 2024." Frost Solutions did not respond by December 11, 2024.

**Answer:**    Admitted that Vue's counsel sent a letter to Frost's counsel on or about

November 27, 2024, concerning the allegations in paragraph 153. Frost denies any remaining

allegations of paragraph 155.

156.    Frost Solutions eventually responded through counsel by letter dated December 14. 2024. In that letter, Frost Solutions admitted that Mr. Ostrander accessed Vue's systems after he was hired as Frost Solutions' Vice President of Commercial Operations. Frost Solutions neither denied that it had received information about Vue's systems as a result of Mr. Ostrander's access nor provided any assurances that it would refrain from using information Mr. Ostrander accessed.

**Answer:**    Admitted that Frost's counsel sent a letter to Vue's counsel on December 13,

2024, in response to Vue's November 27, 2024 letter. Frost denies any remaining allegations of

paragraph 156.

157.     TAPCO is a marketer and reseller of goods in the Transportation and Government Services industry. As to Vue, TAPCO serves an important role in selling Vue's products and services to public entities throughout the country. TAPCO represents approximately 50% of Vue's sales in a given year.

**Answer:**     Admitted that TAPCO is a provider of traffic safety and parking solutions and has a network through which it can distribute road safety products to its customers. Frost denies any remaining allegations of paragraph 157.

158.     In March 2024, TAPCO and Vue entered into a Sales Representation and Distribution Agreement (the "TAPCO Agreement"). Under the TAPCO Agreement, TAPCO was identified as Vue's preferred dealer for the government market (i.e. to public entities). TAPCO agreed to market and sell Vue's products and services to public entity customers throughout the country. In return, TAPCO would be paid a fee based on the Vue products and services sold.

**Answer:**     Admitted that on March 1, 2024, TAPCO and Vue entered into a Sales Representation and Distribution Agreement. Answering further, the allegations of paragraph 158 refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the terms of the referenced document, such allegations are denied.

159.     Pursuant to this agreement, Vue invested significant time, resources, and effort into developing the TAPCO relationship. Vue also forewent opportunities to develop relationships with other similar parties because it had entered into the TAPCO Agreement.

**Answer:**     Frost lacks knowledge or information sufficient to form a belief as to the truth of the specific allegations of paragraph 159, and therefore denies them.

160.     In the TAPCO Agreement, TAPCO promised to use commercially reasonable efforts to market and promote Vue's products and services, to establish and maintain a sales and marketing organization sufficient to market and sell Vue's products and services, to keep secret Vue's confidential information, and to achieve certain minimum market and sales performance metrics.

**Answer:**     The allegations of paragraph 160 refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize

the terms of the referenced document, such allegations are denied.

161.    The term of the TAPCO Agreement runs until February 25, 2025, unless it is sooner terminated due to a party's material breach that could not be cured or was not cured within 10 days after receiving notice of the breach.

**Answer:**    The allegations of paragraph 161 refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the terms of the referenced document, such allegations are denied.

162.    Frost Solutions knew that TAPCO had entered into an agreement with Vue under which TAPCO was marketing and selling Vue's products and services.

**Answer:**    Admitted that Frost became aware at some point before the filing of this answer that TAPCO and Vue had entered into an agreement. Frost denies any remaining allegations of paragraph 162.

163.    In parallel with this Action, Frost Solutions initiated a lawsuit against Cory Moore ("Moore"), another former Frost Control employee, who subsequently was employed by TAPCO, in the United States District Court for the Northern District of Illinois, *Frost Solutions, LLC v. Cory Moore, 1:22-cv-06910* (the "Moore Action"). Frost Solutions alleged in the Moore Action that Moore had stolen trade secrets and confidential information to solicit Frost Solutions customers on behalf of TAPCO. Frost Solutions eventually amended its complaint in the Moore Action to name TAPCO itself as a defendant and allege that TAPCO had tortiously interfered with Frost Solutions' contracts and prospective business relations. In the Moore Action, Frost Solutions characterized TAPCO as a competitor.

**Answer:**    Admitted that on December 8, 2022, Frost filed a lawsuit against Cory Moore related to Moore's theft and misuse of Frost's confidential business information and trade secrets and to enforce his contractual obligations to Frost, and that Frost amended its complaint in that lawsuit to assert claims against TAPCO. Frost denies any remaining allegations of paragraph 163.

164.    In late October or early November 2024, Frost Solutions settled the claims it asserted against Moore and TAPCO in the Moore Action.

**Answer:**    Admitted that Frost's lawsuit against Cory Moore and TAPCO settled in November 2024.

165.    Upon information and belief, as part of the settlement of the Moore Action, TAPCO agreed to terminate Moore's employment with TAPCO. Upon information and belief, at the time of the settlement with TAPCO, Frost Solutions knew that the TAPCO Agreement would not validly expire until February 25, 2025.

**Answer:**    Denied.

166.    Upon information and belief, Frost Solutions required TAPCO to terminate the TAPCO Agreement with Vue, cease its dealings with Vue and commence a new relationship with Frost Solutions.

**Answer:**    Denied.

167.    On November 6, 2024, TAPCO sent an email and letter to Baglien purporting to terminate the TAPCO Agreement with immediate effect.

**Answer:**    Admitted that on or about November 6, 2024, Vue received a letter from TAPCO terminating the TAPCO Agreement. Frost denies any remaining allegations of paragraph 167.

168.    TAPCO identified as the "primary basis" for the termination that TAPCO recently discovered that its now former employee, Moore, suffered from a conflict of interest because of an unspecified "financial relationship" with Vue. TAPCO did not identify any clause in the TAPCO Agreement that prohibited or even addressed whether employees of TAPCO could have a "financial relationship" with Vue. As such, TAPCO failed to identify a contractual obligation breached by Vue or allow Vue an opportunity to attempt to cure a breach (if one occurred, which it did not).

**Answer:**    The allegations in this paragraph refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the terms of the referenced document, such allegations are denied. Answering further, Frost admits that TAPCO terminated its relationship with Vue because it discovered that Vue failed to disclose to TAPCO that Moore was a Vue investor when he had been responsible for negotiating contract terms on TAPCO's behalf, and he had discretion over the margins at which to sell Vue products,

and that TAPCO conveyed that this constituted an unacceptable conflict of interest and violation of the implied covenant of good faith and fair dealing. Frost denies any remaining allegations of paragraph 168.

169.    TAPCO contended that Vue violated the covenant of good faith and fair dealing implied in the TAPCO Agreement, but it did not identify any clause within the TAPCO Agreement from which such a covenant could extend that related to Moore's "financial relationship" with Vue. Again, TAPCO did not afford Vue an opportunity to attempt to cure whatever breach allegedly supported terminating the TAPCO Agreement.

**Answer:**    The allegations in this paragraph refer to a written document, the contents of which speak for themselves. To the extent these allegations are inconsistent with or mischaracterize the terms of the referenced document, such allegations are denied. Answering further, Frost admits that TAPCO terminated its relationship with Vue because it discovered that Vue failed to disclose to TAPCO that Moore was a Vue investor when he had been responsible for negotiating contract terms on TAPCO's behalf, and he had discretion over the margins at which to sell Vue products, and that TAPCO conveyed that this constituted an unacceptable conflict of interest and violation of the implied covenant of good faith and fair dealing. Frost denies any remaining allegations of paragraph 169.

170.    TAPCO did not identify or even suggest that it actually suffered any harm as a result of Moore's allegedly improper "financial relationship." TAPCO's proffered reasons for prematurely terminating the TAPCO Agreement with Vue are pretextual, and upon information and belief, Frost Solutions was instrumental in inducing and effectuating TAPCO's unlawful breach of the TAPCO Agreement with Vue.

**Answer:**    Denied.

171.    As such, TAPCO's attempted termination of the TAPCO Agreement, which was imposed on TAPCO by Frost Solutions, was ineffective. At most, the November 6, 2024 letter constituted notice that TAPCO would not renew the TAPCO Agreement when it expires on February 25, 2025. As such, TAPCO remains obligated to fulfill the TAPCO Agreement until February 25, 2025. TAPCO's insistence that it has terminated the TAPCO Agreement and its conduct consistent with that position is a breach of the TAPCO Agreement.

**Answer:**    Denied.

172.    Shortly after TAPCO transmitted its faulty November 6, 2024 termination notice, Vue learned that TAPCO was actively engaging with Frost Solutions in a campaign to cause customers to cease doing business with Vue. TAPCO targeted customers that were then under contract with Vue, those who recently renewed their contracts with Vue, those customers that are approaching renewal with Vue, and customers that submitted purchase orders for Vue services through TAPCO months earlier but about which TAPCO neglected to inform Vue. TAPCO attempted to induce those customers to not renew with Vue but to purchase equipment and services from Frost Solutions.

**Answer:**    Denied.

173.    Because TAPCO's attempted termination was ineffective and it remained obligated under the TAPCO Agreement at the time of these actions, TAPCO breached the TAPCO Agreement, with the inducement and assistance of Frost Solutions.

**Answer:**    Denied.

174.    More specifically, TAPCO promised to use commercially reasonable efforts to further the promotion, marketing, sale and distribution of Vue's products, but, as a result of Frost Solutions' inducement, TAPCO has done the opposite- it has tried to steer customers away from Vue's products and to Frost Solutions' services. TAPCO promised to establish and maintain a sales and marketing organization sufficient to successfully market and sell Vue's products, but, as a result of Frost Solutions' interference, TAPCO abandoned its efforts to sell Vue's products and instead engaged its personnel to carry out a campaign to cause Vue harm in the marketplace. TAPCO promised not to make any materially misleading or untrue statements concerning Vue's products, but it has instead spread falsehoods in a targeted effort to benefit Frost Solutions, all as a result of Frost Solutions' interference. Finally, TAPCO will not achieve the Minimum Market and Sales Performance Levels set in the Agreement, due in part to Frost Solutions' interference.

**Answer:**    Denied.

175.    Frost Solutions also induced TAPCO to share Vue's confidential information, information that TAPCO promised in the TAPCO Agreement not to share or use for the benefit of third parties. Frost Solutions has caused TAPCO to disclose and use for the benefit of Frost Solutions confidential information about Vue's customers and prospective customers. Frost Solutions has used this confidential information to steal business away from Vue and otherwise to further its campaign to unlawfully crush a competitor and cause substantial harm, economic and emotional.

**Answer:**    Denied.

176.    Frost Solutions therefore has unlawfully and without a privilege interfered with the TAPCO Agreement and with Vue's contracts and advantageous business relationships with the customers who had purchased or were going to purchase Vue's products and services through TAPCO.

38

**Answer:**      Denied.

## COUNT I
### (Negligent Infliction of Emotional Distress)

177.    Counterclaim-Plaintiffs restate and incorporate by reference the preceding paragraphs of the Counterclaim as though fully set forth herein.

**Answer:**      Frost restates and incorporates by reference its responses to the allegations

set forth in each of the above paragraphs.

178.    Frost Solutions, through Kirsh, misused Confidential Information produced by Counterclaim-Plaintiffs in the Action, in violation of the Protective Order, to contact Counterclaim-Plaintiffs' insurance carrier to alert them to the existence of the Jan 5 Letter, the basis for which Kirsh and Frost Solutions knowingly misrepresented.

**Answer:**      Denied.

179.    Based on, at a minimum, the Complaint, the May 22 Interrogatory Response, the Aug 1 Supplemental Interrogatory Response, and the Dec 21 Email produced by Frost Solutions in the Action, Frost Solutions, including Kirsh and its agent the Frost Solutions Attorney, knew that the Jan 5 Letter Grievances were entirely unrelated to the allegations and claims raised in the Complaint but misrepresented the basis of the Jan 5 Letter to induce the insurance carrier to reconsider its coverage position.

**Answer:**      Denied.

180.    Frost Solutions has a duty to exercise reasonable care towards Counterclaim-Plaintiff Lareau.

**Answer:**      Denied.

181.    Frost Solutions breached that duty by, among other things, "dropping a dime" on Counterclaim-Plaintiffs by calling their insurance carrier and knowingly misrepresenting the basis of the Jan 5 Letter for the purpose of inducing the carrier to withdraw coverage. Despite knowing that the Jan 5 Letter was entirely unrelated to the claims asserted in the Action, Frost Solutions told the carrier otherwise. Frost Solutions also violated the protective order by misusing information that was designated as confidential. In taking these actions, Frost Solutions knew or should have known that Counterclaim-Plaintiff Lareau would experience severe emotional distress.

**Answer:**      Denied.

182.    It was foreseeable that Frost Solutions' negligent actions would cause Counterclaim-Plaintiff Lareau to suffer emotional distress.

**Answer:**    Denied.

183.    As a result of Frost Solutions' negligent conduct, Counterclaim-Plaintiff Lareau has suffered serious mental and emotional harm accompanied by objective physical symptoms, including without limitation anxiety, loss of appetite, loss of interest in activities, and insomnia. The emotional distress has also impacted his personal relationships.

**Answer:**    Denied.

184.    As a result of Frost Solutions' actions, Counterclaim-Plaintiff Lareau has suffered, and continues to suffer from, severe emotional distress, for which he is entitled to damages in an amount to be determined at trial.

**Answer:**    Denied.

185.    Frost Solutions acted in a wanton, malicious, and oppressive manner entitling Counterclaim-Plaintiff Lareau to enhanced compensatory damages.

**Answer:**    Denied.

## COUNT II
### (Tortious Interference with TAPCO Agreement)

186.    Counterclaim-Plaintiffs restate and incorporate by reference the preceding paragraphs of the Counterclaim as though fully set forth herein.

**Answer:**    Frost restates and incorporates by reference its responses to the allegations set forth in each of the above paragraphs.

187.    Counterclaim-Plaintiff Vue has a contractual and economic relationship with TAPCO.

**Answer:**    Admitted that Vue and TAPCO started doing business in September 2022 and entered into agreements in 2022 and 2024.

188.    Frost Solutions was aware of this relationship between Counterclaim-Plaintiff Vue and TAPCO.

**Answer:**    Admitted that Frost Solutions became aware of Vue's and TAPCO's economic relationship at some point before the filing of this answer.

189.    Frost Solutions tortiously interfered with the contractual and economic relationship between Counterclaim-Plaintiff Vue and TAPCO by inducing TAPCO to attempt to terminate the TAPCO Agreement without justification and contrary to its terms; causing TAPCO to fail to use reasonable efforts to market and promote Vue products and services as required by the TAPCO Agreement; causing TAPCO to dismantle the sales and marketing organization that TAPCO promised to maintain; inducing TAPCO to share Vue's confidential information; and causing TAPCO to fall short of the sales and performance metrics stated in the TAPCO Agreement.

**Answer:**    Denied.

190.    As a result of Frost Solutions' actions, Counterclaim-Plaintiffs were, and continue to be, harmed, and they are entitled to damages in an amount to be determined at trial.

**Answer:**    Denied.

191.    Vue will suffer irreparable harm as a result of Frost Solutions' tortious interference with Vue's contract with TAPCO without an injunction.

**Answer:**    Denied.

## COUNT III
### (Interference with Contractual Relations with Customers)

192.    Counterclaim-Plaintiffs restate and incorporate by reference the preceding paragraphs of the Counterclaim as though fully set forth herein.

**Answer:**    Frost restates and incorporates by reference its responses to the allegations set forth in each of the above paragraphs.

193.    Counterclaim-Plaintiff Vue has a contractual and economic relationship with customers that purchased products and services through TAPCO.

**Answer:**    The Court has dismissed Count III so that no answer to paragraph 193 is required. To the extent an answer is required, denied.

194.    Frost Solutions was aware of these customers' contracts to purchase goods and services from Vue through TAPCO.

**Answer:**       The Court has dismissed Count III so that no answer to paragraph 194 is required. To the extent an answer is required, denied.

195.    Frost Solutions tortiously interfered with the contractual and economic relationship between Counterclaim-Plaintiff Vue and these customers by misusing Vue's confidential information to cause the customers to break their contracts with Vue.

**Answer:**       The Court has dismissed Count III so that no answer to paragraph 195 is required. To the extent an answer is required, denied.

196.    As a result of Frost Solutions' actions, Counterclaim-Plaintiff Vue was, and continues to be, harmed, and it is entitled to damages in an amount to be determined at trial.

**Answer:**       The Court has dismissed Count III so that no answer to paragraph 196 is required. To the extent an answer is required, denied.

197.    Vue will suffer irreparable harm as a result of Frost Solutions' tortious interference with Vue's contractual relations with its customers without an injunction.

**Answer:**       The Court has dismissed Count III so that no answer to paragraph 197 is required. To the extent an answer is required, denied.

## COUNT IV
### (Interference with Prospective Business Relations)

198.    Counterclaim-Plaintiffs restate and incorporate by reference the preceding paragraphs of the Counterclaim as though fully set forth herein.

**Answer:**       Frost restates and incorporates by reference its responses to the allegations set forth in each of the above paragraphs.

199.    Frost Solutions knew of Vue's prospective business relations, in part as a result of the confidential information supplied by TAPCO.

**Answer:**       The Court has dismissed Count IV so that no answer to paragraph 194 is required. To the extent an answer is required, denied.

42

200.    Frost Solutions, without privilege to do so, used that confidential information to induce or otherwise improperly cause Vue's actual and prospective customers not to enter into and/or to discontinue a business relationship with Vue.

**Answer:**    The Court has dismissed Count IV so that no answer to paragraph 200 is required. To the extent an answer is required, denied.

201.    As a result of Frost Solutions' actions, Counterclaim-Plaintiff Vue was, and continues to be, harmed, and it is entitled to damages in an amount to be determined at trial.

**Answer:**    The Court has dismissed Count IV so that no answer to paragraph 201 is required. To the extent an answer is required, denied.

202.    Vue will suffer irreparable harm as a result of Frost Solutions' tortious interference with Vue's relationships with its prospective business relations without an injunction.

**Answer:**    The Court has dismissed Count IV so that no answer to paragraph 202 is required. To the extent an answer is required, denied.

## COUNT V
### (Tortious Interference with East End Group Contract)

203.    Counterclaim-Plaintiffs restate and incorporate by reference the preceding paragraphs of the Counterclaim as though fully set forth herein.

**Answer:**    Frost restates and incorporates by reference its responses to the allegations set forth in each of the above paragraphs.

204.    Counterclaim-Plaintiff Vue has a contractual and economic relationship with East End Group.

**Answer:**    Admitted that East End Group, Inc. ordered a unit of Vue's ARC 1 System and signed Quotation #S00024. Frost denies any remaining allegations of paragraph 204.

205.    Frost Solutions was aware of this relationship between Counterclaim-Plaintiff Vue and East End Group, particularly because Frost Solutions had hired East End Group's former Chief Operating Officer, Mr. Ostrander.

43

**Answer:**    Admitted that on or around September 30, 2024, Ostrander joined Frost as its Vice President of Commercial Operations and that Ostrander resigned from full-time employment with East End Group in the fall of 2024, but stayed on part-time at East End Group until April 2025. Frost denies any remaining allegations of paragraph 205.

206.    In its contract with Counterclaim-Plaintiff Vue, East End Group promised that it, among other things: (a) would use Vue's products and services only as permitted by the terms and conditions; (b) would refrain from making Vue's products and services available to third parties for the third parties' business operations; (c) would refrain from reverse engineering any of Vue's products or services; and (d) would not disclose Vue's confidential information.

**Answer:**    Denied.

207.    Frost Solutions tortiously interfered with East End Group's contractual promises by utilizing Mr. Ostrander, Frost Solutions' Vice President, to log into Vue's systems using login credentials that were provided to him solely for the benefit of East End Group when his purpose was to advance Frost Solutions' interest.

**Answer:**    Denied.

208.    Frost Solutions tortiously interfered with East End Group's contractual promises to refrain from allowing access by third parties by utilizing Mr. Ostrander, Frost Solutions' Vice President, to obtain access to Vue's systems to advance Frost Solutions' business operations.

**Answer:**    Denied.

209.    Frost Solutions tortiously interfered with East End Group's contractual promises to refrain from reverse engineering Vue's products and services by utilizing Mr. Ostrander, Frost Solutions' Vice President, to obtain access to Vue's systems to allow Frost Solutions to obtain important intelligence about Vue's products and services.

**Answer:**    Denied.

210.    Frost Solutions tortiously interfered with East End Group's contractual promises to keep secret Vue's confidential information by utilizing Mr. Ostrander, Frost Solutions' Vice President, to obtain access to Vue's systems to allow Frost Solutions to obtain access to information Vue keeps confidential and from which Vue derives economic benefit.

**Answer:**      Denied.


211.      As a result of Frost Solutions' actions, Counterclaim-Plaintiffs were, and continue to be, harmed, and they are entitled to damages in an amount to be determined at trial.

**Answer:**      Denied.


212.      Vue will suffer irreparable harm as a result of Frost Solutions' tortious interference with Vue's contract with East End Group without an injunction.

**Answer:**      Denied.


## COUNT VI
### (Civil Conspiracy)

213.      Counterclaim-Plaintiffs restate and incorporate by reference the preceding paragraphs of the Counterclaim as though fully set forth herein.

**Answer:**      Frost restates and incorporates by reference its responses to the allegations

set forth in each of the above paragraphs.


214.      Frost Solutions and TAPCO jointly engaged in a conspiracy to achieve the unlawful object of causing harm to Counterclaim-Plaintiff Vue's business operations by misusing Vue's confidential information, breaching the trust embodied in the TAPCO Agreement, and spreading false information about Vue.

**Answer:**      Denied.


215.      Frost Solutions and TAPCO jointly engaged in a conspiracy to commit a lawful act by unlawful means, including, but not limited to, engaging in what otherwise could be legitimate competition in the marketplace, but misusing Vue's confidential information, breaching the trust embodied in the TAPCO Agreement, and spreading false information about Vue.

**Answer:**      Denied.


216.      Frost Solutions and TAPCO entered into an agreement as to the course of action to achieve their unlawful purpose and to cause harm to Vue.

**Answer:**      Denied.


45

217.    Frost Solutions and TAPCO engaged in one or more unlawful overt acts such as, but not limited to, inducing Vue's customers to reduce their business with Vue or cease doing business with Vue altogether; soliciting Vue's prospective customers utilizing Vue's confidential information against Vue in the process; and spreading false information about Vue in the marketplace.

**Answer:**    Denied.

218.    As a result of Frost Solutions' actions, Counterclaim-Plaintiffs were, and continue to be, harmed, and they are entitled to damages in an amount to be determined at trial.

**Answer:**    Denied.

219.    Vue will suffer irreparable harm as a result of Frost Solutions' civil conspiracy with TAPCO without an injunction.

**Answer:**    Denied.

## AFFIRMATIVE DEFENSES

1.    The Amended Counterclaim has been forfeited because Defendants failed to plead it in response to Frost's First Amended Complaint.

2.    The Amended Counterclaim fails to state a claim upon which relief can be granted.

3.    Vue's counterclaim for tortious interference with the TAPCO Agreement is barred because Frost was asserting a legally protected interest through the Moore Action. This is a complete defense to the alleged tort of interference with contractual relations.

4.    Vue's counterclaims for tortious interference are barred by the *Noerr-Pennington* doctrine.

5.    Vue's counterclaims for tortious interference are barred because Frost's conduct was justified and/or privileged.

6.    Vue's counterclaim for civil conspiracy is barred by the lack of an underlying tort because civil conspiracy is not an independent cause of action.

7.    Vue's counterclaims for tortious interference with the TAPCO Agreement (Count II) and civil conspiracy (Count VI) are barred because Vue's own conduct was the independent,

46

intervening, and superseding cause of the damages it alleges.

8.      Lareau's counterclaim for negligent infliction of emotional distress (Count I) is barred, in whole or in part, by his comparative fault and/or contributory negligence.

9.      Lareau's counterclaim for negligent infliction of emotional distress (Count I) is barred because Frost owed no duty to Lareau.

10.     Lareau's counterclaim for negligent infliction of emotional distress (Count I) is barred because Lareau cannot establish the required causal nexus between Frost's alleged conduct and Lareau's claimed physical symptoms through competent expert testimony.

11.     The counterclaims are barred by the equitable doctrines of laches, waiver, estoppel, and/or unclean hands.

12.     The counterclaims are barred, in whole or in part, because Defendants have suffered no compensable damages caused by Frost's conduct.

13.      The counterclaims are barred, in whole or in part, by Defendants' failure to mitigate their damages, if any.

14.     Frost reserves the right to add to and amend this list up to and including the time of trial.

Dated:  April 13, 2026                                Respectfully submitted,

                                                      **FROST SOLUTIONS, LLC,**

                                                      By its attorneys,

                                                      */s/ Laura L. Carroll*
                                                      Laura L. Carroll (NH Bar No. 17444)
                                                      ARENTFOX SCHIFF LLP
                                                      800 Boylston Street, 32nd Floor
                                                      Boston, MA 02199
                                                      Tel: (617) 973-6100
                                                      Email: laura.carroll@afslaw.com

Todd A. Rowden (admitted *pro hac vice*)
James L. Oakley (admitted *pro hac vice*)
T. Hudson Cross, IV (admitted *pro hac vice*)
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, IL 60601
Tel:     (312) 527-4000
Fax:     (312) 527-4011
Email:  trowden@taftlaw.com
          joakley@taftlaw.com
          hcross@taftlaw.com

Amir R. Tahmassebi (admitted *pro hac vice*)
KONICEK & DILLON, P.C.
70 West Madison Street, Suite 2060
Chicago, IL 60602
Tel:     (312) 328-9166
Fax:     (630) 262-9659
Email:  amir@konicekdillonlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically served copies of this document and exhibit thereto on all counsel of record via the Court's CM/ECF system, pursuant to Fed. R. Civ. P. 5(b)(2)(E).

Dated: April 13, 2026                    */s/ Laura L. Carroll*
                                          Laura L. Carroll