**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

|  |  |
|---|---|
| FROST SOLUTIONS, LLC,<br><br>        Plaintiff,<br><br>  v.<br><br>PATRICK BAGLIEN, CHRISTOPHER LAREAU, and VUE ROBOTICS, LLC,<br><br>        Defendants. | Civil Action No. 1:22-cv-00401-SE |

**FILED PROVISIONALLY UNDER SEAL**

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE THE EXPERT TESTIMONY OF VAIDHYANATHAN SWAMINATHAN**

Defendants Patrick Baglien, Christopher Lareau, and Vue Robotics, LLC, submit the following Memorandum of Law in support of their motion to exclude the testimony of Vaidhyanathan Swaminathan, an expert witness proffered by Plaintiff, Frost Solutions, LLC.

## I.       **INTRODUCTION**

Frost Solutions has disclosed the expert testimony of Mr. Swaminathan, who is expected to: (1) opine on Lareau's and Baglien's use of Frost Control's client relationship management software, HubSpot, and (2) provide certain "reconstructions" of the information that Frost Solutions alleges Lareau and Baglien downloaded from HubSpot.  Mr. Swaminathan's testimony fails to satisfy the foundational requirements of Federal Rule of Evidence 702 and the applicable standards of reliability so it must be excluded.  The opinions expressed in Mr. Swaminathan's report and the attached reconstructions are not the product of reliable principles and methods, are not reliably applied, and largely consist of speculative narrative untethered to validated forensic techniques.  Mr. Swaminathan has not explained how his reconstruction methodology has been (or could ever be) tested, validated, or subjected to peer review, or whether it has been published in forensic literature.  In fact, Mr. Swaminathan's reconstruction methodology cannot be tested because the original data is no longer recoverable because Frost failed to preserve it.

Critically, Mr. Swaminathan's own admissions establish the material defects plaguing his "opinions."  Mr. Swaminathan explicitly acknowledges that his reconstruction efforts cannot confirm the exact field-order, sorting, or whether the file was exfiltrated after downloading.  He further acknowledges that the only way to determine the missing information is by conducting forensic analysis of the specific physical devices—work he said he was retained to perform, but which he apparently did not (or more accurately, could not) do.  Notably, he did not include any such opinions in his report.  Instead, Mr. Swaminathan provides so-called "reconstructions" of

1

the allegedly downloaded information, which (as explained in detail below) contain numerous entries that were entered into HubSpot *after* Baglien and Lareau left Frost Control's employ. Mr. Swaminathan cannot demonstrate that these facially implausible reconstructions are reliable.

Mr. Swaminathan only speculates as to what Messrs. Lareau and Baglien could have done when they had proper and authorized access to Frost Control's HubSpot database. He does not and cannot confirm what they did or whether any alleged downloads actually left Frost Control's systems. If allowed to testify, the expert's testimony would invite the jury to treat a download as synonymous with misappropriation—something Frost Solutions cannot prove and the speculative evidence of which would serve to confuse the jurors rather than assist them. Therefore, Mr. Swaminathan's unreliable and ungrounded testimony and his manually generated, unverifiable exhibits should be excluded.

## II.    MR. SWAMINATHAN'S OPINIONS

Mr. Swaminathan was retained by Plaintiff's counsel to "conduct a forensic examination of digital devices and accounts associated with Patrick Baglien, Christopher Lareau, and Cory Moore[.]" Swaminathan Report, p. 1, attached as **Exhibit A**. Mr. Swaminathan's forensic examination "included, but was not limited to, the analysis of potential data exfiltration, deletion, and unauthorized downloads involving data belong to" Frost Control, with "particular attention . . . given to the forensic analysis of the HubSpot account previously used by Mr. Baglien, Mr. Lareau, and Mr. Moore[.]" *Id.* While Mr. Swaminathan's report is dated September 30, 2025, he does not identify when he took the actions/analysis described therein.

Mr. Swaminathan groups his "Analysis & Findings" into three categories: (1) HubSpot User Accounts; (2) HubSpot Audit Logs; and (3) HubSpot Report Reconstruction. *See* **Ex. A**. As to the first category, Mr. Swaminathan explains the nature of HubSpot (i.e., what the

2

customer relationship management ("CRM") tool does) and how he determined that Mr. Baglien and Mr. Lareau had accounts within HubSpot for Frost Control.[1]  *Id.* at 1-2.  After "examin[ing] the list of user accounts[,]" Mr. Swaminathan identified that Mr. Baglien was listed as a user with "Super Admin" privileges, and explained the many things that he believed a "Super Admin" could do within an organization's HubSpot.  *Id.*  Mr. Swaminathan did not explain the difference in account permissions between a "Super Admin" and other HubSpot accounts.  He did not tie these permissions to the actual movement within Frost Control's HubSpot database.  And he did not explain whether anyone other than Messrs. Baglien and Moore had "Super Admin" accounts at Frost Control.  In fact, Mr. Swaminathan confirmed that as of his review of Frost Control's HubSpot, all user accounts associated with Frost control were deactivated and Mr. Lareau's HubSpot account had even been deleted from the active user list. **Ex. A** at 2.

As to the second category of Mr. Swaminathan's opinions, he explains that he examined "an audit log of reports generated and downloaded by users." **Ex. A** at 2.  The audit log "include[d] the date and time the report was generated, the date and time it was downloaded, the user account associated with each action, and the IP address of the device used to perform the download."  *Id.*  Mr. Swaminathan did not explain whether the audit log included anything other than the aforementioned data points.  Mr. Swaminathan "manually transcribed" what he determined to be "the relevant information as displayed within the HubSpot interface into an Excel spreadsheet[.]"  *Id.* (Exhibit B to his report).  An excerpt of Mr. Swaminathan's "manual transcription" is below:

---

[1] There has been no question in this case whether Messrs. Baglien and Lareau had HubSpot accounts in connection with their previous employment at Frost Control.



Exhibit B to Swaminathan Report, attached hereto as **Exhibit B**. Mr. Swaminathan did not

explain the standard he employed to determine what information is irrelevant. Mr. Swaminathan

further did not explain how he verified the accuracy of his "manual transcription." The only

caveat he provided was that he translated the numerical IP Address to a geolocation. **Ex. A** at 2.

Mr. Swaminathan's "analysis" of the audit logs consisted of summarizing the logged

reports downloaded and/or generated by Messrs. Baglien, Moore, and Lareau over different time

frames, including the number of downloads/report generations, the names of each report, and the

number of individual records in each report. *Id.* at 2-3. In addition, Mr. Swaminathan's

"analysis" concluded that all three users downloaded or generated these reports from multiple

different IP Addresses.[2] *Id.* Mr. Swaminathan did not explain the differing time frames applied

to the different users, what different named reports might mean, or how the reports could be

manipulated and whether such manipulation could be observed using the audit log. Further Mr.

Swaminathan did not explain whether HubSpot required a user to download the report in order to

view the data that was generated. Finally, Mr. Swaminathan did not explain why these

individuals might be operating from different IP addresses or geographic locations.

As to the third category of Mr. Swaminathan's opinions, he "reconstructed" certain

HubSpot reports allegedly generated and downloaded by either Mr. Lareau or Mr. Baglien

---

[2] Mr. Swaminathan acknowledges in a footnote that "IP-based geolocation data may not always be precise. It typically reflects an approximate location based on the registered information of the IP address, which might or might not correspond to an internet service provider (ISP) location rather than the user's physical address." **Ex. A** at 2, fn.2.

months (or even years) prior to the "reconstruction." **Ex. A** at 3-4. Mr. Swaminathan starts this section of his opinion noting that "HubSpot automatically deletes reports from the platform 30 days after they are generated. As a result, the original content of the exported reports is no longer recoverable from the HubSpot portal itself." *Id.* at 3. Thus, to reconstruct each report, he "exported all records and timestamps from the Deals and Contacts objects and then filtered those full datasets based on the record creation and modification timestamps to recreate what <u>might have been included</u>[.]" *Id.* (Exhibits C-K of his report) (emphasis added). Mr. Swaminathan does not provide any further explanation as to how filtering "based on the record creation and modification timestamps" reliably demonstrates that Mr. Baglien or Mr. Lareau generated and downloaded data, or what such filtering even means. In fact, as can be seen below, <u>all</u> of the reconstructed reports attached to Mr. Swaminathan's Expert Report (and upon which Frost Solutions relies to establish its claims) contain numerous records that were unambiguously inputted into HubSpot <u>after</u> Messrs. Baglien and Lareau left Frost Control.

For example, Exhibit C to Mr. Swaminathan's report contains ███████████████ ██████████████████████████████████. *See* **Exhibit C**, L.R. 2.5(b) Excerpts of Exhibit C to Swaminathan Report. Of those ███████████, the following chart demonstrates the number of entries in each category that have dates after Messrs. Lareau and Baglien left Frost Control, all of which are also highlighted in **Exhibit C**:

| | | | | | |
|---|---|---|---|---|---|
| ███████ ███████ ███ | ███████ ██████████ ███ | ████████ | ██████████ ███ | ███ ██████████ ███ | ███ ███████████ ███ |
| █ | █ | █ | █ | █ | █ |
| ███ ██████████ ███ | ██████████ ████████ ███ | █████████ █████████ ███ | █████████ ████████ ███ | █████████ ████ ██████████ | |
| ██████ | █ | █ | ██ | ██ | |

As a further example, Exhibits D-K to Mr. Swaminathan's report each contain ▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Each of

those exhibits also contain dates after Messrs. Lareau and Baglien left Frost Control.  The

following chart demonstrates the number of entries in each of Exhibits D-K that relate to the

entities for which Frost Solutions claims damages and the number of entries in each category for

each exhibit that have dates after Messrs. Lareau and Baglien left Frost Control, all of which are

also highlighted in corresponding excerpted exhibits to this Memorandum:

| ▬▬ | ▬▬▬▬ ▬▬▬ ▬ | ▬▬ ▬▬ | ▬▬ ▬▬ ▬ | ▬▬ ▬▬▬▬ ▬ | ▬▬ ▬▬▬▬ ▬ | ▬▬ ▬▬▬ ▬ |
|---|---|---|---|---|---|---|
| ▬▬▬▬▬▬▬▬ ▬▬▬▬▬ | ■ | ■ | ▮ | ■ | ■ | ■ |
| ▬▬▬▬▬▬▬▬ ▬▬▬▬▬ | ■ | ■ | ▮ | ■ | ■ | ■ |
| ▬▬▬▬▬▬▬▬ ▬▬▬▬▬ | ■ | ■ | ▮ | ■ | ■ | ■ |
| ▬▬▬▬▬▬▬▬ ▬▬▬▬▬ | ■ | ■ | ▮ | ■ | ■ | ■ |
| ▬▬▬▬▬▬▬▬ ▬▬▬▬▬ | ■ | ■ | ▮ | ■ | ■ | ■ |
| ▬▬▬▬▬▬▬▬ ▬▬▬▬▬ | ■ | ■ | ▮ | ■ | ■ | ■ |
| ▬▬▬▬▬▬▬▬ ▬▬▬▬▬ | ■ | ■ | ▮ | ■ | ■ | ■ |
| ▬▬▬▬▬▬▬▬ ▬▬▬▬▬ | ■ | ■ | ▮ | ■ | ■ | ■ |

As can be seen above and attached, there are many entries in Mr. Swaminathan's

"reconstructions" that were obviously inputted after Messrs. Baglien and Lareau left Frost

Control because the applicable dates for certain categories of information fall after they

separated from employment.  And for those categories of information that are not dated, it is

impossible to tell when the data was inputted into HubSpot using Mr. Swaminathan's

"reconstructions."  Yet, Mr. Swaminathan does not address—let alone explain—how his

reconstruction method is reliable despite containing information that obviously was not in

HubSpot on the date of the alleged downloads and could not possibly support Frost's claims.

Mr. Swaminathan ends his expert report by asserting that "[w]hile this method [of manually reconstructing reports] reliably shows which records would have appeared in those exports, the only way to confirm the exact field-order, sorting, or whether someone exfiltrated the file (e.g., emailed it or uploaded it elsewhere) is through forensic analysis of the download activity on the users' devices at those points in time." **Ex. A** at 4.  No such analysis was done. Although Mr. Swaminathan reports that he was retained to "conduct a forensic examination of digital devices[,]" he does not provide any analysis of or opinions relating to such a forensic examination in his report.  In fact, both of Frost Solutions' principals testified ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████.[3]  Deposition of Michael Kirsh, excerpts attached as **Exhibit L**, at 111-113; Deposition of Michael Bott, Individually, excerpts attached as **Exhibit M**, at 119-125; Deposition of Michael Bott, Individually and as Corporate Representative for Frost Solutions, excerpts attached as **Exhibit N**, at 214-218. Therefore, the forensic analysis Mr. Swaminathan contends is critical, was not and could not be completed.

## III.    ADMISSIBILITY STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  Under that rule, an expert witness may testify in the form of an opinion or otherwise if the proponent demonstrates that it is more likely than not that:

---

[3] This stands in stark contrast to the original complaint filed in this matter, which suggested that Frost Control and then Frost Solutions had identified and maintained possession of Messrs. Baglien and Lareau's Frost Control laptops.  *See* ECF No. 1 at ¶ 49 (alleging that after purchasing the Frost Control assets, Frost Solutions, "[t]hrough its counsel, . . . retained a forensics consultant *to image Baglien's and Lareau's company [Frost Control] laptops, perform an analysis of the underlying metadata activity on the laptops*, and perform a forensic analysis on Frost Solutions' and Frost Control's cloud-based systems to determine what else, if anything was taken by Baglien and/or Lareau." (emphasis added)).

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Frost Solutions must meet three initial requirements in order to introduce expert testimony: "(1) that the proposed expert is qualified 'by knowledge, skill, experience, training or education;' (2) that the testimony is helpful to the trier of fact 'to understand the evidence or to determine a fact in issue;' and (3) that the expert's testimony is reliable." *B.D. v. Ayotte*, 2025 DNH 037, Case No. 21-cv-00004-PB, 2025 U.S. Dist. LEXIS 46610, at *7 (D.N.H. Mar. 14, 2025) (quoting Rule 702). "[T]hese requirements assign a 'gatekeeping role for the judge' to ensure that 'an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Id.* (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)). *See also* Fed. R. Evid. 702, Advisory Committee Note to 2000 Amendments ("The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded.").

Frost Solutions has the burden of establishing Mr. Swaminathan's opinion is both reliable and relevant. *See Milward v. Rust-Oleum Corp.*, 820 F.3d 469, 473 (1st Cir. 2016). *Daubert* outlines four factors for courts to consider in determining whether an expert's opinion is reliable: "whether the expert's methodology has been objectively tested; whether it has been subjected to peer review and publication; the technique's known or potential error rate; and whether the expert's technique has been generally accepted within the relevant industry." *Lawes v. CSA Architects and Engineers LLP*, 963 F.3d 72, 98 (1st Cir. 2020).

In addition to reliability, *Daubert* imposes a special relevancy requirement. *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998). "To be admissible, expert testimony must be relevant not only in the sense that all evidence must be relevant, *see* Fed. R. Evid. 702, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue, *see Daubert*, 509 U.S. at 591-92." *Id.* "In addition, to be helpful to the jury, the expert's conclusions must have a valid scientific connection to the pertinent inquiry. This means that the conclusion must not only be relevant to the facts at issue, but also that each step in the expert's process, including the link between the universe of pertinent facts and his conclusions, must be reliable." *Lawes v. CSA Architects*, 963 F.3d at 98 (internal citations, quotations omitted). An opinion is unreliable and should be excluded if it is based on the expert's *ipse dixit*, i.e., the expert's unsupported assertions. *See Collision Communications, Inc. v. Nokia Solutions and Networks OY*, 691 F. Supp. 3d 360, 368 (D.N.H. 2023); *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). If the court concludes that "there is simply too great an analytical gap between the data and the opinion proffered[,]" the expert testimony should be excluded. *GE v. Joiner*, 522 U.S. at 146.

## IV.    MR. SWAMINATHAN'S OPINIONS ARE INADMISSIBLE

### A. Mr. Swaminathan Cannot Testify as to Exfiltration or Any Forensic Examination of Specific Devices Because Frost Spoliated that Evidence.

In his report, Mr. Swaminathan writes that he was retained to "conduct a forensic examination of digital devices . . . associated with Patrick Baglien, Christopher Lareau, and Cory Moore[,]" including "the analysis of potential data exfiltration, deletion, and unauthorized downloads[.]" **Ex. A**, p. 1. Mr. Swaminathan does not, however, provide any analysis or forensic examination of specific devices associated with Messrs. Baglien, Lareau, or Moore. That is because, as confirmed by Frost Solutions, the Frost Control devices in Frost Solutions'

9

possession (1) could not be accurately tied to any specific user and (2) were wiped, such that they did not have any useful information remaining.  Therefore, any testimony about an examination of specific devices, data exfiltration, data deletion, or unauthorized downloads is not based on sufficient facts or data and should be excluded.  Moreover, because that analysis is nowhere in Mr. Swaminathan's report, any testimony relating to it must be excluded.  *See Gay v. Stonebridge Life Ins. Co.*, 660 F.3d 58, 64 (1st Cir. 2011) (allowing only a "reasonable elaboration" of opinions disclosed in expert report, but not new or different opinions).

### B. Mr. Swaminathan's Opinion Relating to "Super Admin" Privileges Is Not Supported by Sufficient Facts or Data.

Mr. Swaminathan's statements about the permissions of a "Super Admin" are unreliable and not supported by sufficient facts or data.  First, the only citation Mr. Swaminathan provides as the basis for the "Super Admin" privileges is a link to a general help page on HubSpot's website.  This citation in itself is unreliable because it points to a dynamic webpage for a dynamic system that could have (and likely did) change between 2021 and the present.  Moreover, because Frost Control's HubSpot accounts were deactivated by the time Mr. Swaminathan performed his analysis (whenever that may have been), there is no way for him to opine as to the specific "Super Admin" permissions in Frost Control's database.  This "opinion" requires speculation from the jury about what could or might have been done in Frost Control's database, not what was in fact done.  In addition, there is no way for Mr. Swaminathan to opine as to what the "Super Admin" permissions entailed in comparison to other user permissions at Frost Control.  And, there is no indication and no way for Ms. Swaminathan to test the pervasiveness of the "Super Admin" role across Frost Control's users.  Therefore, Mr. Swaminathan's opinions relating to the "Super Admin" permissions assigned to Messrs. Baglien and Moore and their respective privileges are entirely speculative, not supported by sufficient

10

facts or data, and unreliable and should be excluded.

### C. Mr. Swaminathan's Manually Transcribed Audit Log is Unreliable.

Mr. Swaminathan's apparent reconstruction starts from an unreliable position that taints all of his analysis. Mr. Swaminathan explains that he examined "an audit log of reports generated and downloaded by users." **Ex. A** at 2. Instead of providing a screen shot or other print-out of the audit log, Mr. Swaminathan "manually transcribed" what he considered "the relevant information" from the audit log into an excel spreadsheet. *Id.* (Exhibit B to his report). According to Mr. Swaminathan, the audit log "include[d] the date and time the report was generated, the date and time it was downloaded, the user account associated with each action, and the IP address of the device used to perform the download." *Id.* Mr. Swaminathan failed to mention whether the audit log included any data points beyond those mentioned or whether it included users in addition to Messrs. Baglien, Lareau, or Moore.

This manual transcription of what Mr. Swaminathan deemed relevant from a dynamic web interface is inherently unreliable. It introduces human error and selection bias into the apparent methodology, and there is no indication of what Mr. Swaminathan deemed relevant or not and why. In addition, by only transcribing those actions taken by Messrs. Baglien, Lareau, and Moore, Mr. Swaminathan's transcriptions artificially limit the universe of information available to the jury because they have the potential to create an inference that no other individuals in the company took the actions outlined therein. Moreover, Mr. Swaminathan disclosed no procedures to ensure completeness, accuracy, or verification. Therefore, Mr. Swaminathan's manual transcription (Exhibit B to his Report) and any testimony related thereto is unreliable, will only serve to confuse the jury, and should be excluded.

**D. Mr. Swaminathan's Reconstructions are Unreliable.**

Mr. Swaminathan's reconstruction is premised on an untenable assumption: that one can recreate historical data exports from snapshots of a dynamic system when the original exports were permanently deleted months (or even years) earlier. This creates an insurmountable reliability problem that Frost Solutions cannot overcome and should serve as another basis to exclude Mr. Swaminathan's testimony and his reconstructions. To attempt to overcome this problem, Mr. Swaminathan states that he "exported all records and timestamps from the Deals and Contacts objects and then filtered those full datasets based on the record creation and modification timestamps to recreate what might have been included[.]" **Ex. A** at 3. This approach appears to use data (as of the unknown date/time that Mr. Swaminathan completed his reconstruction) to infer past data, without any reported mechanism to validate the data set against the actual historical record. In fact, Mr. Swaminathan's reconstructions have obvious flaws—they contain data well after Mr. Baglien and Mr. Lareau's employment at Frost Control ended (including well into 2022). This casts substantial doubt on the ability of those reports to reliably establish what was downloaded previously. For example, in Exhibit D to Mr. Swaminathan's report, ███████████████████████████████████████████ ████████████ both many months after Messrs. Baglien and Lareau left Frost Control:

Exhibit D to Swaminathan Report

**Ex. D** at 4. Data obviously inputted after Messrs. Baglien and Lareau left Frost Control's

12

employ renders the reconstructions inherently unreliable and should result in their exclusion.

In addition, Mr. Swaminathan's reconstruction method itself is inherently unreliable and should be excluded.  He presumes knowledge of the original report filters, columns, and sort criteria, which he admits he cannot confirm; instead, he substitutes a hypothetical dataset for the missing original artifacts.  This is rank speculation and is not tethered to any testing or validation method.  In fact, Mr. Swaminathan does not report *any* testing of his reconstructions because the reconstructions cannot be tested—there are no files against which to validate his methods.  Moreover, Mr. Swaminathan has not provided any indication that his reconstruction methods have been tested or validated in other settings or against independent data.  And he provides no citations to peer-reviewed literature or other sources that have reviewed or endorsed his approach (i.e., the use of timestamp-based filtering to recreate deleted CRM exports).  *See Nook v. Long Island R.R. Co.*, 190 F. Supp. 2d 639, 642 (S.D.N.Y. 2002) (excluding expert testimony where opinion was not "based on testing or objective data regarding the actual conditions[;]" did not "proffer any specific industry standards[;]" provides no basis for testing the expert's conclusions; and fails to "cite any published authority in support of its recommendations and conclusions[.]").

Finally, in his report, Mr. Swaminathan omits a potential margin of error and sensitivity for potential alternative filters or sort conditions.  Mr. Swaminathan's reconstruction uses counts of report generations/downloads to determine what Defendants did within HubSpot.  However, such counts do not account for export filtering options, property and column selection, sorting and field order, subset versus complete exports, and/or post-export modifications available to users of the CRM.  For example, what if the alleged downloads actually only contained a subset of the available data in each of the contacts or deals objects?  Or, given that the vast majority of the entries in the reconstructions have a ███████████████████████████████, what if all of

13

the other data points had been changed after Messrs. Baglien and Lareau left Frost Control?  The fact is that there is no way to know and Mr. Swaminathan does not provide any potential error rates to account for that. These variables are not minor details; they are fundamental to determining what data was actually exported. Without accounting for them, the reconstructed exhibits represent speculation rather than reliable evidence and should be excluded.

Critically, Mr. Swaminathan's reconstruction does not establish the ultimate outcome that Frost Solutions' claims require—that Defendants misappropriated Frost Control's confidential information and trade secrets.  Counts of report generations/downloads *while Defendants worked at Frost Control* do not establish the substance or sensitivity of the data accessed, user intent, or any transfer beyond HubSpot's export and download functions.  Mr. Swaminathan even admits that endpoint analysis, i.e. determining where the files actually went after being downloaded, is required to confirm exfiltration, which he admits he did not perform.  If Mr. Swaminathan cannot confirm what was actually exported, then the reconstructed exhibits do not reliably answer or help to answer a central factual question in this case.  *See Jodoin v. Toyota Motor Corp.*, 284 F.3d 272, 278 (1st Cir. 2002) ("When a party introduces evidence that attempts to reconstruct an accident, that party must show a substantial similarity in circumstances between the reconstruction and the original accident." (quotations omitted)).

V.    **CONCLUSION**

Frost cannot meet its burden under Federal Rule of Evidence 702 to establish by a preponderance of the evidence that Swaminathan's testimony will help the trier of fact to understand the evidence, is based on sufficient facts or data, or is reliable. Therefore, this court should exclude both his testimony and the introduction of the "reconstructed" spreadsheets.

Respectfully submitted,


PATRICK BAGLIEN, CHRISTOPHER LAREAU
AND VUE ROBOTICS, LLC,

By their attorneys,

SHEEHAN PHINNEY BASS & GREEN, P.A.

Dated: April 23, 2026                        */s/ Abbygale M. Dow*
                                             David W. McGrath (NH Bar No. 9347)
                                             James P. Harris (NH Bar No. 15336)
                                             Ryan P. Lirette (NH Bar No. 19561)
                                             Abbygale M. Dow (NH Bar No. 272938)
                                             1000 Elm Street, 17th Floor
                                             Manchester, NH 03101
                                             (603) 627-8255
                                             dmcgrath@sheehan.com
                                             jharris@sheehan.com
                                             rlirette@sheehan.com
                                             adow@sheehan.com


## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically served copies of the foregoing on all counsel of record via the Court's CM/ECF system.

Dated:  April 23, 2026                        */s/ Abbygale M. Dow*